# In the United States Court of Federal Claims

### No. 15-1072C
### Filed: April 4, 2019

```
* * * * * * * * * * * * *    *
ST. BERNARD PARISH                *
GOVERNMENT,                       *
                                  *    Motion to Dismiss;  Breach  of
            Plaintiff,            *    Contract;   Monetary   Damages;
    v.                            *    Equitable  Relief;  Indemnification;
                                  *    Standing;  Equal Access to Justice
                                  *    Act.
UNITED STATES,                    *
                                  *
            Defendant.            *
                                  *
* * * * * * * * * * * * *    *
```

**Robert E. Couhig**, Couhig Partners, LLC, New Orleans, LA, for plaintiff. Of counsel were **Jason A. Cavignac** and **Cory S. Grant**, Couhig Partners, LLC, New Orleans, LA, and **William M. McGoey**, St. Bernard Parish Government, New Orleans, LA.

**Steven C. Hough**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Steven J. Gillingham**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Joseph H. Hunt**, Assistant Attorney General, Civil Division, Department of Justice.

## O P I N I O N

### HORN, J.

The above-captioned case was filed in the United States Court of Federal Claims on September 25, 2015. Relevant federal district court proceedings concluded in March 2018 and relevant State court proceedings concluded in February 2017. In this court, plaintiff St. Bernard Parish Government (St. Bernard Parish), a political subdivision located in the State of Louisiana, asserts that the United States, acting through the United States Army Corps of Engineering (Army Corps), breached a contract between St. Bernard Parish and the Army Corps related to the repair of levees in Louisiana following Hurricane Katrina.

## FINDINGS OF FACT

On September 1, 2005, the President of St. Bernard Parish, Henry Rodriguez, Jr.,

issued an Executive Order under the Louisiana Homeland Security and Emergency Assistance and Disaster Act. See LA. STAT. ANN. § 29:721, et seq. (2005). In the September 1, 2005 Executive Order, Mr. Rodriguez stated that Hurricane Katrina had "struck" the State of Louisiana and caused severe flooding and damage to southeastern Louisiana, including St. Bernard Parish. After noting in the Executive Order that the Governor of the State of Louisiana had declared a state of emergency for the entire State of Louisiana, Mr. Rodriguez declared a state of emergency "for the entire Parish." Mr. Rodriguez also stated in his Executive Order:

> I am hereby authorized to commandeer or utilize private property during this local disaster pursuant to the authority of the Parish President under La. [Louisiana Revised Statute] R.S. 29:727 and grant rights of entry for usage for this purpose: emergency hurricane protection work, including access, borrow, disposal, construction and any other required work.

The Louisiana Homeland Security and Emergency Assistance and Disaster Act, cited by Mr. Rodriguez in the September 1, 2005 Executive Order, provides that, "[i]n addition to any other powers conferred upon the parish president by the constitution, laws, or by a home rule charter or plan of government, such authority may," "[s]ubject to any applicable requirements for compensation, commandeer or utilize any private property if he finds this necessary to cope with the local disaster." See LA. STAT. ANN. § 29:727(f)(4) (2005).[1]

     According to an October 10, 2005 memorandum authored by Steven Stockton, a Deputy Director of Civil Works at the Army Corps, Mr. Stockton met with John Paul Woodley, who plaintiff states was an "Assistant Secretary of the Army (Civil Works)," on October 3, 2005. The October 10, 2005 memorandum indicates that the purpose of the October 3, 2005 meeting was to provide John Paul Woodley with "information regarding options for recommended policy deviations to the Corps policy regarding local sponsor requirements to provide all lands, easements, rights-of-way, and disposal or borrow areas (LERRD)[[2]] associated with rehabilitation of damaged federal and non-federal hurricane protection and flood control projects at no cost to the federal government." Steven Stockton's October 10, 2005 memorandum states that John Paul Woodley verbally approved two "potential deviations to policy" during the October 3, 2005 meeting. Specifically, the October 10, 2005 memorandum indicates that John Paul Woodley verbally approved a "[w]aiver for the LERRDs on the federal Chalmette levee in St. Bernard Parish" and a "[w]aiver for the LERRDs on the non-federal St. Bernard levee interim level of protection to 10 feet." According to the October 10, 2005 memorandum,

---

[1] The Louisiana Homeland Security and Emergency Assistance and Disaster Act has been amended several times since 2005. See LA. STAT. ANN. § 29:727 (2019). The language in subsection (f)(4), quoted above, however, remains unchanged. See id.

[2] Documents in the record before the court and quoted by the court in this Opinion refer to lands, easements, rights-of-way, and disposal or borrow areas as both "LERRD" and "LERD." When referring to lands, easements, rights-of-way, disposal or borrow areas, the court will use the term "LERD," but the court will quote the term as it is used in the original document.

Mr. Woodley also requested information "regarding the project sponsors ability to pay the required LERRD costs and the estimated cost to federal government for the recommended policy deviations."

On October 17, 2005, the Army Corps sent a letter to George Lopez, the President of the Lake Borgne Basin Levee District (Lake Borgne). According to plaintiff, Lake Borgne "is a statutorily created political subdivision of the State of Louisiana charged with the duty of overseeing and maintaining flood protection levees in the Parish of St. Bernard." In the October 17, 2005 letter, the Army Corps requested that Lake Borgne provide the Army Corps with a right of entry to a 6.51-acre area of land located in St. Bernard Parish in order for the Army Corps "to perform surveys, soil borings, environmental clearances on, and obtain borrow material." The Army Corps' letter stated that:

> Should the investigations conclude that the material in the proposed area be suitable for use as borrow material, the material will be excavated and used in association with restoring the Verret to Caernarvon Levee located in St. Bernard Parish, Louisiana. The property proposed for this work consists of 6.51 acres and is located in Section 31, Township 13 South, Range 13 East, St. Bernard Parish Louisiana . . . .

The Army Corps' October 17, 2005 letter stated that the Army Corps' work would consist of surveys, soil borings, and cultural resource investigations. The October 17, 2005 letter indicated that the Army Corps would "[a]ccess, obtain borrow, and construct (repair and rehabilitate) the Verret to Caernarvon Levee in St. Bernard Parish to design grade prior to Hurricane Katrina." The Army Corps' letter also stated that "[t]his right of entry is required immediately in order to complete the emergency work before next hurricane season. The right of entry will remain valid until completion of construction."

On October 19, 2005, George Lopez, the President of Lake Borgne, issued a document titled "AUTHORIZATION FOR ENTRY FOR ACCESS, SURVEYS, SOIL BORINGS, ENVIRONMENTAL CLEARANCES, BORROW, and CONSTRUCTION (Repair and Rehabilitation)." (capitalization in original). The October 19, 2005 document stated that Lake Borgne "has acquired the real property interests required by the Department of the Army as requested via letter dated October 17, 2005, from Linda C. Labure, Chief, Real Estate Division." The October 19, 2005 document stated:

> The property interests in part are via Henry Rodriguez, Jr.'s Parish President of St. Bernard Parish, invoking emergency powers of the Louisiana Homeland Security and Emergency Assistance and Disaster Act, R.S. 29:721 et. Seq. and commandeering of certain private property which private owners of real property shall be identified and compensated by LBBLD [Lake Borgne Basin Levee District] in accordance with Louisiana State law and which compensation to private landowners should be via agreement or settlement that shall not exceed the fair market value of the interest in real property commandeered or utilized at the time of the use.

3

Should such an agreement or settlement not be reached within twelve months of the use of the property then the LBBLD will file appropriate judicial proceedings. The LBBLD is otherwise vested with sufficient title and interest in lands, to support repair and rehabilitation of the Lake Pontchartrain Louisiana and Vicinity, Hurricane Protection Levee in its jurisdiction and is described as follows and shown on attached maps.

Additionally, George Lopez authorized the Army Corps to enter the above-described 6.51 acres of land "for access, surveys, soil borings, environmental clearances, borrow, and construction as set forth" in the Army Corps' plans and specifications.

Five days later, on October 24, 2005, Henry Rodriguez, Jr., issued a document titled "Commandeering Property and Granting Right of Entry for Access, Surveys, Soil Borings, Environmental Clearances, Borrow, and Construction in Connection with the Emergency Repairs of the Lake Pontchartrain Louisiana and Vicinity Hurricane Protection Levee, St. Bernard Parish."[3] The October 24, 2005 document issued by Henry Rodriguez, Jr., stated that Mr. Rodriguez was taking certain actions in accordance with St. Bernard Parish's September 1, 2005 Executive Order. Henry Rodriguez, Jr., stated in the October 24, 2005 document that he was "commandeer[ing] the use of certain private immovable property generally located in Section 31, Township 13 South, Range 13 East, St. Bernard Parish, Louisiana . . . . Said private property consists of approximately 6.51 acres." Henry Rodriguez, Jr., then stated:

> Said immovable property shall be used to gain access, obtain surveys, soil borings, cultural resources investigations, HTRW [hazardous, toxic, and radioactive waste] assessments, borrow, and construct (Repair and Rehabilitate) for the potential use in emergency levee restoration work. The work associated with the potential use of this site consists of obtaining borrow materials, gaining access, and constructing (repair and rehabilitating) the Verret to Caernarvon Levee in St. Bernard. As such, the Parish hereby obtains an assignable right and easement to gain access and obtain surveys, soil borings, cultural resources investigations, and HTRW assessments from said private immovable property, reserving however to the landowners, their heirs and assigns, all such rights and privileges in said land as may be used without interfering with or abridging the rights hereby acquired.

> Second, I hereby tender and grant an irrevocable right of entry to these lands to the Lake Borgne Basin Levee District for its use in obtaining access, surveys, soil borings, cultural resources investigations, HTRW assessments, borrow, and construction. I further understand that the Levee District will tender an Authorization for Entry for Access, Surveys, Soil

---

[3] According to defendant, because Henry Rodriguez, Jr.'s "Commandeering Order was not signed until October 24, 2005," George Lopez's October 19, 2005 "Authorization for Entry" was not effective until October 24, 2005.

Borings, Environmental Clearances, Borrow, and Construction to the United States Army Corps of Engineers, the Department of the Army, its agents, employees, and contractors to enter upon these lands to perform said surveys and investigations as set forth in the plans and specifications held in the U.S. Army Corps of Engineers' District Office, New Orleans, Louisiana.

In granting this irrevocable right of entry for access, surveys, soil borings, environmental clearances, borrow, and construction, the St. Bernard Parish agrees to hold and save the United States of America, its officers, agents, and assigns free from all damages arising from the construction, operation, maintenance, repair, replacement, and rehabilitation of the Project, except for damages due to the fault or negligence of the Government or its contractors.

On November 3, 2005, the Army Corps, St. Bernard Parish, and Lake Borgne entered into a Cooperation Agreement for post-flood response assistance (the Cooperation Agreement). On December 1, 2005, the Army Corps, St. Bernard Parish, and Lake Borgne entered into an Amended Cooperation Agreement for post-flood response assistance (the Amended Cooperation Agreement), which rescinded and replaced the parties' November 3, 2005 Cooperation Agreement. Under the Amended Cooperation Agreement, the "Government," which was defined as the United States Department of the Army "represented by the District Engineer, New Orleans District, U.S. Army Corps of Engineers," was to "expeditiously construct the Construction Effort,[4] applying those procedures usually followed or applied in Federal projects, pursuant to Federal laws, regulations, and policies." The "Public Sponsors," which the Amended Cooperation Agreement defined as St. Bernard Parish and Lake Borgne, were "afforded the opportunity to review and comment" on the Army Corps' solicitations for contracts involving performance of the "Construction Effort," but the "award of contracts, modifications or change orders, and performance of all work on the Construction Effort (whether the work is performed under contract or by Government personnel or by non-Federal Government personnel), shall be exclusively within the control of the [Army Corps] District Engineer." Pursuant to Article II.B of the Amended Cooperation Agreement, the Public Sponsors were required to provide "right of entry to all lands, easements, and rights-of-way, including suitable borrow and dredged or excavated material disposal areas, determined by the Government to be necessary for construction, operation, and maintenance of the Construction Effort and the non-federal levee." Article II.D of the Amended Cooperation Agreement stated that the "Public Sponsors shall hold

---

[4] Article I.A of the Amended Cooperation Agreement stated that:

The term "Construction Effort" shall mean repair consisting of enlargement (lift) of an existing levee section of non-Federal levee that lies within St. Bernard Parish, Louisiana with varying crown elevations ranging from approximately +6 to +10 North American Vertical Datum (NGVD), and will be constructed within the existing levee rights of way.

and save the Government free from all damages arising from the construction, operation, and maintenance of the Construction Effort, the non-Federal levee, and any related betterments, except for damages due to the fault or negligence of the Government or the Government's contractors."

Article III of the Amended Cooperation Agreement was titled "LANDS AND PUBLIC LAW 91-646." (capitalization in original). Article III.A of the Amended Cooperation Agreement stated that the government was to provide the Public Sponsors with a description of its real estate requirements, and that the Public Sponsors, "at no cost to the Government," were to "provide right of entry, to all lands, easements, and rights-of-way, including suitable borrow and dredged or excavated material disposal areas, (hereinafter LERD) as may be determined by the Government in that description." Article III.A of the Amended Cooperation Agreement defined three-types of LERD: "Public Sponsor LERD;" "Other Non-Federal Governmental LERD;" and "Private LERD." Regarding the first type of LERD, Public Sponsor LERD, Article III.A.1 stated that Public Sponsor LERD was LERD that the Public Sponsors owned, claimed, or controlled "in a manner that is free and clear of any liens, defects of title, or encumbrances, including the release or subordination to the Construction Effort of any third party interests, as determined by the Government to be necessary for the construction, operation and maintenance of the Construction Effort." Regarding the second type of LERD, Other Non-Federal Government LERD, Article III.A.2 stated:

> The Public Sponsors shall use their best efforts to provide right of entry to LERD that any other non-Federal governmental entity owns, claims, or controls (hereinafter Other Non-Federal Governmental LERD) in a manner that is free and clear of any liens, defects of title, or encumbrances, including the release or subordination to the Construction Effort of any third party interests within such LERD, as determined by the Government to be necessary for the construction, operation and maintenance of the Construction Effort.

Article III.A.3 defined Private LERD, which was the third type of LERD identified in Article III, as "all other LERD not owned, claimed, or controlled by the Public Sponsors or Other Non-Federal Governmental Entities." Article III.A.3 further stated:

> a. The Public Sponsors shall secure or cause to be secured an executive commandeering order or orders from the President of St. Bernard Parish, Louisiana, which said order or orders shall commandeer Private LERD, in accordance with powers set forth in La. R.S. 29:721,[5] et seq., including all

_____

[5] The Louisiana statute cited in the Amended Cooperation Agreement provides "[t]his Chapter shall be cited as the 'Louisiana Homeland Security and Emergency Assistance and Disaster Act,'" which, as discussed above, is the Louisiana statute cited by Henry Rodriguez, Jr., the President of St. Bernard, in his September 1, 2005 Executive Order stating that Henry Rodriquez, Jr., was authorized to commandeer private property and grants of rights of entry for emergency worked related to damage caused by Hurricane

privately owned third party interests, as determined by the Government to be necessary for the construction, operation and maintenance of the Construction Effort;

b. In the event that the commandeering official is not the presiding official of the Public Sponsors, the Public Sponsors must secure a right of entry from the commandeering official to the Private LERD described in the Commandeering Order or Orders; and

c. The Public Sponsors shall tender a right of entry to the Government for the Private LERD.

According to Article II.B.1:

As further specified in Article III, after receiving the Public Sponsors' right of entry to the lands, easements, and rights of way, including suitable borrow and dredged or excavated material disposal areas (LERD) that are described in Article III.A.2 [discussing Other Non-Federal Governmental LERD], and III.A.3. [discussing Private LERD] of this Amendment, the Government, subject to the availability of appropriations, shall identify and pay just compensation to the owners of a compensable interest in the LERD described in Article III.A.3 of this Amendment. Additionally, the Government, subject to the availability of appropriations, shall acquire interests in those LERD described in Article III.A.2 of this Amendment to which the Public Sponsors were unable to obtain right of entry despite their best efforts.

Article III.B of the Amended Cooperation Agreement also discussed the Army Corps' requirement to acquire interests in those lands which the Public Sponsors were unable to obtain to a right of entry. Article III.B stated:

[T]he Government in the name of the Public Sponsors, shall identify and provide just compensation to the owners of a compensable interest in the Private LERD and shall acquire the requisite interests in the non-Federal Governmental LERD to which the Public Sponsors, despite their its [sic] best efforts, was unable to obtain a free and unencumbered right of entry, all in accordance with the applicable provisions of the Uniform Relocation Assistance and Real Property Acquisitions Policy Act of 1970, Public Law 91-646, as amended by Title IV of the Surface Transportation and Uniform Relocation Assistance Act of 1987 (Public Law 100-17), and the Uniform Regulations contained in 49 CFR Part 24, in acquiring lands, easements, and rights of way, required for construction, operation, and maintenance of the non-Federal levee and the Construction Effort, including those

_____

Katrina. See LA. STAT. ANN. § 29:721.

7

necessary for relocations, borrow materials, and dredged or excavated material disposal, and shall inform all affected persons of applicable benefits, policies, and procedures in connection with said Act.

Article III.B of the Amended Cooperation Agreement further stated:

1. The Government shall obtain a deed or servitude agreement, as appropriate, in the name of the Public Sponsors, for those interests described in the Commandeering Order or Orders referenced in Paragraph A.3.a. [discussing Private LERD] of this Article. In like manner, the Government shall obtain a deed or servitude agreement, as appropriate, in the name of the appropriate Public Sponsor, for those interests in the non-Federal Governmental LERD to which the Public Sponsors, despite their best efforts, was unable to obtain a free and unencumbered right of entry.

2. Where the Government is unable to obtain free and unencumbered title on the behalf of the Public Sponsors or to reach an agreement with the interest owners in the Private and Other Non-Federal Governmental LERD, the Government shall obtain such interests, in the name of the United States of America, through the exercise of its eminent domain authority.

After "the Construction Effort is complete and the acquisition and eminent domain proceedings finalized," Article III.B.3 of the Amended Cooperation Agreement stated that the Army Corps would transfer all of the Other Non-Governmental LERD and Private LERD acquired "pursuant to paragraph B.2.of [sic] this Article," which is quoted above, to the Public Sponsors through quitclaim deed, which the "Public Sponsors hereby agree to accept." Article IV.A indicated that "Construction Effort costs are currently estimated to be $8,155,000. In order to meet the Public Sponsors' cash payment requirements, the Public Sponsors must provide a cash contribution estimated to be $0.0."

According to plaintiff's supplemental complaint,[6] from the land commandeered by St. Bernard Parish, the Army Corps identified land that belonged to Avis Melerine Juan and Alfreda Melerine Pizani, who appear to be sisters, "as being necessary for the repair and rehabilitation of the levees breached in the aftermath of Hurricane Katrina." Plaintiff states in its supplemental complaint that the Army Corps, through the Army Corps' contractors, excavated borrow material from the land owned by Ms. Juan and Ms. Pizani in 2005 and 2006. According to plaintiff's supplemental complaint, the Army Corps "solely determined the borrow areas required to repair the levees and requested a right of entry to this specific property," and neither St. Bernard Parish nor Lake Borgne were involved with drafting the plans and specifications related to excavating borrow material from Ms. Pizani's and Ms. Juan's land. Plaintiff asserts that the Army Corps "returned" Ms. Pizani's

---

[6] On April 28, 2017, plaintiff filed its "FIRST SUPPLEMENTAL AND AMENDING COMPLAINT." (capitalization in original). As discussed below, plaintiff's "FIRST SUPPLEMENTAL AND AMENDING COMPLAINT" is properly classified as a supplemental complaint, rather than an amended complaint. (capitalization in original).

and Ms. Juan's land "with a certification by the Corps that their use had been completed" on July 13, 2006. Defendant states that "the Government negotiated to purchase temporary easements" from Ms. Juan and Ms. Pizani in 2006 and 2007, but that negotiations between the government and Ms. Juan and Ms. Pizani "proved unsuccessful."

Louisiana State Trial Court Proceedings

On July 10, 2007, Ms. Juan and Ms. Pizani filed a lawsuit against St. Bernard Parish and Lake Borgne in the Thirty Fourth Judicial District Court of the Louisiana District Courts (the Louisiana State Trial court). See Complaint, Pizani v. St. Bernard Parish, No. 109-548 (34th Jud. Dist. Ct. July 10, 2007). Ms. Juan and Ms. Pizani alleged in the Louisiana State Trial court that, "[o]n or about October 24, 2005, Defendants [St. Bernard Parish and Lake Borgne] commandeered Petitioners' property, continuing their adverse possession until July 13, 2006." Id. at 1. According to Ms. Juan's and Ms. Pizani's complaint in Pizani v. St. Bernard Parish in the Louisiana State Trial court, when Ms. Juan's and Ms. Pizani's "property was returned to them on July 13, 2006, Petitioners [Ms. Juan and Ms. Pizani] learned that Defendants had participated in the extraction of at least 97,931 cubic yards of soil from their property." Id. In Ms. Juan's and Ms. Pizani's complaint in the Louisiana State Trial court, Ms. Juan and Ms. Pizani sought damages equal to

> the unit value of no less than the 97,931 cubic yards of soil extracted and/or converted from their property at the fair market value at the time of extraction, which Petitioners aver is $25.00 per cubic yard, together with legal interests from the date of extraction, attorney fees, and all costs of these proceedings pursuant to R.S. 13:5111.

Complaint at 2, Pizani v. St. Bernard Parish, No. 109-548. In defendant's motion to dismiss in this court, defendant states that "[t]he Pizanis [Ms. Juan and Ms. Pizani] also named the [Lake Borgne Basin] Levee District as a defendant, but subsequently voluntarily dismissed the Levee District from the state court action."

On December 20, 2016, the Louisiana State Trial court issued a judgment against St. Bernard Parish[7] in Pizani v. St. Bernard Parish. See Judgment at 1-2, Pizani v. St. Bernard Parish, No. 109-548 (34th Jud. Dist. Ct. Dec. 20, 2016). According to the Louisiana State Trial court's December 20, 2016 judgment, Ms. Juan and Ms. Pizani were "the owners in indivision [sic] of real property in St. Bernard Parish which was commandeered by Defendant St. Bernard Parish Government on October 24, 2005 and returned to Plaintiffs on July 13, 2006." Id. at 1. The Louisiana State Trial court stated that it was "mak[ing] the following awards, individually and collectively, to the Plaintiffs for compensation and damages sustained as. [sic] a result of the commandeer, and for statutory attorney fees, expert fees, and the court costs." Id. The Louisiana State Trial court entered judgment in favor of Ms. Pizani "and against Defendant St. Bernard Parish

---

[7] The Louisiana State Trial court's December 20, 2016 judgment does not indicate that the Louisiana State Trial court entered judgment against Lake Borgne.

