# In the United States Court of Federal Claims

**No. 15-1072C**
**Filed: October 28, 2026**

* * * * * * * * * * * * * * *
**ST. BERNARD PARISH GOVERNMENT,** *
**Plaintiff,** *
**v.** *
**UNITED STATES,** *
**Defendant.** *
* * * * * * * * * * * * * * *

**Claude F. Reynaud, Jr.**, Breazeale Sachse & Wilson, LLP, Baton Rouge, LA, for plaintiff. With him were **Jason A. Cavignac** and **Robert E. Couhig, Jr.**, Couhig Partners, LLC, New Orleans, LA, of counsel.

**Vincent de Paul Phillips, Jr.**, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. With him were **Steven J. Gillingham**, Assistant Director, Commercial Litigation Branch; **Patricia McCarthy**, Director, Commercial Litigation Branch; and **Brett A. Shumate**, Assistant Attorney General, Department of Justice, Washington, DC.

## O P I N I O N

**HORN, J.**

Plaintiff, St. Bernard Parish Government (St. Bernard Parish), a political subdivision in the State of Louisiana,[1] filed a breach of contract suit in the United States Court of Federal Claims asserting that the United States, acting through the United States Army Corps of Engineers (Army Corps), breached a December 1, 2005 Amended

---

[1] "A parish is a political corporation created for the purpose of administering a portion of the State and to which part of the powers of government is delegated to that effect . . . ." State ex rel. Centani v. Marrero, 13 Teiss. 185, 187 (La. Ct. App. 1915) (omission added); see also Vanderhoff v. Beary, 853 So. 2d 752, 755 (La. Ct. App. 2003), writ denied, 862 So. 2d 987 (La. 2004); Miller v. United States, 213 Ct. Cl. 59, 61 n.2, 550 F.2d 17 (1977) ("A Parish is a jurisdictional and political subdivision in Louisiana, corresponding to counties in other states of the Union.").

Cooperation Agreement[2] between St. Bernard Parish, the Lake Borgne Basin Levee District (Lake Borgne),[3] and the Army Corps relating to the repair of levees in Louisiana following a major hurricane. Adding to the complexity of plaintiff's claims in the above captioned case, for many years there were multiple Louisiana State court proceedings, as well as United States District Court proceedings in the United States District Court for the Eastern District of Louisiana, which addressed some of the same or other similar issues arising from the same hurricane. Proceedings in this court have involved a motion to dismiss filed by the defendant United States, which was denied by the court, followed by a protracted and confrontational discovery period. The current Opinion addresses the parties' bifurcated cross-motions for partial summary judgment in this court on the issue of defendant's liability for breach of contract under the Amended Cooperation Agreement pursuant to Rule 56(a) (2021) of the Rules of United States Court of Federal Claims (RCFC), including difficult considerations regarding the impact of previous agreements and decisions in various other lawsuits brought by and involving the parties in the case currently before the court. In a variety of State and Federal courts, both parties fought hard and long for their version of how the case should be decided. In the case currently under review in the United States Court of Federal Claims, there was an extensive, highly contested, discovery period, made worse by many potentially relevant records having been damaged as a result of major flooding after the hurricane. The parties also disagreed vigorously on the legal issues presented, with few, if any, agreement on the important, relevant issues.

## FINDINGS OF FACT

On September 1, 2005, the then President of St. Bernard Parish, Henry Rodriguez, Jr., issued an Executive Order under the Louisiana Homeland Security and Emergency Assistance and Disaster Act. See LA. STAT. ANN. § 29:721, et seq. (2005). In the September 1, 2005 Executive Order, Henry Rodriguez, Jr. acknowledged that a major hurricane "struck the state of Louisiana, causing severe flooding and damage to Southeastern Louisiana, including St. Bernard Parish, which has threatened the safety and security of the citizens of St. Bernard Parish along with private property and public facilities." Henry Rodriguez, Jr. stated in the September 1, 2005 Executive Order that "[t]he Governor of the State of Louisiana, [sic] declared a state of emergency for the entire state pursuant to Proclamation No. 48 KBB2005, and I, as Parish President, declare a State of Emergency for the entire Parish." (alterations added). In the September 1, 2005

[2] As discussed below, the Amended Cooperation Agreement supplanted an earlier cooperation agreement signed by St. Bernard Parish, the Lake Borgne Basin Levee District, and the Army Corps on November 3, 2005. Plaintiff and defendant agree that the December 1, 2005 Amended Cooperation Agreement governs the issues in this case, including plaintiff's and defendant's obligations related to the repair of levees and the payment of "just compensation" to private landowners.

[3] Lake Borgne is a statutorily created political subdivision of the State of Louisiana charged with the duty of overseeing and maintaining flood protection levees in the Parish of St. Bernard. See LA. STAT. ANN. § 38:327(A) (2026).

Executive Order, Henry Rodriguez, Jr. ordered the following:

> I am hereby authorized to commandeer or utilize private property during this local disaster pursuant to the authority of the Parish President under La. R.S. [Louisiana Revised Statute] 29:727 and grant rights of entry for usage for this purpose: emergency hurricane protection work, including access, borrow,[4] disposal, construction and any other required work.

(alteration and footnote added). At the time Henry Rodriguez, Jr. issued the September 1, 2005 Executive Order, the Louisiana Homeland Security and Emergency Assistance and Disaster Act provided that "[i]n addition to any other powers conferred upon the parish president by the constitution, laws, or by a home rule charter or plan of government, such authority may," "[s]ubject to any applicable requirements for compensation, commandeer or utilize any private property if he finds this necessary to cope with the local disaster." See LA. STAT. ANN. § 29:727(f)(4) (2005) (alterations added).[5]

On October 3, 2005, Mr. Steve Stockton, the then Deputy Director of Civil Works for the Army Corps, met with Mr. Paul Woodley, the then Assistant Secretary of the Army for Civil Works. This meeting was memorialized in an October 10, 2005 memorandum authored by Mr. Stockton (the October 10, 2005 Memorandum for Record), in which Mr. Stockton recounted that the purpose of the October 3, 2005 meeting was to provide Mr. Woodley with "information regarding options for recommended policy deviations to the [Army] Corps['] policy regarding local sponsor requirements to provide all lands, easements, rights-of-way, and disposal or borrow areas (LERRD)[6] associated with rehabilitation of damaged federal and non-federal hurricane protection and flood control projects at no cost to the federal government." (alterations and footnote added). Mr. Stockton also related in the October 10, 2005 Memorandum for Record that, "[i]n order to address the need to proceed with contracts for the preparation of the borrow areas for the federal Chalmette levee in St. Bernard Parish and to start construction of the non-federal St. Bernard levee," Mr. Woodley had verbally approved two policy deviations during the October 3, 2005 meeting, which were "[w]aiver for the LERRDs on the federal Chalmette

---

[4] "Borrow" or "'[b]orrow material' refers to soil 'dug in one location for use at another.'" White Oak Realty, L.L.C. v. United States Army Corps of Eng'rs, 746 F. App'x 294, 296 n.2 (5th Cir. 2018) (alteration added).

[5] The Louisiana Homeland Security and Emergency Assistance and Disaster Act has been amended several times since 2005. See LA. STAT. ANN. § 29:727 (2026). The language in subsection (f)(4), quoted above, however, remains unchanged between 2005 and 2026. See id.

[6] Some documents in the record before the court use the acronym "LERRD" to refer to lands, easements, rights-of-way, and disposal or borrow areas, while other documents in the record before the court use the acronym "LERD" to refer to the same. In this Opinion, the court will use the acronym "LERD" because the Amended Cooperation Agreement uses the acronym "LERD."

levee in St. Bernard Parish" and "[w]aiver for the LERRDs on the non-federal St. Bernard levee interim level of protection to 10 feet." (alterations added). According to the October 10, 2005 Memorandum for Record, Mr. Woodley also requested "information regarding the project sponsors ability to pay the required LERRD costs and the estimated cost to federal government for the recommended policy deviations."

On October 17, 2005, Ms. Linda LaBure, the then Chief of the Real Estate Division of the Army Corps, sent a letter to Mr. George Lopez, the then President of Lake Borgne. The Army Corps' October 17, 2005 letter to Mr. Lopez stated:

> Under the provisions of P.L. 84-99 [Public Law 84-99 (1955) (titled "Emergency Response to Natural Disasters")] the U.S. Army Corps of Engineers proposes to perform emergency construction within southeast Louisiana for the Task Force Guardian project.[7] This project involves the repair and rehabilitation of certain levees and flood control works to the authorized hurricane protection height previously constructed. Our goal is to ensure this level of protection as soon as possible, but no later than June 1, 2006.
>
> We [the Army Corps] propose to access and perform surveys, soil borings, cultural resources investigations, hazardous, toxic and radioactive waste (HTRW) investigations on property that has been proposed as a potential borrow source for emergency levee restoration work. Should the investigations conclude that the material in the proposed area be suitable for use as borrow material, the material will be excavated and used in association with restoring the Verret to Caernarvon Levee located in St. Bernard Parish, Louisiana. The property proposed for this work consists of

---

[7] A Judge of the United States Court of Federal Claims has explained the "Task Force Guardian" project as follows:

> In the aftermath of the storms, the [Army] Corps set about restoring, strengthening, and improving the levees. The agency divided this mission into two distinct efforts. The first was Task Force Guardian, which began around October 2005. This project focused solely on repairing the damage to the levees incurred during the hurricanes. The work was undertaken pursuant to Public Law No. 84–99, 69 Stat. 186, which pertains to "the repair or restoration of any flood control work threatened or destroyed by flood, including the strengthening, raising, extending, or other modification thereof." This emergency effort would eventually require approximately seven million embanked cubic yards of clay. The [Army] Corps achieved most of the aims of Task Force Guardian by June 2006, although it did not finish the work completely until some months later.

Nat'l Food & Beverage Co. v. United States, 105 Fed. Cl. 679, 684 (2012) (alterations added; internal references omitted).

> 6.51 acres and is located in Section 31, Township 13 South, Range 13 East, St. Bernard Parish Louisiana, and further described as south of State Highway 46 and north of Bayou Road, between the Mississippi River, east of the Caernarvon Freshwater Diversion Structure and southwest of the Mississippi River Gulf Outlet, west of Verret as shown on the enclosed maps.

(alterations and footnote added). The October 17, 2005 letter noted that work would consist of, among other activities, "[a]ccess, obtain borrow, and construct (repair and rehabilitate) the Verret to Caernarvon Levee in St. Bernard Parish to design grade prior to Hurricane Katrina." (alteration added). The October 17, 2005 letter further stated:

> By this letter, we [the Army Corps] are requesting right of entry, including ingress and egress, to perform surveys, soil borings, environmental clearances on, and obtain borrow material from a 6.51 acre area as shown on the enclosed map. This right of entry is required immediately in order to complete the emergency work before next hurricane season. The right of entry will remain valid until completion of construction.

(alteration added). The 6.51 acres described in the October 17, 2005 letter was land owned by Mrs. Alfreda Melerine Pizani and Mrs. Avis Melerine Juan.[8] The Army Corps included with the October 17, 2005 letter a document titled "AUTHORIZATION FOR ENTRY FOR ACCESS, SURVEYS, SOIL BORINGS, ENVIRONMENTAL CLEARANCES, BORROW, and CONSTRUCTION (Repair and Rehabilitation)," (capitalization in original), for the President of Lake Borgne to fill out and send back to the Army Corps.

On October 19, 2005, Mr. Lopez, the then President of Lake Borgne, sent a completed "AUTHORIZATION FOR ENTRY FOR ACCESS, SURVEYS, SOIL BORINGS, ENVIRONMENTAL CLEARANCES, BORROW, and CONSTRUCTION (Repair and Rehabilitation)," (capitalization in original), form to the Army Corps as requested. (the Authorization for Entry). The Authorization for Entry stated that Lake Borgne had "acquired the real property interests required by the Department of the Army as requested via letter dated October 17, 2005, from Linda C. Labure [sic], Chief, Real Estate Division." (alteration added). The Authorization for Entry continued:

> The property interests in part are via Henry Rodriguez, Jr.'s Parish President of St. Bernard Parish, invoking emergency powers of the Louisiana Homeland Security and Emergency Assistance and Disaster Act, R.S. 29:721 et. Seq. and commandeering of certain private property which

[8] Documents in the record before the court sometimes refer to the owners of the land at issue in this case, collectively, as "the Pizanis," and other times as "Ms. Pizani" and "Ms. Juan." When referring to the two landowners, the court will use "Mrs. Pizani and Mrs. Juan," unless the court quotes documents submitted by the parties to the court, which remain unchanged.

> private owners of real property shall be identified and compensated by LBBLD [Lake Borgne Basin Levee District] in accordance with Louisiana State law and which compensation to private landowners should be via agreement or settlement that shall not exceed the fair market value of the interest in real property commandeered or utilized at the time of the use. Should such an agreement or settlement not be reached within twelve months of the use of the property then the LBBLD will file appropriate judicial proceedings. The LBBLD is otherwise vested with sufficient title and interest in lands, to support repair and rehabilitation of the Lake Pontchartrain Louisiana and Vicinity, Hurricane Protection Levee in its jurisdiction and is described as follows and shown on attached maps.

(alteration added). The Authorization for Entry also stated: "I [Mr. Lopez] hereby authorize the Department of the Army, its agents, employees, and contractors to enter upon these lands [the 6.51 acres owned by Mrs. Pizani and Mrs. Juan] for access, surveys, soil borings, environmental clearances, borrow, and construction as set forth in the plans and specifications held" by the Army Corps. (alterations added). The Authorization for Entry further stated:

> In granting this Authorization for Entry for Access, Surveys, Soil Borings, Environmental Clearances, Borrow, and Construction (Repair and Rehabilitation), the Board of Commissioners of the Lake Borgne Basin Levee District agrees to hold and save the United States of America, its officers, agents, and assigns free from all damages arising from the construction, operation, maintenance, repair, replacement, and rehabilitation of the Project, except for damages due to the fault or negligence of the Government or its contractors.

(capitalization in original).

Five days later, on October 24, 2005, the then St. Bernard Parish President, Henry Rodriguez, Jr., issued a document titled "Commandeering Property and Granting Right of Entry for Access, Surveys, Soil Borings, Environmental Clearances, Borrow, and Construction in Connection with the Emergency Repairs of the Lake Pontchartrain Louisiana and Vicinity Hurricane Protection Levee, St. Bernard Parish." (the Commandeering Order). The Commandeering Order stated the following:

> I, Henry Rodriguez, Jr., President, St. Bernard Parish take the following actions in accordance with that certain Executive Order of St. Bernard Parish, Office of the Parish President, signed September 1, 2005, concerning emergency powers under the Louisiana Homeland Security and Emergency Assistance and Disaster Act, R.S. 29:721 et seq. and titled <u>Commandeering Property</u>.
>
> First, I hereby commandeer the use of certain private immovable property generally located in Section 31, Township 13 South, Range 13 East, St.

> Bernard Parish, Louisiana, further described as south of State Highway 46 and north of Bayou Road, between the Mississippi River, east of the Caernarvon Freshwater Diversion Structure and southwest of the Mississippi River Gulf Outlet, west of Verret as shown on the enclosed maps entitled Task Force Guardian Hurricane Protection, Right of Entry for Soil Borings in Proposed Borrow Area, St. Bernard Parish, dated 10/10/05 and Lake Pontchartrain and Vicinity/5A - St. Bernard Parish revised 17 June 2003. Said private property consists of approximately 6.51 acres.
>
> Said immovable property shall be used to gain access, obtain surveys, soil borings, cultural resources investigations, HTRW [hazardous, toxic, and radioactive waste] assessments, borrow, and construct (Repair and Rehabilitate) for the potential use in emergency levee restoration work. The work associated with the potential use of this site consists of obtaining borrow materials, gaining access, and constructing (repair and rehabilitating) the Verret to Caernarvon Levee in St. Bernard. As such, the Parish hereby obtains an assignable right and easement to gain access and obtain surveys, soil borings, cultural resources investigations, and HTRW assessments from said private immovable property, reserving however to the landowners, their heirs and assigns, all such rights and privileges in said land as may be used without interfering with or abridging the rights hereby acquired.
>
> Second, I hereby tender and grant an irrevocable right of entry to these lands to the Lake Borgne Basin Levee District for its use in obtaining access, surveys, soil borings, cultural resources investigations, HTRW assessments, borrow, and construction. I further understand that the Levee District will tender an Authorization for Entry for Access, Surveys, Soil Borings, Environmental Clearances, Borrow, and Construction to the United States Army Corps of Engineers, the Department of the Army, its agents, employees, and contractors to enter upon these lands to perform said surveys and investigations as set forth in the plans and specifications held in the U.S. Army Corps of Engineers' District Office, New Orleans, Louisiana.
>
> In granting this irrevocable right of entry for access, surveys, soil borings, environmental clearances, borrow, and construction, the St. Bernard Parish agrees to hold and save the United States of America, its officers, agents, and assigns free from all damages arising from the construction, operation, maintenance, repair, replacement, and rehabilitation of the Project, except for damages due to the fault or negligence of the Government or its contractors.

(alteration added; emphasis in original).

On November 3, 2005, after the then St. Bernard Parish President, Henry Rodriguez, Jr., issued the Commandeering Order commandeering the use of 6.51 acres of property owned by Mrs. Pizani and Mrs. Juan, the Army Corps, St. Bernard Parish, and Lake Borgne entered into the original Cooperation Agreement. Thereafter, on December 1, 2005, the Army Corps, St. Bernard Parish, and Lake Borgne entered into an agreement titled "AMENDMENT NO. 1 COOPERATION AGREEMENT BETWEEN THE UNITED STATES OF AMERICA AND THE LAKE BORGNE BASIN LEVEE DISTRICT AND THE PARISH OF ST. BERNARD, LOUISIANA FOR POST FLOOD RESPONSE ASSISTANCE (FLOOD or COASTAL STORM)." (capitalization in original) (the Amended Cooperation Agreement). The Amended Cooperation Agreement stated that it concerned "the acquisition of suitable borrow areas for the rehabilitation of particular features of the non-Federal levee lying within St. Bernard Parish, Louisiana." The Amended Cooperation Agreement referred to the Army Corps as "the Government," and referred to St. Bernard Parish and Lake Borgne, collectively, as the "Public Sponsors." Under "ARTICLE I – DEFINITIONS AND GENERAL PROVISIONS," (capitalization in original), the Amended Cooperation Agreement included the following definitions:

> A. The term "Construction Effort" shall mean repair consisting of enlargement (lift) of an existing levee section of non-Federal levee that lies within St. Bernard Parish, Louisiana with varying crown elevations ranging from approximately +6 to +10 North American Vertical Datum (NGVD), and will be constructed within the existing levee rights of way. The levee construction covers a total of 16.3 miles of levee and will be separated into 4 segments (2 segments to be accomplished by contract, 1 segment to be accomplished by Corps of Engineers hired labor, and the fourth segment to be accomplished by Louisiana National Guard), each segment described as follows:
>
> Segment 1: Paris Road to the Violet Canal (including the levee along the north bank of the Violet Canal) - 6.2 miles to be completed by contract;
>
> Segment 2: Violet Canal South Bank Levee - 1.4 miles to be completed by Corps of Engineers hired labor maintenance units;
>
> Segment 3: Violet Canal to Pump Station 5 - 1.7 miles to be completed by the Louisiana National Guard;
>
> Segment 4: Pump Station 5 to Verret (where the non Federal levee intersects the Hurricane Protection Levee) - 7.5 miles to be accomplished by contract.
>
> All levee sections will be the same, that is, an earthen levee section built up to a crown elevation of +10 NGVD with 1 vertical on 3 horizontal side slopes. The levee crown will be 10-feet wide, all in accordance with the one time exceptions to cost sharing policy, which are described in the CECW-ZB

> Memorandum For Records SUBJECT: ASA(CW) Verbal Approval of Policy Deviations dated 10 October 2005.
>
> B. The term "Construction Effort costs" shall mean all costs incurred by the Government directly related to construction of the Construction Effort. Such term shall include, but is not necessarily limited to: actual construction costs, including supervision and inspection costs; costs of contract dispute settlements or awards; the costs of lands, easements, rights of way, borrow, and relocations that are not owned, claimed or controlled by the Public Sponsors; and the cost of investigations to identify the existence of the hazardous substances as identified in Article XII.A. The term shall not include any costs for operation and maintenance; any costs that correct deferred or deficient maintenance; any increased costs for betterments or Public Sponsors' preferred alternatives; periodic nourishment under the project authorization; or the costs of lands, easements, rights-of-way, borrow, or relocations that are owned, claimed, or controlled by the Public Sponsors.
>
> C. The term "betterment" shall mean the design and construction of a Construction Effort feature accomplished on behalf of, or at the request of, the Public Sponsor, whether singly or collectively, in accordance with standards that exceed the standards that the Government would otherwise apply for accomplishing the Construction Effort.

(capitalization in original). Under "ARTICLE II – OBLIGATIONS OF THE GOVERNMENT AND PUBLIC SPONSORS," (capitalization in original), the Amended Cooperation Agreement provided:

> A. The Government, subject to receiving funds appropriated by the Congress of the United States, shall expeditiously construct the Construction Effort, applying those procedures usually followed or applied in Federal projects, pursuant to Federal laws, regulations, and policies. The Public Sponsors shall be afforded the opportunity to review and comment on all such solicitations for all contracts, including relevant plans and specifications, prior to the issuance of such solicitations. The District Engineer will, in good faith, consider the comments of the Public Sponsors, but award of contracts, modifications or change orders, and performance of all work on the Construction Effort (whether the work is performed under contract or by Government personnel or by non-Federal Government personnel), shall be exclusively within the control of the District Engineer.
>
> B. As further specified in Article III, the Public Sponsors shall provide right of entry to all lands, easements, and rights-of-way, including suitable borrow and dredged or excavated material disposal areas, determined by the Government to be necessary for construction, operation, and maintenance of the Construction Effort and the non-Federal levee.

> > 1. As further specified in Article III, after receiving the Public Sponsors' right of entry to the lands, easements, and rights of way, including suitable borrow and dredged or excavated material disposal areas (LERD) that are described in Article III.A.2. and III.A.3. of this Amendment, the Government, subject to the availability of appropriations, shall identify and pay just compensation to the owners of a compensable interest in the LERD described in Article III.A.3 of this Amendment. Additionally, the Government, subject to the availability of appropriations, shall acquire interests in those LERD described in Article III.A.2 of this Amendment to which the Public Sponsors were unable to obtain right of entry despite their best efforts.
> >
> > 2. As further specified in Article III, the Government shall perform such relocations as it determines to be necessary for the Construction Effort.

(capitalization in original). Under "ARTICLE III – LANDS AND PUBLIC LAW 91-646," (capitalization in original), the Amended Cooperation Agreement provided:

> A. The Government shall provide the Public Sponsors with a description of the anticipated real estate requirements and relocations for the Construction Effort. Thereafter, the Public Sponsors shall, at no cost to the Government, provide right of entry, to all lands, easements, and rights-of-way, including suitable borrow and dredged or excavated material disposal areas, (hereinafter LERD) as may be determined by the Government in that description, or in any subsequent description, to be necessary for the construction, operation, and maintenance of the non-Federal levee and the Construction Effort, in the manner hereinafter discussed.
>
> > 1. The Public Sponsors shall provide right of entry to all LERD that they own, claim or control (hereinafter Public Sponsor LERD) in a manner that is free and clear of any liens, defects of title, or encumbrances, including the release or subordination to the Construction Effort of any third party interests, as determined by the Government to be necessary for the construction, operation and maintenance of the Construction Effort;
> >
> > 2. The Public Sponsors shall use their best efforts to provide right of entry to LERD that any other non-Federal governmental entity owns, claims, or controls (hereinafter Other Non-Federal Governmental LERD) in a manner that is free and clear of any liens, defects of title, or encumbrances, including the release or subordination to the Construction

Effort of any third party interests within such LERD, as determined by the Government to be necessary for the construction, operation and maintenance of the Construction Effort; and

3. The Public Sponsors shall provide right of entry to all other LERD not owned, claimed, or controlled by the Public Sponsors or Other Non-Federal Governmental Entities (hereinafter Private LERD) as follows:

a. The Public Sponsors shall secure or cause to be secured an executive commandeering order or orders from the President of St. Bernard Parish, Louisiana, which said order or orders shall commandeer Private LERD, in accordance with powers set forth in La. R.S. 29:721, et seq.,[9] including all privately owned third party interests, as determined by the Government to be necessary for the construction, operation and maintenance of the Construction Effort;

b. In the event that the commandeering official is not the presiding official of the Public Sponsors, the Public Sponsors must secure a right of entry from the commandeering official to the Private LERD described in the Commandeering Order or Orders; and

c. The Public Sponsors shall tender a right of entry to the Government for the Private LERD.

4. The necessary lands, easements, and rights-of-way may be provided incrementally for each construction contract. All lands, easements, and rights-of way determined by the Government to be necessary for work to be performed under a construction contract must be furnished prior to the advertisement of that construction contract.

B. The Government shall perform such relocations as it determines to be necessary for the construction, operation, and maintenance of the

[9] The Louisiana statute cited in the Amended Cooperation Agreement is the same Louisiana statute cited by Henry Rodriguez, Jr., in his September 1, 2005 Executive Order, which stated that he was "hereby authorized to commandeer and utilize private property" and "grant rights of entry" for emergency work related to damage caused by the hurricane. See also LA. STAT. ANN. § 29:721.

Construction Effort. In addition, the Government in the name of the Public Sponsors, shall identify and provide just compensation to the owners of a compensable interest in the Private LERD and shall acquire the requisite interests in the non-Federal Governmental LERD to which the Public Sponsors, despite their its [sic] best efforts, was unable to obtain a free and unencumbered right of entry, all in accordance with the applicable provisions of the Uniform Relocation Assistance and Real Property Acquisitions Policy Act of 1970, Public Law 91-646, as amended by Title IV of the Surface Transportation and Uniform Relocation Assistance Act of 1987 (Public Law 100-17),[10] and the Uniform Regulations contained in 49 CFR Part 24, in acquiring lands, easements, and rights of way, required for construction, operation, and maintenance of the non-Federal levee and the Construction Effort, including those necessary for relocations, borrow materials, and dredged or excavated material disposal, and shall inform all affected persons of applicable benefits, policies, and procedures in connection with said Act.

> 1. The Government shall obtain a deed or servitude agreement, as appropriate, in the name of the Public Sponsors, for those interests described in the Commandeering Order or Orders referenced in Paragraph A.3.a. of this Article. In like manner, the Government shall obtain a deed or servitude agreement, as appropriate, in the name of the appropriate Public Sponsor, for those interests in the non-Federal Governmental LERD to which the Public Sponsors, despite their best efforts, was unable to obtain a free and unencumbered right of entry.
>
> 2. Where the Government is unable to obtain free and unencumbered title on the behalf of the Public Sponsors or to reach an agreement with the interest owners in the Private and Other Non-Federal Governmental LERD, the Government shall obtain such interests, in the name of the United States of America, through the exercise of its eminent domain authority.

[10] The Uniform Relocation Assistance and Real Property Acquisition Policies for Federal and Federally Assisted Programs Act, 42 U.S.C. § 4601, et seq. (2000), is interchangeably referred to in multiple ways in the record and in the parties' briefs, including as "the Uniform Relocation Assistance and Real Property Acquisition Policies Act," "the Uniform Relocation Assistance and Real Property Acquisitions Policy Act of 1970," "the Uniform Relocation Assistance and Real Property Acquisition Policy Act," "the Uniform Relocation Act," and the "URA." In this Opinion, the court will use the term "URA," except if quoting directly from a source provided to the court, which will remain unchanged.

> 3. After the Construction Effort is complete and the acquisition and eminent domain proceedings finalized, the Government shall transfer and assign all of the Private and Other Non-Federal Governmental LERD acquired in the name of the United States of America pursuant to paragraph B.2. of this Article to the Public Sponsors through quitclaim deed, which said transfer, quitclaim, and assignment the appropriate Public Sponsors hereby agree to accept.

(alteration added; capitalization in original; footnotes added).

According to the record before the court, Mrs. Pizani's and Mrs. Juan's property was commandeered on October 24, 2005 and the Army Corps entered Mrs. Pizani's and Mrs. Juan's property and excavated borrow material beginning in November 2005. The Army Corps completed excavation work on Mrs. Pizani's and Mrs. Juan's property on May 24, 2006. On January 23, 2006, roughly halfway through the Army Corps' use of Mrs. Pizani's and Mrs. Juan's property, the Army Corps sent a letter to Mrs. Pizani,[11] stating:

> As we have discussed, the U.S. Army Corps of Engineers (Corps) has been charged by the President and the Congress of the United States to bring the hurricane protection system in southeast Louisiana back up to its pre-Katrina authorized level of protection. The Corps is undertaking this work in coordination with the St. Bernard Parish Government and the Lake Borgne Basin Levee District (LBBLD), and repairs are now underway. New perpetual rights of way for borrow areas are required for the repairs, as well as temporary rights of way, such as access corridors, stockpiling, and construction. As a recipient of this letter, we would like to formally advise you that your property located in Section 31, Township 13 South, Range 13 East, and consisting of 6.51 acres, St. Bernard Parish, Louisiana has been identified as one that is being affected by this repair work.
>
> The deadline for performing this work is very short, June 1, 2006, the start of the next hurricane season. Using ordinary procedures, there would be no way of acquiring real property rights from landowners and still have time to perform the construction work prior to June 1. Accordingly, extraordinary measures must be utilized to deal with the extraordinary events. By the "Louisiana Homeland Security and Emergency Assistance and Disaster Act," the Louisiana Legislature conferred upon parish presidents and the Mayor of the City of New Orleans the authority to commandeer private property to respond to a disaster such as the aftermath of a devastating hurricane. These laws can be found in Title 29 of

[11] The Army Corps' January 23, 2006 letter appears to have been addressed only to Mrs. Pizani, even though both Mrs. Pizani and Mrs. Juan owned the land identified in the Army Corps' letter as "undivided owners in the property."

> the Louisiana Revised Statutes, beginning at Article 721 (http://www.legis.state.la.us/lss/lss.asp?doc=85667).
>
> One of the provisions of that Act is Article 727, subpart F. (4), which reads:
>
> > F. In addition to any other powers conferred upon the parish president [and Mayor of New Orleans] by the constitution, laws, or by a home rule charter or plan of government, such authority may do any or all of the following:
> >
> > > 4. Subject to any applicable requirements for compensation, commandeer or utilize any private property if he finds this necessary to cope with the local disaster. (http://www.legis.state.la.us/lss/lss.asp?doc=85673).
>
> The Corps and LBBLD have asked the President, St. Bernard Parish Government to exercise this authority in order to accomplish the necessary hurricane protection repairs caused by this disaster. In other words, we have asked him to commandeer the private property rights needed to perform the repair work.

(alterations in original). The Army Corps' January 23, 2006 letter continued:

> As the statute [LA. STAT. ANN. § 29:727(f)(4)] states, "applicable requirements for compensation to landowners must be accomplished". [sic] The Corps has agreed to handle the completion of the acquisition process, which includes title research and appraisals, to ensure that just compensation is offered to the proper landowners. Accordingly, after the President, St. Bernard Parish Government, exercised the commandeering authority over your property and granted the LBBLD the right of entry to start the necessary repairs, the Corps commenced efforts to acquire the needed property rights. This process is proceeding as quickly as feasible in accordance with all the due process and just compensation requirements of the Constitution and laws of the United States.
>
> A brief description of what has transpired to date in regard to your property is explained as follows. Your property was commandeered in October 2005 for access, borrow, and construction. Work initiated on the site in November 2005. As discussed during a recent conversation with you, our use of the borrow site is currently nearing completion. At your request on behalf of your family, and as a safety precaution, a six foot fence will be installed around the perimeter of the pit at the conclusion of its use. In recent discussions you were also informed that a U.S. Army Corps of Engineers, Real Estate Appraiser would be making contact with you. Since that conversation,

> coordination has taken place between yourself, Mrs. Juan, and the Real Estate Appraiser, and a site visit has been scheduled for Friday, January 27, 2006, at 1:00 pm. The importance of performing a 30-50 year title search by an Attorney has also been explained. A recent inquiry was made to the St. Bernard Clerk of Court's Office on January 12, 2006, whereby they informed us that the courthouse still does not have the capability for an Attorney to perform title research. Please be advised that this is an important step in our process that must be performed, prior to the payment of just compensation.