Government in the full sum of $989,000.00, together with legal interest thereon from the date of commandeer of October 24, 2005, until paid." Id. The Louisiana State Trial court also entered a separate judgment amount in favor of Ms. Juan "against Defendant St. Bernard Parish Government in the full sum of $989,000.00, together with legal interest thereon from the date of commandeer of October 24, 2005, until paid." Id. Additionally, the Louisiana State Trial court ordered that:

> [J]udgment herein in favor of Plaintiffs Alfreda Melerine Pizani and Avis Melerine Juan against Defendant St. Bernard Parish Government for attorney fees pursuant to R.S. 13:5111 in the amount of forty percent (40%) of the combined total (awarded sums plus interest, expert fees, and costs) of all sums awarded Plaintiffs herein less $59,400.00.

See Judgment at 1, Pizani v. St. Bernard Parish, No. 109-548. Ms. Juan and Ms. Pizani also were awarded "expert fees" and court costs "in the sum of $14,200.03, together with legal interest thereon from date of judgment until paid." See id. at 2. On January 18, 2017, the Louisiana State Trial court issued an amended judgment of its December 20, 2016 judgment by awarding "legal interest on the attorney fees awarded herein from the date of the signing of the Court's final Judgement on December 20, 2016 until paid." See Amended Judgment at 1, Pizani v. St. Bernard Parish, No. 109-548 (34th Jud. Dist. Ct. Jan. 12, 2017).

On February 21, 2017, the Louisiana State Trial court that had issued the two judgments against St. Bernard Parish issued a written findings of fact and reasons for judgment. See Written Findings of Fact and Reasons for Judgment, Pizani v. St. Bernard Parish, No. 109-548 (34th Jud. Dist. Ct. Feb. 21, 2017). In its written findings of fact and reasons for judgment, the Louisiana State Trial court noted that Ms. Pizani's and Ms. Juan's property was commandeered by order of St. Bernard Parish pursuant to the Louisiana Homeland Security and Emergency Assistance and Disaster Act, and that the Louisiana Homeland Security and Emergency Assistance and Disaster Act requires that "'amount of compensation shall be calculated in the same manner as compensation due for a taking of property pursuant to the condemnation laws of this state.'" Id. at 1 (quoting LA. STAT. ANN. § 29:730(G)). According to the Louisiana State Trial court, the Louisiana State Constitution "has been interpreted to mean that a landowner whose property is taken is entitled to be placed in the same pecuniary position in which he would have been if the property had not been taken." Id. The Louisiana State Trial court began its damages computation by taking 384,000 cubic yards of clay,[8] which the Louisiana State Trial court

---

[8] The Louisiana State Trial court's written findings of fact and reasons for judgment does not indicate why the Louisiana State Trial court used 384,000 cubic yards of clay to determine damages, notwithstanding that the complaint before the Louisiana State Trial court only sought damages for "the unit value of no less than the 97,931 cubic yards of soil extracted and/or converted from their property." Defendant states, however, that the Louisiana State Trial court's written findings of fact and reason is "[b]ased upon the 384,000 cubic yards of clay that theoretically could have been extracted rather than the fair market value of" Ms. Juan's and Ms. Pizani's property.

valued at $5.00 per cubic yard of clay, and multiplied the 384,000 cubic yards of clay by $5.00 per cubic yard of clay, which produced damages of $1,920,000.00. See id. at 2. The Louisiana State Trial court then added $58,000.00, which compensated Ms. Juan and Ms. Pizani for "[s]everance damages to the remainder of Plaintiffs' property along Bayou Road consisting of reasonable and necessary costs to engineer and rectify drainage issues caused by construction of the adjacent dirt pit," to the $1,920,000.00 of damages related to the removal of clay, thereby producing damages of $1,978,000.00. See id. The Louisiana State Trial court stated, "[s]ince Plaintiffs were undivided owners of the property commandeered in October of 2005, each is entitled to one-half of the total compensation award of $1,978,000.00," which is equal to $989,000.00, plus interest "from the date of commandeer of October 24, 2005," as well as costs, expert fees, and reasonable attorneys' fees.[9] See id. The Louisiana State Trial court concluded its written findings of fact and reasons for judgment by stating:

> This Court notes that this is one of several post-Katrina commandeer cases, which are very familiar to this Court from its prior decision in the case of Borgnemouth Realty Co., Ltd. v. Parish of St. Bernard, No. 112,833 (34th JDC), 141 So.3d 891, (La. App. 4th Cir. 2014), writs denied, 14-1285 (La. 9/26/14), 149 So.3d 266, which case was nearly identical to the facts in another takings case decided by Judge Fernandez in Olivier Plantation, L.L.C. v. Parish of St. Bernard, No. 109,272 (34th JDC), 151 So.3d 965, (La. App. 4th Cir. 2014), writs denied, 14-2496, (La. 2/27/15), 160 So.3d 173. This Court is cognizant from the evidence presented in this case and in the Borgnemouth Realty case that a cooperation agreement existed between St. Bernard Parish and the United States Army Corps of Engineers (USACOE) which required the USACOE to compensate property owners for takings related to the Parish's commandeer of property under the cooperation agreement.
>
> Although not called upon to decide this issue under the circumstances of this case, this Court would note for the benefit of the involved parties that it is the observation of this Court that the facts of the instant Pizani case are so nearly identical to those of the Borgnemouth Realty and Olivier Plantation cases that the same result should obtain here in the Pizani case as resulted in the Borgnemouth Realty and Olivier Plantation cases regarding the USACOE's obligation to indemnify St. Bernard Parish for liability resulting from the Parish's commandeer of private property pursuant to the cooperation agreement.

Written Findings of Fact and Reasons for Judgment at 2, Pizani v. St. Bernard Parish, No. 109-548.

---

[9] As described below, as of the date of the issuance of this Opinion, the record before this court has no indication that the Louisiana State Trial court's judgments have been paid to Ms. Juan or Ms. Pizani.

On January 20, 2017, following the Louisiana State Trial court's issuance of its January 18, 2017 amended judgment against St. Bernard, but before the Louisiana State Trial court issued its February 21, 2017 written findings of fact and reasons for judgment, St. Bernard Parish, Ms. Pizani, and Ms. Juan entered into a "JOINT AND RECIPROCAL AGREEMENT." (capitalization in original). The pertinent portion of the Joint and Reciprocal Agreement provides:

> Owing to the risks, benefits, and vicissitudes of further litigation, Plaintiffs and St. Bernard hereby mutually agree to immediately cease all adverse action between and against each other in *Alfreda Melerine Pizani and Avis Melerine Juan vs. St. Bernard Parish, et al* [sic]*,* 34th Judicial District Court, # 109-548 Div. E, waiving all appellate rights in Louisiana state courts. It is the mutual intent of the parties to this Joint and Reciprocal Agreement that the Judgement signed December 20, 2016 in the above captioned matter (as amended) become final and executory for purposes of immediate executory and collection proceedings in the United States Court of Federal Claims, or other necessary forum, to resolve this very old case for both parties.

> In consideration for the reciprocal agreements set forth herein, Plaintiffs agree to suspend and forego all collection rights against St. Bernard regarding the Judgement provided that St. Bernard pursues indemnification for payment of the Judgement (as amended) in the United States Court of Federal Claims in Case No. 15-1072C[10] and for a period of 60 days past termination and finality of all such proceedings, including appeals, and also further agree to accept such amounts recovered in the United States Court of Federal Claims in Case No. 15-1072C (or such other proceedings as may be instituted for collection of the Judgement, as amended) in full satisfaction of all sums owed to Plaintiffs by St. Bernard in the Judgement (as amended). Plaintiffs hereby further agree to execute a full Release and Satisfaction of the Judgement (as amended) in favor of St. Bernard within 30 days of receipt of all sums recovered from the United States in the United States Court of Federal Claims (or such other proceedings as may be instituted for collection of the Judgement, as amended), or upon receipt of all sums received from settlement agreed to by all parties, whichever comes first. Plaintiffs agree not to execute against St. Bernard unless St. Bernard collects funds from the United States in payment of the Judgement and fails to pay the funds to Plaintiffs within 60 days of receipt. Nothing contained herein shall obligate St. Bernard to pay to Plaintiffs any sums awarded to St. Bernard and recovered from the United States which are solely and expressly attributable to attorney's fees incurred by St. Bernard's attorneys in representing St. Bernard Parish.

---

[10] As discussed above, St. Bernard filed its initial complaint in the above-captioned case, Case No. 15-1072C, on September 25, 2015.

In consideration for the reciprocal agreements set forth herein, St. Bernard hereby agrees to immediately cease all actions in 34th Judicial District Court in the above captioned matter, and shall immediately formally notify the Court that it waives its prior request for Reasons for Judgement pursuant to La. C.C.P. art. 1917. St. Bernard further agrees to forthwith institute at its sole costs all proceedings necessary to obtain indemnification or payment from the United States for all sums due under the Judgement (as amended) including, but not limited to, Case No. 15-1072 C in the United States Court of Federal Claims. St. Bernard shall aggressively pursue all such actions to finality, including all appeals, unless a settlement satisfactory to both Plaintiffs is reached before finality of the proceedings.

(emphasis in original).

On August 15, 2018, in Chalmette, Louisiana, Ms. Juan, Ms. Pizani, and St. Bernard Parish executed a document titled "ADDENDUM TO JOINT AND RECIPROCAL AGREEMENT." (capitalization in original). The August 15, 2018 Addendum to the Joint and Reciprocal Agreement states that the purpose of the Addendum is to "clarify the intent of the original [Joint and Reciprocal] Agreement," and that, "[s]hould SBPG [St. Bernard Parish Government] be unsuccessful in collecting any funds in the Court of Claims [sic], the Landowners shall be entitled to collect the value of the Judgement from SBPG."

Proceedings in the United States District Court for the Eastern District of Louisiana

Defendant in the above-captioned case states that, after negotiations "to purchase temporary easements from" Ms. Juan and Ms. Pizani in 2006 and 2007 "proved unsuccessful" and after Ms. Juan and Ms. Pizani filed their July 10, 2007 complaint against St. Bernard Parish in the Louisiana State Trial court, on February 14, 2008, the United States government filed a complaint in condemnation in the United States District Court for the Eastern District of Louisiana. The February 14, 2008 complaint in condemnation in the United States District Court for the Eastern District of Louisiana states that "[t]his is an action of a civil nature brought by the United States of America for the taking of property, under its power of eminent domain, and for the ascertainment and award of just compensation to the parties in interest." Complaint at 1, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Feb. 14, 2008). The February 14, 2008 Eastern District of Louisiana complaint indicated that the government sought to obtain a "Temporary Borrow Easement" on Tract No. B100E-1 and a "Temporary Work Area Easement" on Tract No. B100E-2. Id., Ex. C. The February 14, 2008 complaint described the Temporary Borrow Easement as:

A temporary and assignable right and easement to clear, borrow, excavate and remove soil, dirt, and other materials from the land described in Schedule A as Tract No. B100E-1, for a period not to exceed one year, beginning with date possession of the land was granted to the United States; subject, however, to existing easements for public roads and highways, public utilities, railroads; reserving, however, to the landowners,

their heirs and assigns, all such rights and privileges in said land as may be used without interfering with or abridging the rights and easement hereby acquired.

Id. The February 14, 2008 complaint described the Temporary Work Area Easement as:

A temporary easement and right-of-way in, on, over and across the land described in Schedule A as Tract No. B100E-2, for a period not to exceed one year, beginning with date possession of the land was granted to the United States, for use by the United States, its representatives, agents, and contractors as a work area, including the right to move, store and remove equipment and supplies, and erect and remove temporary structures on the land and to perform any other work necessary and incident to the construction of the Emergency Levee Repairs, Non-Federal Chalmette Back Levee, Creedmore Borrow Area, St. Bernard Parish, Louisiana Project, together with the right to trim, cut, fell and remove therefrom all trees, underbrush, obstructions, and any other vegetation, structures, or obstacles within the limits of the right-of-way; reserving, however, to the landowners, their heirs and assigns, all such rights and privileges as may be used without interfering with or abridging the rights and easement hereby acquired; subject, however, to existing easements for public roads and highways, public utilities, railroads and pipeline.

Id. The February 14, 2008 complaint indicated that the "Purported Owners" of Tract Nos. B100E-1 and B100E-2 were Ms. Pizani, Ms. Juan, the "Sheriff & Ex-Officio Tax Collector," and the "Department of Taxation and Revenue." Id., Ex. E.

Also on February 14, 2008, the government filed its declaration of taking in the same proceeding in the United States District Court for the Eastern District of Louisiana. See Declaration of Taking, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Feb. 14, 2008). The government's declaration of taking stated that the government was depositing a "gross sum estimated" of $59,400.00, which was the estimated "just compensation for all of said land." Id. at 2.

In defendant's motion to dismiss filed in the above-captioned case in this court, defendant states that, after the government filed the February 14, 2008 complaint and declaration of taking, the government and Ms. Juan and Ms. Pizani engaged in further negotiations regarding the government's action before the United States District Court for the Eastern District of Louisiana, but the parties still were unable to reach an agreement. On September 7, 2010, the government filed an amended complaint, as well as an amended declaration of taking, in the United States District Court for the Eastern District of Louisiana. The September 7, 2010 amended complaint stated that, "[b]y authority of the Deputy Assistant Secretary of the Army and the Attorney General of the United States, and pursuant to Rule 71.1(f) of the F.R.Cv.P. [Federal Rules of Civil Procedure], the estate being taken herein is hereby being changed from a temporary easement to a taking in fee." Amended Complaint at 2, United States v. 6.83 Acres of Land, No. 08-999 (E.D.

La. Sept. 7, 2010). The September 7, 2010 amended complaint further stated that the government was acquiring

> fee simple title to Tract No. B100, subject, however, to existing easements for public roads and highways, public utilities, railroads and pipelines; excepting and excluding from the taking all oil and gas in and under said land and all appurtenant rights for the exploration, development, production and removal of said oil and gas.

Id., Ex. C-1.

In the September 7, 2010 amended declaration of taking, the government stated that the government was increasing the "gross sum estimated" of "just compensation for all of said land" to $134,000.00. Amended Declaration of Taking at 2, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Sept. 7, 2010). The government's amended declaration of taking stated that "[i]t is intended by this amendment that the aforesaid Declaration of Taking is not to be changed in any way except as expressly set forth." Id.

On October 19, 2011, the United States District Court for the Eastern District of Louisiana entered an Order stating that "the Clerk of this Court be and hereby is ordered to make the following disbursement of principal, together with accrued interest, less the assessment fee for the administration of funds, out of the funds in the registry of the Court." Order to Disburse Funds at 2, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Oct. 19, 2011). The Eastern District of Louisiana directed that Ms. Pizani was to receive $67,000.00 and that Ms. Juan was to receive $67,000.00. See id. The October 19, 2011 Order stated:

> [S]aid disbursement be without prejudice to the right of said defendants to demand and receive additional compensation for the taking of said tracts of land, and that should the compensation finally determined to be due to said defendants be less than the amount hereby disbursed, the United States shall have a right to recover the difference.

Id.

On January 15, 2013, the government filed a motion for a determination of the appropriate date of valuation, in which the government requested that the United States District Court for the Eastern District of Louisiana determine "whether its jurisdiction to award just compensation in this land condemnation proceeding extends to valuing the interests taken as of the time the property was commandeered both in terms of the extent of the interests taken and the time it was taken." Motion for a Determination of the Appropriate Date of Valuation at 1, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Jan. 15, 2013). In the government's memorandum in support of its January 15, 2013 motion, the government argued:

> In a condemnation case, identifying the date as of which the property taken

is to be valued is a necessary prerequisite to determining just compensation. Ordinarily, where the United States utilizes a Declaration of Taking under authority of the Declarations of Takings Act (40 U.S.C. § 3114), the date of valuation is the date on which the United States fulfills all of the requirements of the Act, namely, filing of the Declaration of Taking in federal district court, together with a deposit of estimated just compensation. However, in the emergency aftermath of Hurricanes Katrina and Rita, the instant case did not follow the ordinary route. Instead, in order to allow repair work on the Chalmette Back Levee to proceed as quickly as possible, St. Bernard Parish utilized state law to commandeer real property owned by Defendants, Alfreda Melerine Pizani and Avis Melerine Juan (hereinafter referred to jointly as "Pizani"). St. Bernard Parish simultaneously granted an irrevocable right of entry to the Lake Borgne Basin Levee District ("LBBLD"), which in turn provided a right of entry to the U.S. Army Corps of Engineers ("Corps"), which was charged by Congress with performing the levee repairs.

\* \* \*

The United States and Pizani now dispute whether the Court should award just compensation as of the Corps' entry onto the Pizani property at the time of commandeering, or as of the dates of filing of the Declarations of Taking.

In United States v. Dow, 357 U.S. 17 (1958), the Supreme Court held that where the federal government takes legal possession prior to the filing of a Declaration of Taking, the date of possession is the proper date on which to determine value. The United States therefore respectfully requests that, pursuant to Dow, this Court find that the proper date of valuation of the Pizani property is the date on which possession was granted to the United States through the commandeering.

Memorandum in Support at 1-2, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Jan. 15, 2013). The government requested that the District "Court find that the applicable date of valuation of the property taken herein is October 24, 2005, the date the property was commandeered and possession granted to the Corps." Id. at 10.

On February 15, 2013, the United States submitted a filing titled "OFFER OF JUDGMENT" in the United States District Court for the Eastern District of Louisiana. See Offer of Judgment at 1, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Feb. 15, 2013) (capitalization in original). The February 15, 2013 Offer of Judgment stated that the United States

offers to have judgment of just compensation taken against it in the total amount of $475,000 as full payment of just compensation for the taking of: (1) temporary interests in 6.83 acres of land, as described in the declaration of taking filed herein; (2) the taking of the fee interest in the same 6.83 acres

16

of land, as described in the amended declaration of taking filed herein; and (3) the commandeering of 6.51 acres of land by St. Bernard Parish on October 24, 2005. The offered amount of $475,000 is inclusive of attorney's fees, accrued interest upon any deficiency and costs, if any.

Id. (internal references omitted). The February 15, 2013 Offer of Judgment asserted that the Ms. Juan and Ms. Pizani had fourteen days to accept the United States' offer of judgment in writing, and that "this offer is considered withdrawn if not accepted." Id. at 2. The docket of the relevant condemnation proceeding before the United States District Court for the Eastern District of Louisiana does not indicate that Ms. Juan and Ms. Pizani accepted the government's February 15, 2013 Offer of Judgment, and the parties also have not indicated to this court that Ms. Juan and Ms. Pizani accepted the government's February 15, 2013 Offer of Judgment.

On February 26, 2013, Ms. Juan and Ms. Pizani filed a motion to stay the proceedings before the United States District Court for the Eastern District of Louisiana. See Motion to Stay at 1, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Feb. 26, 2013). Also on February 26, 2013, Ms. Juan and Ms. Pizani filed an opposition to defendant's January 15, 2013 motion for a determination of the appropriate date of valuation. See Opposition to Motion for a Determination of the Appropriate Date of Valuation, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Feb. 26, 2013). In the opposition, Ms. Juan and Ms. Pizani argued that the "date of taking cannot be October 24, 2005," and that the "date of taking is the filing date of the Declaration of Taking." Id. at 2, 5. On March 5, 2013, the government filed an opposition to Ms. Juan's and Ms. Pizani's motion to stay, and, on March 6, 2013, the government filed a reply in support of its motion for a determination of the valuation date.

On April 5, 2013, the United States District Court for the Eastern District of Louisiana issued an Order granting Ms. Juan's and Ms. Pizani's February 26, 2013 motion to stay and dismissing the government's January 15, 2013 motion for a determination of the appropriate date of valuation as moot. See Order and Reasons at 1, 7, 9, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Apr. 5, 2013). In the April 5, 2013 Order, the United States District Court for the Eastern District of Louisiana stated:

On filing a declaration of taking and depositing the amount of estimated compensation stated in the declaration, title to the estate or interest specified in the declaration vests in the Government; the land is condemned and taken for the use of the Government; and the right to just compensation for the land vests in the persons entitled to the compensation. 40 U.S.C. § 3114(b)(1)-(3). While the United States argues that it actually took possession [sic] the property in question at an earlier date, that issue is the subject of the plaintiff's Motion for a Determination of the Appropriate Date of Valuation and will not be resolved at this time. The statute that authorizes the use of condemnation actions states that title vested in the United States at the time the Complaint in Condemnation was filed and the deposit of estimated compensation was made.

Id. at 7 (internal reference omitted). Regarding the proceeding before the Louisiana State Trial court discussed above, which involved Ms. Pizani, Ms. Juan, and St. Bernard Parish, the United States District Court for the Eastern District of Louisiana stated:

> If these cases [in the Eastern District of Louisiana and the Louisiana State Trial court] proceed simultaneously, this Court will have to determine the date of the federal taking, to establish the date upon which the property should be valued. If this Court determines that the date of the Federal taking was, as the United States argues, the same date as the taking by St. Bernard, both the state and federal courts will use the same valuation date to determine just compensation. See, e.g. 40 U.S. [sic] § 1334(c)(1) ("Compensation shall be determined and awarded in the proceeding and established by judgment. The judgment shall include interest, in accordance with section 3116 of this title, on the amount finally awarded as the value of the property as of the date of taking and shall be awarded from that date to the date of payment."). This could lead to a situation in which the same property, taken on the same date but by different parties, could be valued differently in state and federal court. To allow these parallel cases to proceed simultaneously would create the possibility of conflict between courts of different sovereigns, the specific kind of conflict that the prior-existing-jurisdiction rule is meant to prevent.

Id. at 9 (internal reference omitted).