(alterations added).

On June 19, 2006, the Army Corps sent a letter addressed to Mrs. Juan[12] concerning a May 25, 2006 site inspection of the "Creedmoor Borrow pit" (a.k.a. Mrs. Pizani's and Mrs. Juan's property) conducted by Mrs. Michelle Marceaux, Ms. Rebecca Huffman, and Mr. Michael Stack from the Army Corps. The Army Corps' June 19, 2006 letter stated:

> The site inspection was scheduled upon the completion of our use of the site from which we obtained borrow material to restore a portion of the non-Federal Chalmette Back Levee during emergency restoration efforts. Additionally, and as requested by you and your sister, Mrs. Alfreda Pizani, we wanted to provide the keys to the gate locks on the fence raised around the newly constructed borrow pit to you and your sister, the fee owners.

The June 19, 2006 letter also summarized past discussions between the Army Corps and Mrs. Pizani and Mrs. Juan concerning potential liability arising from the borrow pit. Specifically, the June 19, 2006 letter stated:

> On May 25, 2006, prior to turning the gate lock keys over to you, a site inspection was performed to ensure that the Corps construction crew had addressed all concerns on behalf of yourself and your sister in regard to the security of the fence, specifically the holes that were located at one end of the pit large enough for a child to crawl under. Upon inspection, the concerns had been corrected by adding a second pipe along the bottom of the fence in the east corner and down the eastern side of the fence, as well as pushing bulldozed quantities of dirt along the entire bottom perimeter of the fence. It was explained by Mr. Mike Stack, of the Corps of Engineers construction crew, that the entire site had been graded, seeded, and fertilized, and that grass cutting should not take place until the grass reaches at least knee height to give it a better start.

[12] Although the Army Corps' June 19, 2006 letter was addressed only to Mrs. Juan, the last page of the letter indicates that a carbon copy also was sent to Mrs. Pizani.

> On May 25, 2006, at the site inspection, you expressed concerns about taking control of the keys to the gates because you had not yet been compensated for use of the property, and you did not want to take responsibility for the liability. Mrs. Marceaux explained where we were with the acquisition process and that compensation is forthcoming, hopefully before the end of this year. Mrs. Marceaux also provided you and your sister with a copy of a letter that had been recently mailed to the both of you dated May 22, 2006, whereby attached were copies of the Commandeering paperwork, the Authorization for Entry, a survey map, and a legal description. It was determined at the closing of the site visit that the Corps of Engineers would remain in control of the keys until which time a Corps attorney could be consulted as to when the liability issue returned to the landowners, upon completion of construction or upon receiving compensation.
>
> Upon return to the office and consultation with a Corps attorney, our attorney advised that because we are acquiring "temporary" rights for use of an area for borrow material, the fee owners remain liable for the lands before, during, and after construction. In other words, as the underlying fee owner, liability for the land was and still remains with you and your sister as the owners of the property.
>
> After explaining to the Corps attorney the various meetings and discussions that we have had with you and your sister, we have been advised that if the property owners do not want to accept the keys to the gate locks that have been placed on the safety fence installed around the borrow pit, then we will have no choice but to remove the locks, as well as the fence if that is what you would prefer.

The June 19, 2006 letter further stated:

> The Corps of Engineers will not remove any additional material from the borrow pit. As noted in the attached, the Corps agreed not to utilize the 400 feet of road frontage area, despite the fact that this area had been commandeered for our use. As of May 25, 2006, our use of your property for borrow was completed. We are anxious to move forward with our next mission and, therefore, need to make arrangements to either get the keys to the gate locks to you or take action to remove the locks.

On July 13, 2006, Mrs. Pizani and Mrs. Juan signed an acknowledgement letter, which stated:

> This is to acknowledge that Mrs. Avis Juan and Mrs. Alfreda Pizani have been provided with, and have accepted, the keys (4) to the gate locks that have been placed on the security fence that was constructed around the borrow pit, also known as the Creedmoor Borrow Pit, located in Section 31,

> Township 13 South, Range 13 East, south of State Highway 46, and north of Bayou Road, St. Bernard Parish, Louisiana, for which they are the fee owners. The borrow pit was provided on October 24, 2005, for borrow construction in connection with the emergency repairs of the St. Bernard Parish levees in response to Hurricane Katrina. Construction of the pit was completed on May 24, 2006, and is no longer needed for use.

(emphases in original).

On August 17, 2006, at the request of the Army Corps Real Estate Division, Truax, Robles & Baldwin Appraisers LLC completed an appraisal and property market value report on Mrs. Pizani's and Mrs. Juan's property. (the August 2006 Appraisal Report). The August 2006 Appraisal Report stated:

> The proposed acquisitions evaluated herein constitute the imposition of temporary borrow and work area easements/servitudes upon the entirety of the "parent" tract (combination of Tract Nos. B100E-1 and B100E-2), as identified herein; said easements/servitudes give the holder of same the right "to clear, borrow, excavate and remove soil, dirt and other materials" with regard to Tract B100E-1 (230,035 square feet) and "to deposit fill, spoil and waste material . . . to move, store and remove equipment and supplies", etc. with regard to Tract B100E-2 (67,611 square feet) for a period not to exceed one year. As such, the market value of the acquisition constitutes the difference between the "before" acquisition and "remainder" ("after" acquisition) property values with due consideration being afforded compensation or rent for loss of use logically associated with imposition of the temporary easements/servitudes.
>
> An inspection of subject property was last accomplished on August 14, 2006. However, the purpose of this appraisal is to establish the market value of the acquisitions, which were accomplished on October 24, 2005; thus, the date of the acquisitions, or October 24, 2005, is the effective date of valuation. It is specifically presumed herein that, except for the removal of excavated soils pursuant to provisions of the borrow easement/servitude evaluated herein, there is no material difference in the physical condition/status of subject property between the date of last inspection and the effective date of valuation; such was asserted to be the case by the property owner.

(omission in original).

The August 2006 Appraisal Report evaluated a "temporary right and easement to clear, borrow, excavate and remove soil, dirt, and other materials from (Tract No. B100E-1), for a period not to exceed one (1) year," and a "temporary easement and right-of-way in, on, over and across Tract No. B100E-2 for a period not to exceed one year." The August 2006 Appraisal Report addressed "both the unencumbered or fee simple

interest/estate in subject property and/or same as encumbered by the cited easement/servitude." The August 2006 Appraisal Report stated that the property interests appraised excluded "mineral rights" and "other subterranean interest (i.e., water, gravel, salt, etc.)." The August 2006 Appraisal Report described the "before" acquisition property as a "±297,646 square foot, vacant land parcel"[13] and the "after" acquisition property as a:

> ±297,646 square foot, vacant land parcel with 230,035 square feet of same (Tract B100E-1) being physically "improved" with a "borrow pit" (excavated area to a depth of ±20'); thus, only 67,611 square feet (Tract B100E-2 or the "parent" tract to a depth of ±325' from Louisiana Highway 46) of subject "parent" tract is usable/developable "after" acquisition. Note: Those areas of the "before" parcel encumbered with the "borrow" easement/servitude (tract B100E-1; 230,035 square feet) effectively constitute a "borrow pit" (excavated or nonfunctional perimeter areas)

(emphasis in original).[14]

According to the August 2006 Appraisal Report, "[t]he value of the subject property both 'before' and 'after' acquisition" was determined by "employing the Sales Comparison Approach to Value" which analyzes "recent sales of similar properties in the general area showing the value of the subject property by comparison." (alteration added; capitalization and emphasis in original). Accordingly, the August 2006 Appraisal Report included a sales

[13] Neither party attempts to explain the meaning of the "±" symbol that is used repeatedly in the two appraisal reports in the record currently before the court. The "±" symbol is sometimes used "to indicate a plus or minus quantity (such as 4 in 'the population age was 30 ± 4 years')." See Plus/minus sign, Merriam Webster.com Dictionary, https://www.merriam-webster.com/dictionary/plus%2Fminus%20sign (last visited Oct. 28, 2026).

[14] As indicated above, the 2006 Appraisal Report described Mrs. Pizani's and Mrs. Juan's property as a "parent" tract, totaling approximately 297,646 square feet, and consisting of Tract B100E-1 (230,035 square feet) and Tract B100E-2 (67,611 square feet). When converted to acreage, these figures yield a 6.83-acre "parent" tract, consisting of a 5.28-acre Tract B100E-1 and 1.55-acre Tract B100E-2. The court notes, however, that, as discussed above, the portion of Mrs. Pizani's and Mrs. Juan's property identified in the Commandeering Order and Authorization for Entry was 6.51 acres. As discussed below, defendant has explained, in the context of defendant's later condemnation proceeding in the United States District Court for the Eastern District of Louisiana: "The two tracts [Tract B100E-1 and Tract B100E-2] were largely congruent with the approximately 6.51 acres of land commandeered. After obtaining and reviewing property surveys in 2006 in preparation for negotiations with [Mrs.] Pizani [and Mrs. Juan], the Corps increased the area condemned [to 6.83 acres] to include land on both the south and the east side of the property, so that [Mrs.] Pizani [and Mrs. Juan] would not be left with an uneconomic remnant." (alterations added).

comparison of five rural and vacant land plots for residential development in the St. Bernard Parish area, sold between February and July of 2006. The August 2006 Appraisal Report determined that the market value of the property "before" acquisition, or a fee simple interest in the entire "parent" tract, as of October 24, 2005, was $134,000.00, and the market value of the property "after" acquisition was $88,000.00, less "rent loss" of $13,400.00,[15] to equal $74,600.00. The August 2006 Appraisal Report consequently determined that the market value of the government's acquisition of the temporary easements identified above was $59,400.00, which was the difference between the market value of the property "before" and "after" the Army Corps acquired the temporary easements ($134,000.00 – ($88,000.00 – $13,400.00) = $59,400.00).

On November 17, 2006, the Army Corps sent an appraisal report letter addressed to Mrs. Juan,[16] which stated:

> In accordance with the Commandeering Order executed by the St. Bernard Parish President on October 24, 2005, your property was commandeered for use as a temporary borrow area, and shortly thereafter, the borrow area was reduced in size per your request in order to leave more road frontage, the remainder of which is located nearer to Highway 46 was used as a temporary work area for the staging and stockpiling of material and construction equipment. The property was used for approximately one year in connection with the emergency repairs and rehabilitation of the non-Federal Chalmette back levee, St. Bernard Parish, due to Hurricane Katrina.

---

[15] With respect to "rent loss," the August 2006 Appraisal Report explained:

> Determining the value of the rent loss due to the property owner for imposition of the temporary servitudes/easements is rather simple. This "acquisition" is equivalent to the renting of the area to be so encumbered for 12 months. Annual land rents are typically established based upon application of a rate of return to the underlying land value; rates of between ±8.5% to ±10% are currently evidenced in the market, with other lease terms/provisions dictating the particularly applicable rate. Given the relatively small size of this parcel, current market dynamics and the short duration of the temporary easements/servitudes, a rate of ±10% is judged applicable in this instance. Thus, the "value" of the rent loss is calculated as follows:
>
> <u>Value "Before" Acquisition</u>
> $134,000 x 10% per year x 1 year = $13,400

(capitalization and emphasis in original; footnote omitted).

[16] Although the Army Corps' November 17, 2006 letter was addressed only to Mrs. Juan, the last page of the letter indicates that a carbon copy also was sent to Mrs. Pizani.

> By provisions of the Fifth Amendment of the U.S. Constitution, all owners of property utilized for this work will be provided with an offer of just compensation for any temporary and/or permanent rights required for the construction, maintenance, and operation of the project.
>
> We are in receipt of the tract appraisal for property, which our current records indicate that you purportedly own. The property is located adjacent to Highway 46, described as Lot 1, Creedmoor Plantation, Section 31, Township 13 South, Range 13 East, St. Bernard Parish, Louisiana, identified in Government records as Tract Nos. B100E-1 and B100E-2.
>
> In compliance with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Public Law 91-646, as amended, we are advising that just compensation for the tracts listed above has been established as $59,400, and the breakdown is as follows:

| Tract No. | Acreage | Estate | Amount |
|---|---|---|---|
| B100E-1 | 5.28 acs | Temporary Borrow Area | $50,600 |
| B100E-2 | 1.55 acs | Temporary Work Area | $8,800 |
| TOTAL | | | $59,400 |

(capitalization and formatting in original). The November 17, 2006 appraisal report letter described the appraisal methodology as follows:

> The amount of just compensation previously stated is based upon and is not less than our approved appraisal of the fair market value of the estates appraised. Fair market value is defined as the amount in cash, or in terms reasonably equivalent to cash, for which in all probability, the property would be sold by a knowledgeable owner willing, but not obligated to sell to a knowledgeable purchaser who desires, but is not obligated to buy.
>
> The estimated market value of the estates is the amount that the market value of fee title is reduced by the imposition of the estates. Our appraisal was made by a qualified real estate appraiser using standard, nationally accepted valuation techniques recognized by authorities in the appraisal field, and taking into consideration the value of the land, its location, and its highest and best use. He has disregarded any increase or decrease in the fair market value caused by the Government's project. The Federal statute provides that just compensation is determined based upon the value of the property on the date of taking. The date of taking for your property would be the date that the local official commandeered your property, October 24, 2005.
>
> The basic approaches to value which may be considered by the appraiser can be classified as market data, income, and cost. Primary reliance for the

> valuation of the property was placed on the market data approach, including the prices at which similar property has sold recently. The current highest and best use of the subject property is for possible development with a maximum of two single family homes. In making the appraisal, five sales of land similar to your land, which sold recently, including one with a borrow pond, were used for comparison. These sales were adjusted on the basis of such factors as size, location, terms of sale, lapse of time, topography, and improvements. After completion, the appraisal was reviewed by a qualified appraiser who approved it as a well-documented conclusion of the market value of the estates to be acquired.

According to a document titled "Negotiator's Report," which was submitted as an exhibit to defendant's cross-motion for partial summary judgment, the Army Corps' negotiator, Ms. Michelle Marceaux, thereafter contacted Mrs. Pizani, Mrs. Juan, and/or their then counsel, Mr. Robert Talley,[17] several times between November 17, 2006 and May 30, 2007, in order to negotiate the government's acquisition of the temporary borrow area easement and the temporary work area easement described in the August 2006 Appraisal Report and the November 17, 2006 appraisal report letter. On November 22, 2006, Ms. Marceaux contacted both Mrs. Pizani and Mrs. Juan and explained that the sisters could submit a counteroffer in response to the Army Corps' initial $59,400.00 offer of just compensation. On December 4, 2006, Ms. Marceaux followed up with Mrs. Pizani, reiterated that she could submit a counteroffer, and "requested that she get with Mrs. Avis [Juan] and include in her counteroffer letter, the basis for the counteroffer and any supporting documentation she could produce and that we [the Army Corps] would take it into consideration." (alterations added). On December 19, 2006, Ms. Marceaux followed up with Mrs. Pizani and Mrs. Juan about the status of their counteroffer. On January 17, 2007, Ms. Marceaux again followed up with Mrs. Pizani and Mrs. Juan about the status of their counteroffer. According to the Negotiator's Report, on January 19, 2007, "[a] letter was drafted to both Mrs. Alfreda [Pizani] and Mrs. Avis [Juan] indicating that we [the Army

---

[17] As discussed below, the above captioned case involved an extensive and overly hard fought discovery period, including multiple attempts at settlement of discovery disputes to no avail, all of which was made more difficult by the contentious and uncooperative nature of the relationships between some of the early participants and some of the representatives earlier in the case. Although, the current lead attorney for defendant has been effective to work cooperatively with plaintiff's counsel. In addition, Mr. Robert Talley, who was Mrs. Pizani's and Mrs. Juan's counsel during negotiations with the Army Corps, albeit not formally involved as counsel of record in the above captioned case for the plaintiff, initially refused to answer interrogatories in the case currently under review, citing blanket claims of privilege, even after this court's Orders instructing Mr. Talley to respond to the interrogatories. After a long while, Mr. Talley eventually responded to the interrogatories in writing, albeit providing some non-responsive answers. Mr. Talley declined further involvement in the case currently before the court, except that he attended the oral argument on the parties' cross-motions for partial summary judgment in the above captioned case as an observer and sat at plaintiff's counsel table, according to Mr. Talley, for "[m]oral support." (alteration added).

Corps] were ready, willing, and able to continue negotiations with them and asked that they contact us regarding the status of their counteroffer by NLT [no later than] 3 February 2007." (alterations added). The Negotiator's Report then recounts a January 29, 2007 telephone call between Ms. Marceaux and Mrs. Pizani:

> Mrs. Alfreda [Pizani] phoned. She wanted to know what the letter meant when we said, if we didn't hear from them by the 3rd of February, we, the Corps, would take the next step. I explained to her that following regulations, I would have to send another letter explaining that we had been trying to negotiate in good faith and we weren't able to agree on a price. I also told her though, that since she had contacted us and was trying to get a counteroffer in here, the letter wasn't necessary yet. She is supposed to get with her sister, Ms. Avis [Juan] tonight. She wasn't able to do it over the weekend.

(alterations added). On February 5, 2007, Ms. Marceaux attempted to contact Mrs. Pizani by phone again to "check the status of the counteroffer." On the same day, Mrs. Pizani returned Ms. Marceaux's phone call and informed Ms. Marceaux that "she and her sister had sought counsel" and that counsel, Mr. Talley, was "currently reviewing their [Mrs. Pizani's and Mrs. Juan's] data." (alteration added). The Negotiator's Report then recounts a February 6, 2007 telephone call between Ms. Marceaux and Mr. Talley, Mrs. Pizani's and Mrs. Juan's then counsel, to follow up on their land which had been commandeered as a borrow site as part of the hurricane damage repair. The Negotiator's Report states:

> I [Ms. Marceaux] explained that back on 5 Feb, Ms. Alfreda Pizani had told me that she and her sister had provided all their information to him [Mr. Talley] and that he was reviewing it for them. I also explained that she had told me that he would be contacting me and to date I had received no call from him. Mr. Talley explained that he was not in the office today. I told him that was okay that I was just following up to see what could be done to get this acquisition moving forward. He explained that he would pull their file when he get's [sic] back in the office tomorrow and touch base with the ladies. He confirmed that I needed a counteroffer in writing - I confirmed. I also explained that one could be faxed to me. He said he was provided with a pretty good docile [sic] of material and that he had all my contact information. He said I'd be hearing from him soon.

(alterations added). On February 15, 2007, Ms. Marceaux again followed up with Mr. Talley "on the status of the counteroffer of the property in St. Bernard Parish which was owned by his clients Mrs. Alfreda Pizani and Mrs. Avis Juan." On March 20, 2007, once again, Ms. Marceaux mailed a letter "to Mr. Talley requesting that he contact me [Ms. Marceaux] NLT 13 April 2007 with an acceptance of our offer or a proposed counteroffer." (alteration added). On March 21, 2007, Ms. Marceaux "emailed Mr. Talley informing him that I [Ms. Marceaux] had placed a letter in the mail to him." (alteration added). On April 13, 2007, Ms. Marceaux received a phone call from Mr. Talley "requesting a meeting with Mrs. Linda Labure [sic] and others of authority, in order to discuss the property in St.

Bernard Parish, and several complicating issues that go with it." (alteration added). An in-person meeting was set for May 30, 2007.

On May 30, 2007, Mr. Talley met with Army Corps representatives, including Ms. Linda LaBure, the then Chief of the Real Estate Division of the Army Corps, in person in New Orleans. According to the Negotiator's Report, at the in-person meeting, "Mr. Talley introduced a letter to Mrs. Labure [sic] and the other attendees, explaining that his clients [Mrs. Pizani and Mrs. Juan] had elected to decline the Government offer of $59,400." (alterations added). The letter introduced by Mr. Talley at the May 30, 2007 meeting stated:

> According to my clients [Mrs. Pizani and Mrs. Juan], approximately 97,931 cubic yards of soil was extracted from their property. The unit value of the extracted soil was $25 per cubic yard, according to a December 29, 2006 article in the Times Picayune quoting Major General Don Riley, the [Army] Corps' Director of Civil Works. Doing the math, my clients have lost $2,448,275.00 of marketable soil.
>
> My clients are also entitled to attorney fees in the amount of 1/3 of the $2,448,275.00, or $816,091.66. The combined amount due to these nice ladies for the property taken is therefore **<u>$3,264,366.66</u>**. Please consider this a counteroffer to the $59,400.00 previously offered.

(alterations added; all emphasis in original).[18] The Negotiator's Report recounted the following discussion between Ms. Linda LaBure and Mr. Talley:

> Once the letter was reviewed by [Army] Corps['] personnel, Ms. Labure [sic] explained to Mr. Talley that if he was asking for her to agree to pay reimbursement to his clients at per cubic yard values, she was not allowed to do that. She explained to him that the borrow pit was obtained for use as a Government-furnished borrow pit and that we [the Army Corps] only compensate surface use, or acreage used. Mr. Talley stated that soil is a mineral and minerals could be sold in the open market. He explained that Ms. Alfreda[ Pizani]'s brother-in-law had approached the Corps and that he had indicated that he thought he would be paid by the truckload. Michelle [LaBure] confirmed that at no time did the Corps represent that they would be paid by truckload or by cubic yard. All details of what was to transpire in regard to the construction of the pit was explained to the landowners prior to the construction taking place and the compensation by surface use/by the acreage and not by cubic yards was clearly explained on numerous occasions.

[18] It is unclear, based on the record currently before the court, how Mrs. Pizani and Mrs. Juan determined "approximately 97,931 cubic yards of soil was extracted from their property."

(alterations added). By email on the same day, May 30, 2007, the Army Corps submitted a response to the counteroffer with a second offer of "just compensation" of $100,000.00. On June 7, 2007, on behalf of Mrs. Pizani and Mrs. Juan, Mr. Talley rejected the Army Corps' $100,000.00 counteroffer. The Army Corps, therefore, then determined that negotiations were unsuccessful and, on July 6, 2007, sent Mr. Talley a letter notifying him that the Army Corps was going to begin eminent domain proceedings by filing a condemnation action in the United States District Court for the Eastern District of Louisiana.[19]

Proceedings in the 34th Judicial District Court of the Louisiana District Courts

On July 10, 2007, Mrs. Pizani and Mrs. Juan filed a State court lawsuit against St. Bernard Parish and Lake Borgne in the 34th Judicial District Court of the Louisiana District Courts (the Louisiana State Trial Court).[20] See Complaint, Pizani v. St. Bernard Parish, No. 109-548 (34th Jud. Dist. Ct. July 10, 2007). Mrs. Pizani and Mrs. Juan alleged in the Louisiana State Trial Court complaint that, "[o]n or about October 24, 2005, Defendants [St. Bernard Parish and Lake Borgne] commandeered Petitioners' [Mrs. Pizani's and Mrs. Juan's] property, continuing their adverse possession until July 13, 2006." Id. at 1 (alterations added). According to the Louisiana State Trial Court complaint, when Mrs. Pizani's and Mrs. Juan's "property was returned to them on July 13, 2006, Petitioners learned that Defendants had participated in the extraction of at least 97,931 cubic yards of soil from their property." Id. In the Louisiana State Trial Court complaint, Mrs. Pizani and Mrs. Juan sought damages equal to

> the unit value of no less than the 97,931 cubic yards of soil extracted and/or converted from their property at the fair market value at the time of extraction, which Petitioners aver is $25.00 per cubic yard, together with legal interests from the date of extraction, attorney fees, and all costs of these proceedings pursuant to R.S. 13:5111.

Complaint at 2, Pizani v. St. Bernard Parish, No. 109-548.

Nearly ten years later, on December 20, 2016, the Louisiana State Trial Court issued a judgment against St. Bernard Parish in Pizani v. St. Bernard Parish. See Judgement at 1-2, Pizani v. St. Bernard Parish, No. 109-548 (34th Jud. Dist. Ct. Dec. 20, 2016). According to the Louisiana State Trial Court's December 20, 2016 judgment:

> Plaintiffs [Mrs. Pizani and Mrs. Juan] were the owners in indivision of real property in St. Bernard Parish which was commandeered by Defendant St.

[19] As more fully discussed below, the condemnation action in the United States District Court for the Eastern District of Louisiana was initially filed by the United States on February 14, 2008.

[20] According to plaintiff, Mrs. Pizani and Mrs. Juan voluntarily dismissed Lake Borgne from the Louisiana State Trial Court action on August 21, 2008.

> Bernard Parish Government on October 24, 2005 and returned to Plaintiffs on July 13, 2006. The Court makes the following awards, individually and collectively, to the Plaintiffs for compensation and damages sustained as a result of the commandeer, and for statutory attorney fees, expert fees, and the court costs.

Id. at 1 (alteration added). The Louisiana State Trial Court's December 20, 2016 judgment further provided the following:

> **IT IS ORDERED, ADJUDGED AND DECREED** that there be judgment herein in favor of Plaintiff Alfreda Melerine Pizani and against Defendant St. Bernard Parish Government in the full sum of $989,000.00, together with legal interest thereon from the date of commandeer of October 24, 2005, until paid.
>
> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that there be a judgment herein in favor of Plaintiff Avis Melerine Juan and against Defendant St. Bernard Parish Government in the full sum of $989,000.00, together with legal interest thereon from the date of commandeer of October 24, 2005, until paid.
>
> **IT IS FUTHER ORDERED, ADJUDGED AND DECREED** that there be judgment herein in favor of Plaintiffs Alfreda Melerine Pizani and Avis Melerine Juan against Defendant St. Bernard Parish Government for attorney fees pursuant to R.S. 13:5111 in the amount of forty percent (40%) of the combined total (awarded sums plus interest, expert fees, and costs) of all sums awarded Plaintiffs herein less $59,400.00.[21] The Court further determines that the attorney fee award is reasonable and appropriate under

[21] As discussed more fully below, on February 14, 2008, after attempting to negotiate with Mrs. Pizani and Mrs. Juan and failing to achieve an agreement on just compensation, the United States initiated formal condemnation proceedings in the United States District Court for the Eastern District of Louisiana for a "Temporary Borrow Easement" and a "Temporary Work Area Easement" in connection with the Army Corps' use of Mrs. Pizani's and Mrs. Juan's property, filed a Complaint in Condemnation and a Declaration of Taking, and deposited a "gross sum estimated" of $59,400.00 as "just compensation." The sum of $59,400.00 referenced in the Louisiana State Trial Court's December 20, 2016 judgment appears to reflect the initial deposit of "just compensation" by the United States in the United States District Court for the Eastern District of Louisiana on February 14, 2008. The court notes, however, that, as discussed below in this Opinion, on September 7, 2010, the United States subsequently filed an amended Complaint in Condemnation and amended Declaration of Taking in the same United States District Court for the Eastern District of Louisiana condemnation action for a taking in fee simple and increased its deposit of "just compensation" to a total of $134,000.00 for the taking in fee simple, which Mrs. Pizani and Mrs. Juan withdrew in exchange for a fee simple interest in Mrs. Pizani's and Mrs. Juan's property.

> the circumstances of this case and after consideration of the applicable Williamson factors.
>
> **IT IS FUTHER ORDERED, ADJUDGED AND DECREED** that there be judgment herein in favor of Plaintiffs Alfreda Melerine Pizani and Avis Melerine Juan against Defendant St. Bernard Parish Government for expert fees and court costs pursuant to R.S. 13:5111 and 13:5112 in the sum of $14,200.03, together with legal interest thereon from date of judgment until paid.

Id. (emphasis and capitalization in original; footnote added). On January 18, 2017, the Louisiana State Trial Court issued an amended judgment of its December 20, 2016 judgment by ordering that "the attorney fees awarded in this matter to Plaintiffs pursuant to R.S. 13:5111 shall accrue legal interest thereon from the date of judgment of December 20, 2016, until paid." See Amended Judgment at 1, Pizani v. St. Bernard Parish, No. 109-548 (34th Jud. Dist. Ct. Jan. 18, 2017).

Following the Louisiana State Trial Court's judgment, on January 20, 2017, St. Bernard Parish entered a "JOINT AND RECIPROCAL AGREEMENT," (capitalization in original), with Mrs. Pizani and Mrs. Juan. The pertinent portion of the Joint and Reciprocal Agreement provided:

> Owing to the risks, benefits, and vicissitudes of further litigation, Plaintiffs [Mrs. Pizani and Mrs. Juan] and St. Bernard hereby mutually agree to immediately cease all adverse action between and against each other in Alfreda Melerine Pizani and Avis Melerine Juan vs. St. Bernard Parish, et al, 34th Judicial District Court, # 109-548 Div. E, waiving all appellate rights in Louisiana state courts. It is the mutual intent of the parties to this Joint and Reciprocal Agreement that the Judgement signed December 20, 2016 in the above captioned matter (as amended) become final and executory for purposes of immediate executory and collection proceedings in the United States Court of Federal Claims, or other necessary forum, to resolve this very old case for both parties.
>
> In consideration for the reciprocal agreements set forth herein, Plaintiffs agree to suspend and forego all collection rights against St. Bernard regarding the Judgement provided that St. Bernard pursues indemnification for payment of the Judgement (as amended) in the United States Court of Federal Claims in Case No. 15-1072C [the case currently under review] and for a period of 60 days past termination and finality of all such proceedings, including appeals, and also further agree to accept such amounts recovered in the United States Court of Federal Claims in Case No. 15-1072C (or such other proceedings as may be instituted for collection of the Judgement, as amended) in full satisfaction of all sums owed to Plaintiffs by St. Bernard in the Judgement (as amended). Plaintiffs hereby further agree to execute a full Release and Satisfaction of the Judgement (as amended) in favor of St.

> Bernard within 30 days of receipt of all sums recovered from the United States in the United States Court of Federal Claims (or such other proceedings as may be instituted for collection of the Judgement, as amended), or upon receipt of all sums received from settlement agreed to by all parties, whichever comes first. Plaintiffs agree not to execute against St. Bernard unless St. Bernard collects funds from the United States in payment of the Judgement and fails to pay the funds to Plaintiffs within 60 days of receipt. Nothing contained herein shall obligate St. Bernard to pay to Plaintiffs any sums awarded to St. Bernard and recovered from the United States which are solely and expressly attributable to attorney's fees incurred by St. Bernard's attorneys in representing St. Bernard Parish.
>
> In consideration for the reciprocal agreements set forth herein, St. Bernard hereby agrees to immediately cease all actions in 34th Judicial District Court in the above captioned matter, and shall immediately formally notify the Court that it waives its prior request for Reasons for Judgement pursuant to La. C.C.P. art. 1917. St. Bernard further agrees to forthwith institute at its sole costs all proceedings necessary to obtain indemnification or payment from the United States for all sums due under the Judgement (as amended) including, but not limited to, Case No. 15-1072 C in the United States Court of Federal Claims. St. Bernard shall aggressively pursue all such actions to finality, including all appeals, unless a settlement satisfactory to both Plaintiffs is reached before finality of the proceedings.

(alterations added; emphasis in original).