On May 22, 2017, the government filed a motion to lift the stay in the case before the United States District Court of Louisiana because "final judgment has been rendered" in the Louisiana State Trial court. See Motion to Reopen Case, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. May 22, 2017). On May 24, 2017, Ms. Juan and Ms. Pizani filed a motion to continue the stay in the United States District Court for the Eastern District of Louisiana. See Motion to Continue Stay, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. May 24, 2017). In the May 24, 2017 motion, Ms. Juan and Ms. Pizani argued:

> Judge Marian Blank Horn of the U.S. Court of Federal Claims rendered summary judgment against the United States for $1,428,335.00[11] [sic] and

---

[11] As discussed below, on July 12, 2016, the undersigned issued an unreported Order granting Lake Borgne's and St. Bernard Parish's motion for summary judgment against the United States in Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. Ms. Juan's and Ms. Pizani's May 24, 2017 motion, however, misstated the amounts awarded in those two related cases. The court's July 12, 2016 Order awarded damages of $1,655.380.03 in Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and damages of $2,768,373.04 in St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. The parties in Lake Borgne Basin Levee District, et al.

$2,768,373.04 in St. Bernard Parish's two Court of Claims [sic] complaints. (Ct. Cl. Nos. 15-103C and 15-518C, Doc. 37). The United States conceded in those proceedings that the Plaintiffs (including St. Bernard Parish) were entitled to summary judgment.

\* \* \*

Defendants [Ms. Juan and Ms. Pizani] submit that if the related Court of Federal Claims complaint [in the above-captioned case in this court] is resolved by summary judgment, as were the related <u>Olivier Plantation</u> and <u>Borgnemouth Realty</u> Cases (Ct. Cl. Nos. 15-103C and 15-518C), there would be no necessity to pursue the instant condemnation case since Defendants do not contest the taking or the compensation received for the taking.

In sum, this condemnation proceeding may be closed and dismissed if the related Court of Federal Claims complaint (Ct. Cl. No. 15-1072C) is resolved by summary judgment, which occurred in the related <u>Olivier Plantation</u> and <u>Borgnemouth Realty</u> Cases (Ct. Cl. Nos. 15-103C and 15-518C).

<u>Id.</u> at 3-4.

On July 17, 2017, the United States District Court for the Eastern District of Louisiana issued an Order granting the government's motion to lift the stay of the case before the Eastern District of Louisiana and stated that the "parties have failed to persuade the Court that any proceedings in the Court of Federal Claims has a direct bearing on this Court's jurisdiction, such that this Court should relinquish its jurisdiction until that proceeding is finalized." Order at 1, <u>United States v. 6.83 Acres of Land</u>, No. 08-999 (E.D. La. July 17, 2017). On August 18, 2017, the United States District Court for the Eastern District of Louisiana issued an Order scheduling a three-day bench trial to commence on April 23, 2018. <u>See</u> Scheduling Order at 2, <u>United States v. 6.83 Acres of Land</u>, No. 08-999 (E.D. La. Aug. 18, 2017). On March 29, 2018, the United States District Court for the Eastern District of Louisiana issued another Order, which stated:

The Court having been advised by counsel for the parties that all of the parties to this action have firmly agreed upon a compromise,

IT IS ORDERED that the action be and it is hereby dismissed without costs and without prejudice to the right, upon good cause shown, to reopen the action or to seek summary judgment enforcing the compromise if settlement is not consummated within a reasonable time. The Court retains jurisdiction

---

v. United States, Case No. 15-103C, and in <u>St. Bernard Parish Government, et al. v. United States</u>, Case No. 15-518C, had submitted joint status reports to the court reflecting the above amounts as "full and complete satisfaction of any and all claims that have been made or could be made in" those two cases.

for all purposes, including enforcing the settlement agreement entered into by the parties.

See Order of Dismissal at 1, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. March 29, 2018) (capitalization in original).

Procedural History in the Above-Captioned Case

On September 25, 2015, plaintiff St. Bernard Parish filed a complaint in the above-captioned case with this court. Also on September 25, 2017, plaintiff filed a notice of directly related cases, in which plaintiff stated "[t]his case is directly related to Lake Borgne Basin Levee District v. United States, No. 15-103C (Judge Horn) **and** St. Bernard Parish Government and Lake Borgne Basin Levee District v. United States, No. 15-518C (Judge Horn)," two cases which were assigned to the undersigned and are referenced above and discussed below. (emphasis in original). Plaintiff asserted in the notice of directly related cases that "virtually all of the legal issues and the factual issues are the same," but noted that "differences between the related cases and the present case is that the present case involves a different tract of land, a different group of landowners, a different amount of alleged damages," and that "the Corps ultimately expropriated the tract of land in this case, whereas the Corps did not ever expropriate the tract of land in the Borgnemouth and Olivier cases."

In the September 25, 2015 complaint in this court, plaintiff alleged that defendant, the United States, breached its contract with plaintiff when plaintiff "provided access to private property, and the Corps entered the property and removed borrow material to repair levees in Louisiana in the aftermath of Hurricane Katrina." Plaintiff noted in its September 25, 2015 complaint that Ms. Juan and Ms. Pizani had filed a lawsuit in the Louisiana State Trial court, which, at the time plaintiff's September 25, 2015 complaint in this court was filed, was still pending in the Louisiana State Trial court. On October 14, 2015, the court issued an Order staying the above-captioned case at the request of the parties "pending resolution of certain related cases in Louisiana state court and the United States District Court for the Eastern District of Louisiana."

On April 28, 2017, while the above-captioned case was stayed, plaintiff filed its "FIRST SUPPLEMENTAL AND AMENDING COMPLAINT" in the current case before the court. (capitalization in original). In plaintiff's supplemental complaint, plaintiff alleges that the defendant, acting through the Army Corps, had entered into the Amended Cooperative Agreement with plaintiff, which, pursuant to Article III.B of the Amended Cooperative Agreement, required the Army Corps to assume "the obligation to pay just compensation to landowners whose property is commandeered, agreeing that it will 'identify and provide just compensation to the owners of a compensable interest in the Private LERD.'" (quoting Article III.B of the Amended Cooperation Agreement). According to plaintiff, the Army Corps excavated borrow material from property owned by Ms. Juan and Ms. Pizani in 2005 and 2006, but the Army Corps has not compensated Ms. Pizani or Ms. Juan for the damages they sustained as a result of the Army Corps' entry "onto and excavation of material from property owned by Ms. Pizani and Ms. Juan. This refusal

to provide just compensation to the property owners under the terms of the Amended Cooperation Agreement, on behalf [sic] SBPG, constitutes a breach of the express and/or implied terms of the Amended Cooperation Agreement." Plaintiff requests

> that this Court enforce the terms of the Amended Cooperation Agreement . . . as well as any principal, interest, attorney's fees and costs awarded by the Louisiana state court. The Pizani Judgments are now final judgments, no longer appealable, and SBPG is entitled to an Order requiring the United States to pay the judgments under this Court's precedent in the Olivier [sic] and Borgnemouth cases (USCFC Nos. 15-103C and 15-518C).

According to plaintiff, "[d]amages for breach of contract shall place the wronged party in as good a position as it would have been in had the breaching party fully performed its obligation," and defendant is required to compensate plaintiff for the losses it sustained when defendant allegedly failed to compensate Ms. Juan and Ms. Pizani in violation of the Amended Cooperation Agreement.

Alternatively, in plaintiff's supplemental complaint, plaintiff asserts that "the language in the Amended Cooperation Agreement constitutes an agreement to indemnify SBPG for those expenses," and that the "Corps is therefore required to indemnify SBPG for the entire amount of the Pizani Judgments issued by the Louisiana courts, including the principal, interest, attorney's fees, and costs." In plaintiff's supplemental complaint, plaintiff also argues that it is entitled to recover attorneys' fees under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 1241 (2018), and that the court has jurisdiction "over this action against the United States founded upon an express contract, an implied-in-fact contract, or, in the alternative, an indemnity agreement between SBPG and the United States, pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1)."

The court subsequently held a status conference and issued an Order stating that, as discussed with the parties during the status conference, the stay in the above-captioned case is lifted. Thereafter, defendant filed a motion to dismiss pursuant to Rule 12(b)(1) (2018) of the Rules of the United States Court of Federal Claims (RCFC), or, in the alternative, motion to dismiss pursuant to RCFC 12(b)(6). Defendant argues that the court should dismiss plaintiff's complaint for lack of subject matter jurisdiction under RCFC 12(b)(1) because plaintiff lacks standing, as plaintiff allegedly has not suffered a cognizable injury. According to defendant, plaintiff has not yet paid the Louisiana State Trial court's December 20, 2016 judgment or the January 18, 2017 amended judgment, and, that, in the Joint and Reciprocal Agreement, Ms. Juan and Ms. Pizani agreed not to execute the judgment and amended judgment against St. Bernard Parish and to suspend and forgo all collection rights. Additionally, defendant contends that plaintiff's request for an order directing defendant "to pay the judgment(s) issued in the Louisiana Court in favor of Ms. Pizani and Ms. Juan" is a request for specific performance of the Amended Cooperation Agreement, and "there is no jurisdiction over St. Bernard's claim for equitable relief." Defendant also argues that the court should dismiss St. Bernard Parish's indemnification claim for lack of subject-matter jurisdiction "because the Tucker Act

extends only to express contracts or implied-in-fact contracts covering different subject matter, St. Bernard has not plausibly alleged a Government representative with actual authority to bind the United States to an indemnification agreement, and St. Bernard does not claim actual, presently due money damages."

Alternatively, defendant asserts that this court should dismiss plaintiff's complaint for failure to state a claim because plaintiff has not sufficiently alleged a duty, a breach of duty, or damages because "[t]he Government did *not* make an open-ended commitment to pay any judgment that might be rendered in favor of landowners like the Pizanis or against St. Bernard in the future." (emphasis in original). According to defendant, "[t]he Government has complied with its obligation by depositing the estimate of fair market value as just compensation in the condemnation action pending before the United States District Court for the Eastern District of Louisiana." Defendant also asserts in its motion to dismiss that the court should dismiss plaintiff's claim for costs and attorneys' fees under EAJA.

Plaintiff filed an opposition to defendant's motion to dismiss, in which plaintiff asserts it has standing in the above-captioned case because plaintiff "has been injured because the Government failed to make a payment to a third party it contractually agreed to make." Plaintiff argues that this court has jurisdiction over its claim that defendant asserts is a "claim for equitable relief," as well as plaintiff's alternative indemnification claim. Plaintiff also contends that it has sufficiently alleged a claim for breach of contract. In plaintiff's response, plaintiff did not address defendant's argument that this court should dismiss plaintiff's claims for attorneys' fees and costs under EAJA. Subsequently, defendant filed a reply in support of defendant's motion to dismiss.

Thereafter, the court heard oral argument in the above-captioned case. At the oral argument, counsel of record for plaintiff suggested that the parties submit supplemental briefs addressing whether the United States' condemnation action in the United States District Court for the Eastern District of Louisiana fully compensated Ms. Juan and Ms. Pizani for the government's taking of Ms. Juan's and Ms. Pizani's land, including the borrow material excavated by the United States Army Corps of Engineers in 2005. The court subsequently issued an Order directing the parties to file supplemental briefs. The court also issued an Order instructing the parties to submit supplemental briefs addressing whether, under the terms of the Joint and Reciprocal Agreement, St. Bernard Parish is liable to Ms. Juan and Ms. Pizani for the December 20, 2016 judgment and January 18, 2017 amended judgment issued by the Louisiana State Trial court.

In plaintiff's supplemental brief addressing whether the condemnation action in the United States District Court for the Eastern District of Louisiana had fully compensated Alfreda Melerine Pizani and Avis Melerine Juan, plaintiff argued that the condemnation action did not compensate Ms. Juan or Ms. Pizani for the Army Corps' excavation of the borrow material taken. In defendant's supplement brief, addressing the same topic, defendant asserts that Ms. Juan and Ms. Pizani have been fully compensated through the condemnation action in the United States District Court for the Eastern District of Louisiana, or, alternatively, that the United States District Court for the Eastern District

will award Ms. Juan and Ms. Pizani just compensation for the borrow material.

In plaintiff's supplemental brief addressing St. Bernard Parish's liability under the Joint and Reciprocal Agreement, plaintiff argues that St. Bernard Parish is liable for the December 20, 2016 judgment and January 18, 2017 amended judgment. Plaintiff stated that, "[i]n order to make that intent crystal clear, the parties to the Agreement have drafted and executed an Addendum, which specifically sets forth their intent in entering into the Agreement" and was attached to plaintiff's supplemental brief addressing the Joint and Reciprocal Agreement. In defendant's supplemental brief, defendant argues that St. Bernard Parish is not liable to Ms. Juan and Ms. Pizani for the December 20, 2016 judgment and January 18, 2017 amended judgment. With respect to the August 15, 2018 Addendum to the Joint and Reciprocal Agreement, defendant argued that the court should not consider the Addendum because the Addendum is untimely and that the Addendum "does not change the meaning of the Joint and Reciprocal Agreement."

Previous Proceedings in Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C

In addition to the complaint filed in the above-captioned case, plaintiff St. Bernard Parish previously had filed complaints in two additional cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, in this court, both of which were assigned to the undersigned and were consolidated for case management purposes.[12]

St. Bernard Parish and Lake Borgne were the plaintiffs in both Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. On March 15, 2016, the undersigned issued an Opinion denying defendant's motions to dismiss the complaints in Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. See Lake Borgne Basin Levee Dist., et al. v. United States, 127 Fed. Cl. 321, appeal dismissed, No. 16-2624, 2016 WL 9665571 (Fed. Cir. Oct. 14, 2016). As noted in the court's discussion of the facts of those two cases in the court's March 15, 2016 Opinion, Lake Borgne, St. Bernard Parish, and the Army Corps had entered into an October 17, 2005 amended cooperation agreement (the Lake Borgne Amended Agreement) concerning the Army Corps' repair of certain levees in St. Bernard Parish, which were part of the Hurricane/Shore Protection Project for Lake Pontchartrain, Louisiana and Vicinity.[13] See

---

[12] Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, was initially assigned to the undersigned on February 3, 2015. St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, initially was assigned to Judge Block, before being reassigned to the undersigned May 29, 2015.

[13] In defendant's reply in support of its motion to dismiss in the above-captioned case, defendant states that the court's Opinion in Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United

id. at 323-24, 326. On September 29, 2005, St. Bernard Parish had commandeered property interests in land owned by Borgnemouth Realty Company, Ltd. (Borgnemouth) and Olivier Plantation, LLC, Park Investments, Ltd., and Morning Park, Inc. (the Olivier Plantation landowners). See id. at 328.

As noted in the undersigned's discussion of the facts of Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, the Olivier Plantation landowners filed a complaint against St. Bernard Parish and Lake Borgne demanding compensation for the removal of borrow material in Louisiana State court on May 18, 2007. See Lake Borgne Basin Levee Dist., et al. v. United States, 127 Fed. Cl. at 328. Thereafter, the Louisiana State court awarded the Olivier Plantation landowners $2,449,930.00 in damages and $832,318.65 in attorneys' fees and costs. See id. at 329. On November 13, 2008, Borgnemouth filed a complaint in Louisiana State court against St. Bernard Parish and Lake Borgne, which requested compensation for borrow material allegedly removed by the Army Corps. See id. On June 20, 2013, the Louisiana State court entered judgment in favor of Borgnemouth, holding St. Bernard and Lake Borgne liable, jointly and severally, for compensation in the amount of $1,241,480.00, as well as for attorneys' fees and costs in the amount of $335,370.00. See id.

Subsequently, St. Bernard Parish and Lake Borgne filed complaints in this court concerning the judgments the Louisiana State court had awarded both to the Olivier Plantation landowners and Borgnemouth. See id. at 329-30. As noted in this court's March 15, 2016 Opinion:

> St. Bernard and Lake Borgne filed an additional complaint in case number 15-518C on May 20, 2015 and filed an amended complaint in case number 15-518C on June 19, 2015. The amended complaint is almost identical to the ones filed by St. Bernard and Lake Borgne in case number 15-103C, but concerns the property allegedly taken from the Olivier Plantation landowners and the state court judgment subsequently awarded against St. Bernard and Lake Borgne in the Olivier Plantation case [in Case No. 109,272].

---

States, Case No. 15-518C, involved a different contract and that the plaintiffs had "alleged that the Government had breached an October 17, 2005 contract to repair the _Federal_ levee. See Lake Borgne [Basin Levee Dist., et al. v. United States], 127 Fed. Cl. at 326. This action alleges that the Government has breached the December 1, 2005 Cooperation Agreement to repair a _non_-Federal levee." (emphasis and capitalization in original). At the oral argument in the above-captioned case, counsel of record for defendant asserted that, "[c]ritically, as a legal matter, our motion presents entirely different issues than those Your Honor decided in Lake Borgne [Basin Levee Dist., et al. v. United States, 127 Fed. Cl. 321]," and that, "in that case, for whatever reason -- prior counsel was involved, I was not -- the United States did not decide to dispute breach or damages once private LERD was determined -- once the land was determined to be private LERD."

Id. at 330. In the complaints filed in this court, St. Bernard Parish and Lake Borgne alleged that the United States had breached the Lake Borgne Amended Agreement by failing to compensate the Olivier Plantation landowners and Borgnemouth for the borrow material allegedly removed by the Army Corps. See id. Alternatively, St. Bernard Parish and Lake Borgne contended that the language in the Lake Borgne Amended Agreement between Lake Borgne, St. Bernard Parish, and the Army Corps constituted an indemnification agreement. See id. The United States moved to dismiss the complaints in both Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. See Lake Borgne Basin Levee Dist., et al. v. United States, 127 Fed. Cl. at 330.

In the court's March 15, 2016 Opinion in Lake Borgne Basin Levee District, the court rejected the United States' argument that Lake Borgne's and St. Bernard Parish's claims were barred by the statute of limitations. See Lake Borgne Basin Levee Dist., 127 Fed. Cl. at 335-36. The court in Lake Borgne Basin Levee District also determined that the court had jurisdiction to consider the attorneys' fees sought by Lake Borgne and St. Bernard Parish, which had been awarded against Lake Borgne and St. Bernard Parish as part of the judgments issued by the Louisiana State courts. See id. at 338-39. This court in Lake Borgne Basin Levee District also found that Lake Borgne and St. Bernard Parish had sufficiently alleged a breach of the Lake Borgne Amended Agreement. See id. at 343. In Lake Borgne Basin Levee District, this court stated:

> The Amended [Lake Borgne] Cooperation Agreement thus envisioned a two step process: 1) the Army Corps would provide plaintiffs with a description of the LERD it needed; and 2) the plaintiffs would provide the Army Corps with right of entry to this LERD. The parties' obligations under the Amended Cooperation Agreement, therefore, attached to the LERD included in the Army Corps' description.

Id. at 340. This court in Lake Borgne Basin Levee District concluded:

> Because there is no evidence in the record at this time that demonstrates that either of the plaintiffs [Lake Borgne and St. Bernard Parish] ever owned, claimed or controlled the LERD at issue prior to commencement of the state court Borgnemouth and Olivier Plantation cases, the court finds that plaintiffs have sufficiently alleged that the LERD at issue was Private, rather than Public Sponsor LERD.

Lake Borgne Basin Levee Dist., et al. v. United States, 127 Fed. Cl. at 344.

This court in Lake Borgne Basin Levee District deferred ruling on the United States' motion to dismiss the Lake Borgne's and St. Bernard Parish's claim that the Lake Borgne Amended Agreement constituted an indemnity agreement. See id. at 345. Specifically, the court stated:

> Although plaintiffs allege in their complaints that "the language in the
> Amended Cooperation Agreement" constituted an indemnification
> agreement, they did not specify, either in their complaints or in their
> oppositions to defendant's motion to dismiss, which language in the
> Amended Cooperation Agreement allegedly did so. Instead, plaintiffs
> waited until the very end of oral argument to even remotely discuss for the
> first time their argument that their alleged indemnification agreement was
> created by the statement in Article III.B of the Amended Cooperation
> Agreement that "the Government in the name of the Public Sponsors,
> identify [sic] and provide [sic] just compensation to the owners of a
> compensable interest in the Private LERD."

Id. (alterations and capitalization in original).

Subsequently, on May 24, 2016, Lake Borgne and St. Bernard Parish moved for
summary judgment against the United States in both Lake Borgne Basin Levee District,
et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v.
United States, Case No. 15-518C. On June 24, 2016, the United States filed responses
to the plaintiffs' motions for summary judgment, agreeing that "[t]here are no remaining
issues precluding entry of judgment in favor of plaintiffs on their breach of contract claim
following this Court's decision on our motion to dismiss." (internal references omitted). On
July 8, 2016, the parties in both cases filed joint status reports agreeing that Lake Borgne
and St. Bernard Parish were "entitled to receive $4,423,753.87 as full and complete
satisfaction of any and all claims that have been made or could be made in the captioned
cases."

On July 12, 2016, the court issued an unreported Order granting Lake Borgne's
and St. Bernard Parish's motions for summary judgment in both Lake Borgne Basin Levee
District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government,
et al. v. United States, Case No. 15-518C. In the July 12, 2016 Order, the court stated:

> It is undisputed that defendant has failed to provide just compensation to
> the owners of the Private LERD at issue in the above-captioned cases,
> resulting in outstanding judgements [issued by the Louisiana State courts]
> against Lake Borgne and St. Bernard for takings in the Louisiana state court
> Borgnemouth and Olivier Plantation cases. By failing to compensate the
> landowners involved in the state court Olivier Plantation and Borgnemouth
> cases, defendant breached its obligations under Article III.B of the Amended
> [Lake Borgne] Cooperation agreement. Plaintiffs, therefore, are entitled to
> summary judgment with regard to their breach of contract claims in both of
> the above-captioned cases.

(internal reference omitted). On July 13, 2016, the Clerk of the Court of the United States
Court of Federal Claims entered judgment in favor of Lake Borgne and St. Bernard Parish,
which stated that Lake Borgne and St. Bernard Parish were to "recover of and from the
United States the amount of $1,655,380.83 as to Case No. 15-103C and $2,768,373.04

as to Case No. 15-518C."

On September 12, 2016, the United States filed a notice of appeal in both <u>Lake Borgne Basin Levee District, et al. v. United States</u>, Case No. 15-103C, and <u>St. Bernard Parish Government, et al. v. United States</u>, Case No. 15-518C. On October 11, 2016, the United States filed an unopposed motion to dismiss the appeals, which the United States Court of Appeals for the Federal Circuit granted.