On February 21, 2017, the Louisiana State Trial Court issued a document titled "WRITTEN FINDINGS OF FACT AND REASONS FOR JUDGMENT." See Written Findings of Fact and Reasons for Judgment, Pizani v. St. Bernard Parish, No. 109-548 (34th Jud. Dist. Ct. Feb. 21, 2017) (capitalization in original). In its Written Findings of Fact and Reasons for Judgment, the Louisiana State Trial Court found that Mrs. Pizani's and Mrs. Juan's property was commandeered by order of St. Bernard Parish pursuant to the Louisiana Homeland Security and Emergency Assistance and Disaster Act, and that such Act requires that the "'amount of compensation shall be calculated in the same manner as compensation due for a taking of property pursuant to the condemnation laws of this state.'" Id. at 1 (quoting LA. STAT. ANN. § 29:730(G)). According to the Written Findings of Fact and Reasons for Judgment issued by the Louisiana State Trial Court, the Louisiana State Constitution "has been interpreted to mean that a landowner whose property is taken is entitled to be placed in the same pecuniary position in which he would have been if the property had not been taken." Written Findings of Fact and Reasons for Judgment at 1, Pizani v. St. Bernard Parish, No. 109-548. The Louisiana State Trial Court computed damages by multiplying 384,000 cubic yards of clay by $5.00 per cubic yard of clay,[22] which produced damages of $1,920,000.00. See id. at 2. The Louisiana State Trial

---

[22] The Louisiana State Trial Court's Written Findings of Fact and Reasons for Judgment did not indicate why the Louisiana State Trial Court used 384,000 cubic yards of clay to

Court also awarded $58,000.00 to compensate Mrs. Pizani and Mrs. Juan for "[s]everance damages to the remainder of Plaintiffs' property along Bayou Road consisting of reasonable and necessary costs to engineer and rectify drainage issues caused by construction of the adjacent dirt pit." See id. (alteration added). The Louisiana State Trial Court, in its Written Findings of Fact and Reasons for Judgment, also stated, "[s]ince Plaintiffs were undivided owners of the property commandeered in October of 2005, each is entitled to one-half of the total compensation award of $1,978,000.00," which is equal to $989,000.00, plus "legal interest from the date of commandeer of October 24, 2005, together with statutory costs and expert fees under LSA R.S. 13:5112 and reasonable attorney fees actually incurred under LSA R.S. 13:5111." See Written Findings of Fact and Reasons for Judgment at 2, Pizani v. St. Bernard Parish, No. 109-548 (alteration added). The Louisiana State Trial Court concluded its Written Findings of Fact and Reasons for Judgment by stating:

> This Court notes that this is one of several post-Katrina commandeer cases, which are very familiar to this Court from its prior decision in the case of Borgnemouth Realty Co., Ltd. v. Parish of St. Bernard, No. 112,833 (34th JDC), 141 So.3d 891, (La. App. 4th Cir. 2014), writs denied, 14-1285 (La. 9/26/14), 149 So.3d 266, which case was nearly identical to the facts in another takings case decided by Judge Fernandez in Olivier Plantation, L.L.C. v. Parish of St. Bernard, No. 109,272 (34th JDC), 151 So.3d 965, (La. App. 4th Cir. 2014), writs denied, 14-2496, (La. 2/27/15), 160 So.3d 173. This Court is cognizant from the evidence presented in this case and in the Borgnemouth Realty case that a cooperation agreement existed between St. Bernard Parish and the United States Army Corps of Engineers (USACOE) which required the USACOE to compensate property owners for takings related to the Parish's commandeer of property under the cooperation agreement.
>
> Although not called upon to decide this issue under the circumstances of this case, this Court would note for the benefit of the involved parties that it is the observation of this Court that the facts of the instant Pizani case are so nearly identical to those of the Borgnemouth Realty and Olivier Plantation cases that the same result should obtain here in the Pizani case as resulted in the Borgnemouth Realty and Olivier Plantation cases regarding the USACOE's [United States Army Corps of Engineers'] obligation to indemnify St. Bernard Parish for liability resulting from the Parish's commandeer of private property pursuant to the cooperation agreement.

---

determine damages. Nor does the Louisiana State Trial Court's Written Findings of Fact and Reasons for Judgment explain why the Louisiana State Trial Court valued each cubic yard of clay at $5.00.

Written Findings of Fact and Reasons for Judgment at 2, Pizani v. St. Bernard Parish, No. 109-548 (alteration added).[23]

On August 15, 2018, Mrs. Pizani, Mrs. Juan, and St. Bernard Parish signed a document titled "ADDENDUM TO JOINT AND RECIPROCAL AGREEMENT." (capitalization in original). The August 15, 2018 Addendum to the Joint and Reciprocal Agreement provided:

> It is the mutual intent of the parties that this Addendum serve to clarify the intent of the original Agreement regarding the following particulars:
>
> > 1. The Landowners agree to suspend and forego all collection rights and efforts against SBPG [St. Bernard Parish Government] for the Judgement while SBPG pursues collection of the funds owed by the United States for the removal of borrow material on the Landowners' property, and for a period of sixty (60) days subsequent to the termination of all proceedings instituted by SBPG; and
> >
> > 2. SBPG agrees to pursue payment of the funds owed by the United States for the removal of borrow material on the Landowners' property, in any and all available forums, including the Federal Court of Claims [sic]; and
> >
> > 3. The Landowners agree to accept such amounts recovered by SBPG from the United States in full satisfaction of the Judgement; and
> > 4. Should SBPG be unsuccessful in collecting any funds in the Court of Claims [sic], the Landowners shall be entitled to collect the value of the Judgement from SBPG; and

---

[23] The court notes that the Louisiana State Trial Court does not appear to take into account the Federal process and the critical factual and legal distinctions that separate Mrs. Pizani's and Mrs. Juan's case from the landowners' cases in Borgnemouth Realty and Olivier Plantation, including, as discussed more fully below, that the United States initiated a formal condemnation action in the United States District Court for the Eastern District of Louisiana against Mrs. Pizani's and Mrs. Juan's property and deposited an estimated sum of just compensation of $134,000.00 in the United States District Court for the Eastern District of Louisiana registry for a taking in fee simple, which Mrs. Pizani and Mrs. Juan withdrew in exchange for a fee simple interest in their property. In addition, as discussed below, in the Borgnemouth Realty and Olivier Plantation cases, as the Louisiana State Trial Court has labeled them, the Federal defendant agreed to the entry of summary judgment and stipulated to the amount of damages that should be, and was, entered as the two judgments in the United States Court of Federal Claims. See Status Report at 1, Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C (Fed. Cl. July 8, 2016).

> 5. SBPG shall not be required to pay Landowners any amounts recovered for attorneys fees awarded to SBPG for prosecuting any action in pursuit of the funds owed by the United States for the removal of borrow material on the Landowners' property.
>
> 6. The parties hereby stipulate that the contents of this Addendum represent the mutual intent of the parties in executing the Joint and Reciprocal Agreement dated January 20, 2017, and hereby desire this language be construed as though originally contained in the Joint and Reciprocal Agreement.

(alterations added).

Proceedings in the United States District Court for the Eastern District of Louisiana

On February 14, 2008, after Mrs. Pizani and Mrs. Juan filed their action against St. Bernard Parish in the Louisiana State Trial Court on July 10, 2007, but before the Louisiana State Trial Court had entered judgment in favor of Mrs. Pizani and Mrs. Juan on December 20, 2016, and before St. Bernard Parish entered the Joint and Reciprocal Agreement with Mrs. Pizani and Mrs. Juan on January 20, 2017, the United States filed a condemnation action in the United States District Court for the Eastern District of Louisiana, captioned United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Feb. 14, 2008). In the United States District Court for the Eastern District of Louisiana condemnation action, the United States filed an initial Complaint in Condemnation (the 2008 Complaint in Condemnation), which stated that "[t]his is an action of a civil nature brought by the United States of America for the taking of property, under its power of eminent domain, and for the ascertainment and award of just compensation to the parties in interest." Complaint in Condemnation at 1, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Feb. 14, 2008) (alteration added). The 2008 Complaint in Condemnation condemned a "Temporary Borrow Easement" and a "Temporary Work Area Easement" in connection with the Army Corps' use of Mrs. Pizani's and Mrs. Juan's property. Id., Schedule C. The 2008 Complaint in Condemnation described the Temporary Borrow Easement as:

> A temporary and assignable right and easement to clear, borrow, excavate and remove soil, dirt, and other materials from the land described in Schedule A as Tract No. B100E-1, for a period not to exceed one year, beginning with date possession of the land was granted to the United States; subject, however, to existing easements for public roads and highways, public utilities, railroads; reserving, however, to the landowners, their heirs and assigns, all such rights and privileges in said land as may be used without interfering with or abridging the rights and easement hereby acquired.

Id. The 2008 Complaint in Condemnation described the Temporary Work Area Easement as:

> A temporary easement and right-of-way in, on, over and across the land described in Schedule A as Tract No. B100E-2, for a period not to exceed one year, beginning with date possession of the land was granted to the United States, for use by the United States, its representatives, agents, and contractors as a work area, including the right to move, store and remove equipment and supplies, and erect and remove temporary structures on the land and to perform any other work necessary and incident to the construction of the Emergency Levee Repairs, Non-Federal Chalmette Back Levee, Creedmore [sic] Borrow Area, St. Bernard Parish, Louisiana Project, together with the right to trim, cut, fell and remove therefrom all trees, underbrush, obstructions, and any other vegetation, structures, or obstacles within the limits of the right-of-way; reserving, however, to the landowners, their heirs and assigns, all such rights and privileges as may be used without interfering with or abridging the rights and easement hereby acquired; subject, however, to existing easements for public roads and highways, public utilities, railroads and pipeline.

Id. (alteration added). The 2008 Complaint in Condemnation further stated that the "Purported Owners" of the property condemned were Mrs. Pizani, Mrs. Juan, the St. Bernard Parish "Sheriff & Ex-Officio Tax Collector," and the State of Louisiana "Department of Taxation and Revenue." Id., Schedule E (capitalization in original).

Also on February 14, 2008, the United States filed a Declaration of Taking in the same United States District Court for the Eastern District of Louisiana condemnation action. (the 2008 Declaration of Taking). See Declaration of Taking, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Feb. 14, 2008). The 2008 Declaration of Taking identified the same Temporary Borrow Easement over Tract No. B100E-1 and the same Temporary Work Area Easement over Tract No. B100E-2 that were described in the 2008 Complaint in Condemnation and above. With the 2008 Declaration of Taking, the United States deposited a "gross sum estimated" of $59,400.00,[24] which purportedly reflected "just compensation for all of said land, which aggregates 6.83 acres,[25] with all buildings

[24] As discussed above, the $59,400.00 sum deposited by the United States with the 2008 Declaration of Taking in the United States District Court for the Eastern District of Louisiana condemnation action appears to be the amount referenced in the Louisiana State Trial Court's December 20, 2016 judgment, which reduced Mrs. Pizani's and Mrs. Juan's recovery for attorney fees by $59,400.00. See Judgement at 1, Pizani v. St. Bernard Parish, No. 109-548.

[25] As discussed above, the court notes that the portion of Mrs. Pizani's and Mrs. Juan's land identified in the Commandeering Order was 6.51 acres. Defendant has explained the discrepancy between the 6.51 acres identified in the Commandeering Order and the 6.83 acres subject to the government's condemnation action as follows: "The two tracts

and improvements thereon and all appurtenances thereto and including any and all interests hereby taken in said land." Id. at 2 (emphasis in original; footnote added). The court notes that Mrs. Pizani and Mrs. Juan did not withdraw the $59,000.00 deposited in the United States District Court for the Eastern District of Louisiana registry at this time, but did later take condemnation payment after the United States filed an amended Complaint in Condemnation and amended Declaration of Taking as part of the same United States District Court for the Eastern District of Louisiana condemnation action in 2010 for $134,000.00, as discussed below.

On August 2, 2010, in anticipation of the United States amending its Complaint in Condemnation and Declaration of Taking in the United States District Court for the Eastern District of Louisiana condemnation action, the United States engaged Truax, Robles & Baldwin Appraisers LLC to complete a second appraisal of Mrs. Pizani's and Mrs. Juan's property. (the August 2010 Appraisal Report). The August 2010 Appraisal Report was conducted to estimate the market value of a fee simple interest in Mrs. Pizani's and Mrs. Juan's property as of October 24, 2005, "the date of the acquisition" by the Army Corps. The August 2010 Appraisal Report noted:

> An inspection of subject property was last accomplished on August 14, 2006. However, the purpose of this appraisal is to establish the market value of subject property, which was utilized/acquired by the government on October 24, 2005; thus, the date of the acquisition, or October 24, 2005, is the effective date of the valuation. It is specifically presumed herein that, except for the removal of excavated soils from a portion of the acquisition parcel that was reportedly accomplished after the date of acquisition, there is no material difference in the physical condition/status of subject property between the date of last inspection and the effective date of valuation; such was asserted to be the case by the property owner.

The August 2010 Appraisal Report concluded that the market value of a fee simple interest in Mrs. Pizani's and Mrs. Juan's property, as of October 24, 2005, was estimated to be $134,000.00. The August 2010 Appraisal Report stated that "mineral rights" were excluded in determining the market value of Mrs. Pizani's and Mrs. Juan's property. In a section titled "Assumptions and Limiting Conditions," the August 2010 Appraisal Report stated: "No consideration is given any mineral rights or other subterranean interest (i.e., water, gravel, salt, etc.), unless specifically identified in the letter of transmittal and other appropriate portions of this appraisal report." Moreover, in a section titled "Scope of the Assignment and Discussion of the Appraisal Development/Reporting Process," the 2010 Appraisal Report stated: "The acquisition of Tract No. B100 (±6.83 acres) by the United

---

[Tract B100E-1 and Tract B100E-2] were largely congruent with the approximately 6.51 acres of land commandeered. After obtaining and reviewing property surveys in 2006 in preparation for negotiations with [Mrs.] Pizani [and Mrs. Juan], the Corps increased the area condemned [to 6.83 acres] to include land on both the south and the east side of the property, so that [Mrs.] Pizani [and Mrs. Juan] would not be left with an uneconomic remnant." (alterations added).

States Army Corps of Engineers and/or a related/alternate governmental agency or entity at a local, state or federal level, excludes only subsurface mineral rights, with all surface use rights typically associated with fee simple estate ownership being acquired."

On September 7, 2010, the United States filed an amended Complaint in Condemnation and an amended Declaration of Taking in the same United States District Court for the Eastern District of Louisiana condemnation action as had previously been filed by the United States. (the 2010 amended Complaint in Condemnation and the 2010 amended Declaration of Taking, respectively). The 2010 amended Complaint in Condemnation stated that "the estate being taken herein is hereby being changed from a temporary easement to a taking in fee." Amended Complaint at 2, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Sept. 7, 2010). The 2010 amended Declaration of Taking described the subject property as "A CERTAIN TRACT OF LAND designated as Tract B100, formerly described as Tract Nos. B100E-1 and B100E-2," and identified the estate taken as:

> **FEE, RESERVING TO THE LANDOWNER ALL RIGHT, TITLE AND INTEREST TO THE UNDERLYING OIL AND GAS**
>
> The fee simple title to Tract No. B100, subject, however, to existing easements for public roads and highways, public utilities, railroads and pipelines; excepting and excluding from the taking all oil and gas in and under said land and all appurtenant rights for the exploration, development, production and removal of said oil and gas.

(capitalization and emphasis in original). With the 2010 amended Declaration of Taking, the United States increased its deposit of "just compensation for all of said land, which aggregates 6.83 acres," to a total aggregate amount of $134,000.00. Amended Declaration of Taking at 2, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Sept. 7, 2010) (emphasis in original).

In defendant's motion for partial summary judgment in the above captioned case, Case No. 15-1072C, defendant explains that the United States filed the 2010 amended Complaint in Condemnation and the 2010 amended Declaration of Taking in the same United States District Court for the Eastern District of Louisiana condemnation action in order to "resolve the Pizanis' concerns about liability for injuries that might occur on the property" that the Army Corps had used as a borrow pit. Specifically, defendant cites to a portion of the Negotiator's Report which recounts Mr. Talley's explanation of Mrs. Pizani's and Mrs. Juan's concerns regarding the borrow pit:

> Mr. Talley opened the meeting by introducing the concerns of his clients and the reasons why they would like to donate the portion of their property that we had constructed a borrow pit on under commandeering orders for repairs of the St. Bernard Levees after Hurricane Katrina, to a public or local entity, like the levee board or the Parish. He produced a self drawn map indicating the portions of the property they would like to retain as colored in

> pink, and the portion of the property that they wanted to donate as indicated in yellow. He indicated that his clients could not get insurance for the borrow pit location, that they were nervously concerned about liability issues, i.e. a child crawling over the fence and drowning, etc. He explained that the sisters were interested in donating the property in order to relieve themselves of the liability.

Aside from defendant's explanation in its cross-motion for partial summary judgment, however, there is little other documentation in the record describing the conversations between the United States and Mrs. Pizani and Mrs. Juan between the time the United States filed the 2008 Complaint in Condemnation and 2008 Declaration of Taking in the United States District Court for the Eastern District of Louisiana on February 14, 2008, and the time the United States filed the 2010 amended Complaint in Condemnation and the 2010 amended Declaration of Taking in the same United States District Court for the Eastern District of Louisiana condemnation action on September 7, 2010.

On October 19, 2011, the United States District Court for the Eastern District of Louisiana entered an "Order to Disburse Funds," directing that Mrs. Pizani receive $67,000.00 and that Mrs. Juan receive $67,000.00 "out of the funds in the registry of the Court." Order to Disburse Funds at 1-2, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Oct. 19, 2011).[26] The October 19, 2011 Order to Disburse Funds additionally ordered

> that said disbursement be without prejudice to the right of said defendants to demand and receive additional compensation for the taking of said tracts of land, and that should the compensation finally determined to be due to said defendants be less than the amount hereby disbursed, the United States shall have a right to recover the difference.

Id. It appears from the record before the court and the parties' briefs that Mrs. Pizani and Mrs. Juan withdrew the $134,000.00 from the registry of the court in the United States District Court for the Eastern District of Louisiana on the same day, October 19, 2011; that Mrs. Pizani and Mrs. Juan actually withdrew the $134,000.00 is not contested in this case.

On January 15, 2013, in the United States District Court for the Eastern District of Louisiana condemnation action, the United States filed a motion for a determination of the appropriate date of valuation. See Motion for a Determination of the Appropriate Date of Valuation at 1, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Jan. 15, 2013). The United States requested that the United States District Court for the Eastern

---

[26] The October 19, 2011 Order to Disburse Funds ordered disbursement of "the funds now on deposit in the registry of the Court," which totaled $134,000.00, including the additional funds the United States deposited on September 7, 2010 with the 2010 amended Declaration of Taking for a taking in fee simple. See Order to Disburse Funds at 1-2, United States v. 6.83 Acres of Land, No. 08-999.

District of Louisiana determine "whether its jurisdiction to award just compensation in this land condemnation proceeding extends to valuing the interests taken as of the time the property was commandeered both in terms of the extent of the interests taken and the time it was taken." Id. In the United States' memorandum in support of its January 15, 2013 motion, the United States argued:

> In a condemnation case, identifying the date as of which the property taken is to be valued is a necessary prerequisite to determining just compensation. Ordinarily, where the United States utilizes a Declaration of Taking under authority of the Declarations [sic] of Takings Act (40 U.S.C. § 3114), the date of valuation is the date on which the United States fulfills all of the requirements of the Act, namely, filing of the Declaration of Taking in federal district court, together with a deposit of estimated just compensation. However, in the emergency aftermath of Hurricanes Katrina and Rita, the instant case did not follow the ordinary route. Instead, in order to allow repair work on the Chalmette Back Levee to proceed as quickly as possible, St. Bernard Parish utilized state law to commandeer real property owned by Defendants, Alfreda Melerine Pizani and Avis Melerine Juan (hereinafter referred to jointly as "Pizani"). St. Bernard Parish simultaneously granted an irrevocable right of entry to the Lake Borgne Basin Levee District ("LBBLD"), which in turn provided a right of entry to the U.S. Army Corps of Engineers ("Corps"), which was charged by Congress with performing the levee repairs.
>
> The respective roles of St. Bernard Parish, LBBLD and the Corps in this process were memorialized by written cooperation agreements. Under these agreements, St. Bernard Parish and LBBLD committed to obtain and provide rights of entry to private lands by utilizing commandeering orders under Louisiana state law. The Corps agreed to compensate affected property owners, either by negotiation of a mutually agreed to amount or, if necessary, through federal condemnation procedures so that the Court could determine compensation. After negotiations with Pizani failed, the United States filed the instant case. The United States and Pizani now dispute whether the Court should award just compensation as of the Corps' entry onto the Pizani property at the time of commandeering, or as of the dates of filing of the Declarations of Taking.
>
> In United States v. Dow, 357 U.S. 17 (1958), the Supreme Court held that where the federal government takes legal possession prior to the filing of a Declaration of Taking, the date of possession is the proper date on which to determine value. The United States therefore respectfully requests that, pursuant to Dow, this Court find that the proper date of valuation of the Pizani property is the date on which possession was granted to the United States through the commandeering.

Memorandum in Support at 1-2, United States v. 6.83 Acres of Land, No. 08-999 (E.D.

La. Jan. 15, 2013) (alteration added). The United States, therefore, requested that the United States District Court for the Eastern District of Louisiana "find that the applicable date of valuation of the property taken herein is October 24, 2005, the date the property was commandeered and possession granted to the Corps." Id. at 10.

On February 15, 2013, the United States submitted a filing titled "OFFER OF JUDGMENT" in the United States District Court for the Eastern District of Louisiana condemnation action. See Offer of Judgment at 1, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Feb. 15, 2013) (capitalization in original). The Offer of Judgment stated that the United States

> offers to have judgment of just compensation taken against it in the total amount of $475,000 as full payment of just compensation for the taking of: (1) temporary interests in 6.83 acres of land, as described in the declaration of taking filed herein; (2) the taking of the fee interest in the same 6.83 acres of land, as described in the amended declaration of taking filed herein; and (3) the commandeering of 6.51 acres of land by St. Bernard Parish on October 24, 2005. The offered amount of $475,000 is inclusive of attorney's fees, accrued interest upon any deficiency and costs, if any.

Id. (internal references omitted). The Offer of Judgment also stated that Mrs. Pizani and Mrs. Juan had fourteen days to accept the United States' Offer of Judgment in writing, and that the "offer is considered withdrawn if not accepted." Id. at 2. There is no indication in the record before the court that Mrs. Pizani or Mrs. Juan accepted the Offer of Judgment.

On February 26, 2013, Mrs. Pizani and Mrs. Juan filed a motion to stay the condemnation action before the United States District Court for the Eastern District of Louisiana in order to allow the Louisiana State Trial Court proceedings in Pizani v. St. Bernard Parish, No. 109-548, discussed above, to conclude. See Motion to Stay at 1, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Feb. 26, 2013). On the same day, February 26, 2013, Mrs. Pizani and Mrs. Juan also filed an opposition to the United States' January 15, 2013 motion for a determination of the appropriate date of valuation. See Opposition to Motion for a Determination of the Appropriate Date of Valuation, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Feb. 26, 2013). In their opposition to the United States' motion for a determination of the appropriate date of valuation, Mrs. Pizani and Mrs. Juan argued that the "date of taking cannot be October 24, 2005," because the Army Corps was only granted a temporary authorization for entry and not possession on October 24, 2005. See id. at 2. Mrs. Pizani and Mrs. Juan also argued that the date of taking cannot be backdated to October 24, 2005 because, unlike in United States v. Dow, 357 U.S. 17 (1958), the Army Corps did not have a "clear, unbroken, and continuous line of physical possession and use of the taken property" from the time the Army Corps allegedly took possession of Mrs. Pizani's and Mrs. Juan's property to the time the Declaration of Taking was filed in the United States District Court for the Eastern District of Louisiana condemnation action. See Opposition to Motion for a Determination of the Appropriate Date of Valuation at 3, United States v. 6.83 Acres of Land, No. 08-

999 (emphasis in original). Mrs. Pizani and Mrs. Juan argued that the "date of taking is the filing date of the Declaration of Taking," February 14, 2008, because, under 40 U.S.C. § 3114(b) (2006), that is when title vests in the government. See Opposition to Motion for a Determination of the Appropriate Date of Valuation at 5, United States v. 6.83 Acres of Land, No. 08-999.

On April 5, 2013, the United States District Court for the Eastern District of Louisiana issued an order granting Mrs. Pizani's and Mrs. Juan's February 26, 2013 motion to stay the United States District Court for the Eastern District of Louisiana condemnation proceedings. See Order and Reasons at 1, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Apr. 5, 2013). Regarding the proceeding before the Louisiana State Trial Court in Pizani v. St. Bernard Parish, No. 109-548, the United States District Court for the Eastern District of Louisiana stated:

> This situation implicates the "prior-exclusive-jurisdiction rule," which provides that when a state or federal court of competent jurisdiction has obtained possession, custody, or control of particular property, that authority and power over the property may not be disturbed by any other court. United States v. Sid-Mars Restaurant & Lounge, Inc., 644 F.3d 270, 274-75 (5th Cir. 2011), citing 13F Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3631 (3rd ed. 2009), see also Mandeville v. Canterbury, 318 U.S. 47, 63 S. Ct. 472, 87 L. Ed. 605 (1943). The court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the other. [United States v.] Sid-Mars [Restaurant & Lounge, Inc., 644 F.3d] at 275, citing Princess Lida of Thurn and Taxis v. Thompson, 305 U.S. 456, 466, 59 S.Ct. 275, 83 L.Ed. 285 (1939). The primary reason for this rule is to prevent conflicts between federal and state courts. [United States v.] Sid-Mars [Restaurant & Lounge, Inc., 644 F.3d] at 275, citing Mandeville [v. Canterbury], 318 U.S. at 49. In actions in rem, where the jurisdiction of a state court has first attached, a federal court of a concurrent jurisdiction is precluded from exercising its jurisdiction over the same res to defeat or impair the state court's jurisdiction, control of the res being essential to the full exercise of jurisdiction. Byrd-Frost, Inc. v. Elder, 93 F.2d 30, 32 (5th Cir. 1937).
>
> The state court obtained jurisdiction over the property in question before this Court did. This Court finds the reasoning in Judge Fallon's Order persuasive. In that case, Judge Fallon chose to stay the federal proceedings in a similar case until the resolution of the state court proceedings. Olivier Plantation, LLC, et al. v. St. Bernard Parish, 09-cv-3581 (E.D. La. 2012). Judge Fallon applied the prior-exclusive-jurisdiction rule to justify staying the federal proceedings, but did not entirely strip his Court of jurisdiction over the property. To avoid conflict with the state court, he chose to stay the proceedings until completion of the state court case, and thereafter resolve the issues raised in the federal claim.

> If these cases [in the United States District Court for the Eastern District of Louisiana and the Louisiana State Trial Court] proceed simultaneously, this Court will have to determine the date of the federal taking, to establish the date upon which the property should be valued. If this Court determines that the date of the Federal taking was, as the United States argues, the same date as the taking by St. Bernard, both the state and federal courts will use the same valuation date to determine just compensation. See, e.g. 40 U.S. [sic] § 1334(c)(1) ("Compensation shall be determined and awarded in the proceeding and established by judgment. The judgment shall include interest, in accordance with section 3116 of this title, on the amount finally awarded as the value of the property as of the date of taking and shall be awarded from that date to the date of payment."). This could lead to a situation in which the same property, taken on the same date but by different parties, could be valued differently in state and federal court. To allow these parallel cases to proceed simultaneously would create the possibility of conflict between courts of different sovereigns, the specific kind of conflict that the prior-existing-jurisdiction rule is meant to prevent.

Order and Reasons at 7-9, United States v. 6.83 Acres of Land, No. 08-999 (alterations added; internal references and footnotes omitted; all emphasis in original). Moreover, in the April 5, 2013 Order, the United States District Court for the Eastern District of Louisiana deferred ruling on the United States' January 15, 2013 motion for a determination of the appropriate date of valuation. See id. at 7.[27] Specifically, the United States District Court for the Eastern District of Louisiana stated:

> On filing a declaration of taking and depositing the amount of estimated compensation stated in the declaration, title to the estate or interest specified in the declaration vests in the Government; the land is condemned and taken for the use of the Government; and the right to just compensation for the land vests in the persons entitled to the compensation. 40 U.S.C. § 3114(b)(1)-(3). While the United States argues that it actually took possession [sic] the property in question at an earlier date, that issue is the subject of the plaintiff's Motion for a Determination of the Appropriate Date of Valuation and will not be resolved at this time. The statute that authorizes the use of condemnation actions states that title vested in the United States at the time the Complaint in Condemnation was filed and the deposit of estimated compensation was made.

Order and Reasons at 7, United States v. 6.83 Acres of Land, No. 08-999 (alteration added; internal reference omitted).

---

[27] As indicated below, ultimately, on March 29, 2018, the United States District Court for the Eastern District of Louisiana dismissed the condemnation action without ruling on the United States' January 15, 2013 motion for a determination of the appropriate date of valuation. See Order of Dismissal at 1, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. March 29, 2018).

On May 22, 2017, after the Louisiana State Trial Court entered judgment in favor of Mrs. Pizani and Mrs. Juan, the United States filed a motion to lift the stay placed by the United States District Court for the Eastern District of Louisiana in United States v. 6.83 Acres of Land, No. 08-999. See Motion to Reopen Case, United States v. 6.83 Acres of Land, No. 08-999, at 4-5 (E.D. La. May 22, 2017). On May 24, 2017, Mrs. Pizani and Mrs. Juan filed a motion to continue the stay in the United States District Court for the Eastern District of Louisiana condemnation action. See Motion to Continue Stay, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. May 24, 2017). In their motion in the United States District Court for the Eastern District of Louisiana, Mrs. Pizani and Mrs. Juan argued:

> [T]he U.S. Court of Federal Claims rendered summary judgment against the United States for $1,428,335.00[28] and $2,768,373.04 in St. Bernard Parish's two [United States] Court of [Federal] Claims complaints. (Ct. Cl. Nos. 15-103C and 15-518C, Doc. 37). The United States conceded in those proceedings that the Plaintiffs (including St. Bernard Parish) were entitled

[28] As discussed more fully below, separate and distinct from the case currently under review, which is Case No. 15-1072C, this court also issued a single, unreported Order on July 12, 2016 granting the motions for summary judgment against the United States in the two other, separately filed and consolidated cases in the United States Court of Federal Claims: Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. See Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C, slip op. at 5 (Fed. Cl. July 12, 2016). In this court's unreported July 12, 2016 Order, this court awarded damages of $1,655,380.83 in Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and awarded damages of $2,768,373.04 in St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. See Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C, slip op. at 5. Significantly, in those two consolidated cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, St. Bernard Parish and Lake Borgne, together with the United States, had submitted joint status reports to the court reflecting mutual agreement, and the government's concession, that the above amounts should be entered by the court as "full and complete satisfaction of any and all claims that have been made or could be made in" those consolidated cases. See Status Report at 1, Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C. This court notes that the above-referenced consolidated cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, are distinct cases from the case currently before this court, which is Case No. 15-1072C, and which is currently under review. Moreover, Mrs. Pizani's and Mrs. Juan's May 24, 2017 motion to continue a stay, filed in the proceedings in the United States District Court for the Eastern District of Louisiana and discussed above, misstated the amounts awarded in Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, in the United States Court of Federal Claims.

> to summary judgment.
>
> . . .
>
> Defendants [Mrs. Pizani and Mrs. Juan] submit that if the related [United States] Court of Federal Claims complaint [in the case currently before this court, Case No. 15-1072C] is resolved by summary judgment, as were the related Olivier Plantation and Borgnemouth Realty Cases (Ct. Cl. Nos. 15-103C and 15-518C),[29] there would be no necessity to pursue the instant condemnation case since Defendants do not contest the taking or the compensation received for the taking.
>
> In sum, this condemnation proceeding may be closed and dismissed if the related [United States] Court of Federal Claims complaint (Ct. Cl. No. 15-1072C) is resolved by summary judgment, which occurred in the related Olivier Plantation and Borgnemouth Realty Cases (Ct. Cl. Nos. 15-103C and 15-518C).
>
> Consequently, Defendants respectfully submit that no good reason exists to reopen this case until the summary proceedings have been held in the related [United States] Court of Federal Claims complaint (Ct. Cl. No. 15-1072C). Further, no good reason exists to set a scheduling conference in this matter as requested by the Plaintiff United States of America, if the related [United States] Court of Federal Claims complaint (Ct. Cl. No. 15-1072C) is resolved summarily.

See Motion to Continue Stay at 3-4, United States v. 6.83 Acres of Land, No. 08-999 (alterations, omission, and footnotes added).

On July 17, 2017, the United States District Court for the Eastern District of Louisiana issued an order granting the United States' motion to lift the stay in United States v. 6.83 Acres of Land, No. 08-999, and stated that "[t]he parties have failed to persuade the Court that any proceedings in the [United States] Court of Federal Claims

---

[29] Also as discussed more fully below, Mrs. Pizani's and Mrs. Juan's filing in the United States District Court for the Eastern District of Louisiana condemnation action appears to use the names "Olivier Plantation" and "Borgnemouth Realty" to refer to the United States Court of Federal Claims Case Nos. 15-103C and 15-518C, respectively. The correct caption for Case No. 15-103C, which is sometimes designated by the parties in filings in a number of the courts involved as "Olivier Plantation," is Lake Borgne Basin Levee District, et al. v. United States. The correct caption for Case No. 15-518C, which is sometimes designated by the parties in filings in a number of the courts involved as "Borgnemouth Realty," is St. Bernard Parish Government, et al. v. United States. Each of those cases are separate and factually distinct, and, therefore, also legally distinct, from the case currently before this court, St. Bernard Parish Government v. United States, Case No. 15-1072C.

has a direct bearing on this Court's jurisdiction, such that this Court should relinquish its jurisdiction until that proceeding is finalized." Order at 1, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. July 17, 2017) (alterations added). On August 18, 2017, the United States District Court for the Eastern District of Louisiana issued an order scheduling a three-day bench trial to commence on April 23, 2018. See Scheduling Order at 2, United States v. 6.83 Acres of Land, No. 08-999 (E.D. La. Aug. 18, 2017).