**DISCUSSION**

<u>Standing</u>

In the case currently before the court, defendant argues that plaintiff lacks standing because St. Bernard Parish has not pled that it paid the Louisiana State Trial court judgments and, in the January 20, 2017 Joint and Reciprocal Agreement, Ms. Juan and Ms. Pizani "expressly 'agree[d] not to execute against St. Bernard' and 'to suspend and forego all collection rights.'" (alteration in original) (quoting the Joint and Reciprocal Agreement). Defendant asserts that "St. Bernard had not suffered an injury in fact as of its commencement of this action and is without the standing required to bring this action." According to defendant:

> The problem is not that St. Bernard has agreed to pay any recovery from this action to the Pizanis pursuant to the Joint and Reciprocal Agreement— it is that St. Bernard has not suffered an injury in fact because it had not paid the state court judgment when it filed this action and will not pay the state court judgment under the Joint and Reciprocal Agreement.

Quoting <u>Paradise Creations, Inc. v. UV Sales, Inc.</u>, 315 F.3d 1304, 1310 (Fed. Cir. 2003), defendant argues that "the lack of a cognizable injury is 'a defect in standing [that] cannot be cured after the inception of the lawsuit.'" (alteration in original).

Plaintiff contends that "[t]his court has found constitutional standing in several cases similar to this one, in which the Plaintiff brought an action against the Government seeking a sum of money that would be passed on to a third party." Plaintiff also argues that it has standing and "has been injured because the Government failed to make a payment to a third party it contractually agreed to make." Plaintiff alleges that "it has been cast in judgment for an amount the Government agreed to pay by virtue of the Amended Cooperation Agreement." In plaintiff's opposition to defendant's motion to dismiss, plaintiff did not address whether standing must be determined at the time of the original complaint or whether a defect in standing subsequently can be "cured." At the oral argument, however, plaintiff argued that "I have never heard of that [standing] as something that could not be cured even if it was a problem through amendment."

Additionally, in plaintiff's opposition to defendant's motion to dismiss, plaintiff asserts that "the Landowners have recorded their judgments in the St. Bernard Parish Mortgage Office," which plaintiff asserts "could have a negative impact on St. Bernard's

credit rating, its ability to borrow money, and the interest rate it has to pay to take out a loan." Defendant, however, notes that Ms. Juan and Ms. Pizani did not record the judgments until May 8, 2017, which occurred after plaintiff's supplemental complaint was filed on April 28, 2017, and defendant argues that the recordation of the judgments is "neither concrete and particularized nor actual and imminent, and therefore cannot support standing."

"Standing is 'a threshold inquiry that in no way depends on the merits of the case.'" Reoforce, Inc. v. United States, 853 F.3d 1249, 1264 (Fed. Cir.) (quoting Izumi Seimitsu Kogyo Kabushiki Kaisha v. U.S. Philips Corp., 510 U.S. 27, 31 (1993) (per curiam)), cert. denied, 138 S. Ct. 517 (2017); see also Starr Int'l Co., Inc. v. United States, 856 F.3d 953, 963 (Fed. Cir. 2017) (citation omitted), cert. denied, 138 S. Ct. 1324 (2018); Phigenix, Inc. v. Immunogen, Inc., 845 F.3d 1168, 1173 (Fed. Cir. 2017) (citing Massachusetts v. Envtl. Prot. Agency, 549 U.S. 497, 505 (2007)); Canadian Lumber Trade All. v. United States, 517 F.3d 1319, 1330 (Fed. Cir.), cert. denied, 555 U.S. 819 (2008); Sicom Sys., Ltd. v. Agilent Techs., Inc., 427 F.3d 971, 975 (Fed. Cir. 2005) ("Standing to sue is a threshold requirement in every federal action."); Myers Investigative and Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102-04 (1998)). The United States Court of Federal Claims, an Article I tribunal, applies the same standing requirements as other federal tribunals created under Article III of the United States Constitution. See Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (quoting Anderson v. United States, 344 F.3d 1343, 1350 n.1 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003)); see also Starr Int'l Co., Inc. v. United States, 856 F.3d at 964 (citation omitted); Tinton Falls Lodging Realty, LLC v. United States, 800 F.3d 1353, 1364 n.4 (Fed. Cir. 2015) (citation omitted); Abou-el-Seoud v. United States, 136 Fed. Cl. 537, 555 (2018) ("The standing requirements, derived from Article III of the United States Constitution, also apply to the United States Court of Federal Claims." (citing Anderson v. United States, 344 F.3d at 1350 n.1)); Square One Armoring Serv., Inc. v. United States, 123 Fed. Cl. 309, 321 (2015) ("Although the Court of Federal Claims is not an Article III court, it is well-established that various justiciability doctrines of Article III apply to this court." (citations omitted)).

The United States Supreme Court has stated that, in order to establish standing, a plaintiff

> must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and 3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-561 (1992)); see also Lexmark Int'l, Inc. v. Static Control Components, Inc., 134 S. Ct. 1377, 1386 (2014) ("The plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in

fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." (quoting Lujan v. Defs. of Wildlife, 504 U.S. at 560)); Reoforce, Inc. v. United States, 853 F.3d at 1263 (quoting Steel Co. v. Citizens for a Better Env't, 523 U.S. at 103); Apotex, Inc. v. Daiichi Sankyo, Inc., 781 F.3d 1356, 1362 (Fed. Cir.) (citation omitted), cert. denied, 136 S. Ct. 481 (2015); Consumer Watchdog v. Wis. Alumni Research Found., 753 F.3d 1258, 1260-61 (Fed. Cir. 2014) (citations omitted), cert. denied, 135 S. Ct. 1401 (2015). "The party invoking federal jurisdiction bears the burden of establishing these elements." Lujan v. Defs. of Wildlife, 504 U.S. at 561 (citing FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990); and Warth v. Seldin, 422 U.S. 490, 508 (1975)); see also Madstad Eng'g, Inc. v. U.S. Patent & Trademark Office, 756 F.3d 1366, 1371 (Fed. Cir. 2014) (citing Lujan v. Defs. of Wildlife, 504 U.S. at 561), cert. denied, 135 S. Ct. 1398 (2015); Sicom Sys., Ltd. v. Agilent Techs., Inc., 427 F.3d 971, 976 (Fed. Cir. 2005) ("The party bringing the action bears the burden of establishing that it has standing." (citation omitted)).

Regarding defendant's argument that standing "cannot be cured after the inception of the lawsuit," defendant notes that, in Paradise Creations, Inc. v. UV Sales, Inc., which the court notes involved a patent infringement claim, the United States Court of Appeals for the Federal Circuit stated that "a defect in standing cannot be cured after the inception of the lawsuit." See Paradise Creations, Inc. v. UV Sales, Inc., 315 F.3d at 1310. The United States Court of Appeals for the Federal Circuit, however, specifically had stated earlier in the Opinion in Paradise Creations, Inc. v. UV Sales, Inc. that "this court has determined that in order to assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title to the patent *at the inception of the lawsuit*." Id. at 1309 (emphasis in original) (citing Lans v. Digital Equip. Corp., 252 F.3d 1320, 1328 (Fed. Cir. 2001); Enzo APA & Son, Inc. v. Geapag A.G., 134 F.3d 1090, 1092 (Fed. Cir. 1998); Jim Arnold Corp. v. Hydrotech Sys., Inc., 109 F.3d 1567, 1572 (Fed. Cir. 1997); and Gaia Techs., Inc. v. Reconversion Techs., Inc., 93 F.3d 774, 778 (Fed. Cir. 1996), amended on other grounds, 104 F.3d 1296 (Fed. Cir. 1996), withdrawing mandate in part, 104 F.3d 1298 (Fed. Cir.), reh'g denied and suggestion for reh'g en banc declined (Fed. Cir. 1997)). Indeed, regarding its patent jurisdiction, the United States Court of Appeals for the Federal Circuit has indicated that:

> In the area of patent infringement, this court has held that if the original plaintiff lacked Article III initial standing, the suit must be dismissed, and the jurisdictional defect cannot be cured by the addition of a party with standing, nor by the subsequent purchase of an interest in the patent in suit.

Schreiber Foods, Inc. v. Beatrice Cheese, Inc., 402 F.3d 1198, 1203 (Fed. Cir. 2005) (citations omitted); see also Alps S., LLC v. Ohio Willow Wood Co., 787 F.3d 1379, 1385 (Fed. Cir. 2015) ("The party asserting patent infringement is 'required to have legal title to the patents on the day it filed the complaint and that requirement can not be met retroactively.'" (quoting Abraxis Bioscience, Inc. v. Navinta LLC, 625 F.3d 1359, 1366 (Fed. Cir. 2010), reh'g and reh'g en banc denied, 672 F.3d 1239 (Fed. Cir.), cert. denied, 565 U.S. 825 (2011))), cert. denied, 136 S. Ct. 897 (2016).

In Gaia Technologies, Inc. v. Reconversion Technologies, Inc., which also involved patent and trademark claims, the United States Court of Appeals for the Federal Circuit stated:

If Gaia [which was the plaintiff in the District Court] can prove that it was the assignee of the Intellectual Property at the time the suit was filed, Gaia has standing to sue for patent infringement under 35 U.S.C. § 281 (1994) as a patentee, see 35 U.S.C. § 100(d) (1994) (noting that "patentee" includes those who are successors in title to the patentee), and for trademark infringement under 15 U.S.C. § 1114 as a registrant, see 15 U.S.C. § 1127 (1994) (noting that "registrant" embraces the legal assigns of the registrant). Absent ownership of the Intellectual Property, Gaia lacked standing to sue on the patent and trademark infringement claims.

Gaia Techs., Inc. v. Reconversion Techs., Inc., 93 F.3d at 777 (capitalization in original). The Federal Circuit further stated:

"As a general matter, parties should possess rights before seeking to have them vindicated in court. Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue. Parties could justify the premature initiation of an action by averring to the court that their standing through assignment is imminent. Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignments in order to expand their arsenal and the scope of litigation. Inevitably, delay and expense would be the order of the day."

Id. at 780 (quoting Procter & Gamble Co. v. Paragon Trade Brands, Inc., 917 F. Supp. 305, 310 (D. Del. 1995)). The Federal Circuit, therefore, articulated a reason for requiring standing at the inception of patent infringement and trademark infringement claims. See id.

Commentators have noted that "a special rule appears to exist in patent cases on the issue of standing. Namely, filing suit prior to obtaining sufficient rights in the patent to have standing results in dismissal . . . ." Timothy R. DeWitt & Tamara S. Klein, A Fatal Mistake: Lack of Standing at the Time of Filing A Patent Infringement Complaint Results in Dismissal with Prejudice, 27 AIPLA Q.J. 189, 216-17 (1999); see also Paul R. Gugliuzza, The Federal Circuit As A Federal Court, 54 WM. & MARY L. REV. 1791, 1844 (2013) (stating that the United States Court of Appeals for the Federal Circuit "gradually expanded the category of procedural issues 'unique' to patent law, applying its own law to the due process component of personal jurisdiction, the standard for injunctive relief, standing, and the meaning of 'prevailing party' under the Federal Rules of Civil Procedure" (footnotes omitted)). Moreover, the United States Court of Appeals for the Federal Circuit has stated that, "[b]efore a court may exercise jurisdiction over a patent

infringement action, it must be satisfied that, 'in addition to Article III standing, the plaintiff also possesse[s] standing as defined by § 281 of the Patent Act.'" Drone Techs., Inc. v. Parrot S.A., 838 F.3d 1283, 1292 (Fed. Cir. 2016) (second alteration in original) (quoting Alps S., LLC v. Ohio Willow Wood Co., 787 F.3d at 1382). Defendant, however, has not put forth any justification for extending the requirements articulated for standing in a patent infringement case to a non-patent case such as the above-captioned case.

Moreover, the United States Court of Appeals for the Federal Circuit has permitted parties to remedy jurisdictional defects with supplemental complaints in other situations not involving standing in a patent case. In Prasco, LLC v. Medicis Pharmaceutical Corp., which involved an appeal of a decision by the United States District Court for the Southern District of Ohio, the United States Court of Appeals for the Federal Circuit stated that "[t]his is a patent case concerning the scope of our jurisdiction over declaratory judgment actions." Prasco, LLC v. Medicis Pharm. Corp., 537 F.3d 1329, 1333 (Fed. Cir. 2008). Specifically, the Federal Circuit in Prasco, LLC v. Medicis Pharmaceutical Corp. stated that "[t]he only issue on appeal is whether the facts alleged in this case establish that there is a justiciable case or controversy within the meaning of the Declaratory Judgment Act and Article III of the Constitution." Id. at 1335. The United States Court of Appeals for the Federal Circuit stated that, "[a]s an initial matter," the parties disputed whether allegations in the appellant's "Amended Complaint that concern actions taken after the filing of the initial complaint can be used to establish subject matter jurisdiction." Id. at 1337. In Prasco, LLC, the United States Court of Appeals for the Federal Circuit stated:

> Because the Amended Complaint included allegations regarding events that happened after the first complaint, technically it is a supplemental complaint, not an "amended complaint." See Fed.R.Civ.P. 15(d)[14] (allowing a party to "serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented"); 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1504, at 184 ("Parties and courts occasionally confuse supplemental pleadings with amended pleadings and mislabeling is common. However, these misnomers are not of any significance and do not prevent the court from considering a motion to amend or supplement under the proper portion of Rule 15.").

> Rule 15(d) expressly allows for supplemental complaints to "cure" defects in the initial complaint. Fed.R.Civ.P. 15(d) ("Permission [to serve a supplemental pleading] may be granted even though the original pleading is defective in its statement of a claim for relief or defense."). The Supreme Court has confirmed that supplemental pleadings can be used to cure subject matter jurisdiction deficiencies. See Mathews v. Diaz, 426 U.S. 67, 75, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) (explaining that there was "little

---

[14] The language in Rule 15(d) of the Federal Rules of Civil Procedure is identical to the language in RCFC 15(d) (2018).

difficulty" in a party's failure to file an application that was a "nonwaivable condition of jurisdiction" until after he was joined in the action because "[a] supplemental complaint in the District Court would have eliminated this jurisdictional issue"); see also 6A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1505, at 191 (explaining that, prior to the 1963 amendment to Rule 15(d), some courts had not allowed curing of defects through supplemental complaints, but that the addition of the second sentence to 15(d) in 1963 removed "any uncertainty on the point").

Thus, while "[l]ater events may not create jurisdiction where none existed at the time of filing," the proper focus in determining jurisdiction are "the facts existing at the time the complaint *under consideration* was filed." GAF Bldg. Materials Corp. v. Elk Corp., 90 F.3d 479, 483 (Fed. Cir. 1996) (emphasis added) (quoting Arrowhead Indus. Water, Inc. v. Ecolochem Inc., 846 F.2d 731, 734 n.2 (Fed. Cir. 1988)); see also Rockwell Int'l Corp. v. United States, 549 U.S. 457, 127 S.Ct. 1397, 1409, 167 L.Ed.2d 190 (2007) ("[W]hen a plaintiff files a complaint in federal court and then voluntarily amends the complaint, courts look to the amended complaint to determine jurisdiction."); Connectu LLC v. Zuckerberg, 522 F.3d 82 (1st Cir. 2008). As the district court accepted Prasco's Amended Complaint, it is the Amended Complaint that is currently under consideration, and it is the facts alleged in this complaint that form the basis for our review.

Id. (alterations, except for the first alteration, and emphasis in original); see also Rockwell Int'l Corp. v. United States, 549 U.S. at 473-74; Black v. Sec'y of Health & Human Servs., 93 F.3d 781, 790 (Fed. Cir. 1996) ("[D]efects in a plaintiff's case—even jurisdictional defects—can be cured while the case is pending if the plaintiff obtains leave to file a supplemental pleading under Rule 15(d) reciting post-filing events that have remedied the defect." (citations omitted)).

In a footnote in Prasco, LLC, the United States Court of Appeals for the Federal Circuit stated that "[i]t is Rule 15(d), not Rule 15(a), that governs supplemental complaints, even if the complaint is mislabeled as an amended complaint." Prasco, LLC v. Medicis Pharm. Corp., 537 F.3d at 1337 n.5; see also Idaho Power Co. v. United States, 105 Fed. Cl. 141, 146 n.4 (2012) (citation omitted); Petro-Hunt, L.L.C. v. United States, 105 Fed. Cl. 37, 44 (2012) (Allegra, J.) ("Because these events occurred after the filing of plaintiff's original complaint . . . it must be viewed not as an amended complaint under RCFC 15(c), but rather as a supplemental complaint under RCFC 15(d)."), aff'd, 862 F.3d 1370 (Fed. Cir. 2017), cert. denied, 138 S. Ct. 1989 (2018); Cent. Pines Land Co. v. United States, 99 Fed. Cl. 394, 403 (2011) ("[T]he court finds that although the plaintiffs styled the January 6, 2003 as a "First Amended and Restated Complaint," because this complaint contains additional allegations concerning events that occurred after the plaintiffs filed their initial complaint . . . the 2003 complaint is a de facto supplemental complaint." (citing RCFC 15(d))), aff'd, 697 F.3d 1360 (Fed. Cir. 2012).

In <u>Northstar Financial Advisors Inc. v. Schwab Investments</u>, in an appeal from the United States District Court for the Northern District of California, the United States Court of Appeals for the Ninth Circuit considered whether standing could be established after the original complaint was filed. <u>See</u> <u>Northstar Fin. Advisors Inc. v. Schwab Invs.</u>, 779 F.3d 1036, 1043 (9th Cir.), <u>amended</u> <u>on denial of reh'g and reh'g en banc</u> (9th Cir. 2015). The plaintiff, Northstar Financial Advisors, Inc. (Northstar), filed a class action complaint on behalf of a Schwab Total Bond Market Fund (the Fund). <u>See</u> <u>id.</u> At the time Northstar filed its complaint, Northstar did not own any shares in the Fund. <u>See</u> <u>id.</u> The United States Court of Appeals for the Ninth Circuit stated that the District Court judge "dismissed Northstar's complaint for lack of standing with a suggestion that this defect could be cured by filing an amended complaint." <u>Id.</u> (emphasis in original) (citation omitted).

Subsequently, Northstar obtained an assignment of a claim from a client-shareholder of the Fund and filed an "amended complaint," which the United States District Court for the Northern District of California treated as a supplemental complaint. <u>See</u> <u>id.</u> The United States Court of Appeals for the Ninth Circuit stated:

> Rule 15(d) permits a supplemental pleading to correct a defective complaint and circumvents "the needless formality and expense of instituting a new action when events occurring after the original filing indicated a right to relief." Wright, Miller, & Kane, Federal Practice and Procedure: Civil 3d § 1505, pgs. 262-63. Moreover, "[e]ven though [Rule 15(d) ] [sic] is phrased in terms of correcting a deficient statement of 'claim' or a 'defense,' a lack of subject-matter jurisdiction should be treated like any other defect for purposes of defining the proper scope of supplemental pleading." <u>Id.</u> at § 1507, pg. 273.

<u>Northstar Fin. Advisors Inc. v. Schwab Invs.</u>, 779 F.3d at 1044 (first and second alteration in original). The United States Court of Appeals for the Ninth Circuit determined that the Judge in United States District Court for the Northern District of California "did not abuse her discretion in permitting Northstar to file a supplemental pleading after a post-complaint assignment from a party that clearly had standing," and that, "by filing a supplemental pleading alleging a post-complaint assignment from a party that clearly had standing, Northstar has standing to prosecute this case." <u>Id.</u> at 1048, 1065. Moreover, other courts have determined that the court should look to the complaint currently under consideration when determining jurisdictional standing. <u>See</u> <u>G&E Real Estate, Inc. v. Avison Young-Washington, D.C., LLC</u>, 168 F. Supp. 3d 147, 160 (D.D.C.) ("[S]tanding may be assessed by the timing of the filing of the operative complaint in an action—whether the original complaint or a supplemental or amended complaint."), <u>recons. denied</u>, 201 F. Supp. 3d 50 (D.D.C. 2016); <u>see also</u> <u>Travelers Ins. Co. v. 633 Third Assocs.</u>, 973 F.2d 82, 88 (2d Cir. 1992) (permitting a plaintiff to file a supplemental complaint and stating that "[i]f the complaint as amended alleges sufficient facts to support the requisite injury . . . plaintiff will have established standing to sue"); <u>Perry v. Vill. of Arlington Heights</u>, 180 F.R.D. 334, 337 (N.D. Ill. 1998) ("Among other things, a supplemental complaint may correct deficiencies such as lack of standing." (citing <u>West v. Sullivan</u>, 1990 WL 107862, at *3

(E.D. Pa. July 26, 1990))), aff'd, 186 F.3d 826 (7th Cir. 1999).[15]

In the above-captioned case currently under consideration, on September 25, 2015, plaintiff St. Bernard Parish filed its initial complaint, in which plaintiff stated that Ms. Pizani's and Ms. Juan's lawsuit was pending before the Louisiana State Trial court. On April 28, 2017, plaintiff filed a "MOTION FOR LEAVE TO FILE FIRST SUPPLEMENTAL AND AMENDING COMPLAINT" pursuant to RCFC 15, which the court granted, and filed its "FIRST SUPPLEMENTAL AND AMENDING COMPLAINT." (capitalization in original). In plaintiff's filing identified as its First Supplemental and Amending Complaint, plaintiff stated that the Louisiana State Trial court had issued a judgment against plaintiff in December 2016 and an amended judgment against plaintiff in January 2017, both of which occurred after plaintiff had filed its original complaint in this court on September 25, 2015. Although plaintiff did not indicate under which subsection of RCFC 15 plaintiff was filing its April 28, 2017 submission, because plaintiff labeled its April 28, 2017 filing as a "FIRST SUPPLEMENTAL AND AMENDING COMPLAINT" and because the filing set out a "transaction, occurrence, or event that happened after the date of the pleading to be supplemented," plaintiff's April 28, 2017 filing will be treated by this court as a supplemental complaint under RCFC 15(d).[16] (capitalization in original).

---

[15] In defendant's motion to dismiss, defendant cites to Rothe Development Corp. v. Department of Defense, 413 F.3d 1327 (Fed. Cir. 2005), in which the United States Court of Appeals for the Federal Circuit stated that "'standing is to be determined as of the commencement of suit.'" See id. at 1334 (quoting Lujan v. Defs. of Wildlife, 504 U.S. at 570 n.5) (citing Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. at 189-93; Paradise Creations, Inc. v. UV Sales, Inc., 315 F.3d at 1309; and Becker v. Fed. Election Comm'n, 230 F.3d 381, 386 n.3 (1st Cir. 2000)). In Rothe Development Corp. v. Department of Defense, however, the plaintiff had not filed a supplemental complaint. See Rothe Dev. Corp. v. Dep't of Def., 413 F.3d at 1334. In that case, the United States Court of Appeals for the Federal Circuit did not analyze whether a court should analyze a plaintiff's standing by examining the original complaint or a supplemental complaint under RCFC 15(d), and none of the cases cited by the Federal Circuit address whether a supplemental complaint could cure a defect in standing, if such a standing defect existed at the time the original complaint was filed. See Rothe Dev. Corp. v. Dep't of Def., 413 F.3d at 1334.