On March 29, 2018, however, the United States District Court for the Eastern District of Louisiana issued an "Order of Dismissal," which stated:

> The Court having been advised by counsel for the parties that all of the parties to this action have firmly agreed upon a compromise,
>
> IT IS ORDERED that the action be and it is hereby dismissed without costs and without prejudice to the right, upon good cause shown, to reopen the action or to seek summary judgment enforcing the compromise if settlement is not consummated within a reasonable time. The Court retains jurisdiction for all purposes, including enforcing the settlement agreement entered into by the parties.

See Order of Dismissal at 1, United States v. 6.83 Acres of Land, No. 08-999 (capitalization in original).

Despite the immediately above quoted language in the United States District Court for the Eastern District of Louisiana's March 29, 2018 Order of Dismissal, there is no record in the case currently before the court that the United States ever reached a settlement agreement with Mrs. Pizani and Mrs. Juan after the United States District Court for the Eastern District of Louisiana issued the March 19, 2018 Order of Dismissal and dismissed the condemnation action. At the oral argument on defendant's motion to dismiss in the case currently before the court, Case No. 15-1072C, plaintiff's generally careful counsel at the time, Mr. Robert E. Couhig, Jr.,[30] represented to this court that "we have agreed to settle the condemnation action that was the basis of this, but specifically excluded in that settlement is the land that was taken, the soil." Defendant's counsel at the time, Mr. Steven C. Hough, however, stated that the condemnation action in the United States District Court for the Eastern District of Louisiana "has not been settled yet." Defendant's counsel continued: "I am disappointed that counsel decided to talk about the terms of a settlement agreement that are still being negotiated. No settlement agreement has been agreed to, and the Government has not agreed to the carve-out that Mr. Couhig suggested, and we addressed it in our brief as well." Subsequently, also in the case currently before this court, Case No. 15-1072C, the court ordered both St. Bernard Parish

[30] The court notes that, at the time the United States District Court for the Eastern District of Louisiana issued the March 29, 2018 Order of Dismissal, Mr. Couhig also was representing Mrs. Pizani and Mrs. Juan in the United States District Court for the Eastern District of Louisiana condemnation action. See Order of Dismissal at 1, United States v. 6.83 Acres of Land, No. 08-999.

and the United States to file supplemental briefs on the impact the condemnation action in the United States District Court for the Eastern District of Louisiana, in United States v. 6.83 Acres of Land, No. 08-999, might have on the ongoing proceedings before this court in Case No. 15-1072C. In a footnote in its supplemental brief, defendant reiterated that "[t]he Government does not agree that the parties to the EDLA [United States District Court for the Eastern District of Louisiana] Action have reached settlement." (alterations added). Also in its supplemental brief, defendant represented that even though the United States District Court for the Eastern District of Louisiana's March 29, 2018 Order of Dismissal stated that the condemnation action was dismissed, without prejudice, and could be reopened so that Mrs. Pizani and Mrs. Juan could "'seek summary judgment enforcing the compromise if settlement is not consummated within a reasonable time,' the Pizanis have made no effort to do so" and "[t]here is no reason to think that they would seek to do so at this belated date." (alteration added). According to defendant, the United States District Court for the Eastern District of Louisiana condemnation action remains "administratively closed."[31] As quoted above, however, in the March 29, 2018 Order of Dismissal, the United States District Court for the Eastern District of Louisiana stated that it "retains jurisdiction for all purposes, including enforcing the settlement agreement entered into by the parties." See Order of Dismissal at 1, United States v. 6.83 Acres of Land, No. 08-999.

Previous Proceedings in the United States Court of Federal Claims in Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, (Sometimes Referred to as the "Consolidated Cases") Which are Separate from the Case Currently Under Review, Case No. 15-1072C

As referenced above, in addition to the complaint filed in this court and currently under review, Case No. 15-1072C, plaintiff St. Bernard Parish previously had filed complaints in two separate and distinct cases in this court, captioned Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. Those two cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, were consolidated for case management purposes. St. Bernard Parish and Lake Borgne were the plaintiffs in both Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, and each of these two cases arose from similar facts, but at different locations.

In the above-referenced, earlier consolidated cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, Lake Borgne, St. Bernard Parish, and the Army

[31] The court notes, however, that, in defendant's motion for partial summary judgment in the United States Court of Federal Claims, defendant asserts that "either party can reopen the Federal condemnation proceedings" in the United States District Court for the Eastern District of Louisiana.

Corps had entered into an amended cooperation agreement (the Lake Borgne Amended Cooperation Agreement) concerning the Army Corps' repair of certain levees in St. Bernard Parish, which were part of the Hurricane/Shore Protection Project for Lake Pontchartrain, Louisiana and Vicinity. See Lake Borgne Basin Levee Dist. v. United States, 127 Fed. Cl. 321, 323-24, 326 (2016). On September 29, 2005, St. Bernard Parish had commandeered land owned by Borgnemouth Realty Company, Ltd. (Borgnemouth) and Olivier Plantation, LLC, Park Investments, Ltd., and Morning Park, Inc. (collectively, the Olivier Plantation landowners). See id. at 328. The Olivier Plantation landowners filed a complaint against St. Bernard Parish and Lake Borgne seeking compensation for the removal of borrow material from their property in Louisiana state court on May 18, 2007. See id. at 328; see also Olivier Plantation, LLC, Park Invs., Ltd., and Morning Park, Inc. v. Parish of St. Bernard, Lake Borgne Basin Levee District, 34th Judicial District Court, St. Bernard Parish, Dkt. 109-272 (May 18, 2007). The Louisiana state court awarded the Olivier Plantation landowners $2,449,930.00 in damages for the Army Corps' removal of borrow material and $832,318.65 in attorneys' fees and costs. See Lake Borgne Basin Levee Dist. v. United States, 127 Fed. Cl. at 329; see also Olivier Plantation, LLC, Park Invs., Ltd., and Morning Park, Inc. v. Parish of St. Bernard, Lake Borgne Basin Levee District, 34th Judicial District Court, St. Bernard Parish, Dkt. 109-272. Separately, on November 13, 2008, Borgnemouth filed a complaint in Louisiana state court against St. Bernard Parish and Lake Borgne seeking compensation for borrow material removed from Borgnemouth's property by the Army Corps. See Lake Borgne Basin Levee Dist. v. United States, 127 Fed. Cl. at 329; see also Borgnemouth Realty Co. v. Parish of St. Bernard, 34th Judicial District Court, St. Bernard Parish, Dkt. 112-833 (Nov. 13, 2008). The Louisiana state court entered judgment in favor of Borgnemouth and found St. Bernard Parish and Lake Borgne liable, jointly and severally, for compensation in the amount of $1,241,480.00, as well as for attorneys' fees and costs in the amount of $335,370.00. See Lake Borgne Basin Levee Dist. v. United States, 127 Fed. Cl. at 329; see also Borgnemouth Realty Co. v. Parish of St. Bernard, 34th Judicial District Court, St. Bernard Parish, Dkt. 112-833. Significantly, the United States did not initiate condemnation proceedings against, or otherwise attempt to compensate, either the Borgnemouth or the Olivier Plantation landowners, believing that "the Army Corps had no duty to compensate the owners of the LERD at issue in either of the above-captioned cases because it was Public Sponsor LERD." See Lake Borgne Basin Levee Dist. v. United States, 127 Fed. Cl. at 340.

After the Louisiana state courts entered judgment in Borgnemouth Realty Co. v. Parish of St. Bernard, 34th Judicial District Court, St. Bernard Parish, Dkt. 112-833, and Olivier Plantation, LLC, Park Invs., Ltd., and Morning Park, Inc. v. Parish of St. Bernard, Lake Borgne Basin Levee District, 34th Judicial District Court, St. Bernard Parish, Dkt. 109-272, St. Bernard Parish and Lake Borgne filed two, separate cases in the United States Court of Federal Claims, Case Nos. 15-103C and 15-518C, not the case currently under review, which is Case No. 15-1072C, referencing the two judgments that the Louisiana state courts had awarded to the Olivier Plantation landowners and Borgnemouth in their respective Louisiana state court actions. See Lake Borgne Basin Levee Dist. v. United States, 127 Fed. Cl. at 329-30. In each case, Case No. 15-103C and Case No. 15-518C, St. Bernard Parish and Lake Borgne alleged that the United

States had breached the Lake Borgne Amended Cooperation Agreement by failing to compensate the Olivier Plantation landowners and Borgnemouth for the borrow material allegedly removed by the Army Corps. See id. The United States moved to dismiss both Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. See Lake Borgne Basin Levee Dist. v. United States, 127 Fed. Cl. at 330.

On March 15, 2016, the United States Court of Federal Claims issued an Opinion, under the caption Lake Borgne Basin Levee District v. United States, 127 Fed. Cl. 321, denying defendant United States' motions to dismiss Case Nos. 15-103C and 15-518C and finding that Lake Borgne and St. Bernard Parish had sufficiently alleged a breach of the Lake Borgne Amended Cooperation Agreement to proceed. See id. at 343. In Lake Borgne Basin Levee District, et al. v. United States, this court stated:

> The [Lake Borgne] Amended Cooperation Agreement thus envisioned a two step process: 1) the Army Corps would provide plaintiffs with a description of the LERD it needed; and 2) the plaintiffs would provide the Army Corps with right of entry to this LERD. The parties' obligations under the [Lake Borgne] Amended Cooperation Agreement, therefore, attached to the LERD included in the Army Corps' description.

Id. at 340 (alterations added). This court in Lake Borgne Basin Levee District, et al. v. United States concluded:

> Because there is no evidence in the record at this time that demonstrates that either of the plaintiffs [Lake Borgne and St. Bernard Parish] ever owned, claimed or controlled the LERD at issue prior to commencement of the state court Borgnemouth and Olivier Plantation cases, the court finds that plaintiffs have sufficiently alleged that the LERD at issue was Private, rather than Public Sponsor LERD.

Lake Borgne Basin Levee Dist. v. United States, 127 Fed. Cl. at 343 (alteration added).

Subsequently, on May 24, 2016, Lake Borgne and St. Bernard Parish moved for summary judgment against the United States in both Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. See Plaintiff's Motion for Summary Judgment, Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C (Fed. Cl. May 24, 2016). On June 24, 2016, the United States filed responses in both cases, Case Nos. 15-103C and 15-518C, to the plaintiffs' motions for summary judgment, agreeing that "[t]here are no remaining issues precluding entry of judgment in favor of plaintiffs on their breach of contract claim following this Court's decision on our motion to dismiss." Defendant's Response to Plaintiff's Motion for Summary Judgment at 1, Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C (Fed. Cl. June 24, 2016) (alteration added; internal references omitted). On July 8, 2016, the parties filed joint status reports in each case, Case No. 15-103C and Case No. 15-518C, agreeing

that Lake Borgne and St. Bernard Parish were "entitled to receive $4,423,753.87 as full and complete satisfaction of any and all claims that have been made or could be made in the captioned cases." Status Report at 1, Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C. The parties' July 8, 2016 joint status reports continued:

> In Borgnemouth Realty Co., Ltd. v. Parish of St. Bernard, the state court judgment against plaintiffs was $984,040.00 for the taking, and $265,948.41 in attorney's fees. The state court also awarded interest, which is $405,392.42 through the date of this report. Thus, the total amount the plaintiffs have been ordered to pay Borgnemouth Reality is $1,655,380.83. In Olivier Plantation, LLC v. Parish of St. Bernard, the judgment against plaintiffs was $1,428,335.00 for the taking, and $471,350.55 for attorney's fees. The Court also awarded interest, which is $868,687.48 as of the date of this report. Thus, the total amount that plaintiffs have been ordered to pay Olivier Plantation is $2,768,373.04.

Status Report at 1, Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C.

On July 12, 2016, this court issued a single, unreported Order granting Lake Borgne's and St. Bernard Parish's undisputed motions for summary judgment in both Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. See Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C, slip op. at 1 (Fed. Cl. July 12, 2016). The court's July 12, 2016 Order, stated:

> It is undisputed that defendant has failed to provide just compensation to the owners of the Private LERD at issue in the above-captioned cases, resulting in outstanding judgements against Lake Borgne and St. Bernard for takings in the Louisiana state court Borgnemouth and Olivier Plantation cases. By failing to compensate the landowners involved in the state court Olivier Plantation and Borgnemouth cases, defendant breached its obligations under Article III.B of the [Lake Borgne] Amended Cooperation [A]greement. Plaintiffs, therefore, are entitled to summary judgment with regard to their breach of contract claims in both of the above-captioned cases.

Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C, slip op. at 3 (alterations added; internal reference omitted). On July 13, 2016, the Clerk of the Court of the United States Court of Federal Claims entered judgment in favor of Lake Borgne and St. Bernard Parish, which stated that Lake Borgne and St. Bernard Parish were to "recover of and from the United States the amount of $1,655,380.83 as to Case No. 15-103 C and $2,768,373.04 as to Case No. 15-518 C." Judgment, Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C (Fed. Cl. July 13, 2016). On September 12, 2016, the United States filed a notice of appeal in both Lake

Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. See Defendant's Notice of Appeal, Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C (Fed. Cl. Sep. 12, 2016). On October 11, 2016, the United States filed an unopposed motion to dismiss the appeals, which the United States Court of Appeals for the Federal Circuit granted on October 14, 2016. See Order, Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 16-2624 and 16-2626 (Fed. Cir. Oct. 14, 2026).

Proceedings in the Above Captioned Case Currently Under Review in the United States Court of Federal Claims, St. Bernard Parish Government v. United States, Case No. 15-1072C

As indicated above, on September 25, 2015, plaintiff, St. Bernard Parish, filed its complaint in the above captioned case currently under review in the United States Court of Federal Claims, Case No. 15-1072C. In its complaint, plaintiff alleges that defendant, the United States, breached the Amended Cooperation Agreement after plaintiff gave the Army Corps access to Mrs. Pizani's and Mrs. Juan's private property, and the Army Corps entered the property and removed borrow material to repair levees in Louisiana in the aftermath of a major hurricane. Plaintiff notes in its complaint that Mrs. Pizani and Mrs. Juan had filed a lawsuit in the Louisiana State Trial Court, which, at the time of plaintiff's filing its complaint in this court on September 25, 2015, was still pending in the Louisiana State Trial Court. Moreover, at the time plaintiff filed its complaint in this court on September 25, 2015, defendant United States' condemnation action was still pending in the United States District Court for the Eastern District of Louisiana.

On October 14, 2015, this court issued an order staying the above captioned case in the United States Court of Federal Claims, Case No. 15-1072C, at the request of the parties "pending resolution of certain related cases in Louisiana state court and the United States District Court for the Eastern District of Louisiana." On April 28, 2017, while the case currently before this court was stayed, plaintiff filed its "FIRST SUPPLEMENTAL AND AMENDING COMPLAINT" in this court, the United States Court of Federal Claims. (capitalization in original).[32] As also described above, in plaintiff's amended complaint, plaintiff alleges that defendant entered into the Amended Cooperation Agreement with plaintiff, and that Article III.B of the Amended Cooperation Agreement required the Army Corps to assume "the obligation to pay just compensation to landowners whose property is commandeered, agreeing that it will 'identify and provide just compensation to the owners of a compensable interest in the Private LERD.'" According to plaintiff, between 2005 and 2006, the Army Corps excavated borrow material from the property owned by Mrs. Pizani and Mrs. Juan, but has "failed to compensate Ms. Pizani and Ms. Juan for the losses they allegedly sustained as a result of the Corps's [sic] entry onto and excavation

---

[32] Plaintiff filed its amended complaint in the case currently before the court, Case No. 15-1072C, after the Louisiana State Trial Court entered judgment in favor of Mrs. Pizani and Mrs. Juan, see Judgement at 1-2, Pizani v. St. Bernard Parish, No. 109-548 (34th Jud. Dist. Ct. Dec. 20, 2016), but while the United States' condemnation action in the United States District Court for the Eastern District of Louisiana was still pending.

of material from property owned by Ms. Pizani and Ms. Juan." (alteration added). Plaintiff, St. Bernard, alleges in its breach of contract action filed in the United States Court of Federal Claims that "[t]his refusal to provide just compensation to the property owners under the terms of the Amended Cooperation Agreement, on behalf [of] SBPG, constitutes a breach of the express and/or implied terms of the Amended Cooperation Agreement." (alterations added). Plaintiff further argues in its amended complaint:

> SBPG requests that this Court enforce the terms of the Amended Cooperation Agreement, by ordering the Corps to compensate Ms. Pizani and Ms. Juan for the losses, in the amounts set out by the Pizani Judgments, which are attached as Exhibits A & B "in the name of the Public Sponsors," as provided in Article III.B and/or Article II.B.1 of the Amended Cooperation Agreement, as well as any principal, interest, attorney's fees and costs awarded by the Louisiana state court. The Pizani Judgments [entered in the Louisiana State Trial Court] are now final judgments, no longer appealable, and SBPG is entitled to an Order requiring the United States to pay the judgments under this Court's precedent in the Olivier and Borgnemouth cases (USCFC [United States Court of Federal Claims, Case] Nos. 15-103C and 15-518C).

(alterations added; footnote omitted).[33] Plaintiff also states that damages for breach of contract are meant to "place the wronged party in as good a position as it would have been in had the breaching party fully performed its obligation," and, consequently, argues that

[33] As also emphasized above, not only are the facts of the "Olivier and Borgnemouth cases," as plaintiff has labeled them, significantly different from the case currently under review, which is Case No. 15-1072C, but also significantly different in the two earlier consolidated cases is the critical fact that in those cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, the United States conceded that there were "no remaining issues precluding entry of judgment in favor of plaintiffs on their breach of contract claim" because, in those earlier consolidated cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, defendant "took no action to negotiate or condemn, believing that compensation was not required." Defendant's Response to Plaintiff's Motion for Summary Judgment at 1, Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C. Significantly, in those earlier consolidated cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, the United States agreed to the entry of summary judgment against the United States and agreed that the plaintiffs in those cases were "entitled to receive $4,423,753.87 as full and complete satisfaction of any and all claims that have been made or could be made in the captioned cases." Status Report at 1, Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C.

> [t]he Corps is required to compensate SBPG for all losses it has sustained as a result of the Corps's [sic] failure to meet its contractual obligation to compensate the affected landowner, including all attorney's fees, and costs SBPG expended in defending the Pizani Lawsuit brought by Ms. Pizani and Ms. Juan in Louisiana state court and in prosecuting this action.

(alterations added).

Moreover, plaintiff argues in its amended complaint that "[i]n the alternative, the language in the Amended Cooperation Agreement constitutes an agreement to indemnify" St. Bernard Parish "for the entire amount of the Pizani Judgments[34] issued by the Louisiana courts, including the principal, interest, attorney's fees, and costs." (alteration and footnote added). Plaintiff also argues in its amended complaint that it was entitled to recover attorneys' fees under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412 (2016).

Although plaintiff raised the indemnification issue in its amended complaint, the court notes that plaintiff has not addressed the indemnification issue in plaintiff's cross-motion for partial summary judgment, which was filed after plaintiff's amended complaint was filed. In its cross-motion for partial summary judgment, however, defendant asserts that plaintiff's indemnification argument "is foiled by the plain language of the contract" and "the total absence of plain language or any words whatsoever" indicating that defendant agreed to indemnify plaintiff. The only relevant language in the Amended Cooperation Agreement favors defendant's position: "The Public Sponsors shall hold and save the Government free from all damages arising from the construction, operation, and maintenance of the Construction Effort, the non-Federal levee, and any related betterments, except for damages due to the fault or negligence of the Government or the Government's contractors." There is no term in the Amended Cooperation Agreement that would require the United States to indemnify plaintiff "for the entire amount of the Pizani Judgments issued by the Louisiana courts," as plaintiff suggests in its amended complaint.

On September 15, 2017, after plaintiff filed its amended complaint, this court lifted the stay placed in the above captioned case now under review, Case No. 15-1072C, in the United States Court of Federal Claims. Thereafter, on January 16, 2018, defendant filed a motion to dismiss the case in the United States Court of Federal Claims, Case No. 15-1072C, pursuant to RCFC 12(b)(1) and 12(b)(6). Defendant argued that "St. Bernard

---

[34] As discussed above, on December 20, 2016, the Louisiana State Trial Court issued a judgment against St. Bernard Parish in Pizani v. St. Bernard Parish, see Judgment, Pizani v. St. Bernard Parish, No. 109-548, and, on January 18, 2017, the Louisiana State Trial Court issued an amended judgment of its December 20, 2016 judgment. See Amended Judgment, Pizani v. St. Bernard Parish, No. 109-548. In its amended complaint, plaintiff refers to the Louisiana State Trial Court's judgment dated December 20, 2016, and the Louisiana State Trial Court's amended judgment dated January 18, 2017, "collectively as the 'Pizani Judgements.'"

lacks standing to bring this action" for a breach of contract because "St. Bernard has not pled that it paid the state court judgment to the Pizanis." Defendant continued, "[t]o the contrary, in the Joint and Reciprocal Agreement,[35] the Pizanis expressly '[a]greed not to execute against St. Bernard' and 'to suspend and forego all collection rights.'" (first alteration and footnote added; second alteration in defendant's brief). Defendant also argued that "[t]he Court lacks jurisdiction to grant the equitable relief sought by St. Bernard: an order directing specific performance of the [Amended] Cooperation Agreement by the Government." (alterations added). Defendant further argued that the court "should dismiss the complaint for failure to state a claim upon which relief can be granted" because, according to defendant, St. Bernard failed to plausibly allege a duty, a breach of duty, and damages.

On April 4, 2019, the court denied defendant's motion to dismiss in the case currently before the court, Case No. 15-1072C. See St. Bernard Parish Gov't v. United States, 142 Fed. Cl. 504 (2019). With respect to whether plaintiff had standing to file its breach of contract claim in the United States Court of Federal Claims, this court found:

> In the Joint and Reciprocal Agreement, Ms. Juan and Ms. Pizani did not settle the dispute with St. Bernard Parish. The Joint and Reciprocal Agreement provides a mechanism to potentially resolve the dispute between Ms. Juan and Ms. Pizani and St. Bernard Parish if St. Bernard Parish is successful in this court in the above-captioned case. The Joint and Reciprocal Agreement, at this time, however, has not settled the parties' dispute and St. Bernard Parish's potential remaining liability for the judgments entered by the Louisiana State Trial court, given the unresolved nature of the relationship between Ms. Juan, Ms. Pizani, and St. Bernard Parish if St. Bernard Parish does not recover funds from the United States in the above-captioned case.

Id. at 539. This court continued:

> A decision favorable to plaintiff [St. Bernard] could, if successful, address the injury suffered by plaintiff, as plaintiff would no longer be liable to Ms. Juan and Ms. Pizani under the Joint and Reciprocal Agreement, provided plaintiff pays the funds to Ms. Juan and Ms. Pizani within sixty days of

---

[35] As indicated above, after the Louisiana State Trial Court entered judgment in favor of Mrs. Pizani and Mrs. Juan, and against St. Bernard Parish, in Pizani v. St. Bernard Parish, No. 109-548, Mrs. Pizani, Mrs. Juan, and St. Bernard Parish entered a "Joint and Reciprocal Agreement" pursuant to which Mrs. Pizani and Mrs. Juan agreed to "suspend and forego all collection rights and efforts against SBPG for the Judgement while SBPG pursues collection of the funds owed by the United States for the removal of borrow material," and St. Bernard Parish agreed to "pursue payment of the funds owed by the United States for the removal of borrow material on the Landowners' [Mrs. Pizani's and Mrs. Juan's] property, in any and all available forums, including the Federal Court of Claims [sic]." (alterations added).

> receipt of funds. Plaintiff has established an injury potentially traceable to defendant's alleged conduct that could be redressed with a favorable decision by this court and, therefore, has met its burden to establish standing in the above-captioned case.

Id. (alteration added).

Regarding defendant's argument that plaintiff's complaint should be dismissed for lack of subject matter jurisdiction, the court found:

> [T]he substance of plaintiff's supplemental complaint is a breach of contract action against defendant, not a request for equitable relief. Plaintiff's supplemental complaint seeks damages arising out of an alleged breach of the Amended Cooperation Agreement and requests that this court award damages to "compensate SBPG for all losses it has sustained as a result of the Corps's failure to meet its contractual obligation to compensate the affected landowner[s]," which exceeds $10,000.00. The court's interpretation of plaintiff's supplemental complaint as seeking monetary relief from the United States is consistent with the arrangement set forth in the Joint and Reciprocal Agreement, in which Ms. Juan and Ms. Pizani "agree[d] to accept such amounts recovered in the United States Court of Federal Claims in Case No. 15-1072C (or such other proceedings as may be instituted for collection of the Judgement, as amended)" by St. Bernard Parish "in full satisfaction of all sums owed to Plaintiffs by St. Bernard in the Judgement (as amended)." As indicated in plaintiff's supplemental complaint, the "true nature" of plaintiff's request is money damages alleged to be equivalent to the amount of the "judgment(s) issued in the Louisiana Court in favor of Ms. Pizani and Ms. Juan," as well as "accumulating legal interest on the foregoing up to the date of payment," which plaintiff asserts it sustained as a result of the government's alleged breach of the Amended Cooperation Agreement. See Katz v. Cisneros, 16 F.3d [1204,] 1207 [(Fed. Cir. 1994)]. Reference to the amount of damages by plaintiff in this sentence clouds the fundamental nature of plaintiff's claim, an alleged "breach [by defendant] of its contract [the Amended Cooperation Agreement] with St. Bernard Parish Government." As discussed below, the government has not disputed that a contract between the parties existed. The court, therefore, has jurisdiction over plaintiff's breach of contract action and request for money damages.

Id. at 543–44 (first, fourth and fifth alterations added). With respect to defendant's argument that plaintiff had failed to state a claim, this court found that, when considering the record then before the court, and, when reviewing

> the documents on the docket of the Eastern District of Louisiana, it is currently unclear whether defendant has complied with its duty under the Amended Cooperation Agreement to "identify" and "provide" "just

> compensation" to the owners of a compensable interest in the Private LERD based on the government's actions in the proceeding before the [United States District Court for the] Eastern District of Louisiana. Because plaintiff's complaint plausibly alleges that the United States has not complied with its duty under the Amended Cooperation Agreement to "identify" and "provide" "just compensation" to the owners of a compensable interest in the Private LERD, including Ms. Juan and Ms. Pizani, the court finds that plaintiff sufficiently has alleged a breach of the Amended Cooperation Agreement, so as to avoid dismissal for failure to state a claim.

Id. at 551 (alteration added).

After the court's decision, defendant filed a motion for reconsideration on the denial of defendant's motion to dismiss. After defendant's motion for reconsideration was fully briefed, and after consideration by the court, defendant's motion for reconsideration was denied. See St. Bernard Parish Gov't v. United States, 143 Fed. Cl. 676 (2019).

As also described above, an extensive and hard fought discovery period followed, which was made more difficult by the contentious and uncooperative nature of the relationships, particularly on the part of defendant's earlier counsel of record (not defendant's current, more recently appointed counsel of record) that surfaced during the period of discovery, as well as the flooding which affected the St. Bernard Parish area and which destroyed extensive, potentially relevant, records. Throughout the long and contentious discovery period in the case currently before the court, the parties also filed numerous motions, both for extensions of time and for the court to try to resolve discovery disputes between the parties. Adding to the difficulty of discovery and the length of time utilized in the above captioned case were multiple substitutions of counsel, both for plaintiff and defendant.[36] After the close of discovery, plaintiff submitted a motion for

---

[36] The court notes that between the date of filing of the above captioned case and the date of the issuance of this Opinion, there have been three Department of Justice attorneys of record in total and four attorneys of record for plaintiff in total. Specifically, for a short period between the filing of the above captioned case and March 29, 2016, Mr. Vincent de Paul Phillips served as lead counsel for defendant. Subsequently, between March 29, 2016 and December 28, 2016, Mr. James R. Sweet served as lead counsel for defendant. Thereafter, from December 28, 2016 through January 27, 2023, Mr. Steven C. Hough served as lead counsel for defendant. On January 27, 2023, Mr. Phillips again became lead counsel of record for defendant and Mr. Phillips has remained ably in that role through the date of the issuance of this Opinion. In addition, from the date of filing of the above captioned case through March 26, 2018, Mr. William M. McGoey served as lead counsel for plaintiff. Thereafter, from March 26, 2018 to March 13, 2025, Mr. Robert E. Couhig, Jr. served as lead counsel for plaintiff. Next, between March 13, 2025 and January 7, 2026, Mr. Jason A. Cavignac served as lead counsel for plaintiff. Subsequently, from January 7, 2026 through the date of the issuance of this Opinion, Mr. Claude F. Reynaud, Jr. has served as lead counsel for plaintiff, although Mr. Cavignac has remained as an attorney for plaintiff.

partial summary judgment on liability, pursuant to RCFC 56, seeking a ruling that defendant is liable to plaintiff for breach of contract under the Amended Cooperation Agreement, with a determination of damages, if necessary, to be made in later proceedings. Plaintiff makes two arguments in support of its motion for partial summary judgment. First, plaintiff argues:

> St. Bernard is entitled to the entry of summary judgment on its breach of contract claim because defendant has already litigated and lost the same issue, between these same parties, in the [two consolidated cases in] Lake Borgne [Basin Levee Dist. v. United States, 127 Fed. Cl. 321] matter[, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C]. Specifically, in Lake Borgne this Court found that defendant's failure to provide just compensation to landowners from whom defendant took borrow material was a breach of the Amended Cooperation Agreement. St. Bernard is entitled to entry of partial summary judgment on the issue of liability in its favor here because defendant is estopped from relitigating the same issue here under the exact same factual scenario.

(alterations added). Second, plaintiff argues that "[e]ven if this Court determines that the doctrine of offensive collateral estoppel does not apply to St. Bernard's claims in this matter, St. Bernard remains entitled to partial summary judgment on the issue of defendant's liability for breach of contract." (alteration added). Plaintiff argues that it remains entitled to partial summary judgment because:

> [A] series of contracts existed between St. Bernard and the United States, pursuant to which the United States undertook the duty to identify and justly compensate owners of Private LERD, which it has failed to do. As a result of defendant's breach, St. Bernard has had a considerable state court judgment levied against it.

(alteration added).

Defendant, in its cross-motion for partial summary judgment, argues that the government's obligations under the Amended Cooperation Agreement are unambiguous and the government "met its obligation to 'identify and provide just compensation' as required in Article III.B. of the Amended Cooperation Agreement" by initiating a formal condemnation action in the United States District Court for the Eastern District of Louisiana and depositing an estimated sum of "just compensation" in the United States District Court for the Eastern District of Louisiana court registry, which Mrs. Pizani and Mrs. Juan subsequently withdrew. Defendant further asserts that plaintiff's argument "that the mere existence of the state court judgments entered against it establishes breach" is not enough to prove that defendant breached the Amended Cooperation Agreement because the Amended Cooperation Agreement required the government to provide "just compensation" to Mrs. Pizani and Mrs. Juan in accordance with the URA, which, defendant argues, is what the government did during the federal condemnation

proceedings in the United States District Court for the Eastern District of Louisiana. With respect to plaintiff's issue preclusion argument, defendant argues:

> The Parish is incorrect and has effectively conceded that issue preclusion does not apply here by acknowledging that this case presents a "significant factual difference" from the previous [consolidated] LBBLD [Lake Borgne Basin Levee Dist. v. United States, 127 Fed. Cl. 321] litigation because here the Army Corps negotiated with the Pizanis before filing the Federal condemnation action.

(alterations added). Indeed, defendant argues that issue preclusion is not applicable to the case currently before this court because of the significant factual difference that, in the case currently before the court, the United States attempted to negotiate with Mrs. Pizani and Mrs. Juan, initiated a condemnation action in the United States District Court for the Eastern District of Louisiana, and deposited $134,000.00 in the United States District Court for the Eastern District of Louisiana registry, which Mrs. Pizani and Mrs. Juan withdrew. In its cross-motion for partial summary judgment, defendant argues:

> The LBBLD cases did not involve the question of whether the Army Corps' compliance with the URA process under that same Article III.B satisfied its "just compensation" obligation, because the Army Corps did not take any action to provide compensation in those cases. Rather, the issue was whether the LERD at issue was Public Sponsor LERD for which the United States had no obligation under the contract to pay any compensation.