[16] The relevant portion of RCFC 15(d) states:

> On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense.

RCFC 15(d).

Liability under the Joint and Reciprocal Agreement

In plaintiff's supplemental complaint in this court, plaintiff states that the Louisiana State Trial court entered judgment and entered an amended judgment against plaintiff in favor of Ms. Juan and Ms. Pizani. Defendant, however, asserts that, under the terms of the January 20, 2017 Joint and Reciprocal Agreement, Ms. Juan and Ms. Pizani cannot enforce the December 20, 2016 judgment and January 18, 2017 amended judgment against St. Bernard Parish even if St. Bernard Parish is "unsuccessful" in the above-captioned case. According to defendant, in the Joint and Reciprocal Agreement, Ms. Juan and Ms. Pizani "agreed that they would take action against St. Bernard if and only if 'St. Bernard collects funds from the United States in payment of the Judgement and fails to pay the funds to Plaintiffs within 60 days of receipt.'" (quoting the Joint and Reciprocal Agreement). According to defendant, this court should not consider the August 15, 2018 Addendum to the Joint and Reciprocal Agreement because the Addendum was not timely presented and is extrinsic evidence that may not be used to interpret the terms of an unambiguous contract. Defendant argues that the Addendum "flatly contradicts the plain text of the Joint and Reciprocal Agreement by providing that the Pizanis' recovery from St. Bernard would *not* be limited to what St. Bernard recovers from the United States in this action." (emphasis in original).

Plaintiff, however, asserts that St. Bernard Parish would remain liable to Ms. Juan and Ms. Pizani for the December 20, 2016 judgment and January 18, 2017 amended judgment "in the event SBPG was unsuccessful in recovering the compensation owed by the United States." According to plaintiff:

> While the parties believed that this was clear from the Agreement, out of an abundance of caution and to confirm their intent they have drafted and executed the attached Addendum [signed by Ms. Juan, Ms. Pizani, and St. Bernard Parish Government] so as to avoid any ambiguity.
>
> The United States will likely attempt to ascribe ambiguity to the third sentence of the third full paragraph of the Agreement, which states: "Plaintiffs agree not to execute against St. Bernard unless St. Bernard collects funds from the United States in payment of the Judgement and fails to pay the funds to Plaintiffs within 60 days of receipt." However, this attempt would be misplaced. The language of the third full paragraph is intended to be read sequentially, such that each sentence makes reference to the preceding sentence(s) and should be read in that context. Accordingly, the intent of this sentence was to cover the post-settlement or post-final judgment period of the collection proceedings against the United States. This sentence was a necessary compromise between the parties as St. Bernard was concerned about delays in appropriations from the United States to fund a final judgment after finality of the collection proceedings, while Plaintiffs wanted a definitive and fixed period of time for St. Bernard to pay Plaintiffs' Judgement once St. Bernard received sums from the United States --- whether by settlement or payment of a final judgment.

Under Louisiana State law,[17] Louisiana State courts apply the general contract interpretation rules contained in the articles of the Louisiana Civil Code. See Landis Constr. Co. v. St. Bernard Par., 151 So. 3d 959, 962 (La. Ct. App. 2014), writ denied, 159 So. 3d 467 (La. 2015); see also Bartlett Constr. Co. v. St. Bernard Par. Council, 763 So. 2d 94, 98 (La. Ct. App.), writ denied, 773 So. 2d 142 (La. 2000). Under article 2045 of the Louisiana Civil Code, a court must attempt to ascertain the common intention of the parties executing the contract at issue. See La. Civ. Code art. 2045 (2019); see also Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC, 112 So. 3d 187, 192 (La. 2013) ("'Contracts have the effect of law for the parties' and the '[i]nterpretation of a contract is the determination of the common intent of the parties.'" (alteration in original) (quoting Marin v. Exxon Mobil Corp., 48 So. 3d 234, 258 (La. 2010))). The common intent of the parties is to be determined "in accordance with the general, ordinary, plain and popular meaning of the words used in the contract." Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC, 112 So. 3d at 192 (citing Prejean v. Guillory, 38 So. 3d 274, 279 (La.), reh'g denied, 45 So. 3d 1035 (La. 2010)). "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ. Code art. 2046 (2019); see also Prejean v. Guillory, 38 So. 3d at 279 (quoting La. Civ. Code art. 2046); Hoffman v. Travelers Indem. Co. of Am., 144 So. 3d 993, 998 (La. Ct. App. 2014). As such, under Louisiana State law, contracts "are

---

[17] The United States Court of Appeals for the Federal Circuit has looked to State contract law when analyzing a contract between parties other than the United States. See Grav v. United States, 886 F.2d 1305, 1308 (Fed. Cir.) (analyzing a contract between two private parties for the sale of seven milk cows under South Dakota State contract law), reh'g denied and suggestion for reh'g en banc declined (Fed. Cir. 1989); see also Verinata Health, Inc. v. Ariosa Diagnostics, Inc., 830 F.3d 1335, 1338 (Fed. Cir. 2016) (stating that arbitration agreements between private parties are "governed by state contract law, except to the extent state law is displaced by federal substantive law regarding arbitration" (internal quotation marks and citation omitted)). Plaintiff has not indicated under which State law it believes the court should analyze the Joint and Reciprocal Agreement and the Addendum, but defendant has argued that, "[w]hile Federal law governs the Cooperation Agreement between the Government and St. Bernard, the Joint and Reciprocal Agreement between St. Bernard and the Pizanis is presumably governed by Louisiana state law." (citation and internal references omitted).

The Joint and Reciprocal Agreement and the Addendum were executed in Chalmette, Louisiana. Under Louisiana State law, a contract "is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue." La. Civ. Code art. 3537 (2018). Because both documents were executed in Chalmette, Louisiana, by Ms. Juan and Ms. Pizani as the owners of the impacted land located in Louisiana, and St. Bernard Parish, Louisiana; the documents involve LERD taken in Louisiana; and that previous relevant judicial proceedings have taken place in the Louisiana State Trial court and the Eastern District of Louisiana federal court, Louisiana law seems to be the appropriate law to reference as the applicable law in this Opinion despite plaintiff's silence on the issue.

to be interpreted as a matter of law, and the use of extrinsic evidence is proper only where a contract is ambiguous after examination of the four corners of the agreement." See Bartlett Constr. Co. v. St. Bernard Par. Council, 763 So. 2d at 98; see also BRP LLC (Del.) v. MC La. Minerals LLC, 196 So. 3d 37, 48 (La. Ct. App. 2016) ("Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract, unless the written expression of the common intention of the parties is ambiguous." (citing Miller v. Miller, 1 So. 3d 815 (La. Ct. App. 2009))).

Under Louisiana State law, a contract is ambiguous when "its written terms are susceptible to more than one interpretation, there is uncertainty as to its provisions, or the parties' intent cannot be ascertained from the language used." Leftwich v. New Orleans Weddings Magazine, 165 So. 3d 916, 921 (La. Ct. App. 2014) (citing First Bank and Trust v. Redman Gaming of La., Inc., 131 So. 3d 224, 228-29 (La. Ct. App. 2013)). A contract also is considered to be ambiguous on the issue of intent when the contract "'lacks a provision bearing on that issue.'" See Landis Constr. Co. v. St. Bernard Par., 151 So. 3d at 963 (quoting Campbell v. Mellon, 817 So. 2d 69, 75 (La. 2002)); see also Kennedy v. Saheid, 209 So. 3d 985, 991 (La. Ct. App. 2016) ("A contract is deemed ambiguous on the issue of intent when either it lacks a provision bearing on that issue, the terms of the contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language used." (citations omitted)), writ denied, 215 So. 3d 681 (La. 2017).

In the above-captioned case, the pertinent portion of the Joint and Reciprocal Agreement provides:

> Owing to the risks, benefits, and vicissitudes of further litigation, Plaintiffs and St. Bernard hereby mutually agree to immediately cease all adverse action between and against each other in *Alfreda Melerine Pizani and Avis Melerine Juan vs. St. Bernard Parish, et al* [sic], 34th Judicial District Court, # 109-548 Div. E, waiving all appellate rights in Louisiana state courts. It is the mutual intent of the parties to this Joint and Reciprocal Agreement that the Judgement signed December 20, 2016 in the above captioned matter (as amended) become final and executory for purposes of immediate executory and collection proceedings in the United States Court of Federal Claims, or other necessary forum, to resolve this very old case for both parties.

> In consideration for the reciprocal agreements set forth herein, Plaintiffs agree to suspend and forego all collection rights against St. Bernard regarding the Judgement provided that St. Bernard pursues indemnification for payment of the Judgement (as amended) in the United States Court of Federal Claims in Case No. 15-1072C and for a period of 60 days past termination and finality of all such proceedings, including appeals, and also further agree to accept such amounts recovered in the United States Court of Federal Claims in Case No. 15-1072C (or such other proceedings as may be instituted for collection of the Judgement, as amended) in full satisfaction

of all sums owed to Plaintiffs by St. Bernard in the Judgement (as amended). Plaintiffs hereby further agree to execute a full Release and Satisfaction of the Judgement (as amended) in favor of St. Bernard within 30 days of receipt of all sums recovered from the United States in the United States Court of Federal Claims (or such other proceedings as may be instituted for collection of the Judgement, as amended), or upon receipt of all sums received from settlement agreed to by all parties, whichever comes first. Plaintiffs agree not to execute against St. Bernard unless St. Bernard collects funds from the United States in payment of the Judgement and fails to pay the funds to Plaintiffs within 60 days of receipt. Nothing contained herein shall obligate St. Bernard to pay to Plaintiffs any sums awarded to St. Bernard and recovered from the United States which are solely and expressly attributable to attorney's fees incurred by St. Bernard's attorneys in representing St. Bernard Parish.

In consideration for the reciprocal agreements set forth herein, St. Bernard hereby agrees to immediately cease all actions in 34th Judicial District Court in the above captioned matter, and shall immediately formally notify the Court that it waives its prior request for Reasons for Judgement pursuant to La. C.C.P. art. 1917. St. Bernard further agrees to forthwith institute at its sole costs all proceedings necessary to obtain indemnification or payment from the United States for all sums due under the Judgement (as amended) including, but not limited to, Case No. 15-1072 C in the United States Court of Federal Claims. St. Bernard shall aggressively pursue all such actions to finality, including all appeals, unless a settlement satisfactory to both Plaintiffs is reached before finality of the proceedings.

(emphasis in original).

Under the terms of the Joint and Reciprocal Agreement, Ms. Juan and Ms. Pizani indicated that the Louisiana State court proceedings between St. Bernard Parish, Ms. Juan, and Ms. Pizani would cease so that December 20, 2016 judgment and January 18, 2017 amended judgment would become final so that St. Bernard Parish could pursue collection proceeding against the United States in the United States Court of Federal Claims to be paid to Ms. Juan and Ms. Pizani "within 60 days of receipt." Although the terms of the Joint and Reciprocal Agreement is explicit regarding the rights of Ms. Juan and Ms. Pizani if St. Bernard Parish recovers funds from the United States, the Joint and Reciprocal Agreement is less than clear as to the parties' obligations and relationship in the event that St. Bernard Parish does not recover funds from the United States partial or full funds related to the December 20, 2016 judgment and January 18, 2017 amended judgment in the case in this court, or in another possible court proceeding. The Joint and Reciprocal Agreement primarily addresses cessation of the Louisiana State Trial court proceedings between St. Bernard Parish and Ms. Juan and Ms. Pizani in order for St. Bernard to pursue "immediate executory and collection proceedings in the United States Court of Federal Claims, or other necessary forum." Ms. Juan and Ms. Pizani also indicated they will "agree to execute a full Release and Satisfaction of the Judgement (as

amended) in favor of St. Bernard within 30 days of receipt of all sums recovered from the United States in the United States Court of Federal Claims (or such other proceedings as may be instituted for collection of the Judgement, as amended)." The Joint and Reciprocal Agreement does not contain a provision indicating that Ms. Juan and Ms. Pizani will execute a "full Release and Satisfaction" in exchange for St. Bernard Parish filing a complaint in the United States Court of Federal Claims seeking damages equal to the December 20, 2016 judgment and the January 18, 2017 amended judgment issued by the Louisiana State Trial court against St. Bernard Parish, regardless of whether St. Bernard Parish recovers funds from the United States in the United States Court of Federal Claims. (capitalization in original). The Joint and Reciprocal Agreement also indicates that, if St. Bernard Parish does not recover funds from the United States in the United States Court of Federal Claims, St. Bernard Parish may institute proceeding in an "other necessary forum" in an attempt to recover funds from the United States related to the December 20, 2016 judgment and January 18, 2017 amended judgment issued by the Louisiana State Trial court. The lack of a provision addressing a possible situation in which St. Bernard Parish does not recover funds from the United States creates an ambiguity as to whether Ms. Juan and Ms. Pizani may then enforce the December 20, 2016 judgment and January 18, 2017 amended judgment against St. Bernard Parish.

Moreover, based on the language of the Joint and Reciprocal Agreement, it appears that Ms. Juan, Ms. Pizani, and St. Bernard Parish entered into the Joint and Reciprocal Agreement under the shared anticipation that St. Bernard should be able to recover monies in the above-captioned case. The Joint and Reciprocal Agreement states that "[i]t is the mutual intent of the parties" that the parties to the Agreement cease litigation before the Louisiana State Trial court in order for the December 20, 2016 judgment and January 18, 2017 amended judgment to "become final and executory for purposes of immediate executory and collection proceedings in the United States Court of Federal Claims," but left it more vague, unclear, and open-ended as to the outcome if no such recovery occurred. St. Bernard Parish agreed to pursue "indemnification for payment of the Judgement (as amended) in the United States Court of Federal Claims in Case No. 15-1072C" and to "forthwith institute at its sole costs all proceedings necessary to obtain indemnification or payment from the United States for all sums due under the Judgement (as amended) including, but not limited to, Case No. 15-1072 C in the United States Court of Federal Claims." In exchange for St. Bernard Parish's pursuit of "all sums due under the Judgement (as amended)," Ms. Juan and Ms. Pizani agreed to accept "such amounts recovered" and "all sums recovered," or, alternatively, "all sums received from settlement agreed to by all parties." That the parties entered into the Joint and Reciprocal Agreement under the shared belief that St. Bernard Parish could prevail in the above-captioned case is further reinforced by the statement in the Joint and Reciprocal Agreement that St. Bernard Parish was not obligated to pay Ms. Juan and Ms. Pizani any "attorney's fees incurred by St. Bernard's attorneys in representing St. Bernard Parish" in the the above-captioned case.[18]

---

[18] St. Bernard Parish's recovery of funds in <u>Lake Borgne Basin Levee District, et al. v. United States</u>, Case No. 15-103C, and <u>St. Bernard Parish Government, et al. v. United States</u>, Case No. 15-518C, in which St. Bernard Parish and Lake Borgne had recovered

At the oral argument in the above-captioned case in this court, counsel of record for plaintiff stated that it was the mutual intent of counsel for Ms. Juan and Ms. Pizani and an attorney representing St. Bernard Parish, who signed the Joint and Reciprocal Agreement, that the Joint and Reciprocal Agreement be "a holding position. The Pizanis' counsel agreed not to go after the parish and try and collect against them while this [the above-captioned case] was pending." According to counsel of record for plaintiff at the oral argument, if the court "were to order zero [recovery], we're [St. Bernard Parish] going to be turned around and faced with a $4 1/2 million judgment. We don't get to walk away." Beyond citing to the Joint and Reciprocal Agreement and Addendum thereto, neither plaintiff nor defendant has submitted any other extrinsic evidence that is relevant to the issue of the parties' intent if St. Bernard Parish was unable to recover funds from the United States in the above-captioned case.

The Addendum to the Joint and Reciprocal Agreement states that "[i]t is the mutual intent of the parties that this Addendum serve to clarify the intent of the original" Joint and Reciprocal Agreement. The Addendum states:

On January 20, 2017, Alfreda Melerine Pizani and Avis Merlerine Juan (the "Landowners") and St. Bernard Parish Government ("SBPG") executed a Joint and Reciprocal Agreement regarding the judgement and amended judgement rendered by the 34th Judicial District Court for the Parish of St. Bernard in civil case number 109-548 entitled *Alfreda Melerine Pizani and Avis Melerine Juan vs. St. Bernard Parish, et al* [sic] (the "Judgement"). It is the
mutual intent of the parties that this Addendum serve to clarify the intent of the original Agreement regarding the following particulars:

1.  The Landowners agree to suspend and forego all collection rights and efforts against SBPG for the Judgement while SBPG pursues collection of the funds owed by the United States for the removal of borrow material on the Landowners' property, and for a period of sixty (60) days subsequent to the termination of all proceedings instituted by SBPG; and

2.  SBPG agrees to pursue payment of the funds owed by the United States for the removal of borrow material on the Landowners' property, in any and all available forums, including the Federal Court of Claims [sic]; and

3.  The Landowners agree to accept such amounts recovered by SBPG from the United States in full satisfaction of the Judgement; and

4.  Should SBPG be unsuccessful in collecting any funds in the Court of

---

damages of $1,655.380.03 and $2,768,373.04, respectively, also has been cited by the plaintiff in the current proceeding as distinctly similar to the above-captioned case currently under review.

Claims [sic], the Landowners shall be entitled to collect the value of the Judgement from SBPG; and

5. SBPG shall not be required to pay Landowners any amounts recovered for attorneys [sic] fees awarded to SBPG for prosecuting any action in pursuit of the funds owed by the United States for the removal of borrow material on the Landowners' property.

6. The parties hereby stipulate that the contents of this Addendum represent the mutual intent of the parties in executing the Joint and Reciprocal Agreement dated January 20, 2017, and hereby desire this language be construed as though originally contained in the Joint and Reciprocal Agreement.[19]

For purposes of standing, regarding the issue of whether St. Bernard Parish potentially remains liable to Ms. Juan and Ms. Pizani even after the litigation in this court, the Addendum to the Joint and Reciprocal Agreement confirms the language in the Joint and Reciprocal Agreement. Regarding any potential ambiguity in the January 20, 2017 Joint and Reciprocal Agreement as to whether Ms. Juan and Ms. Pizani can enforce the December 20, 2016 judgment and January 18, 2017 amended judgment against St. Bernard Parish if St. Bernard Parish does not recover funds to cover the State court judgments, under Louisiana State law, the court may consider extrinsic evidence, such as the proffered Addendum. See Hulshoff v. Hulshoff, 81 So. 3d 57, 62 (La. Ct. App. 2011) ("[W]here the terms of the agreement are unclear, the court may consider extrinsic evidence to explain the terms of the agreement and to determine the parties' intent." (citation omitted)); see also Trent v. PPG Indus., Inc., 865 So. 2d 1041, 1048 (La. Ct. App. 2004) (analyzing an addendum to a contract when there was evidence in the record indicating that "the addendum adding the statutory employer provisions to the contract between the parties was meant to be part of the contract and reflected the true intent of the parties"). The Addendum to the Joint and Reciprocal Agreement indicates that Ms.

---

[19] Defendant argues that the court should not consider the Addendum because it was submitted after oral argument. The Addendum, however, was produced as part of a response to a court Order instructing the parties to submit supplemental briefs addressing "whether, under the terms of the Joint and Reciprocal Agreement, St. Bernard is liable to Ms. Pizani and Ms. Juan for the December 20, 2016 judgment and January 18, 2017 amended judgment" and "whether the December 20, 2016 judgment and January 18, 2017 amended judgment are enforceable against St. Bernard if St. Bernard's lawsuit in this court is unsuccessful." The Addendum is the only extrinsic evidence related to the intent of Ms. Juan, Ms. Pizani, and St. Bernard Parish when executing the Joint and Reciprocal Agreement currently before the court and is not contradicted by anything else in the record before the court. The court also notes that, if the above-captioned case were to proceed to trial or further motions for partial summary judgment, the court would be able to receive additional testimony and evidence concerning the intent of Ms. Juan, Ms. Pizani, and St. Bernard Parish when executing the Joint and Reciprocal Agreement.

Juan, Ms. Pizani, and St. Bernard Parish, when executing the Joint and Reciprocal Agreement, always intended for St. Bernard Parish to remain liable to Ms. Juan and Ms. Pizani in the event that St. Bernard Parish is unsuccessful in obtaining a recovery in this court in the above-captioned case. The Addendum is the only extrinsic evidence provided to the court on the issue of the intent of Ms. Juan, Ms. Pizani, and St. Bernard Parish when the parties entered the Joint and Reciprocal Agreement. The intent of Ms. Juan, Ms. Pizani, and St. Bernard Parish when entering the Joint and Reciprocal Agreement appears to have been that Ms. Juan and Ms. Pizani would be able to collect from St. Bernard Parish if plaintiff does not recover funds from the United States in the above-captioned case.

The Addendum does not change the words of the Joint and Reciprocal Agreement, alter the Agreement's "fundamental nature," or "make[] its terms nonsensical," as defendant contends. Under the terms of the Joint and Reciprocal Agreement, as well as the terms of the Addendum, if St. Bernard Parish recovers funds from the United States in the above-captioned case, Ms. Juan and Ms. Pizani will accept whatever funds are collected, not necessarily in the full amount of the Louisiana State court judgments, as a "full Release and Satisfaction of the" December 20, 2016 judgment and the January 18, 2017 amended judgment issued by the Louisiana State Trial court. If St. Bernard Parish does not recover funds from the United States in the above-captioned case, Ms. Juan and Ms. Pizani will retain the right to enforce the December 20, 2016 judgment and the January 18, 2017 amended judgment issued by the Louisiana State Trial court against St. Bernard Parish. Moreover, defendant has not submitted any evidence, extrinsic or otherwise, indicating that Ms. Juan, Ms. Pizani, and St. Bernard Parish intended that Ms. Juan and Ms. Pizani could not enforce or execute the December 20, 2016 Louisiana State Trial court judgment and January 18, 2017 Louisiana State Trial court amended judgment against St. Bernard Parish if St. Bernard Parish is unsuccessful in the above-captioned case in this court, or submitted any evidence which contradicts the statements in the Joint and Reciprocal Agreement or the Addendum.