(citing Lake Borgne Basin Levee Dist. v. United States, 127 Fed. Cl. at 339-44).

**DISCUSSION**

In the case currently before the court, plaintiff and defendant filed cross-motions for partial summary judgment on the issue of defendant's liability for breach of contract under the Amended Cooperation Agreement pursuant to RCFC 56(a). RCFC 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a) (alteration added); see also Young v. United Parcel Serv., Inc., 575 U.S. 206, 231 (2015); Alabama v. North Carolina, 560 U.S. 330, 344 (2010); Hunt v. Cromartie, 526 U.S. 541, 549 (1999); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); Stimson Lumber Co. v. United States, 82 F.4th 1346, 1350 (Fed. Cir. 2023) ("Summary judgment is appropriate when the moving party demonstrates that 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" (quoting Rule 56(a) of the Federal Rules of Civil Procedure and citing Chi. Coating Co. v. United States, 892 F.3d 1164, 1169 (Fed. Cir. 2018))); Anderson v. United States, 23 F.4th 1357, 1361 (Fed. Cir. 2022); Shell Oil Co. v. United States, 7 F.4th 1165, 1171 (Fed. Cir. 2021); Authentic Apparel Grp., LLC v. United States, 989 F.3d 1008, 1014 (Fed. Cir. 2021); Biery v. United States, 753 F.3d 1279, 1286 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); Ladd v. United States, 713 F.3d 648, 651

(Fed. Cir. 2013); Minkin v. Gibbons, P.C., 680 F.3d 1341, 1349 (Fed. Cir. 2012); Noah Sys., Inc. v. Intuit Inc., 675 F.3d 1302, 1309-10 (Fed. Cir. 2012); Advanced Fiber Techs. (AFT) Tr. v. J & L Fiber Servs., Inc., 674 F.3d 1365, 1372 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2012); Fujitsu Ltd. v. Netgear Inc., 620 F.3d 1321, 1325 (Fed. Cir.), reh'g denied (Fed. Cir. 2010); Consol. Coal Co. v. United States, 615 F.3d 1378, 1380 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 564 U.S. 1004 (2011); 1st Home Liquidating Tr. v. United States, 581 F.3d 1350, 1355 (Fed. Cir. 2009); Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1378 (Fed. Cir. 2009); Casitas Mun. Water Dist. v. United States, 543 F.3d 1276, 1283 (Fed. Cir. 2008), reh'g and reh'g en banc denied, 556 F.3d 1329 (Fed. Cir. 2009); Moden v. United States, 404 F.3d 1335, 1342 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2005); Am. Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363, 1370–71 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1139 (2005); Capitol Indem. Corp. v. United States, 162 Fed. Cl. 388, 397 (2022); King v. United States, 159 Fed. Cl. 450, 461 (2022); Desert Sunlight 250, LLC v. United States, 157 Fed. Cl. 209, 222 (2021).

A fact is material if it will make a difference in the result of a case under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248; see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968 (Fed. Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248); Ysla v. United States, 171 Fed. Cl. 333, 340 (2024) ("An outcome-determinative fact is a material fact." (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248)); Mata v. United States, 114 Fed. Cl. 736, 744 (2014); Arrañaga v. United States, 103 Fed. Cl. 465, 467-68 (2012); Thompson v. United States, 101 Fed. Cl. 416, 426 (2011); Cohen v. United States, 100 Fed. Cl. 461, 469 (2011). Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 247–48; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Curtis v. United States, 144 Ct. Cl. 194, 199, 168 F. Supp. 213, 216 (1958), cert. denied, 361 U.S. 843 (1959), reh'g denied, 361 U.S. 941 (1960); Gorski v. United States, 104 Fed. Cl. 605, 609 (2012); Walker v. United States, 79 Fed. Cl. 685, 692 (2008).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249; see, e.g., Schlup v. Delo, 513 U.S. 298, 332 (1995); BASF Corp. v. SNF Holding Co., 955 F.3d 958, 963 (Fed. Cir. 2020); TigerSwan, Inc. v. United States, 118 Fed. Cl. 447, 451 (2014); Dana R. Hodges Tr. v. United States, 111 Fed. Cl. 452, 455 (2013); Cohen v. United States, 100 Fed. Cl. at 469–70; Boensel v. United States, 99 Fed. Cl. 607, 611 (2011); Macy Elevator, Inc. v. United States, 97 Fed. Cl. 708, 717 (2011); Dick Pacific/GHEMM, JV ex rel. W.A. Botting Co. v. United States, 87 Fed. Cl. 113, 126 (2009). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 250–52; Jay v. Sec'y of Health & Hum. Servs., 998 F.2d 979, 982 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1993); Ingham Reg. Med. Ctr. v.

United States, 163 Fed. Cl. 384, 396 (2022) ("'Genuine' issues exist if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 247)); Leggitte v. United States, 104 Fed. Cl. 315, 317 (2012). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968; McKenna v. United States, 170 Fed. Cl. 119, 123 (2024) ("Summary judgment is warranted when 'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587)); 3rd Eye Surveillance, LLC v. United States, 151 Fed. Cl. 49, 54 (2020) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587); Pfizer Inc. v. United States, 149 Fed. Cl. 711, 715 (2020) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587). In such cases, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

Summary judgment, however, will not be granted "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. at 248 (alteration added); see also Long Island Sav. Bank, FSB v. United States, 503 F.3d 1234, 1244 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 555 U.S. 812 (2008); Eli Lilly & Co. v. Barr Lab'ys, Inc., 251 F.3d 955, 971 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2001), cert. denied, 534 U.S. 1109 (2002); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999); TigerSwan, Inc. v. United States, 118 Fed. Cl. at 451; Stephan v. United States, 117 Fed. Cl. 68, 70 (2014); Gonzales-McCaulley Inv. Grp., Inc. v. United States, 101 Fed. Cl. 623, 629 (2011). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. See Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587–88; Yant v. United States, 588 F.3d 1369, 1371 (Fed. Cir. 2009), cert. denied, 562 U.S. 827 (2010), overruled in part on other grounds by Moore v. United States, 66 F.4th 991 (Fed. Cir. 2023); Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co., 272 F.3d 1365, 1369 (Fed. Cir. 2001), reh'g and reh'g en banc denied, 293 F.3d 1364 (Fed. Cir. 2002), cert. denied, 539 U.S. 957 (2003); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d at 1257; Wanlass v. Fedders Corp., 145 F.3d 1461, 1463 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1998); see also Am. Pelagic Co. v. United States, 379 F.3d at 1371 (citing Helifix Ltd. v. Blok-Lok, Ltd., 208 F.3d 1339, 1345–46 (Fed. Cir. 2000)); Dana R. Hodges Tr. v. United States, 111 Fed. Cl. at 455; Boensel v. United States, 99 Fed. Cl. at 611 ("'The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 255) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587–88; Casitas Mun. Water Dist. v. United States, 543 F.3d at 1283; and Lathan Co. Inc. v. United States, 20 Cl. Ct. 122, 125 (1990))); see also Am. Seating Co. v. USSC Grp., Inc., 514 F.3d 1262, 1266-67 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2008); Vivid Techs.,

Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 807 (Fed. Cir. 1999). "However, once a moving party satisfies its initial burden, mere allegations of a genuine issue of material fact without supporting evidence will not prevent entry of summary judgment." Republic Sav. Bank, F.S.B. v. United States, 584 F.3d 1369, 1374 (Fed. Cir. 2009) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48); see also Blackwell v. United States, 171 Fed. Cl. 682, 687-88 (2024) ("'[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" (alteration in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48)); Univ. South Florida v. United States, 146 Fed. Cl. 274, 280 (2019).

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case, and it does not follow that summary judgment should be granted to one side or the other. See Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed. Cir. 1988) (citing Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1391 (Fed. Cir. 1987)); see also Marriott Int'l Resorts, L.P. v. United States, 586 F.3d at 968–69; Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998) ("The fact that both the parties have moved for summary judgment does not mean that the court must grant summary judgment to one party or the other."), reh'g denied and en banc suggestion declined (Fed. Cir. 1999); Massey v. Del Lab'ys, Inc., 118 F.3d 1568, 1573 (Fed. Cir. 1997); B.F. Goodrich Co. v. U.S. Filter Corp., 245 F.3d 587, 593 (6th Cir. 2001); Atl. Richfield Co. v. Farm Credit Bank of Wichita, 226 F.3d 1138, 1148 (10th Cir. 2000); Chevron USA, Inc. v. Cayetano, 224 F.3d 1030, 1037 n.5 (9th Cir. 2000), cert. denied, 532 U.S. 942 (2001); Allstate Ins. Co. v. Occidental Int'l, Inc., 140 F.3d 1, 2 (1st Cir. 1998); LewRon Television, Inc. v. D.H. Overmyer Leasing Co., 401 F.2d 689, 692 (4th Cir. 1968), cert. denied, 393 U.S. 1083 (1969); Rogers v. United States, 90 Fed. Cl. 418, 427 (2009), subsequent determination, 93 Fed. Cl. 607 (2010), aff'd, 814 F.3d 1299 (2015); Consol. Coal Co. v. United States, 86 Fed. Cl. 384, 387 (2009), aff'd, 615 F.3d 1378 (Fed. Cir.), and reh'g and reh'g en banc denied (Fed. Cir. 2010), cert. denied, 564 U.S. 1004 (2011); St. Christopher Assocs., L.P. v. United States, 75 Fed. Cl. 1, 8 (2006), aff'd, 511 F.3d 1376 (Fed. Cir. 2008); Reading & Bates Corp. v. United States, 40 Fed. Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration, or, otherwise stated, in favor of the non-moving party. See First Commerce Corp. v. United States, 335 F.3d 1373, 1379 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Beard v. United States, 125 Fed. Cl. 148, 156 (2016); Two Shields v. United States, 119 Fed. Cl. 762, 775 (2015), aff'd sub nom. Ramona Two Shields v. United States, 820 F.3d 1324 (Fed. Cir. 2016).

In the case currently before the court, the parties have continued to oppose each other on many issues and the government vigorously has pursued persistent and extensive discovery on a variety of issues, although many of the requested documents likely had been lost in the flooding following the hurricane. Earlier in the case, there also appeared to be a path toward resolving a number of issues, which was memorialized by the court in an Order, but defendant's previous counsel of record drew back from an

apparent agreement made at a hearing before the court on how to proceed at that time.[37] As described above, however, certain basic issues of fact do not appear to be contested by the parties at this stage of the case and appear to be clear based on the record currently before the court, including: (1) the President of St. Bernard Parish issued an executive order exercising emergency powers under LA. STAT. ANN. § 29:721, et seq., to commandeer private property, (2) the President of St. Bernard Parish issued the Commandeering Order commandeering 6.51 acres of private property owned by Mrs. Pizani and Mrs. Juan pursuant to LA. STAT. ANN. § 29:721, et seq., and tendering a right of entry to such property to Lake Borgne, (3) Lake Borgne issued a right of entry to the Army Corps onto such property, (4) the private property commandeered was "Private LERD" within the meaning of the Amended Cooperation Agreement, and (5) the United States began to undertake its duty to identify and provide "just compensation" to the owners of a compensable interest in the Private LERD under the Amended Cooperation Agreement. At this point in time, the parties' key dispute remains whether the government, in fact, has provided "just compensation" under the Amended Cooperation Agreement, given all the legal proceedings and events that are part of the history of this case.

Issue Preclusion

As indicated above, plaintiff first argues that the court should grant partial summary judgment in its favor under a theory of "offensive collateral estoppel," or issue preclusion. As articulated by the United States Supreme Court, the rule of issue preclusion, also known as collateral estoppel, precludes a party from re-litigating an issue that was "litigated and resolved in a valid court determination essential to the prior judgment." New Hampshire v. Maine, 532 U.S. 742, 748-49, reh'g denied, 533 U.S. 968 (2001). In other words, "[u]nder the judicially-developed doctrine of collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." United States v. Mendoza, 464 U.S. 154, 158 (1984) (alteration added); see also Allen v. McCurry, 449 U.S. 90, 94 (1980) ("Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."); Ashe v. Swenson, 397 U.S. 436, 443 (1970) ("When an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."). "Collateral estoppel may be used defensively or offensively." Washington Mutual, Inc. v. United States, 130 Fed. Cl. 653, 688 (2017) (citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 (1979)), aff'd, 891 F.3d 1016 (Fed. Cir. 2018). Defensive collateral estoppel refers to when "a plaintiff [is] estopped from asserting a claim that the plaintiff had previously litigated and lost against another defendant," whereas offensive collateral estoppel refers to when "a plaintiff is seeking to estop a defendant from relitigating the issues which the defendant previously

[37] As indicated in this court's Order, earlier in the above captioned case, "[t]he court had previously addressed the [discovery] issues and memorialized an agreed upon way to proceed" but "the parties failed to exchange the documents as instructed," requiring the court to intervene yet again. (alterations added).

litigated and lost against another plaintiff." Parklane Hosiery Co. v. Shore, 439 U.S. at 329 (alteration added).

The United States Supreme Court has explained that issue preclusion guards against "the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." Montana v. United States, 440 U.S. 147, 153-54 (1979) (footnote omitted). The United States Supreme Court has also stated:

> Issue preclusion bars successive litigation of "an issue of fact or law" that "is actually litigated and determined by a valid and final judgment, and . . . is essential to the judgment." Restatement (Second) of Judgments § 27 (1980) (hereinafter Restatement). If a judgment does not depend on a given determination, relitigation of that determination is not precluded. Id., § 27, Comment h.

Bobby v. Bies, 556 U.S. 825, 834 (2009) (omission in original); see also United States v. Mendoza, 464 U.S. at 158 ("Collateral estoppel, like the related doctrine of res judicata, serves to 'relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.'" (footnote omitted) (quoting Allen v. McCurry, 449 U.S. at 94). The doctrine of res judicata "includes the two related concepts of claim preclusion and issue preclusion." Nasalok Coating Corp. v. Nylok Corp., 522 F.3d 1320, 1323 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2008).

The United States Court of Appeals for the Federal Circuit has articulated four conditions for determining whether issue preclusion is appropriate:

> Issue preclusion bars a cause of action when four conditions are met: "(1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the plaintiff had a full and fair opportunity to litigate the issue in the first action."

Laguna Hermosa Corp. v. United States, 671 F.3d 1284, 1288 (Fed. Cir. 2012) (quoting In re Freeman, 30 F.3d 1459, 1465 (Fed. Cir. 1994)); see also Google LLC v. Hammond Dev. Int'l, Inc., 54 F.4th 1377, 1381 (Fed. Cir. 2022); Fairholme Funds, Inc. v. United States, 26 F.4th 1274, 1300 (Fed. Cir. 2022); SynQor, Inc. v. Vicor Corp., 988 F.3d 1341, 1353 (Fed. Cir. 2021); United Access Techs., LLC v. Centurytel Broadband Servs. LLC, 778 F.3d 1327, 1331 (Fed. Cir. 2015); Biafora v. United States, 773 F.3d 1326, 1333 (Fed. Cir. 2014); Sacramento Mun. Util. Dist. v. United States, 566 F. App'x 985, 993-94 (Fed. Cir. 2014); Stephen Slesinger, Inc. v. Disney Enters., 702 F.3d 640, 644 (Fed. Cir. 2012); Fletcher v. United States, 178 Fed. Cl. 241, 251 (2025); Proctor v. United States, 177 Fed. Cl. 360, 369 (2025); Angel v. United States, 172 Fed. Cl. 102, 116 (2024) (quoting Laguna Hermosa Corp. v. United States, 671 F.3d at 1288); Cully Corp. v. United States, 160 Fed. Cl. 360, 373, recons. denied, 163 Fed. Cl. 676 (2022), recons. denied,

165 Fed. Cl. 737 (2023), appeal dismissed, No. 2023-2006, 2023 WL 5038823 (Fed. Cir. Aug. 8, 2023). Moreover, the United States Court of Appeals for the Federal Circuit has stated that "even if all these conditions are met, application of collateral estoppel 'must be confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged.'" Sacramento Mun. Util. Dist. v. United States, 566 F. App'x at 994 (quoting Comm'r of Internal Revenue v. Sunnen, 333 U.S. 591, 599-600 (1948)). Although, the "[f]actual differences must be material, i.e., having legal significance, to prevent operation of collateral estoppel." Arkla, Inc. v. United States, 37 F.3d 621, 625 (Fed. Cir. 1994) (alteration added) (citing Montana v. United States, 440 U.S. at 162). Additionally, "'the requirement that the issue have been actually decided is generally satisfied if the parties to the original action disputed the issue and the trier of fact decided it." Laguna Hermosa Corp. v. United States, 671 F.3d at 1288-89 (citing In re Freeman, 30 F3d. at 1466 (citing Mother's Rest., Inc. v. Mama's Pizza, Inc., 723 F.2d 1566, 1569 (Fed. Cir. 1983))).

The application of the doctrine of issue preclusion, however, includes limitations when it is used against the United States. While the requirement of mutuality between parties has generally been abandoned, the requirement of mutuality remains in cases in which the United States is a litigant. See United States v. Mendoza, 464 U.S. at 158-59. Mutual collateral estoppel may apply when the government was a party in the prior suit. See Montana v. United States, 440 U.S. at 164; United States v. Stauffer Chemical Co., 464 U.S. 165, 169 (1984); United States v. Mendoza, 464 U.S. at 163. The United States Supreme Court has determined, however, that "nonmutual offensive collateral estoppel is not to be extended to the United States." United States v. Mendoza, 464 U.S at 158; see also Wolfe v. McDonough, 28 F.4th 1348, 1359 n.6 (Fed. Cir. 2022); Albano v. United States, 157 Fed. Cl. 751, 760 (2022); Price v. United States, 156 Fed. Cl. 281, 289-90 (2021). The United States Supreme Court further noted that the requirement of mutuality remains in cases in which the United States is a litigant because applying nonmutual offensive collateral estoppel against the government would deprive the United States Supreme Court from "the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari." United States v. Mendoza, 464 U.S at 160 (citing E. I. duPont de Nemours & Co. v. Train, 430 U.S. 112, 135 n.26 (1977)).

In the case currently before the court, plaintiff claims, citing Laguna Hermosa Corp. v. United States, 671 F.3d at 1288, that "the four conditions exist which allow this Court to find that the issue of defendant's breach of the Amended Cooperation Agreement has already been litigated and decided between these two parties" in the earlier consolidated cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. (alteration added).[38] As indicated above, in Laguna Hermosa, the United States Court of Appeals

[38] As discussed above, in addition to the above captioned case currently under review by this court, plaintiff St. Bernard Parish previously filed complaints in two separate cases in the United States Court of Federal Claims: Lake Borgne Basin Levee District, et al. v.

for the Federal Circuit stated that:

> Issue preclusion bars a cause of action when four conditions are met: "(1) the issue is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the plaintiff had a full and fair opportunity to litigate the issue in the first action."

Laguna Hermosa Corp. v. United States, 671 F.3d at 1288 (quoting In re Freeman, 30 F.3d at 1465). In its motion for partial summary judgment in the case currently before the court, Case No. 15-1072C, plaintiff argues that, pursuant to the doctrine of issue preclusion:

> St. Bernard is entitled to the entry of summary judgment on its breach of contract claim because defendant has already litigated and lost the same issue, between these same parties, in the [consolidated] Lake Borgne matter[, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C]. Specifically, in Lake Borgne this Court found that defendant's failure to provide just compensation to landowners from whom defendant took borrow material was a breach of the Amended Cooperation Agreement. St. Bernard is entitled to entry of partial summary judgment on the issue of liability in its favor here because defendant is estopped from

---

United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. On March 15, 2016, this court issued a single Opinion denying defendant's motion to dismiss the consolidated cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, under the caption Lake Borgne Basin Levee District v. United States, 127 Fed. Cl. 321. Subsequently, on July 12, 2016, after the parties had filed joint status reports in both cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, agreeing that Lake Borgne and St. Bernard Parish were "entitled to receive $4,423,753.87 as full and complete satisfaction of any and all claims that have been made or could be made in the captioned cases," see Status Report at 1, Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C, this court issued a single Order granting Lake Borgne's and St. Bernard Parish's motions for summary judgment in the consolidated cases. See Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C, slip op. at 1. The parties in the case currently before the court, Case No. 15-1072C, sometimes refer to those earlier consolidated cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, as well as this court's March 15, 2016 Opinion and July 12, 2016 Order in those consolidated cases, collectively, as "Lake Borgne" or "LBBLD." In this Opinion, the court refers to those consolidated cases by name and number: Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C.

relitigating the same issue here under the exact same factual scenario.

(alterations added).

With respect to the first condition articulated in Laguna Hermosa, that "the issue is identical to one decided in the first action," Laguna Hermosa Corp. v. United States, 671 F.3d at 1288, plaintiff argues in this court that "the issue before this court is identical to the issue decided in [the consolidated] Lake Borgne" cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, because the issue in each case is "whether defendant breached the Amended Cooperation Agreement." (alteration added). Plaintiff "concedes that the two contracts are physically different, inasmuch as they are two different pieces of paper with signatures," but argues that "the obligation at issue – to identify and compensate owners of Private LERD" under Article III.B of the Amended Cooperation Agreement "is identical." Critically, plaintiff also acknowledges that "[t]here is one significant factual difference between the" consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, and the case currently before the court, No. 15-1072C, which is that the government initiated a Federal condemnation action in the case currently before the court, and Mrs. Pizani and Mrs. Juan "withdrew $134,000 deposited by defendant in the registry of the court in the Eastern District of Louisiana in connection with defendant's fee title condemnation action in that court." (alteration added). Plaintiff contends, however, that the fact that Mrs. Pizani and Mrs. Juan withdrew funds from the United States District Court for the Eastern District of Louisiana registry "would simply affect damages awarded; it would have no effect on defendant's liability for breach of contract."

Defendant responds and emphasizes that plaintiff "cannot establish that the issues in these actions are identical" just because Article III.B of the Amended Cooperation Agreement was at issue in both the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, and also is at issue in the case currently under review, Case No. 15-1072C. Defendant also notes that "the Parish acknowledges that this case presents a 'significant factual difference' from the [consolidated] LBBLD cases because [in the case currently under review] the Army Corps initiated a Federal condemnation proceeding, deposited $134,000 in the registry of that court, and the Pizanis withdrew that money," (alterations added), which did not occur in either of the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. Defendant further argues that, regardless of plaintiff's concession, the issues in the case currently under review, Case No. 15-1072C, and the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, are not identical because "[t]he [consolidated] LBBLD cases did not involve the question of whether the Army Corps' compliance with the URA process under that same Article III.B satisfied its 'just compensation' obligation, because the Army Corps

did not take any action to provide compensation" in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. (alterations added). Defendant also argues that the major issue in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, was "whether the LERD at issue was Public Sponsor LERD for which the United States had no obligation under the contract to pay any compensation." (citing Lake Borgne Basin Levee Dist. v. United States, 127 Fed. Cl. at 339-44). Defendant alleges that in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, it was only after the court "ruled that the LERD was not Public Sponsor," that

> the United States was required to concede it could not establish compliance with the Article III.B. duty to identify and provide just compensation in accordance with URA because the Army Corps had not engaged in the URA process of negotiating first and initiating Federal condemnation proceedings if necessary for the LERD it had incorrectly understood was Public Sponsor.

(citing Lake Borgne Basin Levee Dist. v. United States, Nos. 15-103C and 15-518C, slip op. at 3).

In its opposition to defendant's cross-motion for partial summary judgment in the case currently before the court, plaintiff argues that defendant's attempt to distinguish the facts in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, by the assertion that "'the Army Corps did not take any action to provide just compensation'" in the above-referenced consolidated Lake Borgne cases "is incorrect, as defendant did, in fact, initiate a condemnation proceeding against one of the landowners in that consolidated case, Olivier Plantation." Defendant, however, responds:

> [I]n the previous [consolidated] LBBLD litigation, the Parish represented to this Court that there were three parcels of Olivier Plantation land, known as Areas 1, 2, and 3, and that Areas 2 and 3 were the subject of a settlement agreement and were not part of the contract breach action in Case No. 15-518.
>
> More specifically, in that joint stipulation of fact, the Parish stated that Area 1 was "the area which was commandeered by St. Bernard Parish and over which the Levee District possessed an access servitude and urged in state court a right to remove borrow as a result of said servitude." Area 1, the United States contended in the [consolidated] LBBLD cases, was Public Sponsor LERD and, therefore was not subject to compensation under the relevant agreement. see also Olivier Plantation, LLC v. Parish of St. Bernard, 151 So.3d 965, 969 (La. App. 4th Cir. 2014) (citing Borgnemouth

> Realty v. Parish of St. Bernard, 141 So.3d 891, 895 (La. App. 4th Cir. 2014) (explaining that area at issue in those cases was Area 1 LERD over which the Levee District had already acquired the right to remove borrow by virtue of a servitude appropriated between 1967 and 1969). In contrast, Areas 2 and 3 were not areas that the Parish, the Levee District, or any other non-Federal governmental entity owned, claimed, or controlled, thus the United States did not contend that those areas were Public Sponsor LERD and, therefore, those areas were not at issue in the previous cases.
>
> Most importantly, the Army Corps did not initiate a condemnation action against Olivier for the LERD interests in Area 1, which was the parcel at issue in the previous [consolidated] LBBLD cases, despite the Parish's contrary assertion.

(alterations added; internal references omitted).

With respect to the second condition articulated in Laguna Hermosa, that "the issue was actually litigated in the first action," Laguna Hermosa Corp. v. United States, 671 F.3d at 1288, plaintiff argues:

> There is no doubt that this issue [defendant's obligation to St. Bernard under the Amended Cooperation Agreement to provide "just compensation" when it takes Private LERD] was litigated in the first action, as the interpretation of defendant's duty and breach under the Amended Cooperation Act was the ultimate issue in [the consolidated] Lake Borgne [cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C], as it is here[, Case No. 15-1072C].

(alterations added). Plaintiff notes that, in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, this court found:

> It is undisputed that defendant has failed to provide just compensation to the owners of the Private LERD at issue in the above-captioned cases, resulting in outstanding judgments against Lake Borgne and St. Bernard for takings in the Louisiana state court Borgnemouth and Olivier Plantation cases. By failing to compensate the landowners involved in the state court Olivier Plantation and Borgnemouth cases, defendant breached its obligations under Article III.B of the Amended Cooperation Agreement.

(quoting Lake Borgne Basin Levee Dist. v. United States, Nos.15-103C and 15-513C, slip op. at 3). Defendant responds:

> [T]here are four arguments at issue in this case [the case currently before the court, Case No. 15-1072C], none of which were litigated in the

> [consolidated] LBBLD case[s]: (1) the specific duties of the United States regarding its "identify and provide just compensation" obligation; (2) whether the United States performed those duties; (3) whether there was any obligation of the United States at the outset to pay just compensation in an amount that the Louisiana court would award under Louisiana law years later; and (4) whether the Amended Cooperation Agreement includes an indemnification obligation.

(alterations added). Defendant argues that plaintiff "cannot show that the four questions in this case [the case currently before the court, Case No. 15-1072C] were before the LBBLD court by saying the issue concerned 'the interpretation of defendant's duty and breach' and that breach 'was the ultimate issue in Lake Borgne.'" (alteration added).

With respect to the third condition articulated in Laguna Hermosa, that "resolution of the issue was essential to a final judgment in the first action," Laguna Hermosa Corp. v. United States, 671 F.3d at 1288, plaintiff argues only that "the resolution of the breach issue was clearly essential to the final judgment in [the consolidated] Lake Borgne [cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C], as it is here" in the case currently before the court, Case No. 15-1072C. (alterations added). Defendant responds:

> The issue in [the consolidated] LBBLD [cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C] was whether the LERD at issue was Public Sponsor LERD for which the United States had no responsibility to provide just compensation. Accordingly, the subsequent breach analysis was a foregone conclusion because the Army Corps took no action to negotiate or condemn, believing that compensation was not required. The entirety of the Parish's argument on this point is: "This condition is also satisfied, as the resolution of the breach issue was clearly essential to the final judgment in Lake Borgne, as it is here." "[S]uch a conclusory assertion with no analysis is insufficient to develop and preserve the issue." Facebook, Inc. v. Windy City Innovations, LLC, 973 F.3d 1321, 1354 (Fed. Cir. 2020). Regardless, the Parish has failed to demonstrate that the Court in the previous [consolidated] LBBLD cases acknowledged, let alone considered whether the Army Corps breached when it complied with the URA, as required under Article III.B.

(first, second, and fourth alteration added; internal references omitted).

With respect to the fourth condition articulated in Laguna Hermosa, that defendant "had a full and fair opportunity to litigate the issue in the first action," Laguna Hermosa Corp. v. United States, 671 F.3d at 1288, plaintiff argues only that "there is no doubt that defendant had a full and fair opportunity to litigate, and did litigate, the breach of the Amended Cooperation Agreement in the [consolidated] Lake Borgne matter," Lake

Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. (alteration added). Defendant responds that "the United States did not previous [sic] litigate—nor could it have litigated—its compliance with Article III.B. [of the Amended Cooperation Agreement] because the Army Corps did not negotiate or condemn the Borgnemouth or Olivier properties, as it believed those properties constituted Public Sponsor LERD beyond its compensation obligation." (alterations added). In its current cross-motion for partial summary judgment, defendant also notes that "the parties in these cases are not strictly identical" because "this action was brought by the Parish only, whereas [Lake Borgne Basin Levee District, et al. v. United States,] Case No. 15-103C was brought by the Levee District, and the Parish subsequently intervened, and [St. Bernard Parish Government, et al. v. United States,] Case No. 15-518C was brought by both the Levee District and the Parish." (alterations added).

Based on a review of the earlier consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, and a review of the record and the parties' briefs now filed in the case currently before the court, Case No. 15-1072C, plaintiff cannot demonstrate that the doctrine of offensive collateral estoppel applies and should bar defendant from litigating the issues currently before this court on the parties' cross-motions for partial summary judgment, chief among them being whether defendant breached its obligation to "identify and provide just compensation to the owners of a compensable interest in Private LERD" under Article III.B of the Amended Cooperation Agreement. As to the first condition articulated in Laguna Hermosa, the issues currently before this court are not identical to the issues presented in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. The key issue in the earlier consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, was whether the two properties, the Olivier Plantation and Borgnemouth properties, involved Private LERD, for which the Army Corps was contractually obligated to compensate the private landowners under the terms of a cooperation agreement between Lake Borgne, St. Bernard Parish, and the Army Corps, or rather Public Sponsor LERD, for which the Army Corps was not contractually obligated to pay under the terms of the cooperation agreement. See Lake Borgne Basin Levee Dist. v. United States, Nos. 15-103C and 15-518C, slip op. at 1 ("[P]laintiffs argue that the only issue that remains for this court is one of contract interpretation, in particular, whether the property at issue in both of the above-captioned cases [Case Nos. 15-103C and 15-518C] amount to 'Private LERD' as defined in the contract at issue in both cases . . . ." (alterations and omission added)). In the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, this court stated that "because no evidence in the record demonstrates that either plaintiff [St. Bernard Parish or Lake Borgne] ever owned, claimed or controlled the LERD at issue prior to commencement of the state court Borgnemouth and Olivier Plantation cases, the court now finds, as a matter of law, that the LERD at issue in both of [those state court] cases was Private LERD."

Lake Borgne Basin Levee Dist. v. United States, Nos. 15-103C and 15-518C, slip op. at 3 (alterations added). Based on that determination, this court ruled in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, that:

> It is undisputed that defendant has failed to provide just compensation to the owners of the Private LERD at issue in the above-captioned cases [Nos. 15-103C and 15-518C], resulting in outstanding judgements against Lake Borgne and St. Bernard for takings in the Louisiana state court Borgnemouth and Olivier Plantation cases. See [Lake Borgne Basin Levee Dist. v. United States, 127 Fed. Cl. at 328-29]. By failing to compensate the landowners involved in the state court Olivier Plantation and Borgnemouth cases, defendant breached its obligations under Article III.B of the Amended Cooperation [A]greement. Plaintiffs, therefore, are entitled to summary judgment with regard to their breach of contract claims in both of the above-captioned cases.