The Joint and Reciprocal Agreement also does not constitute an accord and satisfaction, as defendant argues. In an accord and satisfaction, "a claim is discharged because some performance other than that which was claimed to be due is accepted as full satisfaction of the claim." Holland v. United States, 621 F.3d 1366, 1377 (Fed. Cir. 2010) (citing O'Connor v. United States, 308 F.3d 1233, 1240 (Fed. Cir. 2002)), reh'g and reh'g en banc denied, (Fed. Cir.), cert. denied, 565 U.S. 928 (2011). Louisiana State courts have stated that, under Louisiana State law, "the doctrine of accord and satisfaction is very much like the doctrine of compromise." See Hawthorne v. Barbier, 841 So. 2d 28, 29 (La. Ct. App. 2003) (citing McClelland v. Sec. Indus. Ins. Co., 426 So.2d 665 (La. Ct. App. 1982)). "A compromise is a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship." La. Civ. Code art. 3071 (2019); see also Maggio v. Parker, 250 So. 3d 874, 878 (La. 2018) (quoting La. Civ. Code art. 3071). In the Joint and Reciprocal Agreement, Ms. Juan and Ms. Pizani did not settle the dispute with St. Bernard Parish. The Joint and Reciprocal Agreement provides a mechanism to potentially resolve the dispute between Ms. Juan and Ms. Pizani and St. Bernard Parish if St.

Bernard Parish is successful in this court in the above-captioned case. The Joint and Reciprocal Agreement, at this time, however, has not settled the parties' dispute and St. Bernard Parish's potential remaining liability for the judgments entered by the Louisiana State Trial court, given the unresolved nature of the relationship between Ms. Juan, Ms. Pizani, and St. Bernard Parish if St. Bernard Parish does not recover funds from the United States in the above-captioned case.

Regarding plaintiff's standing in the above-captioned case, both counsel of record for plaintiff and counsel of record for defendant estimated the amount of the two judgments entered by the Louisiana State Trial court against St. Bernard Parish to be approximately $4,500,000.00 as of the date of the oral argument, with interest continuing to accrue thereafter. Under the terms of the Joint and Reciprocal Agreement, with the explanation of what originally was intended in the Joint and Reciprocal Agreement in the Addendum, St. Bernard Parish, Ms. Juan, and Ms. Pizani made clear that they may enforce the judgments against St. Bernard Parish if St. Bernard Parish is unsuccessful in the above-captioned case in this court. The judgments issued by the Louisiana State Trial court against St. Bernard Parish are based on defendant's alleged breach of the Amended Cooperation Agreement, as borrow material was removed in connection with performance under the Amended Cooperation Agreement. A decision favorable to plaintiff could, if successful, address the injury suffered by plaintiff, as plaintiff would no longer be liable to Ms. Juan and Ms. Pizani under the Joint and Reciprocal Agreement, provided plaintiff pays the funds to Ms. Juan and Ms. Pizani within sixty days of receipt of funds. Plaintiff has established an injury potentially traceable to defendant's alleged conduct that could be redressed with a favorable decision by this court and, therefore, has met its burden to establish standing in the above-captioned case.

<u>Defendant's Motion to Dismiss for Lack of Jurisdiction</u>

Defendant also has moved to dismiss plaintiff's complaint under RCFC 12(b)(1) for lack of subject matter jurisdiction. "Subject-matter jurisdiction may be challenged at any time by the parties or by the court <u>sua sponte</u>." <u>Folden v. United States</u>, 379 F.3d 1344, 1354 (Fed. Cir. 2004) (citing <u>Fanning, Phillips & Molnar v. West</u>, 160 F.3d 717, 720 (Fed. Cir. 1998)); <u>see also</u> <u>Int'l Elec. Tech. Corp. v. Hughes Aircraft Co.</u>, 476 F.3d 1329, 1330 (Fed. Cir. 2007). The Tucker Act, 28 U.S.C. § 1491 (2018), grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund

from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 289-90 (2009); see also United States v. Mitchell, 463 U.S. 206, 216 (1983); Alvarado Hosp., LLC v. Price, 868 F.3d 983, 991 (Fed. Cir. 2017); Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007); cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999). "Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States . . . ." United States v. Mitchell, 463 U.S. at 216; see also United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003); N.Y. & Presbyterian Hosp. v. United States, 881 F.3d 877, 881 (Fed. Cir. 2018); Smith v. United States, 709 F.3d 1114, 1116 (Fed. Cir.), cert. denied, 571 U.S. 945 (2013); RadioShack Corp. v. United States, 566 F.3d 1358, 1360 (Fed. Cir. 2009); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1343 (Fed. Cir. 2008) ("[P]laintiff must . . . identify a substantive source of law that creates the right to recovery of money damages against the United States."); Golden v. United States, 118 Fed. Cl. 764, 768 (2014). In Ontario Power Generation, Inc. v. United States, the United States Court of Appeals for the Federal Circuit identified three types of monetary claims for which jurisdiction is lodged in the United States Court of Federal Claims. The Ontario Power Generation, Inc. court wrote:

> The underlying monetary claims are of three types. . . . First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver. . . . Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." Eastport S.S. [Corp. v. United States, 178 Ct. Cl. 599, 605-06,] 372 F.2d [1002,] 1007-08 [(1967)] (describing illegal exaction claims as claims "in which 'the Government has the citizen's money in its pocket'" (quoting Clapp v. United States, 127 Ct. Cl. 505, 117 F. Supp. 576, 580 (1954)) . . . . Third, the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." Eastport S.S., 372 F.2d at 1007. Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Id.; see also [United States v. ]Testan, 424 U.S. [392,] 401-02 [1976] ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim-whether it be the Constitution, a statute, or a regulation-does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting Eastport S.S., 372 F.2d at 1009)). This category is commonly referred to as claims brought under a "money-mandating" statute.

Ont. Power Generation, Inc. v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004); see also Samish Indian Nation v. United States, 419 F.3d 1355, 1364 (Fed. Cir. 2005); Twp. of Saddle Brook v. United States, 104 Fed. Cl. 101, 106 (2012).

To prove that a statute or regulation is money-mandating, a plaintiff must demonstrate that an independent source of substantive law relied upon "'can fairly be interpreted as mandating compensation by the Federal Government.'" United States v. Navajo Nation, 556 U.S. at 290 (quoting United States v. Testan, 424 U.S. at 400); see also United States v. White Mountain Apache Tribe, 537 U.S. at 472; United States v. Mitchell, 463 U.S. at 217; Blueport Co., LLC v. United States, 533 F.3d 1374, 1383 (Fed. Cir. 2008), cert. denied, 555 U.S. 1153 (2009). The source of law granting monetary relief must be distinct from the Tucker Act itself. See United States v. Navajo Nation, 556 U.S. at 290 (The Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[] that operate[s] to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts)."). "'If the statute is not money-mandating, the Court of Federal Claims lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction.'" Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1308 (Fed. Cir. 2008) (quoting Greenlee Cnty., Ariz. v. United States, 487 F.3d at 876); see also N.Y. & Presbyterian Hosp. v. United States, 881 F.3d at 881; Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (noting that the absence of a money-mandating source is "fatal to the court's jurisdiction under the Tucker Act"); Price v. United States, 133 Fed. Cl. 128, 130 (2017); Peoples v. United States, 87 Fed. Cl. 553, 565-66 (2009).

When deciding a case based on a lack of subject matter jurisdiction or for failure to state a claim, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. See Erickson v. Pardus, 551 U.S. 87, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56 (2007) (citing Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508 n.1 (2002)))); see also Frankel v. United States, 842 F.3d 1246, 1249 (Fed. Cir. 2016) ("In deciding a motion to dismiss, a court is required to accept as true all factual allegations pleaded." (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009))); Fid. & Guar. Ins. Underwriters, Inc. v. United States, 805 F.3d 1082, 1084 (Fed. Cir. 2015); Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011).

"Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1 (1983)), reh'g denied (Fed. Cir. 1997); see also Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. 203, 208 (2011); Gonzalez-McCaulley Inv. Grp., Inc. v. United States, 93 Fed. Cl. 710, 713 (2010). A plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2) (2018); Fed. R. Civ. P. 8(a)(1), (2)

(2019); see also Ashcroft v. Iqbal, 556 U.S. at 677-78 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-57, 570). To properly state a claim for relief, "[c]onclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part) (quoting C. WRIGHT AND A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1286 (3d ed. 2004)); Briscoe v. LaHue, 663 F.2d 713, 723 (7th Cir. 1981) ("[C]onclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss."), aff'd, 460 U.S. 325 (1983). "A plaintiff's factual allegations must 'raise a right to relief above the speculative level' and cross 'the line from conceivable to plausible.'" Three S Consulting v. United States, 104 Fed. Cl. 510, 523 (2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555), aff'd, 562 F. App'x 964 (Fed. Cir.), reh'g denied (Fed. Cir. 2014). As stated in Ashcroft v. Iqbal, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' 550 U.S. at 555. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555).

Equitable Relief or Monetary Damages

Defendant asserts that this court "lacks jurisdiction to grant the equitable relief sought by St. Bernard: an order directing specific performance of the Cooperation Agreement by the Government." Defendant argues that "St. Bernard asks the Court to '[o]rder[] the United States to pay the judgment(s) issued in the Louisiana Court in favor of Ms. Pizani and Ms. Juan,'" which defendant contends is equitable relief that this court may not grant because St. Bernard is requesting "specific performance of the [Amended] Cooperation Agreement, not the recovery of money damages." (first and second alteration in original). Defendant asserts that plaintiff cannot "recast" its request for equitable relief as a request for money damages, and that plaintiff' supplemental "complaint makes clear that St. Bernard is asking the Court to order the Government to perform under the terms of the Cooperation Agreement by making payment directly to the Pizanis."

Plaintiff argues that, "[i]n reality, the nature of this action is St. Bernard seeking damages from the Government in an amount sufficient to provide and pass through to the landowners just compensation pursuant to the Amended Cooperation Agreement, just as this Court found in Olivier and Borgnemouth." Plaintiff asserts that it is seeking damages as a result of defendant's alleged breach of the Amended Cooperation Agreement. Plaintiff also asserts that, "had the Government fulfilled its obligations under the Amended Cooperation Agreement, St. Bernard would not have had to file this action." Furthermore, plaintiff contends that, "to the extent St. Bernard's petition seeks equitable relief, this Court has jurisdiction under the Tucker Act."

Subject to certain exceptions not present in the above-captioned case, the "jurisdiction of the Court of Federal Claims under the Tucker Act is 'limited to actual, presently due money damages from the United States.'" See Todd v. United States, 386 F.3d 1091, 1093 (Fed. Cir. 2004) (quoting United States v. Testan, 424 U.S. at 398); see

also Johnson v. United States, 105 Fed. Cl. 85, 94 (2012) ("Under the Tucker Act, the court's jurisdiction extends only to cases concerning actual, presently due money damages from the United States." (internal quotation marks and citation omitted)). "In addition, the Tucker Act gives this court limited jurisdiction to grant equitable and declaratory relief, but only when such relief is 'an incident of and collateral to' a money judgment." Estes v. United States, 123 Fed. Cl. 74, 81 (2015) (quoting 28 U.S.C. § 1491(a)(2)) (citing Bobula v. U.S. Dep't of Justice, 970 F.2d 854, 859 (Fed. Cir. 1992)); see also Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. Dep't of Homeland Sec., 490 F.3d 940, 943 n.3 (Fed. Cir. 2007) (quoting Bobula v. U.S. Dep't of Justice, 970 F.2d at 859);[20] Bobula v. U.S. Dep't of Justice, 970 F.2d at 859 ("While limited equitable relief is sometimes available in Tucker Act suits, the equitable relief must be incidental to and collateral to a claim for money damages." (citing 28 U.S.C. § 1491(a)(2))); Martinez v. United States, 77 Fed. Cl. 318, 322 (2007) (quoting 28 U.S.C. § 1491(a)(2)), aff'd, 260 F. App'x 298 (Fed. Cir. 2008). When determining the nature of the requested relief, "[w]hat matters is whether the request for relief is, on its face or in substance, a request for money damages as opposed to equitable relief." See Doe v. United States, 372 F.3d 1308, 1314 (Fed. Cir. 2004); see also Kanemoto v. Reno, 41 F.3d 641, 646 (Fed. Cir. 1994) ("'A party may not avoid the [Court of Federal Claims'] jurisdiction by framing an action against the federal government that appears to seek only equitable relief when the party's real effort is to obtain damages in excess of $10,000.'" (alteration in original) (quoting Marshall Leasing, Inc. v. United States, 893 F.2d 1096, 1099 (9th Cir. 1990))); Bevevino v. United States, 87 Fed. Cl. 397, 407 (2009) ("Although plaintiffs' prayer for relief may have been awkwardly phrased, their back pay claims are clearly within this court's jurisdiction." (citations omitted)). The court must determine "whether the true character of the plaintiffs' action" is for equitable relief or for money damages. See Doko Farms v. United States, 13 Cl. Ct. 48, 56 (1987); see also Katz v. Cisneros, 16 F.3d 1204, 1207 (Fed. Cir. 1994) (stating that the court is to examine the "true nature of the action in determining the existence or not of jurisdiction" (citing Livingston v. Derwinski, 959 F.2d 224, 225 (Fed. Cir. 1992))); Acetris Health, LLC v. United States, 138 Fed. Cl. 43, 57 ("[T]he court is mindful that 'in determining the existence or not of jurisdiction,' it must look beyond plaintiff's characterization of its claims and ascertain 'the true nature' of plaintiff's suit." (quoting Katz v. Cisneros, 16 F.3d at 1207)), appeal docketed, No. 18-2399 (Fed. Cir. Sept. 20, 2018).

In plaintiff's supplemental complaint, plaintiff:

[R]equests that this Court enforce the terms of the Amended Cooperation Agreement, by ordering the Corps to compensate Ms. Pizani and Ms. Juan for the losses, in the amounts set out by the Pizani Judgments, which are

---

[20] Gonzales & Gonzales Bonds & Insurance Agency, Inc. v. Department of Homeland Security involved the decision of a United States District Court to transfer a case to the United States Court of Federal Claims. See Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. Dep't of Homeland Sec., 490 F.3d at 945. Bobula v. United States Department of Justice involved a case arising under the Little Tucker Act, 28 U.S.C. § 1346(a)(2), in a United States District Court. See Bobula v. U.S. Dep't of Justice, 970 F.2d at 859.

attached as Exhibits A &B [sic] "in the name of the Public Sponsors," as provided in Article III.B and/or Article II.B.1 of the Amended Cooperation Agreement, as well as any principal, interest, attorney's fees and costs awarded by the Louisiana state court.

Plaintiff also alleges that defendant's "refusal to provide just compensation to the property owners under the terms of the Amended Cooperation Agreement [to which the Army Corps was a party], on behalf SBPG, constitutes a breach of the express and/or implied terms of the Amended Cooperation Agreement." Plaintiff asserts:

> Damages for breach of contract shall place the wronged party in as good a position as it would have been in had the breaching party fully performed its obligation. The Corps is required to compensate SBPG for all losses it has sustained as a result of the Corps's failure to meet its contractual obligation to compensate the affected landowner, including all attorney's fees, and costs SBPG expended in defending the Pizani Lawsuit brought by Ms. Pizani and Ms. Juan in Louisiana state court and in prosecuting this action.

In its prayer for relief, plaintiff requests that this court enter an order

> awarding damages as follows: (1) Ordering the United States to pay the judgment(s) issued in the Louisiana Court in favor of Ms. Pizani and Ms. Juan in satisfaction of any said judgments costs, and accumulating legal interest on the foregoing up to the date of payment, "in the name of the Public Sponsors" . . . .

Although plaintiff's supplemental complaint contains an awkward statement of the case, when it states that St. Bernard Parish is requesting "that this Court enforce the terms of the Amended Cooperation Agreement," the substance of plaintiff's supplemental complaint is a breach of contract action against defendant, not a request for equitable relief. Plaintiff's supplemental complaint seeks damages arising out of an alleged breach of the Amended Cooperation Agreement and requests that this court award damages to "compensate SBPG for all losses it has sustained as a result of the Corps's failure to meet its contractual obligation to compensate the affected landowner[s]," which exceeds $10,000.00. The court's interpretation of plaintiff's supplemental complaint as seeking monetary relief from the United States is consistent with the arrangement set forth in the Joint and Reciprocal Agreement, in which Ms. Juan and Ms. Pizani "agree[d] to accept such amounts recovered in the United States Court of Federal Claims in Case No. 15-1072C (or such other proceedings as may be instituted for collection of the Judgement, as amended)" by St. Bernard Parish "in full satisfaction of all sums owed to Plaintiffs by St. Bernard in the Judgement (as amended)." As indicated in plaintiff's supplemental complaint, the "true nature" of plaintiff's request is money damages alleged to be equivalent to the amount of the "judgment(s) issued in the Louisiana Court in favor of Ms. Pizani and Ms. Juan," as well as "accumulating legal interest on the foregoing up to the date of payment," which plaintiff asserts it sustained as a result of the government's

alleged breach of the Amended Cooperation Agreement. <u>See</u> <u>Katz v. Cisneros</u>, 16 F.3d at 1207. Reference to the amount of damages by plaintiff in this sentence clouds the fundamental nature of plaintiff's claim, an alleged "breach [by defendant] of its contract [the Amended Cooperation Agreement] with St. Bernard Parish Government." As discussed below, the government has not disputed that a contract between the parties existed. The court, therefore, has jurisdiction over plaintiff's breach of contract action and request for money damages.

<u>Defendant's Motion to Dismiss for Failure to State a Claim</u>

As discussed above, defendant also has moved to dismiss plaintiff's complaint pursuant to RCFC 12(b)(6). At the oral argument in this case, counsel of record for defendant stated that, "[f]or purposes of this motion, we are not disputing the existence of a valid contract, but there are no plausibly alleged duties, breach, or damages pled in the amended [supplemental] complaint." Plaintiff asserts that defendant is "ignoring the history of <u>Borgnemouth</u> and <u>Olivier</u> before this court," and that plaintiff's supplemental complaint sufficiently states a claim under the Amended Cooperation Agreement.

In examining what must be pled in order to state a claim, a plaintiff need only state in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." RCFC 8(a)(2) (2018); <u>see</u> <u>also</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 555. The United States Supreme Court has stated:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [<u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)]; <u>Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.</u>, 40 F.3d 247, 251 (7th Cir. 1994), a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, <u>see</u> <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, <u>see</u> 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-36 (3d ed. 2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"), on the assumption that all the allegations in the complaint are true (even if doubtful in fact), <u>see</u>, <u>e.g.</u>, <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 508, n.1 (2002); <u>Neitzke v. Williams</u>, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely") . . . . [W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.

Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56, 570 (footnote and other citations omitted; omissions in original); see also Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-57, 570); Frankel v. United States, 842 F.3d at 1249; A&D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1157 (Fed. Cir. 2014); Bell/Heery v. United States, 739 F.3d 1324, 1330 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Kam-Almaz v. United States, 682 F.3d 1364, 1367 (Fed. Cir. 2012) ("The facts as alleged 'must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).'" (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)); Totes-Isotoner Corp. v. United States, 594 F.3d 1346, 1354-55 (Fed. Cir.), cert. denied, 562 U.S. 830 (2010); Bank of Guam v. United States, 578 F.3d 1318, 1326 (Fed. Cir.) ("In order to avoid dismissal for failure to state a claim, the complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 557)), reh'g and reh'g en banc denied (Fed. Cir. 2009), cert. denied, 561 U.S. 1006 (2010); Cambridge v. United States, 558 F.3d 1331, 1335 (Fed. Cir. 2009) ("[A] plaintiff must plead factual allegations that support a facially 'plausible' claim to relief in order to avoid dismissal for failure to state a claim." (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570)); Cary v. United States, 552 F.3d 1373, 1376 (Fed. Cir.) ("The factual allegations must be enough to raise a right to relief above the speculative level. This does not require the plaintiff to set out in detail the facts upon which the claim is based, but enough facts to state a claim to relief that is plausible on its face." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555, 570)), reh'g denied (Fed. Cir.), cert. denied, 557 U.S. 937 (2009); Christen v. United States, 133 Fed. Cl. 226, 229 (2017); Christian v. United States, 131 Fed. Cl. 134, 144 (2017); Vargas v. United States, 114 Fed. Cl. 226, 232 (2014); Fredericksburg Non-Profit Housing Corp. v. United States, 113 Fed. Cl. 244, 253 (2013), aff'd, 579 F. App'x 1004 (Fed. Cir. 2014); Peninsula Grp. Capital Corp. v. United States, 93 Fed. Cl. 720, 726-27 (2010), appeal dismissed, 454 F. App'x 900 (Fed. Cir. 2011); Legal Aid Soc'y of N.Y. v. United States, 92 Fed. Cl. 285, 292, 298 n.14 (2010).

When deciding a case based on a failure to state a claim, the court "must accept as true the factual allegations in the complaint." Engage Learning, Inc. v. Salazar, 660 F.3d 1346, 1355 (Fed. Cir. 2011); see also Erickson v. Pardus, 551 U.S. at 94 ("In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 555-56 (citing Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508 n.1 (2002)))); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("Moreover, it is well established that, in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."), abrogated on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982), recognized by Davis v. Scherer, 468 U.S. 183, 190 (1984); Harris v. United States, 868 F.3d 1376, 1379 (Fed. Cir. 2017) (citing Call Henry, Inc. v. United States, 855 F.3d 1348, 1354 (Fed. Cir. 2017)); United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006); Samish Indian Nation v. United States, 419 F.3d at 1364; Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003).

The United States Court of Appeals for the Federal Circuit has stated that, at the motion to dismiss for failure to state a claim stage of a proceeding, a

> breach of contract claim requires two components: (1) an obligation or duty arising out of the contract and (2) factual allegations sufficient to support the conclusion that there has been a breach of the identified contractual duty. See Hercules, Inc. v. United States, 24 F.3d 188, 198 (Fed. Cir. 1994); San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir. 1989). In making this assessment, the court must interpret the contract's provisions to ascertain whether the facts plaintiff alleges would, if true, establish a breach of contract. See S. Cal. Edison v. United States, 58 Fed. Cl. 313, 321 (2003) ("Contract interpretation is a matter of law and thus may be addressed by the Court in resolving a motion to dismiss.") (citing Kennedy Heights Apartments, Ltd., I v. United States, 48 Fed. Cl. 574, 578 (2001)).