Lake Borgne Basin Levee Dist. v. United States, Nos. 15-103C and 15-518C, slip op. at 3 (alterations added). Significantly, in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, the United States had not initiated Federal condemnation proceedings against the Olivier Plantation and Borgnemouth properties at issue, nor did the United States otherwise attempt or offer to compensate the Olivier Plantation and Borgnemouth property owners. Therefore, after this court determined that the property at issue in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, involved Private LERD, the United States indicated that "[t]here are no remaining issues precluding entry of judgment in favor of plaintiffs on their breach of contract claim following this Court's decision on our motion to dismiss." Defendant's Response to Plaintiff's Motion for Summary Judgment at 1, Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C (Fed. Cl. June 24, 2016) (alteration added; internal references omitted). Also significantly, the parties in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, agreed that Lake Borgne and St. Bernard Parish were "entitled to receive $4,423,753.87 as full and complete satisfaction of any and all claims that have been made or could be made in the captioned cases." Status Report at 1, Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C.

In contrast, as described above, the key issue currently before this court, in Case No. 15-1072C, revolves around whether defendant breached its contractual obligations under Article III.B of the Amended Cooperation Agreement to provide "just compensation" to the owners of a compensable interest in Private LERD, in light of the facts that the Army Corps attempted to negotiate with Mrs. Pizani and Mrs. Juan, initiated

condemnation proceedings in the United States District Court for the Eastern District of Louisiana first for the taking of two temporary easements and then amending the condemnation action for a taking in fee simple, and deposited $134,000.00 in the court's registry, which Mrs. Pizani and Mrs. Juan subsequently withdrew. Consequently, even though the case currently under review, Case No. 15-1072C, and the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, each concerned whether the Army Corps breached its contractual obligations under Article III.B of similar cooperation agreements to compensate owners of a compensable interest in Private LERD, the underlying factual differences between the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, and the case currently under review by this court, Case No. 15-1072C, are significant and, therefore, demonstrate that the issues in each case are not identical and issue preclusion does not apply. See Laguna Hermosa Corp. v. United States, 671 F.3d at 1288; see also Arkla, Inc. v. United States, 37 F.3d at 625 ("Factual differences must be material, i.e., having legal significance, to prevent operation of collateral estoppel.").

Nonetheless, the court will briefly address the remaining three conditions articulated in Laguna Hermosa. As to the second condition articulated in Laguna Hermosa, the issues now before this court in Case No. 15-1072C were not "actually litigated" in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. In the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, it was "undisputed" that the Army Corps "failed to provide just compensation" to the Olivier Plantation and Borgnemouth property owners. See Lake Borgne Basin Levee Dist. v. United States, Nos.15-103C and 15-513C, slip op. at 3. Defendant acknowledges in its current cross-motion for partial summary judgment that "the Army Corps took no action to negotiate or condemn [in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C], believing that compensation was not required," (alteration added), nor were the private landowners in the earlier consolidated cases paid compensation. Moreover, in the earlier consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, the defendant United States agreed to the entry of summary judgment and stipulated to the amount of damages that should be, and was, entered as the two judgments in the United States Court of Federal Claims. See Status Report at 1, Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C. As indicated above, however, the parties in the case currently under review, Case No. 15-1072C, dispute whether the Army Corps has satisfied its duty to provide "just compensation" under the Amended Cooperation Agreement. As also indicated above, in the case currently under review, Case No. 15-1072C, the Army Corps attempted to negotiate with Mrs. Pizani and Mrs. Juan, initiated condemnation proceedings against Mrs. Pizani's and Mrs. Juan's property in the United States District Court for the Eastern

District of Louisiana first for the taking of two temporary easements and then amending the condemnation action for a taking in fee simple, and deposited $134,000.00 as an estimate of "just compensation" in the United States District Court for the Eastern District of Louisiana's court registry, which Mrs. Pizani and Mrs. Juan subsequently withdrew. Given the differing facts in the case currently under review, Case No. 15-1072C, the issue of whether the Army Corps has satisfied its duty to provide "just compensation," which is the key issue currently before the court in Case No. 15-1072C, was not "actually litigated" in the earlier consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. See Laguna Hermosa Corp. v. United States, 671 F.3d at 1288-89 ("As to the second condition, 'the requirement that the issue have been actually decided is generally satisfied if the parties to the original action disputed the issue and the trier of fact decided it.'").

As to the third condition articulated in Laguna Hermosa, resolution of the issues currently before the court were not "essential" to the court's final judgment in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. In the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, the court did not consider whether the Army Corps could have satisfied its obligation to provide "just compensation" under Article III.B of the Amended Cooperation Agreement by negotiating with the property owners, initiating condemnation proceedings, and depositing an estimate of "just compensation" in a court registry for the property owners to withdraw, as Mrs. Pizani and Mrs. Juan did in the case currently before the court. As to the fourth condition articulated in Laguna Hermosa, the parties did not fully and fairly litigate the issues currently before the court because of the significant factual differences between the case currently before the court, Case No. 15-1072C, and the earlier consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. Accordingly, based on the significant factual differences between the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, and the case currently before the court, Case No. 15-1072C, and given that none of the four Laguna Hermosa conditions outlined above are satisfied, the doctrine of offensive collateral estoppel does not operate to bar defendant from litigating the issues currently before the court on the parties' cross-motions for partial summary judgment. See Laguna Hermosa Corp. v. United States, 671 F.3d at 1288-89.

Breach of Contract

As stated above, the key issue currently before this court is whether defendant legally breached its contractual obligations under Article III.B of the Amended Cooperation Agreement to provide an amount to Mrs. Pizani and Mrs. Juan that can be legally concluded to satisfy the "just compensation" due to Mrs. Pizani and Mrs. Juan for

their compensable interest in the Private LERD taken by the Army Corps. The court examines this legal issue in light of the following historical events and facts that the parties appear not to dispute: (1) that the Army Corps negotiated with Mrs. Pizani and Mrs. Juan, (2) that the United States initiated a condemnation action in the United States District Court for the Eastern District of Louisiana in 2008 for a "Temporary Borrow Easement" and a "Temporary Work Area Easement" in connection with the Army Corps' use of Mrs. Pizani's and Mrs. Juan's property and deposited $59,000.00 in the United States District Court for the Eastern District of Louisiana's registry, (3) that the United States later, in 2010, filed an amended Complaint in Condemnation and an amended Declaration of Taking in the same United States District Court for the Eastern District of Louisiana condemnation action for a taking in fee simple and increased the deposit in the United States District Court for the Eastern District of Louisiana registry to a total of $134,000.00, and (4) that Mrs. Pizani and Mrs. Juan subsequently withdrew the $134,000.00 from the United States District Court for the Eastern District of Louisiana registry in exchange for giving a fee simple interest in their property to the government.

Contract interpretation is a question of law, which can pose an appropriate question for summary judgment resolution. See Anchorage v. United States, 123 F.4th 1315, 1319-20 (Fed. Cir. 2024) (citing Pac. Gas & Elec. Co. v. United States, 536 F.3d 1282, 1284-85 (Fed. Cir. 2008) (citing Winstar Corp. v. United States, 64 F.3d 1531, 1540 (Fed. Cir. 1995), aff'd and remanded, 518 U.S. 839 (1996))); see also Richardson v. United States, 110 F.4th 1375, 1380 (Fed. Cir. 2024) (quoting Nova Grp./Tutor-Saliba v. United States, 87 F.4th 1375, 1379 (Fed. Cir. 2023)); Hahnenkamm, LLC v. United States, 104 F.4th 1333, 1341 (Fed. Cir. 2024) (quoting Agredano v. United States, 595 F.3d 1278, 1280 (Fed. Cir. 2010), cert. denied 562 U.S. 1178 (2011)); Authentic Apparel Grp., LLC v. United States, 989 F.3d at 1014 ("'Contract interpretation is a question of law generally amenable to summary judgment.'" (quoting Premier Off. Complex of Parma, LLC v. United States, 916 F.3d 1006, 1011 (Fed. Cir. 2019) (quoting Varilease Tech. Grp., Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002)))); Kiewit Infrastructure W. Co. v. United States, 972 F.3d 1322, 1328 (Fed. Cir. 2020) (quoting Scott Timber Co. v. United States, 333 F.3d 1358, 1365 (Fed. Cir. 2003)); CENTECH Grp., Inc. v. United States, 175 Fed. Cl. 328, 339 (2025) ("'Contract interpretation is a question of law, which may be decided on summary judgment.'" (quoting SSA Marine, Inc. v. United States, 77 Fed. Cl. 662, 665 (2007) (citing Hughes Commc'ns Galaxy, Inc. v. United States, 998 F.2d 953, 957 (Fed. Cir. 1993)))); Gateway Dev. Comm'n v. United States, 180 Fed. Cl. 495, 506 (2026) (quoting Premier Off. Complex of Parma, LLC v. United States, 916 F.3d at 1011); Schneider Elec. Bldgs. Ams., Inc., v. United States, 163 Fed. Cl. 708, 716 (2023) (quoting Premier Off. Complex of Parma, LLC v. United States, 916 F.3d at 1011).

The question of breach of contract is one of contract interpretation. "Contract interpretation starts with the language of the contract." SUFI Network Servs., Inc. v. United States, 785 F.3d 585, 593 (Fed. Cir. 2015); see also Authentic Apparel Grp., LLC v. United States, 989 F.3d at 1014; Premier Off. Complex of Parma, LLC v. United States, 916 F.3d at 101 (citing NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)); Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 824 (Fed. Cir. 2010), cert. denied, 562 U.S. 1178 (2011); Bell/Heery v. United States, 739 F.3d 1324, 1331

(Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2014); LAI Servs., Inc. v. Gates, 573 F.3d 1306, 1314 (Fed. Cir.), reh'g denied (Fed. Cir. 2009); Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004); Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993); Mostafa v. United States, 180 Fed. Cl. 480, 489 (2026) (quoting Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)); ASG Sols. Corp. v. United States, 170 Fed. Cl. 485, 496 (2024); Schneider Elec. Bldgs. Ams., Inc. v. United States, 163 Fed. Cl. at 721; Ascendant Servs., LLC v. United States, 160 Fed. Cl. 275, 286 (2022); HCIC Enters. v. United States, 147 Fed. Cl. 118, 124 (2020); Nw. Title Agency, Inc. v. United States, 126 Fed. Cl. 55, 57-58 (2016) ("The starting point for any contract interpretation is the plain language of the agreement." (citing Foley Co. v. United States, 11 F.3d at 1034)), aff'd, 855 F.3d 1344 (Fed. Cir. 2017); Beard v. United States, 125 Fed. Cl. at 158; Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. 372, 383-84 (2013). In contract interpretation, the "'plain and unambiguous meaning of a written agreement controls.'" Causam Enters. v. Int'l Trade Comm'n, 155 F.4th 1338, 1344 (Fed. Cir. 2025) (quoting Hercules Inc. v. United States, 292 F.3d 1378, 1380-81 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002) (quoting Craft Mach. Works, Inc. v. United States, 926 F.3d 1110, 1113 (Fed. Cir. 1991))); see also Arko Exec. Servs., Inc. v. United States, 553 F.3d at 1379. "Terms must be given their plain meaning if the language of the contract is clear and unambiguous." SUFI Network Servs., Inc. v. United States, 785 F.3d at 593 (citing Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003)); see also MLB Transportation, Inc. v. United States, 170 Fed. Cl. 322, 336 (2024) ("When the 'provisions of the [contract] are phrased in clear and unambiguous language, they must be given their plain and ordinary meaning[.]'" (alterations in original) (quoting Coast Fed. Bank, FSB v. United States, 323 F.3d at 1038)); JKB Sols. & Servs., LLC v. United States, 170 Fed. Cl. 241, 249 (2024); Manitou Island Transit, LLC v. United States, 168 Fed. Cl. 218, 225 (2023); Gilead Scis., Inc. v. United States, 163 Fed. Cl. 104, 121 (2022); Canpro Invs. Ltd. v. United States, 130 Fed. Cl. 320, 347, recons. denied, 131 Fed. Cl. 528 (2017); Beard v. United States, 125 Fed. Cl. at 158 ("If the contract language is unambiguous, then it must be given its plain and ordinary meaning . . . ." (omission added)). The United States Court of Appeals for the Federal Circuit stated in Massie v. United States:

> In interpreting a contract, "[w]e begin with the plain language." "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense."

Massie v. United States, 166 F.3d 1184, 1189 (Fed. Cir. 1999) (alterations in original) (quoting McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1996); and quoting Harris v. Dep't of Veterans Affs., 142 F.3d 1463, 1467 (Fed. Cir. 1998)); see also Lanclos v. United States, 40 F.4th 1352, 1355 (Fed. Cir. 2022); Coast Pro., Inc. v. United States, 828 F.3d 1349, 1354 (Fed. Cir. 2016); Shell Oil Co. v. United States, 751 F.3d 1282, 1305 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2014); McHugh v. DLT Sols., Inc., 618 F.3d 1375, 1380 (Fed. Cir. 2010); Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000)

(quoting McAbee Constr., Inc. v. United States, 97 F.3d at 1435; and quoting Harris v. Dep't of Veterans Affs., 142 F.3d at 1467); Giove v. DOT, 230 F.3d 1333, 1340-41 (Fed. Cir. 2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs." (citations omitted)); Gould, Inc. v. United States, 935 F.2d at 1274 (indicating that a preferable interpretation of a contract is one that gives meaning to all parts of the contract rather than one that leaves a portion of the contract "useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result" (quoting Arizona v. United States, 216 Ct. Cl. 221, 575 F.2d 855, 863 (1978))). A Judge of the United States Court of Federal Claims has explained:

> "The words of a contract are deemed to have their ordinary meaning appropriate to the subject matter, unless a special or unusual meaning of a particular term or usage was intended, and was so understood by the parties." Lockheed Martin IR Imaging Sys., Inc. v. West, 108 F.3d 319, 322 (Fed. Cir. 1997). "Under general rules of contract law we are to interpret provisions of a contract so as to make them consistent." Abraham v. Rockwell Int'l Corp., 326 F.3d 1242, 1251 (Fed. Cir. 2003). "[A]n agreement is not to be read in a way that places its provisions in conflict, when it is reasonable to read the provisions in harmony . . . . [T]he provisions must be read together in order to implement the substance and purpose of the entire agreement." Air-Sea Forwarders, Inc. v. United States, 166 F.3d 1170, 1172 (Fed. Cir. 1999). "A reasonable interpretation must assure that no contract provision is made inconsistent, superfluous, or redundant." Medlin Const. Grp., Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (internal quotation marks omitted).

Dynetics, Inc. v. United States, 121 Fed. Cl. 492, 512 (2015) (alterations and omission in original); see also ASG Sols. Corp. v. United States, 170 Fed. Cl. at 496; Ingham Reg. Med. Ctr. v. United States, 163 Fed. Cl. at 399 ("The court 'must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.'" (quoting Jowett, Inc. v. United States, 234 F.3d at 1368 (quoting McAbee Constr., Inc. v. United States, 97 F.3d at 1435))); Gilead Scis., Inc. v. United States, 163 Fed. Cl. at 121; Elevated Techs., Inc. v. United States, 160 Fed. Cl. 257, 270 (2022); Marquardt Co. v. United States, 101 Fed. Cl. 265, 268 (2011) ("In interpreting contractual language, the court must give reasonable meaning to all parts of the contract and avoid rendering portions of the contract meaningless." (citation omitted)).

Moreover, under the doctrine of incorporation by reference, extra-contractual documents can sometimes become part of a contract. See Beacon Point Assocs. LLC v. Dep't of Veterans Affs., 139 F.4th 1306, 1309 (Fed. Cir. 2025) ("'Incorporation by reference provides a method for integrating material from various documents into a host document . . . by citing such material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein.'" (omission in original) (citing CSI Aviation, Inc. v. Dep't of Homeland Sec., 31 F.4th 1349, 1355 (Fed.

Cir. 2022))); see also Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d 1339, 1343-44 (Fed. Cir. 2008); St. Christopher Assocs., L.P. v. United States, 511 F.3d 1376, 1384 (Fed. Cir. 2008); Sys. Implementers, Inc. v. United States, 162 Fed. Cl. 754, 765-66 (2022) ("Incorporation by reference integrates material from other documents into a 'host document' by clearly citing that material so they effectively become part of the host document." (quoting CSI Aviation, Inc. v. Dep't of Homeland Sec., 31 F.4th at 1355)); Leeward Constr., Inc. v. United States, 160 Fed. Cl. 446, 455 (2022); Raytheon Co. v. United States, 160 Fed. Cl. 428, 441 (2022). In order to incorporate extrinsic material into a contract by reference, "the incorporating contract must use language that is express and clear, so as to leave no ambiguity about the identity of the document being referenced, nor any reasonable doubt about the fact that the referenced document is being incorporated into the contract." Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d at 1344 (emphasis in original); see also Beacon Point Assocs. LLC v. Dep't of Veterans Affs., 139 F.4th at 1309; CSI Aviation, Inc. v. Dep't of Homeland Sec., 31 F.4th at 1355; Precision Pine & Timber, Inc. v. United States, 596 F.3d at 826 ("To incorporate material by reference, a contract must use clear and express language of incorporation, which unambiguously communicates that the purpose is to incorporate the referenced material, rather than merely acknowledge that the referenced material is relevant to the contract." (citing Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d at 1344-45)); Gov't Acquisitions, Inc. v. United States, No. 25-107, 2026 WL 2264123, at *5 (Fed. Cl. Aug. 4, 2026); Silver State Land LLC v. United States, 148 Fed. Cl. 217, 243 (2020); Peterson Indus. Depot, Inc. v. United States, 140 Fed. Cl. 485, 491 (2018); Pub. Hous. Authorities Directors Ass'n v. United States, 130 Fed. Cl. 522, 532 (2017); IBM Corp. v. United States, 119 Fed. Cl. 145, 154 (2014).

Extra-contractual documents that precede the execution of a contract, and that are not incorporated into the contract by reference, cannot be used to modify the parties' obligations and vary the express terms of the contract. See TEG-Paradigm Env't, Inc. v. United States, 465 F.3d 1329, 1340 (Fed. Cir. 2006) ("[I]t is not permissible to use these extrinsic sources to impart ambiguity into an otherwise unambiguous contract . . . ." (alteration and omission added)); see also Warren v. Off. of Pers. Mgmt., 407 F.3d 1309, 1314 (Fed. Cir. 2005) ("[E]xtrinsic evidence may not be used 'to justify reading a term into an agreement that is not found there.'" (alteration added) (quoting Fox v. Off. of Pers. Mgmt., 100 F.3d 141, 145 (Fed. Cir. 1996))); Assad v. United States, 164 Fed. Cl. 367, 374 (2023) ("If the contract provisions are clear, 'the [C]ourt may not resort to extrinsic evidence to interpret them.'" (alteration in original) (quoting McAbee Constr. Inc. v. United States, 97 F.3d at 1435)).

In order "[t]o recover for a breach of contract, 'a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach.'" Oliva v. United States, 961 F.3d 1359, 1362 (Fed. Cir. 2020) (alteration added) (quoting San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d 957, 959 (Fed. Cir.), reh'g denied (Fed. Cir. 1989)); see also Mutakaber v. Sec'y of State, 162 F.4th 1141, 1146 (Fed. Cir. 2025) (citing Oliva v. United States, 961 F.3d at 1362; and San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d at 959); San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d at

959; Gateway Dev. Comm'n v. United States, 180 Fed. Cl. at 511-12 (quoting San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d at 959); CENTECH Grp., Inc. v. United States, 175 Fed. Cl. at 339 (quoting San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d at 959); Gilead Scis., Inc. v. United States, 169 Fed. Cl. 210, 215 (2024) (quoting San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d at 959); Peanut Wagon, Inc. v. United States, 167 Fed. Cl. 577, 602 (2023) (quoting San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d at 959); Ingham Reg. Med. Ctr. v. United States, 163 Fed. Cl. at 397 (citing San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d at 959); Sunrez Corp. v. United States, 157 Fed. Cl. 640, 649 (2022); Hous. Auth. of Slidell v. United States, 149 Fed. Cl. 614, 626 (2020); Shell Oil Co. v. United States, 130 Fed. Cl. 8, 34 (2017) (quoting San Carlos Irr. & Drainage Dist. v. United States, 877 F.2d at 959), aff'd, 896 F.3d 1299 (Fed. Cir. 2018). "'The plaintiff or party alleging the breach has the burden of proof on all of its breach of contract claims.'" Stockton E. Water Dist. v. United States, 583 F.3d 1344, 1360 (Fed. Cir. 2009) (quoting 23 R. LORD, WILLISTON ON CONTRACTS § 63:14 (4th ed. 1999)), reh'g granted in part, 638 F.3d 781 (Fed. Cir. 2011); see also Gilead Scis., Inc. v. United States, 169 Fed. Cl. at 215 ("As the plaintiff, Gilead bears the burden of proving each element." (citing Beard v. United States, 125 Fed. Cl. at 157)); Beard v. United States, 125 Fed. Cl. at 157 ("To prevail on a breach-of-contract claim, the plaintiff bears the burden of proving: (1) the existence of a valid contract between the parties; (2) a duty arising from the contract; (3) a breach in duty; and (4) damages caused by the breach." (internal quotation marks and citations omitted)). ""[D]amages for breach of contract require a showing of causation," which in turn necessitates a 'comparison between the breach and non-breach worlds.'"" Oliva v. United States, 961 at 1363 (alteration in original) (quoting Vt. Yankee Nuclear Power Corp. v. Entergy Nuclear Vt. Yankee, LLC, 683 F.3d 1330, 1349 (Fed. Cir. 2012) (quoting Yankee Atomic Elec. Co. v. United States, 536 F.3d 1268, 1273 (Fed. Cir. 2008))); see also Fields v. United States, 147 Fed. Cl. 352, 356 (2020), aff'd, 844 F. App'x 372 (Fed. Cir. 2021).

In the case currently before the court, St. Bernard Parish, Lake Borgne, and the Army Corps entered into the Amended Cooperation Agreement on December 1, 2005. Plaintiff, therefore, contends that "[t]he existence of a contract is not at issue." (alteration added). Defendant does not dispute that a valid contract existed between St. Bernard Parish, Lake Borgne, and the United States and agrees that the Amended Cooperation Agreement "controls the issues here." To prevail on its breach of contract claim in the case currently before the court, plaintiff must establish "an obligation or duty arising out of" the Amended Cooperation Agreement. Oliva v. United States, 961 F.3d at 1362; see also Mutakaber v. Sec'y of State, 162 F.4th at 1146. In its motion for partial summary judgment, plaintiff contends that "[t]he existence of a duty under the Amended Cooperation Agreement is only under a token dispute in this case" because defendant "admitted that it undertook the obligations of identifying and providing, 'in the names of the Public Sponsors,' just compensation to the owners of a compensable interest in the Private LERD.'" (alteration added). Plaintiff also claims that because "defendant took the property through a multi-step process, orchestrated by defendant and completely effectuated under Louisiana law," the payment of "just compensation" for defendant's taking must be in accordance with Louisiana law. Plaintiff further contends that:

> [I]n the absence of the Parish President's exercise of his emergency powers, his subsequent Commandeering Order, and the Levee District's Authorization for Entry ("AFE") allowing defendant to enter the lands, defendant had absolutely no right whatsoever in October 2005 to enter and remove borrow from the Landowners' property. The consequence is that, upon issuance of the Commandeering Order, the Landowners were immediately divested of full ownership rights in their property, i.e., a compensable taking had occurred under Louisiana law. Defendant entered and took borrow material subject to those pre-existing compensation rights that had already vested in the Landowners.
>
> This conclusion is inescapable and was apparent to defendant at that time of the taking, as demonstrated by the following documents: (1) the October 10, 2005, Memorandum for Record, whereby defendant approved policy deviations, waiving the requirement that St. Bernard and the Levee District provide LERD at no cost to the government; (2) defendant's October 17, 2005, letter to St. Bernard outlining the process by which it intended to gain access to borrow, at all times utilizing Louisiana law as the mechanism; and (3) the AFE [Authorization for Entry] itself, which was drafted by defendant and explicitly stated in its text that the rights granted to defendant were specifically subject to the obligation to compensate the landowners "in accordance with Louisiana state law . . . via agreement or settlement that shall not exceed the fair market value of the interest in real property commandeered or utilized at the time of the use."

(emphasis and omission in original; alterations added; internal citations omitted). Plaintiff claims that "defendant promised St. Bernard that it would identify and compensate Landowners for borrow removed pursuant to the Commandeering Order and AFE," and so defendant "was agreeing to the compensation requirements of La. R.S. § 29:721, et seq., as previously set forth in the October 17, 2005, letter and in the AFE" when the Army Corps entered into the Amended Cooperation Agreement. Plaintiff argues that the URA, which was referenced in the Amended Cooperation Agreement, and which is discussed more fully below, is inapplicable in the current case because it is "directly contrary to the scheme it [defendant] put in place to obtain borrow material from Landowners exclusively through the Louisiana Homeland Security and Emergency Assistance and Disaster Act." (alteration added). Plaintiff further argues that the URA "did not limit the compensation awarded" in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, so it should not limit the compensation awarded in the case currently before the court, Case No. 15-1072C.[39] Moreover, plaintiff argues that "to

---

[39] As discussed above, in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, after this court determined that the LERD at issue was Private LERD, rather than Public Sponsor LERD, the United States conceded that there were "no remaining issues precluding entry of judgment in favor of plaintiffs on

the extent the reference to the URA in the contract [the Amended Cooperation Agreement] is inconsistent with defendant's obligations in the [Amended] Cooperation Agreement, those inconsistent obligations should be construed against defendant." (alterations added).

In its cross-motion for partial summary judgment in the case currently under review, Case No. 15-1072C, defendant agrees that it was obligated to identify and provide "just compensation" to the owners of a compensable interest in the Private LERD. Defendant argues, however, that "[t]he express language of Article III.B. makes clear that 'just compensation' provided under the Amended Cooperation Agreement is determined in accordance with Federal law," and, specifically, in accordance with the URA. (alteration added). Defendant also argues that, as a federal entity, "[i]t is logical that the Army Corps would be required to provide just compensation under the URA because that Federal law and its implementing regulations mandate the procedures Federal agencies must use in acquiring property via eminent domain procedures under the Fifth Amendment." (alteration added). Defendant further argues that "[r]equiring the United States to apply state takings law, in face of its clear obligation to apply Federal law would create an ambiguity in an otherwise unambiguous contract." (alteration added).

Although the parties agree that the Amended Cooperation Agreement imposed a duty on defendant to "identify and provide just compensation to the owners of a compensable interest in the Private LERD," the parties dispute the proper process to fulfill defendant's duty in light of the particular facts of the case currently before the court. Critically, one of the issues the parties dispute is whether defendant was required to provide "just compensation" in accordance with the URA or whether Louisiana state law

---

their breach of contract claim" because, in those earlier consolidated cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, defendant "took no action to negotiate or condemn, believing that compensation was not required." Defendant's Response to Plaintiff's Motion for Summary Judgment at 1, Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C. Accordingly, the parties filed joint status reports in those consolidated cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, agreeing, based on the particular facts of those consolidated cases, that Lake Borgne and St. Bernard Parish were "entitled to receive $4,423,753.87 as full and complete satisfaction of any and all claims that have been made or could be made in the captioned cases." Status Report at 1, Lake Borgne Basin Levee Dist., et al. v. United States, Nos. 15-103C and 15-518C. Given that the entry of summary judgment and the measure of damages in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, was agreed to by the government and was undisputed by the parties in those cases, plaintiff's argument that the URA "did not limit the compensation awarded" in the above-referenced consolidated Lake Borgne cases is not persuasive for the outcome in the case currently under review, Case No. 15-1072C, in which the parties vigorously dispute both liability and damages.

or elements of Louisiana state law control defendant's obligation to provide "just compensation" under the Amended Cooperation Agreement. To resolve this dispute, the court begins "with the language of the contract." SUFI Network Servs., Inc. v. United States, 785 F.3d at 593. Considering the plain language of the Amended Cooperation Agreement, the first reference to "just compensation" in the Amended Cooperation Agreement appears in Article II.B.1, which stated that "the Government, subject to the availability of appropriations, shall identify and pay just compensation to the owners of a compensable interest in" the Private LERD "[a]s further specified in Article III." (alteration added). Article III.B specified that:

> [T]he Government in the name of the Public Sponsors, shall identify and provide just compensation to the owners of a compensable interest in the Private LERD . . . all in accordance with the applicable provisions of the Uniform Relocation Assistance and Real Property Acquisitions Policy Act of 1970, Public Law 91-646, as amended by Title IV of the Surface Transportation and Uniform Relocation Assistance Act of 1987 (Public Law 100-17), and the Uniform Regulations contained in 49 CFR Part 24, in acquiring lands, easements, and rights of way, required for construction, operation, and maintenance of the non-Federal levee and the Construction Effort, including those necessary for relocations, borrow materials, and dredged or excavated material disposal, and shall inform all affected persons of applicable benefits, policies, and procedures in connection with said Act.
>
> 1. The Government shall obtain a deed or servitude agreement, as appropriate, in the name of the Public Sponsors, for those interests described in the Commandeering Order or Orders referenced in Paragraph A.3.a of this Article [referring to Private LERD]. In like manner, the Government shall obtain a deed or servitude agreement, as appropriate, in the name of the appropriate Public Sponsor, for those interests in the non-Federal Governmental LERD to which the Public Sponsors, despite their best efforts, was unable to obtain a free and unencumbered right of entry.
>
> 2. Where the Government is unable to obtain free and unencumbered title on behalf of the Public Sponsors or to reach an agreement with the interest owners in the Private and Other Non-Federal Governmental LERD, the Government shall obtain such interests, in the name of the United States of America, through the exercise of its eminent domain authority.
>
> 3. After the Construction Effort is complete and the acquisition and eminent domain proceedings is finalized, the Government shall transfer and assign all of the Private and Other Non-

> Federal Governmental LERD acquired in the name of the United States of America pursuant to paragraph B.2. of this Article to the Public Sponsors through quitclaim deed, which said transfer, quitclaim, and assignment the appropriate Public Sponsors hereby agree to accept.

(alterations and omission added). The plain language of the Amended Cooperation Agreement quoted immediately above unambiguously stated that the government was required to provide "just compensation" to the owners of a compensable interest in the Private LERD "all in accordance with the applicable provisions of the Uniform Relocation Assistance and Real Property Acquisitions Policy Act of 1970," 42 U.S.C. § 4601, et seq., and the "Uniform Regulations contained in 49 CFR Part 24," rather than Louisiana law. In fact, the Amended Cooperation Agreement only minimally referenced Louisiana law. The recitals section of the Amended Cooperation Agreement noted that "the Governor of the State of Louisiana has declared a state of emergency for the state of Louisiana pursuant to Proclamation No. 48 KBB 2005," and that the Governor of the State of Louisiana issued additional proclamations to extend the state of emergency. Additionally, Article III.A.3.a of the Amended Cooperation Agreement required the "Public Sponsors," St. Bernard Parish and Lake Borgne, to "secure or cause to be secured an executive commandeering order or orders from the President of St. Bernard Parish, Louisiana, which said order or orders shall commandeer Private LERD, in accordance with powers set forth in La. R.S. 29:721, et seq. . . . ." (omission added). None of these references to Louisiana law in the Amended Cooperation Agreement relate to the Army Corps' duty to provide "just compensation," and the Amended Cooperation Agreement made no other reference to Louisiana law. Moreover, although the parties engaged in an extensive and copious discovery period, none of the evidence presented to the court, or description of the historical events that occurred, clarified further that Louisiana law should control defendant's duty to provide "just compensation" under the Amended Cooperation Agreement. Upon review, there were no conflicting provisions or ambiguities in the Amended Cooperation Agreement with respect to the Army Corps' duty to provide "just compensation" in accordance with the URA and its implementing regulations. Indeed, the Amended Cooperation Agreement made no other references to "just compensation," the Army Corps' duty to compensate private landowners, or how "just compensation" should occur. All provisions of the Amended Cooperation Agreement can be read harmoniously such that the plain language, stating that the government must provide "just compensation" to the owners a compensable interest in the Private LERD "all in accordance with the applicable provisions of the Uniform Relocation Assistance and Real Property Acquisitions Policy Act of 1970" and the "Uniform Regulations contained in 49 CFR Part 24," controls.