Bell/Heery v. United States, 739 F.3d at 1330; see also Fin. & Realty Servs., LLC v. United States, 128 Fed. Cl. 770, 777 (2016) ("Moreover, interpreting a contract is proper at this [motion to dismiss] stage of the proceedings." (citing Varilease Tech. Grp., Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002); and S. Cal. Edison v. United States, 58 Fed. Cl. at 321)); see also Canpro Invs. Ltd. v. United States, 130 Fed. Cl. 320, 347 (interpreting a lease when analyzing a motion to dismiss for failure to state a claim under RCFC 12(b)(6)), recons. denied, 131 Fed. Cl. 528 (2017); Solaria Corp. v. United States, 123 Fed. Cl. 105, 115 (2015) (interpreting a document when analyzing a motion to dismiss for failure to state a claim under RCFC 12(b)(6)), aff'd, 671 F. App'x 797 (Fed. Cir. 2016), cert. denied, 137 S. Ct. 1827 (2017). In Bell/Heery v. United States, the United States Court of Appeals for the Federal Circuit applied standard contract interpretation rules, which provide:

> "Contract interpretation begins with the language of the written agreement." Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (citing Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993)). When interpreting a contract, "if the 'provisions are clear and unambiguous, they must be given their plain and ordinary meaning.'" McAbee Const., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (quoting Alaska Lumber & Pulp Co. v. Madigan, 2 F.3d 389, 392 (Fed. Cir. 1993)). A contract must also be construed as a whole and "in a manner that gives meaning to all of its provisions and makes sense." Id. (citing Hughes Commc'ns Galaxy, Inc. v. United States, 998 F.2d 953, 958 (Fed. Cir. 1993)).

Bell/Heery v. United States, 739 F.3d at 1331.

Duty to Identify and Provide "Just Compensation" to the Owners of a Compensable Interest in the Private LERD Under the Amended Cooperation Agreement

In plaintiff's supplemental complaint, plaintiff asserts that, under the terms of the Amended Cooperation Agreement, the government is required as follows: "'**Government in the name of the Public Sponsors shall** identify and **provide just compensation to the owners of a compensable interest in the Private LERD**.'" (emphasis in original) (quoting the Amended Cooperation Agreement). In support of plaintiff's position that plaintiff has alleged a duty on the part of the defendant, plaintiff quotes the following language from the undersigned's March 15, 2016 Opinion in the Lake Borgne Basin Levee District case:

> The court notes that Article II.B.1 of the [Lake Borgne Basin] Amended Cooperation Agreement states:
>
> > [A]fter receiving the Public Sponsors' right of entry to the lands, easements, and rights of way, including suitable borrow and dredged or excavated material disposal areas (LERD) that are described in Article III.A.2. and III.A.3 of this Amendment, the Government, subject to the availability of appropriations, shall identify and pay just compensation to the owners of a compensable interest in the LERD described in Article III.A.3. of this Amendment.
>
> This language indicates that the Army Corps' obligations with respect to any Private LERD attached when the Army Corps received the right of entry to the LERD from either St. Bernard or Lake Borgne. Further, there is no indication in the Amended Cooperation Agreement that any actions taken by either of the plaintiffs after offering the right of entry to the Army Corps could affect or modify the Army Corps' obligations.

Lake Borgne Basin Levee Dist., et al. v. United States, 127 Fed. Cl. at 342-43 (second alteration in original). Plaintiff argues that, "[d]espite this previous finding by the Court on the issue of the Government's duty under the Amended Cooperation Agreement, to this day, the Landowners [Ms. Juan and Ms. Pizani] remain uncompensated."

According to defendant, under the Amended Cooperation Agreement, "the Government undertook only two obligations with respect to Private LERD: (1) to 'identify and provide just compensation to the owners of a compensable interest in the Private LERD'; and (2) to 'obtain a deed or servitude agreement . . . for those interests described in the Commandeering Order.'"[21] (omission in original). Defendant, contends that the

---

[21] In a footnote in its motion to dismiss for failure to state a claim, defendant contends that "[t]he Government's other obligation under the Cooperation Agreement, to 'obtain a deed or servitude agreement . . . for those interests described in the Commandeering Order,' is not at issue in this action. In any event, the Government already has complied with this obligation." (internal references omitted).

language in the undersigned's March 15, 2016 Opinion in Lake Borgne Basin Levee District, which was quoted by plaintiff in plaintiff's opposition to the motion to dismiss, does not suggest that the Army Corps had any obligation under the Amended Cooperation Agreement "other than identifying and providing just compensation."

Article II.B of the Amended Cooperation Agreement states that "the Public Sponsors shall provide right of entry to all lands, easements, and rights-of-way including suitable borrow and dredged or excavated material disposal areas, determined by the Government to be necessary for construction, operation, and maintenance of the Construction Effort and the non-Federal levee." Article II.B.1 of the Amended Cooperation Agreement further states:

> As further specified in Article III, after receiving the Public Sponsors' right of entry to the lands, easements, and rights of way, including suitable borrow and dredged or excavated material disposal areas (LERD) that are described in Article III.A.2 [discussing Other Non-Federal Governmental LERD], and III.A.3. [discussing Private LERD] of this Amendment, the Government, subject to the availability of appropriations, shall identify and pay just compensation to the owners of a compensable interest in the LERD described in Article III.A.3 of this Amendment. Additionally, the Government, subject to the availability of appropriations, shall acquire interests in those LERD described in Article III.A.2 of this Amendment to which the Public Sponsors were unable to obtain right of entry despite their best efforts.

Article III.B of the Amended Cooperation Agreement provides:

> [T]he Government in the name of the Public Sponsors, shall identify and provide just compensation to the owners of a compensable interest in the Private LERD and shall acquire the requisite interests in the non-Federal Governmental LERD to which the Public Sponsors, despite their its [sic] best efforts, was unable to obtain a free and unencumbered right of entry, all in accordance with the applicable provisions of the Uniform Relocation Assistance and Real Property Acquisitions Policy Act of 1970, Public Law 91-646, as amended by Title IV of the Surface Transportation and Uniform Relocation Assistance Act of 1987 (Public Law 100-17), and the Uniform Regulations contained in 49 CFR Part 24, in acquiring lands, easements, and rights of way, required for construction, operation, and maintenance of the non-Federal levee and the Construction Effort, including those necessary for relocations, borrow materials, and dredged or excavated material disposal, and shall inform all affected persons of applicable benefits, policies, and procedures in connection with said Act.

Article II.B.1 and Article III.B of the Amended Cooperation Agreement both indicate that the government had a duty to identify and provide "just compensation" to the owners of a compensable interest in the Private LERD, which the Amended Cooperation

Agreement indicated was "all other LERD not owned, claimed, or controlled by the Public Sponsors or Other Non-Federal Governmental Entities," that was used in connection with performance under the Amended Cooperation Agreement. In St. Bernard Parish's supplemental complaint, St. Bernard Parish identifies the language in Article II.B1 and Article III.B quoted above and asserts that, under the Amended Cooperation Agreement, the Army Corps "agree[d] that it will 'identify and provide just compensation to the owners of a compensable interest in the Private LERD.'" (quoting Article III.B of the Amended Cooperation Agreement). St. Bernard Parish's complaint, therefore, sufficiently alleges that defendant had a duty to identify and provide "just compensation" to the owners of a compensable interest in the Private LERD under the Amended Cooperation Agreement.

Breach of the Amended Cooperation Agreement

The parties' dispute as to whether plaintiff's complaint sufficiently alleges a breach to avoid dismissal on defendant's motion to dismiss for failure to state a claim centers on whether the United States already has compensated Ms. Juan and Ms. Pizani for the borrow material the Army Corps excavated from Ms. Juan's and Ms. Pizani's land in 2005 and 2006 when the government deposited monies in the United States District Court for the Eastern District of Louisiana in connection with the 2008 declaration of taking and the 2010 amended declaration of taking. Defendant argues that plaintiff has not alleged a claim for breach of the Amended Cooperation Agreement because the "Government has complied with its obligation [under the Amended Cooperation Agreement] by depositing the estimate of fair market value as just compensation in the condemnation action pending before the United States District Court for the Eastern District of Louisiana." Defendant argues that "the Government's 2008 Declaration of Taking included the condemnation of a 'right and easement to clear, borrow, excavate and remove soil, dirt, and other materials . . . for a period not to exceed one year, beginning with the date possession of the land was granted to the United States.'" (omission in original). According to defendant, the government's 2008 Declaration of Taking "did not suggest— let alone expressly indicate—that borrow material was excluded from this taking. To the contrary, the nature of the estate to be acquired by the Declaration of Taking—a temporary borrow easement—makes clear that this property was taken for the purpose of excavating borrow material."

Defendant further contends that the government's 2010 amended declaration of taking "condemned fee simple title" to the land condemned in the 2008 declaration of taking filed in the United States District Court for the Eastern District of Louisiana, and that "the Government has paid just compensation for all land condemned." According to defendant's reply in support of its motion to dismiss, plaintiff has failed to identify "any provision of the Cooperation Agreement that could contractually obligate the Government 'to provide just compensation for the borrow material.' Rather, according to the defendant, the Cooperation Agreement only required the Government to provide the fair market value of the Pizanis' property—which it already has done through the condemnation action." (internal reference omitted) (quoting plaintiff's opposition to defendant's motion to dismiss). Defendant also notes that Ms. Juan and Ms. Pizani have withdrawn the government's estimated just compensation deposit of $134,000.00 from the United States

District Court for the Eastern District of Louisiana, which defendant contends reflected "the fair market value of the fee interest."

Plaintiff, however, asserts that it has adequately alleged that defendant breached its duty under the Amended Cooperation Agreement because the condemnation proceeding before the United States District Court for the Eastern District of Louisiana did not compensate Ms. Juan and Ms. Pizani for the "borrow material/mineral"[22] removed from Ms. Pizani's and Ms. Juan's land in 2005 and 2006. Plaintiff argues:

> [T]he condemnation action, which the Government commenced in 2008, began as an action only for a servitude upon the Landowners' land, and later, in 2010, well after the soil had been excavated and removed from the property, was amended to assert an action for the Landowners' land in fee simple. At no point did the condemnation action purport to include the minerals, i.e. the borrow material that was excavated several years before the condemnation action was instituted. The 2005 excavation of the borrow material is a 'wholly separate taking' from the 2008/2010 condemnation action, under the prior exclusive jurisdiction doctrine.

Additionally, plaintiff alleges that "[t]he Government makes this argument despite this Court's holding in the Olivier and Borgnemouth cases: 'By failing to compensate the landowners involved in the state court Olivier Plantation and Borgnemouth cases, defendant breached its obligations under the Article III.B of the Amended Cooperation agreement.'" (emphasis in original) (quoting the undersigned's July 12, 2016 unreported Order in Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, in which the court noted that defendant "agreed with plaintiffs that, based on the court's March 15, 2016 Opinion, plaintiffs are entitled to summary judgment"). According to defendant, however, the court's decision in its July 12, 2016 unreported Order in Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, which granted plaintiffs' motion for summary judgment, is not controlling because neither breach nor damages were disputed in either of those two cases.

The government's February 14, 2008 complaint in condemnation in the United States District Court for the Eastern District of Louisiana stated that the government sought to acquire a "Temporary Borrow Easement" on Ms. Juan's and Ms. Pizani's land, which the February 14, 2008 complaint in the Louisiana District Court defined as a

> temporary and assignable right and easement to clear, borrow, excavate and remove soil, dirt, and other materials from the land described in Schedule A as Tract No. B100E-1, for a period not to exceed one year,

---

[22] Plaintiff asserts that the Army Corps excavated "valuable soil, a mineral under Louisiana law," from Ms. Pizani's and Ms. Juan's land in 2005 and 2006.

beginning with date possession of the land was granted to the United States.

Complaint, Ex. C, United States v. 6.83 Acres of Land, No. 08-999. The government's February 14, 2008 declaration of taking stated that the government was taking the land described in the February 14, 2008 complaint in condemnation, and that the government was depositing $59,400.00 as the "estimated" "just compensation for all of said land," which was deposited "for the use and benefit of the persons entitled thereto." Declaration of Taking at 2, United States v. 6.83 Acres of Land, No. 08-999. The plain language of the February 14, 2008 complaint indicates that the government was attempting to retroactively acquire a temporary easement "to clear, borrow, excavate and remove soil, dirt, and other materials from the land" owned by Ms. Juan and Ms. Pizani. The plain language of the February 14, 2008 declaration of taking also indicates that the temporary borrow easement the government was seeking to condemn was to be for a duration of not-to-exceed one year, "beginning with date possession of the land was granted to the United States."

The government's subsequent September 7, 2010 amended complaint in the Eastern District of Louisiana stated that the government was acquiring "fee simple title" to Ms. Juan's and Ms. Pizani's land, as described in the February 7, 2008 complaint in condemnation and February 7, 2008 declaration of taking. See Amended Complaint at 2, United States v. 6.83 Acres of Land, No. 08-999. The government's September 7, 2010 amended declaration of taking indicated that the government was increasing the "gross sum estimated" of "just compensation for all of said land" to $134,000.00. Amended Declaration of Taking at 2, United States v. 6.83 Acres of Land, No. 08-999. The government's September 7, 2010 amended declaration of taking also stated that "[i]t is intended by this amendment that the aforesaid Declaration of Taking is not to be changed in any way except as expressly set forth." Id. The government's September 7, 2010 amended declaration of taking, therefore, attempted to provide estimated just compensation for the fee simple value of Ms. Juan's and Ms. Pizani's land.

In the government's January 15, 2013 memorandum in support of the government's January 15, 2013 motion for a determination of the appropriate date of valuation in the Eastern District of Louisiana, the government stated that the "United States and Pizani now dispute whether the Court should award just compensation as of the Corps' entry onto the Pizani property at the time of commandeering," or "as of the dates of filing of the Declarations of Taking." Memorandum in Support at 2, United States v. 6.83 Acres of Land, No. 08-999. According to the government's January 15, 2013 memorandum, "the applicable date of valuation of the property taken herein is October 24, 2005, the date the property was commandeered and possession granted to the Corps." Id. at 10. In Ms. Juan's and Ms. Pizani's February 26, 2013 opposition, however, Ms. Juan and Ms. Pizani asserted that "the date of taking for purposes of Plaintiff's [the government's] Declaration of Taking cannot be October 24, 2005" because, according to Ms. Juan and Ms. Pizani, "[u]nder condemnation law, by statute the date of taking is the filing date of the Declaration of Taking," which occurred on February 14, 2008. See Opposition to Motion for a Determination of the Appropriate Date of Valuation at 4-5,

United States v. 6.83 Acres of Land, No. 08-999.

The United States District Court for the Eastern District of Louisiana did not resolve the government's January 15, 2013 motion for a determination of the appropriate date of valuation, but issued an April 5, 2013 Order stating:

> On filing a declaration of taking and depositing the amount of estimated compensation stated in the declaration, title to the estate or interest specified in the declaration vests in the Government; the land is condemned and taken for the use of the Government; and the right to just compensation for the land vests in the persons entitled to the compensation. 40 U.S.C. § 3114(b)(1)-(3). While the United States argues that it actually took possession [sic] the property in question at an earlier date, that issue is the subject of the plaintiff's Motion for a Determination of the Appropriate Date of Valuation and will not be resolved at this time. The statute that authorizes the use of condemnation actions states that title vested in the United States at the time the Complaint in Condemnation was filed and the deposit of estimated compensation was made.

Order and Reasons at 7, United States v. 6.83 Acres of Land, No. 08-999. After issuing its April 5, 2013 Order, the District Court for the Eastern District of Louisiana subsequently did not address the date on which the taking at issue in the Eastern District of Louisiana occurred. Consequently, the date on which the taking in the proceeding before the District Court for the Eastern District of Louisiana occurred remains unresolved, as the issue appears not settled by the District Court for the Eastern District of Louisiana Order.

Moreover, the parties in the proceeding before the United States District Court for the Eastern District of Louisiana also disputed the amount of compensation owed to Ms. Juan and Ms. Pizani for the taking at issue in the Eastern District of Louisiana. Following the government's deposit of $134,000.00 for the "gross sum estimated" of "just compensation for all of said land" taken by the government, the United States District Court for the Eastern District of Louisiana issued an "ORDER TO DISBURSE FUNDS" in the amount of $134,000.00 to Ms. Juan and Ms. Pizani, and stated in that Order:

> [T]hat said disbursement be without prejudice to the right of said defendants to demand and receive additional compensation for the taking of said tracts of land, and that should the compensation finally determined to be due to said defendants be less than the amount hereby disbursed, the United States shall have a right to recover the difference between the amount disbursed pursuant thereto and the amount of the final judgment determining compensation, together with interest pursuant to 40 U.S.C. § 3116 for the interest which would have otherwise been earned during the time the money was withdrawn until the time the money is replaced.

Order to Disburse Funds at 2, United States v. 6.83 Acres of Land, No. 08-999 (capitalization in original). The Eastern District of Louisiana also issued an Order

scheduling a three-day bench trial to commence on April 23, 2018. See Scheduling Order at 2, United States v. 6.83 Acres of Land, No. 08-999. Prior to trial, however, the Eastern District of Louisiana issued the March 29, 2018 Order stating:

> The Court having been advised by counsel for the parties that all of the parties to this action have firmly agreed upon a compromise,
>
> IT IS ORDERED that the action be and it is hereby dismissed without costs and without prejudice to the right, upon good cause shown, to reopen the action or to seek summary judgment enforcing the compromise if settlement is not consummated within a reasonable time. The Court retains jurisdiction for all purposes, including enforcing the settlement agreement entered into by the parties.

See Order of Dismissal at 1, United States v. 6.83 Acres of Land, No. 08-999 (capitalization in original).

As of the date of the issuance of this court's Opinion in the above-captioned case, a settlement agreement between Ms. Juan, Ms. Pizani, and the United States, as a party in the Eastern District of Louisiana proceedings, does not appear on the docket of the proceeding before the Eastern District of Louisiana. Nor have the parties submitted a settlement agreement to this court between Ms. Juan, Ms. Pizani, and the United States related to the proceedings before the Eastern District of Louisiana. At the oral argument in the case before the court, counsel of record for plaintiff asserted that Ms. Juan, Ms. Pizani, and the government

> have agreed to settle the condemnation action that was the basis of this, but specifically excluded in that settlement is the land that was taken, the soil. It was recognized by both the United States and the Plaintiffs that that property was subject to the state court jurisdiction or determination. So there was never a valuation of that which they stole -- which they took.

Counsel of record for defendant in this court, however, argues that Ms. Juan, Ms. Pizani, and the government "are in negotiations to potentially settle that action," but that "[n]o settlement agreement has been agreed to, and the Government has not agreed to the carve-out [that excludes borrow material] that Mr. Couhig [counsel of record for plaintiff] suggested."

Based on the record before this court, it is unclear whether the action in the United States District Court for the Eastern District of Louisiana compensated Ms. Juan and Ms. Pizani for borrow material taken by the Army Corps in 2005 and 2006, as the parties dispute when the taking at issue in the Eastern District of Louisiana occurred, the amount of compensation owed to Ms. Juan and Ms. Pizani for the taking at issue in the Eastern District of Louisiana, and whether the government's deposit included compensation for the borrow material excavated in 2005 and 2006. Neither plaintiff nor defendant has adequately supported their position as to whether the government's deposits in the United

States District Court for the Eastern District of Louisiana fully compensated Ms. Juan and Ms. Pizani for borrow material taken by the Army Corps in 2005 and 2006. Although disputing the language of the settlement agreement between Ms. Juan, Ms. Pizani, and the United States in the Eastern District of Louisiana proceedings, the parties have not submitted a settlement agreement to the court, notwithstanding the opportunity to submit supplemental briefs addressing the proceedings before the Eastern District of Louisiana. Based on the parties submissions to this court and the documents on the docket of the Eastern District of Louisiana, it is currently unclear whether defendant has complied with its duty under the Amended Cooperation Agreement to "identify" and "provide" "just compensation" to the owners of a compensable interest in the Private LERD based on the government's actions in the proceeding before the Eastern District of Louisiana. Because plaintiff's complaint plausibly alleges that the United States has not complied with its duty under the Amended Cooperation Agreement to "identify" and "provide" "just compensation" to the owners of a compensable interest in the Private LERD, including Ms. Juan and Ms. Pizani, the court finds that plaintiff sufficiently has alleged a breach of the Amended Cooperation Agreement, so as to avoid dismissal for failure to state a claim.

Damages

In its motion to dismiss, defendant argues that plaintiff has not plausibly alleged damages "[f]or the reasons discussed in" its argument regarding plaintiff's alleged lack of standing based on the Joint and Reciprocal Agreement executed by St. Bernard Parish, Ms. Juan, and Ms. Pizani, an argument this court found to be unpersuasive. Defendant also asserts that plaintiff has not suffered damages "because the [Amended] Cooperation Agreement only requires the Government to make payment to the Pizanis, not to St. Bernard, and thus St. Bernard has not been denied a payment that it was entitled to receive under its contract with the Government."

Plaintiff argues that the "Government's steadfast refusal to fulfill its obligations under the Amended Cooperation Agreement" caused plaintiff to suffer damages and "entitle[s]" plaintiff "to a judgment against the Government in the amount of the state court judgment." Quoting from the undersigned's July 12, 2016 unreported Order in the Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, plaintiff argues:

> This Court, in the Olivier and Borgnemouth cases, held that St. Bernard suffered damages because of the Government's breach of its duty to compensate the landowners. "[T]he result of defendant's failure to perform its obligations under the Amended Cooperation Agreement was that plaintiffs were sued in Louisiana state court, judgments were entered against them in the Borgnemouth and Olivier Plantation cases, and the judgments were confirmed on appeal. [internal citations omitted] Plaintiffs, therefore, are entitled to receive the amounts of these judgments as damages."

(alterations in original).