Although plaintiff argues that the Amended Cooperation Agreement should be read in accordance with (1) the October 10, 2005 Memorandum for Record authored by Mr. Stockton, the Army Corps' then Deputy Director of Civil Works, (2) the October 17, 2005 letter from Ms. LaBure, the Army Corps' then Chief of the Real Estate Division, to St. Bernard Parish, (3) the Commandeering Order issued by Mr. Henry Rodriguez, Jr., the President of St. Bernard Parish, and (4) the Authorization for Entry issued by Mr. Lopez,

the President of Lake Borgne, upon review, only the October 10, 2005 Memorandum for Record and the Commandeering Order were referenced in the Amended Cooperation Agreement. Although referenced in the Amended Cooperation Agreement, neither the October 10, 2005 Memorandum for Record, nor the Commandeering Order, imposed a duty on the federal government to pay "just compensation" in accordance with Louisiana state law. The Commandeering Order did not contain a single reference to "just compensation" or otherwise obligate the government to compensate private landowners in accordance with Louisiana state law or otherwise. Likewise, while the October 10, 2005 Memorandum for Record waived the Army Corps' general requirement for Public Sponsors to provide LERD to the government at no cost, it did not provide that the government was obligated to compensate the private landowners in accordance with Louisiana law. Moreover, because the October 17, 2005 letter to St. Bernard Parish and the Authorization for Entry were not referenced in the Amended Cooperation Agreement, they were not incorporated into the Amended Cooperation Agreement by reference and cannot be used to modify the parties' obligations and vary the express terms of the Amended Cooperation Agreement. See Northrop Grumman Info. Tech., Inc. v. United States, 535 F.3d at 1345 ("[T]he language used in a contract to incorporate extrinsic material by reference must explicitly, or at least precisely, identify the written material being incorporated and must clearly communicate that the purpose of the reference is to incorporate the referenced material into the contract (rather than merely to acknowledge that the referenced material is relevant to the contract, e.g., as background law or negotiating history." (alteration added)); see also TEG-Paradigm Env't, Inc. v. United States, 465 F.3d at 1340 ("[I]t is not permissible to use these extrinsic sources to impart ambiguity into an otherwise unambiguous contract . . . ." (alteration and omission added)); Warren v. Off. of Pers. Mgmt., 407 F.3d at 1314; Assad v. United States, 164 Fed. Cl. at 374.

As indicated above, the plain language of the Amended Cooperation Agreement unambiguously required the Army Corps to provide "just compensation" to the owners of a compensable interest in the Private LERD in accordance with the URA and the Uniform Regulations. The URA sets out the policies for the Federal government to follow when acquiring real property and the statute directs that the "heads of Federal agencies shall, to the greatest extent practicable, be guided by the following policies." See 42 U.S.C. § 4651 (2000);[40] see also Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 5-6 (1984) ("The Government's selection amongst and implementation of [the] various methods of acquiring property is governed, to some extent, by the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970[.]" (alterations added; citation omitted)); see also Rollock Co. v. United States, 115 Fed. Cl. 317, 325 (2014) ("As a general matter, the Relocation Act [URA] provides federal agencies with a process for negotiating the purchase of private property for public use." (alteration added)). According to the URA, the government must make reasonable efforts to acquire real property by negotiation before initiating formal condemnation proceedings. See 42 U.S.C. § 4651(1);

[40] In this Opinion, the court cites to the version of the URA and the Uniform Regulations in effect at the time St. Bernard Parish, Lake Borgne, and the Army Corps entered into the Amended Cooperation Agreement on December 1, 2005.

see also Kirby Forest Indus., Inc. v. United States, 467 U.S. at 6 (the URA "enjoins federal agencies, inter alia, to attempt to acquire property by negotiation rather than condemnation, and whenever possible not to take land by physical appropriation" (citations omitted)). In Kirby Forest Industries, Inc. v. United States, the United States Supreme Court explained:

> The United States has the authority to take private property for public use by eminent domain, but is obliged by the Fifth Amendment to provide "just compensation" to the owners thereof. "Just compensation," we have held, means in most cases the fair market value of the property on the date it is appropriated. "Under this standard, the owner is entitled to receive 'what a willing buyer would pay in cash to a willing seller' at the time of the taking."

Kirby Forest Indus., Inc. v. United States, 467 U.S. at 10-11 (citations and footnote omitted); see also Laviolette v. United States, 179 F.4th 1334, 1338 (Fed. Cir. 2026) ("Just compensation 'means in most cases the fair market value of the property on the date it is appropriated.'" (quoting Kirby Forest Indus., Inc. v. United States, 467 U.S. at 10)). Thus, in order to satisfy the United States Constitution's requirement to pay private landowners "just compensation" for private land taken, the URA requires that, "[b]efore the initiation of negotiations for real property," the "[r]eal property shall be appraised" and "the head of the Federal agency concerned shall establish an amount which he believes to be just compensation therefor and shall make a prompt offer to acquire the property for the full amount so established." 42 U.S.C. § 4651(2)-(3) (alterations added). Moreover, the URA provides that "[t]he head of the Federal agency concerned shall provide the owner of real property to be acquired with a written statement of, and summary of the basis for, the amount he established as just compensation." 42 U.S.C. § 4651(3) (alteration added). The URA continues that "[i]f any interest in real property is to be acquired by exercise of the power of eminent domain, the head of the Federal agency concerned shall institute formal condemnation proceedings." 42 U.S.C. § 4651(8) (alteration added). The URA also provides that

> [n]o owner shall be required to surrender possession of real property before the head of the Federal agency concerned pays the agreed purchase price, or deposits with the court in accordance with section 258a of title 40,[41] for the benefit of the owner, an amount not less than the agency's approved appraisal of the fair market value of such property, or the amount of the award of compensation in the condemnation proceeding for such property.

42 U.S.C. § 4651(4) (alteration and footnote added).

---

[41] As discussed more fully below, "section 258a of title 40," which was recodified at 40 U.S.C. § 3114, prescribes one procedure for the federal government to acquire private property by filing a "declaration of taking" in "any court of the United States outside of the District of Columbia brought by and in the name of the United States" and depositing in the court registry an "amount of money estimated by the acquiring authority to be just compensation for the land taken." See id.

The regulations contained in Title 49, Part 24 of the Code of Federal Regulations, which are referred to as the "Uniform Regulations" in the Amended Cooperation Agreement, implement the basic statutory language in the URA. See 49 C.F.R. § 24.1 (2005). At the time the parties entered into the Amended Cooperation Agreement in plaintiff's case, the implementing regulations provided:

> The Agency shall make all reasonable efforts to contact the owner or the owner's representative and discuss its offer to purchase the property, including the basis for the offer of just compensation and explain its acquisition policies and procedures, including its payment of incidental expenses in accordance with § 24.106. The owner shall be given reasonable opportunity to consider the offer and present material which the owner believes is relevant to determining the value of the property and to suggest modification in the proposed terms and conditions of the purchase. The Agency shall consider the owner's presentation.

49 C.F.R. § 24.102(f) (2005). The implementing regulations continued:

> If the information presented by the owner, or a material change in the character or condition of the property, indicates the need for new appraisal information, or if a significant delay has occurred since the time of the appraisal(s) of the property, the Agency shall have the appraisal(s) updated or obtain a new appraisal(s). If the latest appraisal information indicates that a change in the purchase offer is warranted, the Agency shall promptly reestablish just compensation and offer that amount to the owner in writing.

49 C.F.R. § 24.102(g). Moreover, the implementing regulations provided that "[t]he purchase price for the property may exceed the amount offered as just compensation when reasonable efforts to negotiate an agreement at that amount have failed and an authorized Agency official approves such administrative settlement as being reasonable, prudent, and in the public interest." 49 C.F.R. § 24.102(i) (alteration added). Like the statute at 42 U.S.C. § 4651, the implementing regulations also provided:

> Before requiring the owner to surrender possession of the real property, the Agency shall pay the agreed purchase price to the owner, or in the case of a condemnation, deposit with the court, for the benefit of the owner, an amount not less than the Agency's approved appraisal of the fair market value of such property, or the court award of compensation in the condemnation proceeding for the property.

49 C.F.R. § 24.102(j). The implementing regulations, however, added that "[i]n exceptional circumstances, with the prior approval of the owner, the agency may obtain a right-of-entry for construction purposes before making payment available to an owner." Id. (alteration added).

As discussed above, the plain language of the Amended Cooperation Agreement imposed a duty on defendant to "provide just compensation to the owners of a compensable interest in the Private LERD" in accordance with the URA and Uniform Regulations procedures identified above. Defendant argues that "[t]he Army Corps complied with this express contract obligation by first negotiating with the owners of the compensable interest in the Private LERD at issue, the Pizanis, and then condemning the land through a Federal condemnation action." (alteration added). Plaintiff, however, argues that defendant "breached its obligations under the Amended Cooperation Agreement by failing to provide just compensation to the Landowners for the borrow material it excavated and removed from their property." Although the parties dispute whether defendant satisfied its duty to provide "just compensation" under the Amended Cooperation Agreement, the parties do not dispute that the LERD at issue in the case currently before the court was "Private LERD," or that Mrs. Pizani and Mrs. Juan were the "owners of a compensable interest" in the Private LERD.

While the parties agree that Mrs. Pizani and Mrs. Juan were the "owners of a compensable interest" in the Private LERD, the parties have not precisely identified the Private LERD at issue in the case currently before the court, whether by location, acreage, property interest, or otherwise. As an initial matter, when discussing defendant's duty to provide "just compensation" under the Amended Cooperation Agreement, plaintiff uses various terms like "borrow material" and "extracted LERD" instead of the term "Private LERD" that is used in the Amended Cooperation Agreement. For example, as quoted above, plaintiff argues in its motion for partial summary judgment that defendant "breached its obligations under the Amended Cooperation Agreement by failing to provide just compensation to the Landowners for the borrow material it excavated and removed from their property." (emphasis added). Plaintiff also argues in its motion for partial summary judgment that St. Bernard Parish would not have been held liable in the Louisiana State Trial Court case, Pizani v. St. Bernard Parish, No. 109-548, "had the United States fulfilled its obligation under the Amended Cooperation Agreement and justly compensated the Landowners for the borrow material taken from their property." (emphasis added). Moreover, in a supplemental filing, plaintiff asserts that "[t]his case addresses just compensation for the extracted LERD." (alteration and emphasis added). Similarly, when discussing its duty to provide "just compensation" under the Amended Cooperation Agreement, defendant sometimes refers to the "the temporary easement interests taken in the Pizanis' land" or, more broadly, Mrs. Pizani's and Mrs. Juan's "land" itself, instead of the term "Private LERD" that is used in the Amended Cooperation Agreement. For example, defendant argues that it satisfied its duty to provide "just compensation" by "making multiple offers to acquire the temporary easement interests taken in the Pizanis' land" and by "condemning the land through a Federal condemnation action." (emphasis added). As discussed more fully below, although the term "Private LERD," as used in the Amended Cooperation Agreement, may be inclusive of the "borrow material" and "temporary easement interests" taken by the Army Corps, the terms are not synonymous.

Article III of the Amended Cooperation Agreement defined the term "Private LERD" to mean "lands, easements, and rights-of-way, including suitable borrow and dredged or

excavated material disposal areas" that are "not owned, claimed, or controlled by the Public Sponsors or Other Non-Federal Governmental Entities." Moreover, after prescribing the Army Corps' duty to provide "just compensation" to the owners of a compensable interest in the Private LERD in accordance with the URA and Uniform Regulations, Article III.B.1 of the Amended Cooperation Agreement provided that "[t]he Government shall obtain a deed or servitude agreement, as appropriate, in the name of the Public Sponsors, for those interests described in the Commandeering Order or Orders referenced in Paragraph A.3.a. of this Article [III]." (alterations added). Paragraph A.3.a. of Article III of the Amended Cooperation Agreement stated:

> a. The Public Sponsors shall secure or cause to be secured an executive commandeering order or orders from the President of St. Bernard Parish, Louisiana, which said order or orders shall commandeer Private LERD, in accordance with powers set forth in La. R.S. 29:721, et seq., including all privately owned third party interests, as determined by the Government to be necessary for the construction, operation, and maintenance of the Construction Effort[.]

(alteration added). Accordingly, the Amended Cooperation Agreement required the government to identify and provide "just compensation" to the owners of a compensable interest in the Private LERD, or the "lands, easements, rights-of-way, including suitable borrow and dredged or excavated disposal areas" that were identified in the Commandeering Order.

As indicated above, consistent with Paragraph A.3.a. of Article III of the Amended Cooperation Agreement, on October 24, 2005, St. Bernard Parish President, Henry Rodriguez, Jr., issued the Commandeering Order, which "commandeer[ed] the use of certain private immovable property" and stated that "[s]aid private property consists of approximately 6.51 acres," (alterations added), which was later identified as owned by Mrs. Pizani and Mrs. Juan. The Commandeering Order continued:

> Said immovable property shall be used to gain access, obtain surveys, soil borings, cultural resources investigations, HTRW assessments, borrow, and construct (Repair and Rehabilitate) for the potential use in emergency levee restoration work. The work associated with the potential use of this site consists of obtaining borrow materials, gaining access, and constructing (repair and rehabilitating) the Verret to Caernarvon Levee in St. Bernard. As such, the Parish hereby obtains an assignable right and easement to gain access and obtain surveys, soil borings, cultural resources investigations, and HTRW assessments from said private immovable property, reserving however to the landowners, their heirs and assigns, all such rights and privileges in said land as may be used without interfering with or abridging the rights hereby acquired.

Moreover, the Commandeering Order stated:

> I hereby tender and grant an irrevocable right of entry to these lands to the Lake Borgne Basin Levee District for its use in obtaining access, surveys, soil borings, cultural resources investigations, HTRW assessments, borrow, and construction. I further understand that the Levee District will tender an Authorization for Entry for Access, Surveys, Soil Borings, Environmental Clearances, Borrow, and Construction to the United States Army Corps of Engineers, the Department of the Army, its agents, employees, and contractors to enter upon these lands to perform said surveys and investigations as set forth in the plans and specifications held in the U.S. Army Corps of Engineers' District Office, New Orleans, Louisiana.

Based on the above quoted language from the Commandeering Order, the "interests described in the Commandeering Order," or the Private LERD at issue in the above captioned case, included a temporary, assignable, and irrevocable easement upon Mrs. Pizani's and Mrs. Juan's 6.51-acre tract of land for the uses identified in the Commandeering Order, and, specifically, for the use of Mrs. Pizani's and Mrs. Juan's 6.51-acre tract of land for "obtaining borrow materials." Therefore, pursuant to Article III.B of the Amended Cooperation Agreement, defendant was required to provide "just compensation" to Mrs. Pizani and Mrs. Juan for the temporary, assignable, and irrevocable easement upon their 6.51-acre tract of land which was commandeered through the Commandeering Order, as well as for the borrow material excavated from their 6.51-acre tract of land while the Commandeering Order was in effect.

Having established that the government had a duty to provide "just compensation" to Mrs. Pizani and Mrs. Juan for the Private LERD described above, in order to prevail on plaintiff's breach of contract claim, plaintiff must establish that defendant, United States, breached that duty. See Oliva v. United States, 961 F.3d at 1362; see also Mutakaber v. Sec'y of State, 162 F.4th at 1146. In its motion for partial summary judgment, plaintiff alleges that "[d]efendant breached its obligations under the Amended Cooperation Agreement by failing to provide just compensation to the Landowners for the borrow material it excavated and removed from their property," which, plaintiff alleges, "is most clearly evidenced by the state court judgment levied [by the 34th Judicial District Court of the Louisiana District Courts in Pizani v. St. Bernard Parish, No. 109-548] against St. Bernard." (alterations added). Plaintiff continues that St. Bernard "would not have been held so liable had the United States fulfilled its obligation under the Amended Cooperation Agreement and justly compensated the Landowners for the borrow material taken from their property." In addition, plaintiff argues that defendant's condemnation action in the United States District Court for the Eastern District of Louisiana did not fully satisfy defendant's obligation to provide "just compensation" under the Amended Cooperation Agreement, because:

> Defendant entered upon the Landowners' property to excavate borrow material between October 2005 and May 2006, and ultimately returned the property to the Landowners in July 2006. It was not until February 2008,

> over a year and a half later and well after defendant and their representatives vacated the Property, that defendant filed a taking proceeding in the Eastern District of Louisiana wherein it attempted to condemn a servitude of use over the Landowners' property. However, according to the terms of the taking petition, the servitude defendant sought to take had already expired. In September 2010, defendant amended its taking petition to a fee taking. By this point, the fructus of the property — the soil — had already been excavated and thus subject to just compensation under Louisiana law.[42] Defendant therefore could not, and in fact did not, compensate the Landowners for the borrow material via the EDLA [Eastern District of Louisiana] taking proceeding. The proper compensation due was awarded by the Louisiana state court to the Landowners and against St. Bernard.

(alteration and footnote added; emphasis in original).

In its cross-motion for partial summary judgment, defendant argues that plaintiff "has failed to prove breach." Defendant first argues that plaintiff's breach argument relies on the "unsupportable" view that defendant's "just compensation" obligation is governed by Louisiana state law.[43] Instead, defendant argues that "the United States was required

---

[42] In its motion for partial summary judgment, plaintiff asserts that "[u]nder Louisiana law, there are three legally distinct components of ownership of real property: usus, fructus, and abusus." (alteration added) (citing One River Place Condo. Ass'n Inc. v. Mitchell, 609 So. 2d 942, 946 (La. App. 4 Cir. 1992)). As the court has determined above, the Amended Cooperation Agreement required defendant United States to provide "just compensation" to Mrs. Pizani and Mrs. Juan for the Private LERD taken pursuant to the URA and its implementing regulations, not pursuant to Louisiana law. For the sake of clarity, however, the court notes that, under Louisiana law, the term usus refers to "the right to use the property for any legal purpose," the term fructus refers to "the right to enjoy the natural and civil fruits that the property may produce," and the term abusus refers to "the right to alienate, destroy or otherwise dispose of the property at any time and in any legal manner." One River Place Condo. Ass'n Inc. v. Mitchell, 609 So. 2d at 946.

[43] The court notes that, at oral argument on the parties' cross-motions for partial summary judgment, plaintiff's counsel at the time had the following exchange with the court:

> THE COURT: So who are the potential obligors for the additional costs beyond the condemnation action?
>
> [Plaintiff's Counsel] MR. CAVIGNAC: My – our –
>
> THE COURT: Would it be St. Bernard or the Federal Government or –
>
> MR. CAVIGNAC: No, I – Your Honor, I think it's an either/or.

under the URA to first identify the landowners, then attempt to negotiate an agreement with them, and only then file condemnation if negotiations were unsuccessful." Defendant further argues that the United States complied with its duty to provide "just compensation" to the owners of a compensable interest in the Private LERD that was taken when, after unsuccessfully negotiating with Mrs. Pizani and Mrs. Juan, the United States initiated a formal condemnation action in the United States District Court for the Eastern District of Louisiana, in which the United States deposited an initial estimated sum of "just compensation" of $59,000.00, and in which the United States subsequently increased the deposit of "just compensation" to $134,000.00 for a taking of Mrs. Pizani's and Mrs. Juan's property in fee simple, which Mrs. Pizani and Mrs. Juan subsequently withdrew. Defendant continues, "the United States' deposit of $134,000.00 in just compensation [deposited into the United States District Court for the Eastern District of Louisiana registry] was for the full appraised amount of the Pizanis' land, using 'the date of the acquisition, or October 24, 2005, [a]s the effective date of valuation.'" (second alteration in original). With respect to plaintiff's argument that the United States District Court for the Eastern District of Louisiana condemnation action did not satisfy defendant's obligation to "provide just compensation" under the Amended Cooperation Agreement, defendant argues:

> [T]he Amended Cooperation Agreement did not require that the condemnation precede the taking. On the contrary, the plain language of the [Amended] Cooperation Agreement makes clear that only "after receiving [the Parish's and the Levee District's] right of entry to the lands, easements, and rights of way . . . the Government, subject to the availability of appropriations, shall identify and pay just compensation."

(third alteration, emphasis, and omission in original; internal reference omitted). Moreover, defendant argues that the "structure of the Amended Cooperation Agreement reinforces that condemnation would occur only after the taking" because Article III.A first required the Public Sponsors to provide a right of entry to the Private LERD and "Article III.B sets forth the subsequent obligation of the United States to 'identify and provide just compensation' in accordance with the URA."

As indicated above, Article III.B of the Amended Cooperation Agreement required the government to "identify and provide just compensation to the owners of a compensable interest in the Private LERD" in accordance with the URA and the Uniform

---

> THE COURT: I know you don't believe it's St. Bernard Parish, but –
> MR. CAVIGNAC: It's an either/or proposition. I think if the Government's [sic] right that this Relocation Act [referring to the URA] is the end-all, be-all of compensation, then St. Bernard gets -- then we [St. Bernard] are literally the only party who can pay the bill, because St. Bernard issued the commandeering order that allowed the property to be taken from these landowners.

(alterations added; capitalization in original).

Regulations. Expanding on this duty, Article III.B.1 of the Amended Cooperation Agreement continued that the government "shall obtain a deed or servitude agreement, as appropriate, in the name of the Public Sponsors, for" the Private LERD described in the Commandeering Order. According to the URA, the government was required to "make every reasonable effort to acquire expeditiously real property by negotiation." 41 U.S.C. § 4651(1) (2000). Before the initiation of negotiations, however, the URA required the government to have the real property appraised, establish an estimated amount of "just compensation," make a prompt offer to acquire the real property for the estimated amount of "just compensation" so established, and provide the owner of the real property with a written statement of, and basis for, the amount established as "just compensation." See 41 U.S.C. § 4651(2) & (3).

In accordance with section 4651(2) of the URA, before the Army Corps initiated negotiations with Mrs. Pizani and Mrs. Juan to acquire the temporary easement commandeered through the Commandeering Order, the Army Corps engaged Truax, Robles, & Baldwin Appraisers LLC to complete an appraisal and property market value report of Mrs. Pizani's and Mrs. Juan's property.[44] The August 2006 Appraisal Report stated:

> The proposed acquisitions evaluated herein constitute the imposition of temporary borrow and work area easements/servitudes[45] upon the entirety of the "parent" tract (combination of Tract Nos. B100E-1 and B100E-2), as identified herein; said easements/servitudes give the holder of same the right "to clear, borrow, excavate and remove soil, dirt and other materials" with regard to Tract B100E-1 (230,035 square feet) and "to deposit fill, spoil and waste material . . . to move, store and remove equipment and supplies", etc. with regard to Tract B100E-2 (67,611 square feet) for a period not to exceed one year. As such, the market value of the acquisition constitutes the difference between the "before" acquisition and "remainder" ("after"

---

[44] As discussed above, the court notes that the 2006 Appraisal Report identified Mrs. Pizani's and Mrs. Juan's property as 6.83-acre tract of land, whereas the Commandeering Order identified Mrs. Pizani's and Mrs. Juan's property as a 6.51-acre tract of land. Defendant explains that the land appraised was "largely congruent with the approximately 6.51 acres of land commandeered. After obtaining and reviewing property surveys in 2006 in preparation for negotiations with [Mrs.] Pizani [and Mrs. Juan], the Corps increased the area condemned [to 6.83 acres] to include land on both the south and the east side of the property, so that [Mrs.] Pizani [and Mrs. Juan] would not be left with an uneconomic remnant." (alterations added).

[45] The court notes that although the Commandeering Order appears to have commandeered a single "assignable right and easement" upon Mrs. Pizani's and Mrs. Juan's 6.51-acre tract of land, the 2006 Appraisal Report evaluated the acquisition of two temporary easements. As noted below, however, both the Commandeering Order and the 2006 Appraisal Report contemplated the use of Mrs. Pizani's and Mrs. Juan's property for the purpose of obtaining borrow materials.

> acquisition) property values with due consideration being afforded compensation or rent for loss of use logically associated with imposition of the temporary easements/servitudes.

(footnote added; omission in original). The August 2006 Appraisal Report determined that the market value of the government's acquisition of a temporary borrow easement and a temporary work area easement upon Mrs. Pizani's and Mrs. Juan's property was $59,400.00. After obtaining the August 2006 Appraisal Report, as part of complying with Article III.B.1 of the Amended Cooperation Agreement and section 4651(1) of the URA, the Army Corps identified Mrs. Pizani and Mrs. Juan as the owners of a compensable interest in the Private LERD and attempted to acquire the above-described temporary easements from Mrs. Pizani and Mrs. Juan through negotiation. On November 17, 2006, the Army Corps sent an appraisal report letter to Mrs. Pizani and Mrs. Juan which identified Mrs. Pizani and Mrs. Juan as the owners of a compensable interest in the Private LERD: "We are in receipt of the tract appraisal for property, which our current records indicate that you purportedly own." The Army Corps' November 17, 2006 appraisal report letter also stated: "In compliance with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, Public Law 91-646, as amended, we are advising that just compensation for the tracts listed above has been established as $59,400" for the temporary borrow area easement and the temporary work area easement. In accordance with section 4651(3) of the URA, the Army Corps' November 17, 2006 letter provided a written statement of, and summary of the basis for, the amount of just compensation so established:

> The amount of just compensation previously stated is based upon and is not less than our approved appraisal of the fair market value of the estates appraised. Fair market value is defined as the amount in cash, or in terms reasonably equivalent to cash, for which in all probability, the property would be sold by a knowledgeable owner willing, but not obligated to sell to a knowledgeable purchaser who desires, but is not obligated to buy.
>
> The estimated market value of the estates is the amount that the market value of fee title is reduced by the imposition of the estates. Our appraisal was made by a qualified real estate appraiser using standard, nationally accepted valuation techniques recognized by authorities in the appraisal field, and taking into consideration the value of the land, its location, and its highest and best use. He has disregarded any increase or decrease in the fair market value caused by the Government's project. The Federal statute provides that just compensation is determined based upon the value of the property on the date of taking. The date of taking for your property would be the date that the local official commandeered your property, October 24, 2005.
>
> The basic approaches to value which may be considered by the appraiser can be classified as market data, income, and cost. Primary reliance for the valuation of the property was placed on the market data approach, including

> the prices at which similar property has sold recently. The current highest and best use of the subject property is for possible development with a maximum of two single family homes. In making the appraisal, five sales of land similar to your land, which sold recently, including one with a borrow pond, were used for comparison. These sales were adjusted on the basis of such factors as size, location, terms of sale, lapse of time, topography, and improvements. After completion, the appraisal was reviewed by a qualified appraiser who approved it as a well-documented conclusion of the market value of the estates to be acquired.

Additionally, the URA implementing regulations, which also were referenced in the Amended Cooperation Agreement, required the government to "make all reasonable efforts to contact the owner or the owner's representative and discuss its offer to purchase the property, including the basis for the offer of just compensation and explain its acquisition policies and procedures, including its payment of incidental expenses in accordance with [49 C.F.R.] § 24.106." 49 C.F.R. § 24.102(f) (alteration added). The URA implementing regulations also provided that "[t]he purchase price for the property may exceed the amount offered as just compensation when reasonable efforts to negotiate an agreement at that amount have failed and an authorized Agency official approves such administrative settlement as being reasonable, prudent, and in the public interest." 49 C.F.R. § 24.102(i) (alteration added). The record before the court suggests that the Army Corps made "reasonable efforts," see 49 C.F.R. § 24.102(f), to contact Mrs. Pizani, Mrs. Juan, and their counsel at the time of the negotiations, Mr. Robert Talley, to discuss the Army Corps' offer of "just compensation" and to explain the Army Corps' acquisition policies and procedures, as required by the URA implementing regulations. According to the Negotiator's Report, between November 17, 2006, and May 30, 2007, the Army Corps' negotiator, Ms. Michelle Marceaux, contacted, or attempted to contact, Mrs. Pizani, Mrs. Juan, and/or Mr. Talley on twenty-nine separate occasions. Throughout these communications, Ms. Marceaux informed Mrs. Pizani and Mrs. Juan that they could submit a counteroffer and requested that any such counteroffer include the basis for the counteroffer and any supporting documentation that Mrs. Pizani and Mrs. Juan could produce for the Army Corps' consideration. On May 30, 2007, Mr. Talley, Mrs. Pizani's and Mrs. Juan's counsel at the time, ultimately did meet with Army Corps representatives to discuss the ongoing negotiations and presented a counteroffer of $3,264,366.66. The Army Corps responded in turn with a second offer of "just compensation" in the amount of $100,000.00, which exceeded the amount the Army Corps had initially offered as "just compensation" for the two temporary easements, but which Mr. Talley rejected on behalf of Mrs. Pizani and Mrs. Juan. The Army Corps subsequently determined that negotiations were unsuccessful and, on July 6, 2007, sent Mr. Talley a letter notifying him that the Army Corps was going to begin eminent domain proceedings by filing a condemnation suit in the United States District Court for the Eastern District of Louisiana to acquire the temporary easements upon Mrs. Pizani's and Mrs. Juan's property, in accordance with the Amended Cooperation Agreement, the URA, and the Uniform Regulations.[46]

[46] Although not raised by plaintiff in its motion for partial summary judgment or responsive briefing, the court notes that both the URA and the Uniform Regulations provide that a

According to Article III.B.2 of the Amended Cooperation Agreement:

> Where the Government is unable to obtain free and unencumbered title on the behalf of the Public Sponsors or to reach an agreement with the interest owners in the Private . . . LERD, the Government shall obtain such interests, in the name of the United States of America, through the exercise of its eminent domain authority.

(omission added). As noted above, the URA provides that "[i]f any interest in real property is to be acquired by exercise of the power of eminent domain, the head of the Federal agency concerned shall institute formal condemnation proceedings." 41 U.S.C. § 4651(8) (alteration added). Therefore, in accordance with Article III.B.2 of the Amended Cooperation Agreement and section 4651(8) of the URA, after the Army Corps determined that negotiations were unsuccessful, the government filed a condemnation action in the United States District Court for the Eastern District of Louisiana on February 14, 2008. The 2008 Complaint in Condemnation filed in the United States District Court for the Eastern District of Louisiana condemned a "Temporary Borrow Easement" and a "Temporary Work Area Easement" upon Mrs. Pizani's and Mrs. Juan's property "beginning with the date possession of the land was granted to the United States." With the 2008 Complaint in Condemnation, the government also filed the 2008 Declaration of Taking and deposited in the court registry a "gross sum estimated" of $59,400.00, which was based on the fair market value determined in the August 2006 Appraisal Report, and which, according to defendant, reflected "just compensation for all of said land" identified in the 2008 Complaint in Condemnation. See Declaration of Taking at 2, United States v. 6.83 Acres of Land, No. 08-999.

---

private landowner shall not be required to surrender possession of real property before the agency pays the agreed purchase price or deposits an estimated amount of "just compensation" in a federal condemnation proceeding pursuant to 40 U.S.C. § 3114. See 42 U.S.C. § 4651(4); 49 C.F.R. § 24.102(j). Relevant to the case currently before the court, the government did not pay an agreed purchase price or deposit an estimated amount of "just compensation" in the United States District Court for the Eastern District of Louisiana proceeding before entering Mrs. Pizani's and Mrs. Juan's property and removing borrow material between October 24, 2005, and May 24, 2006, after St. Bernard Parish had commandeered the property, given the urgency due to the devastating hurricane and flooding. The URA, however, sets forth the policies that the Federal government should, "to the greatest extent practicable," follow when acquiring real property. See 42 U.S.C. § 4651. Given the extraordinary nature of a major hurricane, which, as the President of St. Bernard Parish recognized in the September 1, 2005 Executive Order, had "struck the state of Louisiana, causing severe flooding and damage," and which "threatened the safety and security of the citizens of St. Bernard Parish," the government appears to have followed the URA and Uniform Regulations process outlined above "to the greatest extent practicable."

By filing the 2008 Complaint in Condemnation and depositing the initial $59,400.00 in the United States District Court for the Eastern District of Louisiana court registry for Mrs. Pizani's and Mrs. Juan's withdrawal, defendant complied with its duty to provide "just compensation" for the temporary easement taken through the Commandeering Order because the 2008 Complaint in Condemnation condemned the same interests that were identified in the Commandeering Order. As described above, the Commandeering Order stated that "the Parish hereby obtains an assignable right and easement to gain access" to Mrs. Pizani's and Mrs. Juan's property and stated that "the potential use of this site [Mrs. Pizani's and Mrs. Juan's property] consists of obtaining borrow materials, gaining access, and constructing (repair and rehabilitating) the Verret to Caernarvon Levee in St. Bernard." (alteration and omission added). Consistent with the Commandeering Order, the 2008 Complaint in Condemnation condemned two temporary easements, including a "Temporary Borrow Easement," which the 2008 Complaint in Condemnation described as "[a] temporary and assignable right and easement to clear, borrow, excavate and remove soil, dirt, and other materials from the land" owned by Mrs. Pizani and Mrs. Juan. (alteration added).