As discussed above, St. Bernard Parish has plausibly alleged a breach of the Amended Cooperation Agreement based on the United States' alleged failure to provide just compensation to Ms. Juan and Ms. Pizani for borrow material excavated by the Army Corps, for damages alleged to be equal to "the unit value of no less than the 97,931 cubic yards of soil extracted and/or converted from their property at the fair market value at the time of extraction" in 2005 and 2006. See Complaint at 1, Pizani v. St. Bernard Parish, No. 109-548. In connection with the Amended Cooperation Agreement, the Army Corps had extracted the borrow material from Ms. Juan's and Ms. Pizani's land in 2005 and 2006. Ultimately, the Louisiana State Trial court issued December 20, 2016 judgment and January 18, 2017 amended judgment against St. Bernard Parish, which the plaintiff's counsel of record, at oral argument, estimated to total $4,500,00.00, and which, under the terms of the Joint and Reciprocal Agreement and Addendum, St. Bernard Parish will be liable for if St. Bernard Parish is unsuccessful in the above-captioned case. The record currently before the court is unclear whether the Army Corps compensated Ms. Juan and Ms. Pizani for the borrow material removed in 2005 and 2006, although Ms. Juan and Ms. Pizani have withdrawn the government's deposited "gross sum estimated" of "just compensation for all of said land" of $134,000.00 from the United States District Court for the Eastern District of Louisiana in 2011. See Order to Disburse Funds at 2, United States v. 6.83 Acres of Land, No. 08-999. St. Bernard Parish alleges it has suffered damages as a result of the government's alleged failure to perform under the Amended Cooperation Agreement and the Louisiana State Trial court's judgments issued against St. Bernard Parish. Plaintiff asserts that the United States' breached the Amended Cooperation Agreement and failed to compensate Ms. Juan and Ms. Pizani for borrow material excavated in 2005 and 2006, which is sufficient to survive defendant's motion to dismiss. See Bell/Heery v. United States, 739 F.3d at 1330. Plaintiff has pled with sufficient specificity to survive a motion to dismiss for failure to state a claim. See Bell Atl. Corp. v. Twombly, 550 U.S. at 555.

Indemnification

In plaintiff's supplemental complaint, plaintiff states that "[t]his Court has jurisdiction over this action against the United States founded upon an express contract, an implied-in-fact contract, or, in the alternative, an indemnity agreement between SBPG and the United States." Plaintiff's supplemental complaint asserts that "the St. Bernard Parish Government respectfully requests that this Court order the United States to indemnify it for its losses."

Defendant asserts that the court lacks jurisdiction over plaintiff's "indemnification claim" under the Amended Cooperation Agreement because St. Bernard Parish has not plausibly alleged a government representative with authority to bind the United States to an indemnification agreement or that the government executed an indemnification agreement with St. Bernard Parish, in addition to which St. Bernard has not alleged actual, presently due money damages. Additionally, defendant argues that this court lacks jurisdiction over any implied-in-fact indemnity contract plaintiff's supplemental complaint may be trying to assert. According to defendant, plaintiff's alternative implied-in-fact

indemnification contract theory fails "[b]ecause the Cooperation Agreement is an express contract addressing the Government's obligation to provide just compensation in connection with the Corps' repair of the non-Federal levee," and "the Court cannot exercise subject matter jurisdiction based upon an implied-in-fact contract." (internal references omitted).

Moreover, defendant argues that "the Court is 'not constrained to accept the allegations of the complaint in respect of the construction of the Agreement,'" and that the indemnification "obligations alleged by St. Bernard are belied by the terms of the Cooperation Agreement." (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)). Defendant asserts that it "did *not* make an open-ended commitment to pay any judgment that might be rendered in favor of landowners like the Pizanis or against St. Bernard in the future. Nor did the Government agree to indemnify St. Bernard . . . ." (emphasis in original). Rather, defendant argues that the only indemnification language in the Amended Cooperation Agreement runs in favor of the government, as the Public Sponsors agreed "to 'hold and save the Government free from all damages arising from the construction, operation, and maintenance of the Construction Effort, the non-Federal levee, and any related betterments, except for damages due to the fault or negligence of the Government or the Government's contractors.'" (quoting Article II.D of the Amended Cooperation Agreement).

Plaintiff appears to be trying to argue that its "indemnification claim" is "for 'payment on behalf of' rather than a pure 'indemnification' claim" and is not premised on an implied-in-fact contract theory. According to plaintiff:

> St. Bernard is asserting a claim based on the breach of an express contract, the Amended Cooperation Agreement, not a separate implied "indemnity agreement" as the Government has argued. As such, this Court may exercise subject matter jurisdiction without St. Bernard pointing to a specific provision in the Amended Cooperation Agreement that entitles them to damages, because damages are presumed in the breach of an express agreement.

Plaintiff alleges that the language of the Amended Cooperation Agreement has "the practical effect of an indemnity agreement" because defendant, "having breached the agreement by refusing to pay the just compensation due [sic] the landowners in the name of the Public Sponsors, must now pay St. Bernard the amounts of the judgment entered in favor of the landowners so that St. Bernard can pay the landowners." In defendant's reply in support of its motion to dismiss, defendant argues that, in St. Bernard Parish's opposition to defendant's motion to dismiss, St. Bernard Parish "appears to disavow having asserted an indemnification claim."

Although St. Bernard Parish asserts that "the language in the Amended Cooperation Agreement constitutes an agreement to indemnify SBPG," plaintiff's supplemental complaint and subsequent filings with the court do not elaborate on plaintiff's, perhaps less than artful, theory of their indemnification concept. The edition of

Black's Law Dictionary[23] that was in effect when the parties entered into the Amended Cooperation Agreement on December 1, 2005 defined "indemnify" as:

> 1. To reimburse (another) for a loss suffered because of a third party's or one's own act of default.[[24]] 2. To promise to reimburse (another) for such a loss. 3. To give (another) security against such a loss.

Indemnify, BLACK'S LAW DICTIONARY (8th ed. 2004) (internal references omitted). The edition of Webster's Third New International Dictionary in effect in 2005 defines "indemnify" as:

> 1 a: to secure or protect against hurt or loss or damage . . . b: to exempt from incurred penalties or liabilities . . . 2: to make compensation to for incurred hurt or loss or damage . . . .

Indemnify, Webster's Third New International Dictionary (3d ed. 1961 & 2002 addendum); see also Indemnify, Oxford English Dictionary (2d ed. 1989)[25] (defining "indemnify" as "[t]o preserve, protect, or keep free *from*, secure *against* (any hurt, harm, or loss); to secure against legal responsibility *for* past or future actions or events; to give an indemnity to;" "[t]o compensate (a person, etc.) *for* loss suffered, expenses incurred, etc.;" "[t]o compensate *for* disadvantages, annoyances, hardships, etc.;" and "[t]o compensate, make up for" (emphasis in original)).

Contrary to defendant's position, on review, it appears that plaintiff is not asserting that an implied-in-fact indemnification contract with the United States existed that related

---

[23] The United States Court of Appeals for the Federal Circuit has looked to the contemporaneous definitions in Black's Law Dictionary, the Oxford English Dictionary, and Webster's New International Dictionary of the English Language when defining the word "indemnified" for purposes of a statute enacted in 1935. See N.Y. & Presbyterian Hosp. v. United States, 881 F.3d at 883-84. In New York & Presbyterian Hospital v. United States, the United States Court of Appeals for the Federal Circuit stated that "we conclude that, at the time of [26 U.S.C.] § 3102(b)'s enactment [in 1935], 'indemnify' was commonly understood to mean 'to compensate' and 'to reimburse,' thereby supporting the conclusion that § 3102(b) is reasonably amenable to an interpretation that it is money-mandating." N.Y. & Presbyterian Hosp. v. United States, 881 F.3d at 886.

[24] Black's Law Dictionary defines "default" as "[t]he omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due." Default, Black's Law Dictionary (8th ed. 2004).

[25] The definition of "indemnify" contained in the Oxford English Dictionary has not been updated since the publication of the second edition of the Oxford English Dictionary in 1989. See Indemnify, OXFORD ENGLISH DICTIONARY, http://www.oed.com/view/Entry/94280?result=15&rskey=A2Yhyw& (last visited Apr. 4, 2019).

to the government's and St. Bernard Parish's performance under the Amended Cooperation Agreement.[26] As plaintiff acknowledged in its opposition to defendant's motion to dismiss and at the oral argument, plaintiff's alternative theory may appear to be asserting that the Amended Cooperation Agreement constituted some sort of undefined "indemnity agreement," rather than the term of art generally understood. Specifically, in its supplemental complaint, plaintiff alleges, without further development, that "the language in the Amended Cooperation Agreement constitutes an agreement to indemnify SBPG for those expenses [the judgments issued by the Louisiana State Trial court against St. Bernard Parish]."

In defendant's motion to dismiss, defendant's reply in support of its motion to dismiss, and at the oral argument, defendant consistently has argued that the only indemnification language in the Amended Cooperation Agreement runs in favor of the government and against St. Bernard Parish, and that the court is not required to accept plaintiff's interpretation of the Amended Cooperation Agreement. While plaintiff generally has alleged that the Amended Cooperation Agreement constitutes an indemnification agreement, plaintiff has not identified in its supplemental complaint, in its opposition to defendant's motion to dismiss, or at the oral argument which Article in the Amended Cooperation Agreement constitutes an agreement by the government to "indemnify" plaintiff. The court notes that the plain language in the Amended Cooperation Agreement does not appear to indicate that the government undertook an obligation to "indemnify" St. Bernard Parish, in the legal definition of the word, for any loss or expense incurred by St. Bernard Parish in connection with performance under the Amended Cooperation Agreement. The defendant is correct that the only indemnification language in the Amended Cooperation Agreement appears to run in favor of the United States, as Article II.D of the Amended Cooperation Agreement states that the "Public Sponsors shall hold and save the Government free from all damages arising from the construction, operation, and maintenance of the Construction Effort, the non-Federal levee, and any related betterments, except for damages due to the fault or negligence of the Government or the Government's contractors." The Amended Cooperation Agreement, however, indicates that the government had a contractual duty to identify and provide "just compensation" to the owners of a compensable interest in the Private LERD.

Based on the parties' filings with the court, the nature of any plaintiff's alleged duty to "indemnify" St. Bernard Parish is confused, and the parties' arguments on the alleged duty to "indemnify" are incongruent. Indeed, after reviewing plaintiff's opposition to defendant's motion to dismiss, defendant asserted that plaintiff had "disavow[ed] having

---

[26] The court would lack jurisdiction over an implied-in-fact agreement regarding defendant's obligations under the Amended Cooperation Agreement. "[T]he existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter, unless the implied contract is entirely unrelated to the express contract." Schism v. United States, 316 F.3d 1259, 1278 (Fed. Cir. 2002) (citing Atlas Corp. v. United States, 895 F.2d 745, 755 (Fed. Cir. 1990)); see also Bank of Guam v. United States, 578 F.3d at 1329 (citations omitted); Gov't Servs. Corp. v. United States, 131 Fed. Cl. 409, 428 (2017).

asserted an indemnification claim," and the parties' filings indicate that the parties are using the words "indemnify" and "indemnification" differently. Moreover, in plaintiff's supplemental complaint, the government's alleged "duty" to "indemnify" St. Bernard Parish is not listed as a stand-alone count. Rather, plaintiff's prayer for relief requests "damages the judgment(s) issued in the Louisiana Court in favor of Ms. Pizani and Ms. Juan in satisfaction of any said judgments costs, and accumulating legal interest on the foregoing up to the date of payment" or that "this Court order the United States to indemnify it for its losses." Without further development by plaintiff, it is unclear whether plaintiff is, in fact, asserting that the government's duty to "indemnify" in a traditional sense of the word requires the government to "reimburse (another) [St. Bernard Parish] for a loss suffered because of a third party's or one's own act of default," as "indemnify" is defined in Black's Law Dictionary, or whether plaintiff only is asserting that the government has a duty to identify and provide "just compensation" to the owners of a compensable interest in the Private LERD, with the "just compensation" aspect being measured by plaintiff by the amount of the judgments issued by the Louisiana State Trial court.

In plaintiff's supplemental complaint, plaintiff also asserts that the Louisiana State Trial court "opined that the Amended Cooperation Agreement constituted an indemnity agreement in the <u>Olivier</u> and <u>Borgnemouth</u> cases." (emphasis in original). In its February 21, 2017 written findings of fact and reasons for judgment, the Louisiana State Trial court had stated:

> This Court notes that this is one of several post-Katrina commandeer cases, which are very familiar to this Court from its prior decision in the case of <u>Borgnemouth Realty Co., Ltd. v. Parish of St. Bernard</u>, No. 112,833 (34th JDC), 141 So.3d 891, (La. App. 4th Cir. 2014), writs denied, 14-1285 (La. 9/26/14), 149 So.3d 266, which case was nearly identical to the facts in another takings case decided by Judge Fernandez in <u>Olivier Plantation, L.L.C. v. Parish of St. Bernard</u>, No. 109,272 (34th JDC), 151 So.3d 965, (La. App. 4th Cir. 2014), writs denied, 14-2496, (La. 2/27/15), 160 So.3d 173. This Court is cognizant from the evidence presented in this case and in the <u>Borgnemouth Realty</u> case that a cooperation agreement existed between St. Bernard Parish and the United States Army Corps of Engineers (USACOE) which required the USACOE to compensate property owners for takings related to the Parish's commandeer of property under the cooperation agreement.

> Although not called upon to decide this issue under the circumstances of this case, this Court would note for the benefit of the involved parties that it is the observation of this Court that the facts of the instant <u>Pizani</u> case are so nearly identical to those of the <u>Borgnemouth Realty</u> and <u>Olivier Plantation</u> cases that the same result should obtain here in the <u>Pizani</u> case as resulted in the <u>Borgnemouth Realty</u> and <u>Olivier Plantation</u> cases regarding the USACOE's obligation to indemnify St. Bernard Parish for liability resulting from the Parish's commandeer of private property pursuant

to the cooperation agreement.

See Written Findings of Fact and Reasons for Judgment at 2, Pizani v. St. Bernard Parish, No. 109-548. The language in the Louisiana State Trial court's written findings of fact and reasons for judgment appears to use the word "indemnify" in a manner as to mean that the government had a duty "to compensate property owners for takings related to the Parish's commandeer of property under the cooperation agreement." See id. In Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, the undersigned, however, did not rule on whether the Amended Lake Borgne Basin Agreement resulted in an indemnification agreement. See Lake Borgne Basin Levee Dist., et al. v. United States, 127 Fed. Cl. at 344-45. Plaintiff's citation to the Louisiana State Trial court's written findings of fact and reasons for judgment further indicates that plaintiff is not using the word "indemnify" in the legal sense of the word, but, rather, in the vernacular sense of the word. Indeed, in plaintiff's opposition to the motion to dismiss, plaintiff asserts that the Amended Cooperation Agreement has the "practical effect" of an indemnification agreement.

The government's duty in the Amended Cooperation Agreement of identifying and providing just compensation to the owners of a compensable interest in the Private LERD, as discussed above, is a duty independent of any possible indemnification duty. The government's duty in the Amended Cooperation Agreement of identifying and providing just compensation to the owners of a compensable interest in the Private LERD, however, may encompass providing compensation equivalent to the amount of the judgments the Louisiana State Trial court entered against St. Bernard Parish. The court, however, would determine the amount of "just compensation" owed to Ms. Juan and Ms. Pizani in subsequent proceedings before reaching such a conclusion.

Regarding defendant's argument that "St. Bernard does not identify a Government representative with actual authority to bind the United States" for an indemnification agreement and that such an indemnification agreement would be impermissibly open-ended, neither party adequately has addressed that argument raised by defendant. Defendant's motion to dismiss only contains one, not fully explained, paragraph alleging both defendant's lack of authority and impermissibly open-ended indemnification agreement arguments, and defendant's reply contains only two sentences alleging both defendant's lack of authority and impermissibly open-ended indemnification agreement arguments. In plaintiff's opposition, plaintiff also does not explicitly address defendant's lack of authority and impermissibly open-ended indemnification agreement arguments. Plaintiff simply asserts that the court "has jurisdiction over St. Bernard's claim for payment of the judgment against it." Given defendant's undeveloped jurisdictional arguments on a possible indemnification claim and plaintiff's inartful choices of terminology while trying to assert rights related to indemnification, the court is unable to address the indemnification questions at this time.

EAJA Claim

In its complaint, plaintiff also argues that it "is entitled to recover attorney's fees incurred in bringing this action under the Equal Access to Justice Act." In its motion to dismiss, defendant argues that the court should dismiss plaintiff's claims for costs and attorney's fees under the EAJA. According to defendant:

> A "unit of local government" is eligible to receive an award of costs and attorney's fees under EAJA only if its "net worth . . . did not exceed $7,000,000 at the time the civil action was filed." 28 U.S.C. § 2412(d)(2)(B). "[F]or purposes of EAJA, net worth is calculated by subtracting total liabilities from total assets." Impresa Construzioni Geom. Domenico Garufi v. United States, 89 Fed. Cl. 449, 451 n.2 (2009) (quoting H.R. Rep. No. 96–418, at 15 (1980)) (internal quotation marks omitted). St. Bernard commenced this action by filing its complaint on September 25, 2015. As of December 31, 2015, St. Bernard reported total assets of $697,254,340 and total liabilities of $87,823,831 for a net worth of $609,430,509. St. Bernard Parish Government, Comprehensive Annual Financial Report 16 (Dec. 31, 2015), https://www.sbpg.net/ArchiveCenter/ViewFile/Item/425. Thus, St. Bernard's net worth substantially exceeded EAJA's eligibility limits as of the time this action was filed.

(footnote omitted) (alteration and omission in original). Plaintiff did not address defendant's argument related to EAJA in its response or at the oral argument.

As indicated by the United States Court of Appeals for the Federal Circuit, "EAJA is a fee-shifting statute that allows a party who prevails in a civil action brought by or against the government to recover attorney's fees and costs." Davis v. Nicholson, 475 F.3d 1360, 1363 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007); see also Robinson v. O'Rourke, 891 F.3d 976, 980 (Fed. Cir. 2018) ("The EAJA is a fee-shifting statute that allows a party who prevails in a civil action brought by or against the government to recover attorney fees and costs."); Ward v. U.S. Postal Serv., 672 F.3d 1294, 1297 (Fed. Cir. 2012). Under EAJA, eligibility for an award of attorneys' fees and expenses in a civil action requires: (1) that an eligible claimant be a prevailing party; (2) that the government's position viewed over the entire course of the dispute was not substantially justified; (3) that no special circumstances make an award unjust; and (4) that any fee application be timely submitted and supported by an itemized statement. See 28 U.S.C. § 2412(d)(1)(A)-(B); see also Scarborough v. Principi, 541 U.S. 401, 407-08 (2004); Comm'r v. Jean, 496 U.S. 154, 160-61 (1990); Norris v. Sec. & Exch. Comm'n, 695 F.3d 1261, 1264 (Fed. Cir. 2012); Ward v. U.S. Postal Serv., 672 F.3d at 1297; Libas, Ltd. v. United States, 314 F.3d 1362, 1365 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2003).

In order for a "unit of local government" to be included in the EAJA's definition of an eligible "party," the unit of local government must have had a net worth of less than $7,000,000.00 and must have had less than 500 employees at the time the civil action

was filed. See 28 U.S.C. § 2412(d)(2)(B); see also Meyer Grp., Ltd. v. United States, 129 Fed. Cl. 579, 584 (2016) (quoting 28 U.S.C. § 2412(d)(2)(B)). "'Net worth, for the purposes of the EAJA, is calculated by subtracting total liabilities from total assets.'" Lion Raisins, Inc. v. United States, 57 Fed. Cl. 505, 511 (2003) (quoting Scherr Constr. Co. v. United States, 26 Cl. Ct. 248, 251 (1992) (citation omitted)); see also Hyperion, Inc. v. United States, 118 Fed. Cl. 540, 544 n.2 (2014) (citing Lion Raisins, Inc. v. United States, 57 Fed. Cl. at 511). The plaintiff bears the burden of demonstrating that it satisfies the net worth requirements set forth in the EAJA. See Info. Scis. Corp. v. United States, 86 Fed. Cl. 269, 280 (citing Asphalt Supply & Serv., Inc. v. United States, 75 Fed. Cl. 598, 601, appeal dismissed (Fed. Cir. 2007); and Al Ghanim Combined Grp. Co. v. United States, 67 Fed. Cl. 494, 496 (2005), amended on denial of recons., 88 Fed. Cl. 626 (2009); see also Hyperion, Inc. v. United States, 118 Fed. Cl. at 544. An unaudited, qualified balance sheet that is not prepared in accordance with the Generally Accepted Accounting Principles (GAAP) is not sufficient to establish net worth. See Scherr Constr. Co. v. United States, 26 Cl. Ct. at 251; see also Info. Scis. Corp. v. United States, 86 Fed. Cl. at 280 ("Self-serving affidavits and unaudited balances, alone, are not considered sufficient to establish a plaintiff's net worth."). Although the EAJA's limitation for filing a timely request for attorneys' fees and costs "should be strictly met," a party that meets the jurisdictional requirements of the EAJA may supplement its request under the EAJA "to set forth a more explicit statement about his net worth." See Bazalo v. West, 150 F.3d 1380, 1384 (Fed. Cir. 1998) (stating that "the content of the EAJA application should be accorded some flexibility"); see also Q Integrated Cos., LLC v. United States, 133 Fed. Cl. 479, 489 (2017) (citing Scarborough v. Principi, 541 U.S. at 416-19).

In the above-captioned case, based on St. Bernard Parish's December 31, 2015 Comprehensive Annual Financial Report, St. Bernard Parish had total assets of $697,254,340.00 and total liabilities of $87,823,831.00 as of December 31, 2015. See St. Bernard Parish Gov't, Comprehensive Annual Financial Report 16 (2015), https://www.sbpg.net/ArchiveCenter/ViewFile/Item/425. St. Bernard Parish's total assets and total liabilities produce a total net worth of $609,430,509.00 as of December 31, 2015, which is slightly more than three months after plaintiff filed its September 25, 2015 complaint. See id. Consequently, St. Bernard Parish's net worth, as of the date on which St. Bernard Parish filed its September 25, 2015 complaint, appears to have exceeded the net worth limitation in EAJA of $7,000,000.00 for a unit of local government. See 28 U.S.C. § 2412(d)(2)(B). At this time, however, the court has not entered a final judgment in the above-captioned case, and plaintiff has not submitted an application for attorneys' fees and costs under EAJA. See 28 U.S.C. § 2412(d)(1)(A) ("A party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application for fees and other expenses which shows that the party is a prevailing party and is eligible to receive an award under this subsection . . . ."). Thus, the court need not decide, at this time, whether plaintiff is eligible to receive to attorneys' fees under the EAJA statute.

**CONCLUSION**

Defendant's motion to dismiss is **DENIED**. The court will set a schedule for further proceedings by separate Order.

**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

68