Moreover, on September 7, 2010, after further conversations with Mrs. Pizani and Mrs. Juan and in response to Mrs. Pizani's and Mrs. Juan's concerns about their potential liability arising from the borrow pit left on their property,[47] the government filed the 2010 amended Complaint in Condemnation and also the 2010 amended Declaration of Taking in the same United States District Court for the Eastern District of Louisiana condemnation action. The 2010 amended Complaint in Condemnation stated that "the estate being taken herein is hereby being changed from a temporary easement to a taking in fee." As stated by the United States Court of Appeals for the Fifth Circuit, the applicable Circuit Court to review the ruling from the United States District Court for the Eastern District of Louisiana, "[t]he default rule in eminent domain is that a taking in fee simple establishes a new title and extinguishes all existing possessory and ownership interests not specifically excepted." United States v. 194.08 Acres of Land, 135 F.3d 1025, 1029 (5th Cir. 1998) (alteration added) (citing A.W. Duckett & Co. v. United States, 266 U.S. 149, 151 (1924)). Moreover, "where the government takes fee simple title, it takes all interests, even those it does not specify; where the government takes less than fee simple title, it must expressly indicate what lesser interests are excluded." United States v. 194.08 Acres of Land, 135 F.3d at 1029 (citing Burkhart v. United States, 227 F.2d 659, 661 (9th Cir. 1955)). In the 2010 amended Complaint in Condemnation filed by the government in the United States District Court for the Eastern District of Louisiana condemnation action, the government described the fee simple interest being condemned

[47] As indicated above, defendant explains in its motion for partial summary judgment that the United States filed the 2010 amended Complaint in Condemnation and the 2010 amended Declaration of Taking in order to "resolve the Pizanis' concerns about liability for injuries that might occur on the property" that the Army Corps had used as a borrow pit. According to the Negotiator's Report, at the May 30, 2007 meeting with the Army Corps representatives, Mrs. Pizani's and Mrs. Juan's counsel, Mr. Talley, "indicated that his clients could not get insurance for the borrow pit location, that they were nervously concerned about liability issues, i.e., a child crawling over the fence and drowning, etc."

in 2010 as follows:

> The fee simple title to Tract No. B100, subject, however, to existing easements for public roads and highways, public utilities, railroads and pipelines; excepting and excluding from the taking all oil and gas in and under said land and all appurtenant rights for the exploration, development, production and removal of said oil and gas.

Significantly, the 2010 amended Complaint in Condemnation did not exclude from the taking in fee simple any other mineral rights, such as the borrow material excavated by the Army Corps. By not specifically excluding Mrs. Pizani's and Mrs. Juan's interests in the borrow material from the fee simple taking, the fee simple taking included and extinguished Mrs. Pizani's and Mrs. Juan's property interests in the borrow material. See United States v. 194.08 Acres of Land, 135 F.3d at 1029.

Along with the 2010 amended Complaint in Condemnation, the government filed the 2010 amended Declaration of Taking and increased the "gross sum estimated" as "just compensation for all of said land" from what had been deposited in the United States District Court for the Eastern District of Louisiana condemnation action based on the August 2006 Appraisal Report, which used October 24, 2005 as the date of valuation, $59,400.00, to a total of $134,000.00, which was determined to be the fair market value of a fee simple interest in Mrs. Pizani's and Mrs. Juan's 6.83-acre property based on the August 2010 Appraisal Report, which again used October 24, 2005 as the date of valuation.[48] Mrs. Pizani and Mrs. Juan withdrew the $134,000.00 from the United States

[48] As opposed to the 2010 amended Complaint in Condemnation filed by the United States in the United States District Court for the Eastern District of Louisiana condemnation action, the court notes that the August 2010 Appraisal Report, upon which the $134,000.00 estimate of "just compensation" deposited in the United States District Court for the Eastern District Louisiana was based, stated: "No consideration is given any mineral rights or other subterranean interest (i.e., water, gravel, salt, etc.), unless specifically identified in the letter of transmittal and other appropriate portions of this appraisal report." The August 2010 Appraisal Report also stated that the government's acquisition of a fee simple interest in Mrs. Pizani's and Mrs. Juan's property "excludes only subsurface mineral rights, with all surface use rights typically associated with fee simple estate ownership being acquired." The government's 2010 amended Complaint in Condemnation filed in the United States District Court for the Eastern District of Louisiana, however, condemned a fee simple interest in Mrs. Pizani's and Mrs. Juan's property and, with respect to mineral rights, excluded only "oil and gas in and under said land and all appurtenant rights for the exploration, development, production and removal of said oil and gas." To the extent that Mrs. Pizani and Mrs. Juan believed that $134,000.00 did not accurately compensate them for all their interests in the property taken, including the borrow material taken, it was their burden to challenge the estimated amount of "just compensation" deposited by the government in the United States District Court for the Eastern District of Louisiana condemnation action. See 40 U.S.C. § 3114(c)(1) ("Compensation shall be determined and awarded in the [condemnation] proceeding and

District Court for the Eastern District of Louisiana court registry on October 19, 2011. Moreover, the condemnation action in the United States District Court for the Eastern District of Louisiana has since been dismissed. Therefore, Mrs. Pizani and Mrs. Juan accepted the $134,000.00 in exchange for giving a fee simple interest in their property to the government.

Plaintiff argues that defendant's condemnation action in the United States District Court for the Eastern District of Louisiana "could not legally satisfy" defendant's obligation to provide "just compensation" under the Amended Cooperation Agreement because, "[u]nder federal law, the date of the taking in a condemnation action is the filing date of the Declaration of Taking" and, in this case, both the original 2008 Declaration of Taking and the 2010 amended Declaration of Taking were filed in the United States District Court for the Eastern District of Louisiana condemnation action after the borrow material had already been removed from Mrs. Pizani's and Mrs. Juan's property by the Army Corps. (alteration added). Although plaintiff does not identify a specific date as the "date of taking," plaintiff argues, citing United States v. McCrory Holding Co., 294 F.2d 812 (5th Cir. 1961), that defendant's attempts to "back date" the date of taking to the date the Army Corps entered Mrs. Pizani's and Mrs. Juan's property on October 24, 2005, should be rejected. Plaintiff argues that the United States District Court for the Eastern District of Louisiana condemnation action "constitutes a separate taking from the original commandeering and removal of borrow material." Citing National Food & Beverage Co. v. United States, 96 Fed. Cl. 258, 269 (2010), plaintiff argues:

> The [United States District Court for the Eastern District of Louisiana] Condemnation Action "does not have the ability to award compensation for the occupation of [Landowners'] property" and the Condemnation Action cannot "address clay removal." As in National Food, compensation for the taking of clay is "within the sole purview of this" Court. Accordingly, defendant did not and could not satisfy its obligations under Article III.B of the Amended Cooperation Agreement through the Condemnation Action.

(second alteration in original).

---

established by judgment." (alteration added)); see also Otay Mesa Prop., L.P. v. United States, 779 F.3d 1315, 1323 (Fed. Cir. 2015) ("Once a taking has been established, it is the landowner who bears the burden of proving an actual loss has occurred."); Loveridge v. United States, 174 Fed. Cl. 379, 394 (2024). Instead, Mrs. Pizani and Mrs. Juan withdrew the $134,000.00 from the United States District Court for the Eastern District of Louisiana court registry as "just compensation" for a fee simple interest in their property and the condemnation action has since been dismissed. See Order of Dismissal at 1, United States v. 6.83 Acres of Land, No. 08-999. The court notes, however, that the Order of Dismissal issued by the United States District Court for the Eastern District of Louisiana stated that dismissal was "without prejudice to the right, upon good cause shown, to reopen the action" and that the United States District Court for the Eastern District of Louisiana "retains jurisdiction for all purposes, including enforcing the settlement agreement entered into by the parties." Id.

Defendant argues plaintiff "is incorrect that the condemnation action could not have addressed the borrow material" because the original 2008 Complaint in Condemnation and the subsequent 2010 amended Complaint in Condemnation filed in the United States District Court for the Eastern District of Louisiana condemned Mrs. Pizani's and Mrs. Juan's 6.83-acre property taken "'beginning with the date possession of the land was granted to the United States'" on October 24, 2005, which was before the borrow material was removed from Mrs. Pizani's and Mrs. Juan's property. Defendant argues that the United States v. McCrory Holding Co., 294 F.2d 812, case does not "establish that the date of taking is the [sic] always the date of the filing," (alteration added), and, moreover, that the National Food & Beverage Co. v. United States, 96 Fed. Cl. 258, case, also relied on by plaintiff, is nonprecedential and inapposite to the case currently before the court, Case No. 15-1072C.

As discussed above, the government attempted to address this "date of taking" issue in the United States District Court for the Eastern District of Louisiana condemnation action by filing a motion in the United States District Court for the Eastern District of Louisiana on January 15, 2013, requesting from the District Court Judge a determination of the appropriate date of valuation. See Motion for a Determination of the Appropriate Date of Valuation at 1, United States v. 6.83 Acres of Land, No. 08-999. The United States District Court for the Eastern District of Louisiana, however, deferred ruling on the government's motion for a determination of the appropriate date of valuation. The United States District Court for the Eastern District of Louisiana's April 5, 2013 Order stated:

> On filing a declaration of taking and depositing the amount of estimated compensation stated in the declaration, title to the estate or interest specified in the declaration vests in the Government; the land is condemned and taken for the use of the Government; and the right to just compensation for the land vests in the persons entitled to the compensation. 40 U.S.C. § 3114(b)(1)–(3). While the United States argues that it actually took possession [sic] the property in question at an earlier date, that issue is the subject of the plaintiff's Motion for a Determination of the Appropriate Date of Valuation and will not be resolved at this time. The statute that authorizes the use of condemnation actions states that title vested in the United States at the time the Complaint in Condemnation was filed and the deposit of estimated compensation was made.

See Order and Reasons at 7, United States v. 6.83 Acres of Land, No. 08-999 (alteration added; internal reference omitted). The United States District Court for the Eastern District of Louisiana did not resolve the "date of taking" issue before dismissing the condemnation action on March 29, 2018.[49]

---

[49] As indicated above, the United States District Court for the Eastern District of Louisiana issued an Order on March 29, 2018, stating that the District Court Judge had "been advised by counsel for the parties that all of the parties to this action have firmly agreed upon a compromise." See Order of Dismissal at 1, United States v. 6.83 Acres of Land,

The Declaration of Taking Act, 40 U.S.C. § 3114, prescribes one procedure for the federal government to acquire real property. The statute at 40 U.S.C. § 3114(b) provides:

> On filing the declaration of taking and depositing in the court, to the use of the persons entitled to the compensation, the amount of the estimated compensation stated in the declaration—
>
> > (1) title to the estate or interest specified in the declaration vests in the Government;
> >
> > (2) the land is condemned and taken for the use of the Government; and
> >
> > (3) the right to just compensation for the land vests in the persons entitled to the compensation.

40 U.S.C. § 3114(b). Although the language of the Declaration of Taking Act states that private property is "taken for the use of the Government" "[o]n filing the declaration of taking and depositing in the court, to the use of the persons entitled to the compensation, the amount of the estimated compensation stated in the declaration," id. (alteration added), both the United States Supreme Court and the United States Court of Claims, this court's predecessor court, have recognized that the date of taking is not always the date the government files its Declaration of Taking in District Court. See United States v. Dow, 357 U.S. at 23; see also Georgia-Pac. v. United States, 215 Ct. Cl. 354, 360, 568 F.2d 1316, 1320 (1978). In United States v. Dow, the United States Supreme Court explained, "[b]roadly speaking, the United States may take property pursuant to its power of eminent domain in one of two ways: it can enter into physical possession of property without authority of a court order; or it can institute condemnation proceedings under various Acts of Congress providing authority for such takings." United States v. Dow, 357 U.S. at 21 (alteration added). The United States Supreme Court recognized that "the passage of title does not necessarily determine the date of 'taking.'" Id. at 22. The United States Supreme Court continued that "[t]he usual rule is that if the United States has entered into possession of the property prior to the acquisition of title, it is the former event which constitutes the act of taking" and "[i]t is that event which gives rise to the claim for compensation and fixes the date as of which the land is to be valued and the Government's obligation to pay interest accrues." Id. at 21-22 (alterations added). Moreover, in United States v. Dow, when explaining the contours of the statute at 40 U.S.C. § 3114, the United States Supreme Court stated:

---

No. 08-999. The District Court Judge thus dismissed the condemnation action "without prejudice to the right, upon good cause shown, to reopen the action or to seek summary judgment enforcing the compromise if settlement is not consummated within a reasonable time." Id.

> The scheme of the [Declaration of] Taking Act makes it plain that when the Government files a declaration before it has entered possession of property the filing constitutes the 'taking.' But neither the language nor the history of the Act provides a reliable indication as to the intention of Congress in cases, such as the one before us, where a declaration is filed after the Government has taken possession. Nevertheless, a number of considerations have led us to the view that in such cases the date of 'taking' is the date on which the Government entered and appropriated the property to public use.

United States v. Dow, 357 U.S. at 23 (alteration added). Similarly, in Georgia-Pacific Corp. v. United States, this court's predecessor court recognized that "[n]either the terms of the legislation granting the Government the right to bring the condemnation action, nor the conception of a condemnation suit, preclude the condemnation court from deciding that the actual date of taking preceded the filing of the suit." Georgia-Pac. Corp. v. United States, 215 Ct. Cl. at 360, 568 F.2d at 1320 (alteration added). Other cases have similarly recognized that the date of filing a Declaration of Taking is not always the date of taking. See, e.g., Petro-Hunt, L.L.C. v. United States, 862 F.3d 1370, 1380 (Fed. Cir. 2017) ("Here, too, we adopt the rule that a taking, permanent or temporary, occurs when the owner is deprived of use of the property, in this case, by physical possession." (citing Caldwell v. United States, 391 F.3d 1226, 1235 (Fed. Cir. 2004))); Stephenson v. United States, 33 Fed. Cl. 63, 74 (1994) ("The district court has the authority to decide compensation as of the date of actual taking, even if that taking occurred prior to the filing of the declaration . . . ." (omission added)). Additionally, plaintiff cites United States v. McCrory Holding Co., 294 F.2d 812, for the broad proposition that "attempts to back date a taking have been routinely rejected." In the McCrory case, which is not binding on the United States Court of Federal Claims, albeit which is binding on the United States District Court for the Eastern District of Louisiana, the United States Court of Appeals for the Fifth Circuit stated that "various times of taking have been established by various courts considering different states of facts," including:

> (a) The time of the appropriation and the entry on the property; (b) the time of the vesting of title; (c) the time of the filing of the declaration of taking; (d) the time of the notice of the intention to take; (e) the time of issuance of summons; (f) the time of filing of oath of appraisers; (g) the time of the injury to the property; (h) the time the property was actually entered upon and possession actually taken; and (1) [sic] miscellaneous dates based upon the peculiar facts of the individual case.

United States v. McCrory Holding Co., 294 F.2d at 815 n.2 (alteration added). Plaintiff's proposed, categorical rule that "[u]nder federal law, the date of the taking in a condemnation action is the filing date of the Declaration of Taking" is not automatically correct. (alteration added).

In the case currently before the court, the Army Corps physically entered Mrs. Pizani's and Mrs. Juan's property under the temporary easement granted based on the

Commandeering Order and took possession of the borrow material, by excavating and removing the borrow material, beginning on October 24, 2005. After physically entering Mrs. Pizani's and Mrs. Juan's property, in accordance with the terms of the Amended Cooperation Agreement, the government attempted to negotiate the acquisition of the Private LERD, but did not file its original Declaration of Taking in the United States District Court for the Eastern District of Louisiana condemnation action until February 14, 2008, and did not file its amended Declaration of Taking in fee simple in the same condemnation action until September 7, 2010. The United States District Court for the Eastern District of Louisiana never resolved the issue of the "date of taking" before dismissing the condemnation action. The Amended Cooperation Agreement explicitly envisioned a commandeering process by which the government could exercise its eminent domain authority and initiate formal condemnation proceedings after the government had physically entered Mrs. Pizani's and Mrs. Juan's property and removed borrow material, and after the government attempted to acquire the Private LERD by negotiation. It appears that a proper date of taking might have been established by the United States District Court for the Eastern District of Louisiana in the condemnation action,[50] but, based on an apparent settlement agreement, the United States District Court for the Eastern District of Louisiana dismissed the condemnation action before doing so. Given that the case currently before the court is a breach of contract action and this court has found no breach of contract has occurred, it is not necessary for this court to do so either.

As indicated above, plaintiff also cites to the National Food & Beverage Co. v. United States, 96 Fed. Cl. 258, case for the proposition that defendant's condemnation action in the United States District Court for the Eastern District of Louisiana "could not legally satisfy" defendant's "just compensation" obligation. In National Food & Beverage Co., the Army Corps of Engineers and Plaquemines Parish entered into a cooperation agreement (the Plaquemines Parish Cooperation Agreement) under which Plaquemines Parish agreed to use its emergency powers to commandeer private property and grant the Army Corps a right of entry to the private property commandeered. See id. at 261. Moreover, "the United States government agreed to 'identify and pay just compensation to the owners of compensable interests' in the property to which Plaquemines Parish

---

[50] The statute at 40 U.S.C. § 3114(c)(1) provides:

> Compensation shall be determined and awarded in the [condemnation] proceeding and established by judgment. The judgment shall include interest, in accordance with section 3116 of this title, on the amount finally awarded as the value of the property as of the date of taking and shall be awarded from that date to the date of payment.

(alteration added). As stated by a Judge of the United States Court of Federal Claims, the Federal District Courts offer "a forum proximate to the location of the property (and local property records) and familiarity with the principles and rules of local property law" and leaving the issues of the date of taking and compensation to the Federal District Courts "would carry out Congress' clear intent that condemnation actions by the government be decided in federal district courts." Stephenson v. United States, 33 Fed. Cl. at 74.

would provide entry." Id. After executing the Plaquemines Parish Cooperation Agreement, "the President of Plaquemines Parish, Benny Rousselle, signed an order commandeering approximately 77.2 acres of land owned by National Food." Id. Thereafter, "the [Army] Corps entered upon the property, and, over several years, a firm under contract to the [Army] Corps removed clay from the property and that clay was used by the [Army] Corps to repair damaged levees." Id. at 260 (alterations added). The Army Corps, however, according to the Judge in the National Food & Beverage Co. case, did not compensate National Food for the clay removed from its property. See id.

National Food sued the federal government in the United States Court of Federal Claims and raised "a Fifth Amendment takings claim, asserting that the clay removed from its property was inversely condemned by the [Army] Corps and that the [Army] Corps and its agent used portions of its property on a temporary basis to stockpile and then transport the clay offsite." Id. at 262 (alterations added). Six months after National Food filed its inverse condemnation suit in the United States Court of Federal Claims, the government filed a direct condemnation action in the United States District Court for the Eastern District of Louisiana against "some of the land at issue" in National Food's inverse condemnation claim and deposited $117,000.00 into the registry of the United States District Court for the Eastern District of Louisiana. See id.; see also United States v. 46.26 Acres of Land, More or Less, No. 10-3062 (E.D. La. Sept. 14, 2010). The government then moved to stay National Food's inverse condemnation action in the United States Court of Federal Claims pending the resolution of the government's direct condemnation action in the United States District Court for the Eastern District of Louisiana. See Nat'l Food & Beverage Co. v. United States, 96 Fed. Cl. at 262. In support of its motion to stay, the government argued that "the district court can determine just compensation for the condemned land, giving consideration not only to the value of National Food's property on the date the Complaint in Condemnation was filed, but also taking into account the value of the clay removed from the property in 2006-2007." Id. at 267.

The United States Court of Federal Claims denied the government's motion to stay National Food's inverse condemnation action in the United States Court of Federal Claims. See Nat'l Food & Beverage Co. v. United States, 96 Fed. Cl. at 269. The United States Court of Federal Claims rejected the government's argument that the United States District Court for the Eastern District of Louisiana could determine "just compensation" for the condemned land, including the value of the clay removed by the Army Corps between 2006 and 2007, because

> only a part of the land of National Food that is at issue in the instant case is also involved in the condemnation action now pending before the district court. The Corps occupied more land when it removed the clay in 2006 and 2007 than it took by the Complaint in Condemnation in 2010. Thus, the underlying premise for the government's motion to stay—that both the district court and this court would be able to render duplicative judgments—is factually incorrect.

Id. at 268. The United States Court of Federal Claims in National Food & Beverage Co.

continued:

> Perhaps more importantly, however, the government is wrong on the law. The district court does not have the ability to award compensation for the occupation of National Food's land for a period that occurred and then stopped several years prior to the condemnation, nor may the district court address clay removal. Those takings claims by National Food are within the sole purview of this court.

Id. The United States Court of Federal Claims explained that the government was "wrong on the law" because:

> The government's argument chiefly relies on Georgia–Pacific Corp. v. United States, 568 F.2d 1316 (Ct. Cl. 1978). In Georgia–Pacific, a claimant brought suit in the Court of Claims for an inverse condemnation, alleging that the government had physically seized its property. Soon afterwards the government filed a condemnation action in district court to take the same property, asserting the taking occurred on the date of the filing instead of the earlier date alleged by the plaintiffs in the Court of Claims. [Georgia–Pac. Corp. v. United States,] 568 F.2d at 1318. The government and the plaintiff disputed the correct date of the taking, and the Court of Claims granted a stay to allow the district court to determine which date of taking was appropriate. Id. at 1319. The court relied on United States v. Dow, which held that when the United States enters into possession of property before it formally acquires title, "it is the former event which constitutes the act of taking." [United States v. Dow,] 357 U.S. 17, 22, 78 S.Ct. 1039, 2 L.Ed.2d 1109 (1958) (quoted in Georgia–Pac., 568 F.2d at 1320).
>
> The facts of Georgia–Pacific differ in crucial respects from the facts of the alleged takings on National Food's property. In Georgia–Pacific, suits in both the Court of Claims and the district court involved the same taking of the same property right, creating a race to judgment between the courts and duplicative litigation costs. However, in National Food's case, this court and the district court are considering distinct and separate takings which address land that overlaps only in part, occurred at different times, and involve entirely separate operative facts. That there are two separate takings instead of one sets the facts of National Food's case apart from those of Georgia–Pacific.
>
> Additionally, in Georgia–Pacific, the United States allegedly had taken possession of land before the condemnation action was filed and continuously maintained the character of its presence through the beginning of the condemnation action. That is not the case here. National Food has alleged that the Corps removed clay from January 26, 2006, to September 30, 2007. There are no allegations that the United States was in possession of or used National Food's property after September 30, 2007. To link

actions that concluded three years ago to a condemnation action filed in 2010 misapprehends the nature and scope of a direct condemnation.

Nat'l Food & Beverage Co. v. United States, 96 Fed. Cl. at 268 (alterations added; footnote omitted).

Plaintiff's reliance on the National Food & Beverage Co. v. United States, 96 Fed. Cl. 258, case is unavailing. First, the National Food & Beverage Co. case is not binding on the court in the case currently under review. See Vir v. United States, 125 Fed. Cl. 293, 302 (2016) ("The only precedents that are controlling on this court [the United States Court of Federal Claims] are those of the United States Supreme Court, the United States Court of Appeals for the Federal Circuit, and the United States Court of Claims, a predecessor court to the United States Court of Federal Claims and the Court of Appeals for the Federal Circuit." (alteration added) (citing Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1353 (Fed. Cir. 2006)); see also W. Coast. Gen. Corp. v. Dalton, 39 F.3d 312, 315 (Fed. Cir. 1994) ("Court of Federal Claims decisions, while persuasive, do not set binding precedent for separate and distinct cases in that court."); Park Props. Assocs., L.P. v. United States, 120 Fed. Cl. 787, 790 (2015) ("'[T]he decisions of this court [the United States Court of Federal Claims] are not binding precedent for judges of this court." (alterations added) (quoting Sotera Def. Sols., Inc. v. United States, 118 Fed. Cl. 237, 258 (2014))), aff'd, 677 F. App'x 676 (Fed. Cir. 2017).

Second, the non-binding National Food & Beverage Co. case concerned a private landowner's Fifth Amendment takings claim against the federal government, see Nat'l Food & Beverage Co. v. United States, 96 Fed. Cl. at 260, whereas the case currently before this court was filed as a breach of contract action between St. Bernard Parish and the federal government. The case currently before the court, therefore, presents different factual and legal issues than were presented and decided in the National Food & Beverage Co. case in the United States Court of Federal Claims. Specifically, unlike in the National Food & Beverage Co. case, the case currently before the court, Case No. 15-1072, requires the court to determine whether defendant breached the terms of a contract that expressly stated that defendant's obligation to provide "just compensation" attached only "after receiving the Public Sponsors' right of entry to" the Private LERD. Therefore, in addition to the significant differences between the National Food & Beverage Co. case and the case currently before the court, plaintiff's reliance on a Judge of the United States Court of Federal Claim's statement in National Food & Beverage Co. that "[t]he district court does not have the ability to award compensation for the occupation of National Food's land for a period that occurred and then stopped several years prior to the condemnation" is at odds with the plain language of the Amended Cooperation Agreement in the St. Bernard case currently before the court, Case No. 15-1072C. (alteration added).

Moreover, as stated above, the National Food & Beverage Co. court declined to stay the landowner's inverse condemnation action pending the resolution of the government's direct condemnation action because "only a part" of National Food's land was at issue in both the United States Court of Federal Claims inverse condemnation

action and the government's direct condemnation action in the United States District Court for the Eastern District of Louisiana. See Nat'l Food & Beverage Co. v. United States, 96 Fed. Cl. at 268. In contrast, in the St. Bernard case currently before the court, defendant's condemnation action in the United States District Court for the Eastern District of Louisiana, for a taking in fee simple, condemned all of Mrs. Pizani's and Mrs. Juan's 6.51-acre property commandeered through the Commandeering Order, not "only a part" of Mrs. Pizani's and Mrs. Juan's property. In fact, in the United States District Court for the Eastern District of Louisiana condemnation action, the government condemned a larger, but coextensive, acreage of Mrs. Pizani's and Mrs. Juan's property, aggregating 6.83 acres, rather than the 6.51 acres commandeered through the Commandeering Order. Thus, there are significant factual and legal distinctions between the case currently before the court and the non-binding Nat'l Food & Beverage Co. v. United States, 96 Fed. Cl. 258, case.

With certain very limited exceptions not relevant to plaintiff's claims, the United States Court of Federal Claims is a court of law, not a court of equity. See United States v. Tohono O'Odham Nation, 563 U.S. 307, 313 (2011) (stating that the United States Court of Federal Claims "has no general power to provide equitable relief against the Government or its officers"). The court acknowledges that outcome in the case currently before the court, Case No. 15-1072C, differs from the outcomes in some other cases raised by plaintiff and discussed herein, particularly including the earlier consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, as well as Mrs. Pizani's and Mrs. Juan's Louisiana State Trial Court case against St. Bernard Parish, Pizani v. St. Bernard Parish, No. 109-548, which also is not binding on this court. There are, however, critical factual and legal distinctions between the case currently before the court, Case No. 15-1072C, and each of those other cases. With respect to the earlier consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, the court reiterates that it was "undisputed" that the United States "failed to provide just compensation" for the Private LERD at issue in those cases because the United States did not initiate Federal condemnation proceedings against the Olivier Plantation and Borgnemouth properties at issue in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, nor did the United States otherwise attempt to compensate the Olivier Plantation and Borgnemouth property owners in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C. See Lake Borgne Basin Levee Dist. v. United States, Nos.15-103C and 15-513C, slip op. at 3. Critically, in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, the parties filed joint status reports agreeing that Lake Borgne and St. Bernard Parish were "entitled to receive $4,423,753.87 as full and complete satisfaction of any and all claims that have been made or could be made in the captioned cases," Status Report at 1, Lake Borgne Basin Levee Dist., et al. v. United States, Nos.

15-103C and 15-518C, and judgment was entered pursuant to the government's agreement to the result. In contrast, in the case currently under review, Case No. 15-1072C, defendant has actively disputed both liability and damages, both factually and during extensive discovery based on the apparent absence of many of the relevant documents destroyed in the flood, and legally. Moreover, unlike in the consolidated Lake Borgne cases, Lake Borgne Basin Levee District, et al. v. United States, Case No. 15-103C, and St. Bernard Parish Government, et al. v. United States, Case No. 15-518C, in the case currently under review, Case No. 15-1072, the Army Corps attempted to negotiate with Mrs. Pizani and Mrs. Juan, initiated condemnation proceedings against Mrs. Pizani's and Mrs. Juan's property in the United States District Court for the Eastern District of Louisiana first for the taking of two temporary easements and then amending the condemnation action for a taking in fee simple, and deposited $134,000.00 as an estimate of "just compensation" in the United States District Court for the Eastern District of Louisiana's court registry, which Mrs. Pizani and Mrs. Juan subsequently withdrew.

Additionally, although the Louisiana State Trial Court issued a judgment against St. Bernard Parish in Pizani v. St. Bernard Parish, No. 109-548, and found that St. Bernard Parish was liable for a taking under the Louisiana Homeland Security and Emergency Assistance and Disaster Act, see LA. STAT. ANN. § 29:721, et seq., the Louisiana State Trial Court's judgment against St. Bernard Parish was based on Louisiana state law, see Written Findings of Fact and Reasons for Judgment at 1-2, Pizani v. St. Bernard Parish, No. 109-548, which, as discussed above, does not control defendant's obligations under the Amended Cooperation Agreement and, therefore, is not dispositive to the parties' breach of contract dispute in the United States Court of Federal Claims case currently before the court. The case currently before the court, Case No. 15-1072C, is a breach of contract action between St. Bernard Parish and the United States, based on the Amended Cooperation Agreement, which expressly stated that the government was required to provide "just compensation" to the owners of a compensable interest in the Private LERD in accordance with the URA and Uniform Regulations, not Louisiana law.

In sum, in the case currently before the court, the undisputed facts demonstrate that (1) the Army Corps negotiated with Mrs. Pizani and Mrs. Juan, (2) the United States initiated a condemnation action in the United States District Court for the Eastern District of Louisiana in 2008 for a "Temporary Borrow Easement" and a "Temporary Work Area Easement" in connection with the Army Corps' use of Mrs. Pizani's and Mrs. Juan's property and deposited $59,000.00 in the United States District Court for the Eastern District of Louisiana's registry, (3) the United States later, in 2010, filed an amended Complaint in Condemnation and an amended Declaration of Taking in the same United States District Court for the Eastern District of Louisiana condemnation action for a taking in fee simple and increased the deposit in the United States District Court for the Eastern District of Louisiana registry to a total of $134,000.00, and (4) Mrs. Pizani and Mrs. Juan subsequently withdrew the $134,000.00 from the United States District Court for the Eastern District of Louisiana registry in exchange for giving a fee simple interest in their property to the government. Because Mrs. Pizani and Mrs. Juan accepted the $134,000.00 in exchange for giving a fee simple interest in their property to the

government, defendant has complied with its duty to provide “just compensation” for all interests taken by the government, including for the borrow material excavated by the Army Corps between October 24, 2005, and May 24, 2006. Based on the undisputed facts in the record before the court, plaintiff has failed to demonstrate that defendant breached the Amended Cooperation Agreement and plaintiff has, therefore, failed to establish a breach of contract. As referenced above: “““[D]amages for breach of contract require a showing of causation,” which in turn necessitates a ‘comparison between the breach and non-breach worlds.”’” Oliva v. United States, 961 at 1363 (alteration in original) (quoting Vt. Yankee Nuclear Power Corp. v. Entergy Nuclear Vt. Yankee, LLC, 683 F.3d at 1349 (quoting Yankee Atomic Elec. Co. v. United States, 536 F.3d at 1273)). As plaintiff has not demonstrated a breach of contract of the Amended Cooperation Agreement, the court does not reach the issue of damages, as there can be no damages without a breach.

## CONCLUSION

Plaintiff’s motion for partial summary judgment is **DENIED**. Defendant’s motion for partial summary judgment is **GRANTED**. Plaintiff’s complaint is **DISMISSED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**